# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| DEFENDING EDUCATION, *et al.*,<br><br>    *Plaintiffs*,<br><br>vs.<br><br>AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, *et al.*,<br><br>    *Defendants*. | Civil Action No. 1:25-cv-01572-RMR-MDB |
| COMMITTEE OF FIVE, INC., d/b/a XX-XY ATHLETICS,<br><br>    *Plaintiff*,<br><br>vs.<br><br>AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, *et al.*,<br><br>    *Defendants*. | Civil Action No. 1:25-cv-01668-RMR-MDB |
| DOXA ENTERPRISES, LTD. d/b/a BORN AGAIN USED BOOKS,<br><br>    *Plaintiff*,<br><br>vs.<br><br>AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, *et al.*,<br><br>    *Defendants*. | Civil Action No. 1:25-cv-02177-RMR-MDB |

## APPENDIX TO PLAINTIFFS' REPLIES IN SUPPORT OF THEIR MOTIONS FOR PRELIMINARY INJUNCTION AND RESPONSES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**TABLE OF CONTENTS**

**Document**                                                                 **Page No.**

**Specific to *Defending Education***

Division and Commission Defendants' Responses to Defending Education
Plaintiffs' First Set of Interrogatories ..................................................................... 1
Defending Education Plaintiffs' Objections and Responses to Defendants'
First Set of Interrogatories .................................................................................. 14
Supplemental Declaration of Lori Gimelshteyn................................................... 71
Second Supplemental Declaration of Dr. Valeri Leswing ................................... 76
Excerpts of Deposition of Lori Gimelshteyn ...................................................... 81
Excerpts of Deposition of Erin Lee .................................................................... 115
Excerpts of Deposition of Travis Morrell, M.D................................................... 172
Excerpts of Deposition of Valeri Leswing, D.O. ............................................... 236
CPAN Complaint................................................................................................ 252
Morrell Complaints............................................................................................. 253
PKC Complaints ................................................................................................ 258
CPAN April 7, 2024 Event Contract .................................................................. 268
CPAN September 19, 2025 Event Contract........................................................ 273
PKC January 21, 2025 Event Contract.............................................................. 284
CPAN Educate & Inform Presentation ............................................................... 286
PKC Art Club Presentation ................................................................................ 310
Defending Education Plaintiffs' Video Links....................................................... 331

**Specific to *XX-XY Athletics***

Division and Commission Defendants' First Supplemental Responses to XX-
XY Athletics' First Set of Interrogatories and Requests for Production ............. 332
XX-XY Athletics' Supplemental Responses to CCRD and Commission
Defendants' First Set of Written Discovery Requests ....................................... 345
XX-XY Athletics Document Production .............................................................. 364
Excerpts of 30(b)(6) Deposition of XX-XY Athletics (Jennifer Sey)................... 454

**Specific to *Born Again Used Books***

Division and Commission Defendants' Responses to Born Again Plaintiff's
First Set of Interrogatories and Requests for Production.................................... 500
Born Again Plaintiff's Responses to CCRD and Commission Defendants'
First Set of Written Discovery Requests ............................................................ 517
Excerpts of 30(b)(6) Deposition of Born Again Used Books (Eric Smith)......... 527

**Pertaining to all cases**

Supplemental Declaration of Aubrey Sullivan ................................................... 550
CCRD Public Accommodation Discrimination 101 Presentation...................... 554
CCRD Sexual Orientation, Gender Identity, and Gender Expression
Discrimination ................................................................................................... 602
Excerpts of Deposition of Ilan Meyer, Ph.D. ................................................... 634
Excerpts of 30(b)(6) Deposition of Colorado Civil Rights Division (Aubrey
Sullivan).............................................................................................................. 733

Confidential – Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-MDB

DEFENDING EDUCATION, et al.,

Plaintiffs,

v.

AUBREY C. SULLIVAN, et al.,

Defendants.

---

## DIVISION AND COMMISSION DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

---

Defendants Aubrey Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly, and Eric Artis, in their official capacities (the "Division and Commission Defendants") hereby provide their responses to Plaintiffs' First Set of Interrogatories.

### INTERROGATORIES

1.    Identify and describe all final actions concerning 3 C.C.R. §708-1, Rule 81.6(A)(4) since 2009, including (a) the charging party(ies) and the respondent(s); (b) the alleged aggrieved party(ies); (c) the allegations or findings concerning the "misus[e] [of] an individual's preferred name, form of address, or gender-related pronoun"; and (d) the final disposition, including any measures the respondent(s) agreed or were ordered to take or any act or practice the respondent(s) agreed or were ordered to cease.

**OBJECTIONS**: Division and Commission Defendants object to the extent that this request seeks information or documents which may not be disclosed pursuant to C.R.S. § 24-34-306(3). Consistent with C.R.S. § 24-34-306(3) and the December 5, 2025 email from Janna Fischer to Plaintiffs' counsel, Division and Commission Defendants will exclude information identifying any charging parties and/or aggrieved

1

**1**

parties and respondents. Division and Commission Defendants further object to the extent to this request as unduly burdensome as asking to "identify and describe" "all final actions" "since 2009."  Division and Commission's case management system, CaseConnect, includes case information and/or case documents dated 2016 and later.

**RESPONSE**: Subject to Division and Commission's objections, in the attached Exhibit A, Division and Commission Defendants describe actions against places of public accommodations that included allegations of "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." Pursuant to Federal Rule of Civil Procedure 33(d), Division and Commission Defendants further identify cases involving such allegations in the context of places of public accommodation (CCRD003847-3978), housing (CCRD003734-3846), and employment (CCRD003324-3733).

2.　　　Explain whether Plaintiffs' desired speech, as outlined in their declarations, *see* Dkt.27-2 ¶¶12-18; Dkt.27-3 ¶¶12-18; Dkt.27-5 ¶¶6-16; Dkt.27-6 ¶¶7-15, violates the Colorado Anti-Discrimination Act and its implementing regulations. If Defendants cannot provide a definitive answer, then explain why they cannot do so and provide the framework and factors that would need to be considered in order to make such a determination.[1]

**OBJECTIONS**: Division and Commission Defendants object to the extent that this request calls for a legal conclusion. Division and Commission Defendants further object to the extent that this request is compound.

**RESPONSE**: Subject Division and Commission Defendants' objections, the speech at issue raised by Plaintiffs describes (1) interactions and/or verbal statements in which individuals are misgendered and/or deadnamed, *see* Dkt.27-2 ¶¶12-14 (CPAN's statements and interactions at events); Dkt.27-3 ¶¶12-14 (PKC statements and interactions at events); Dkt.27-5 ¶¶6-12 (Dr. Morrell, interactions with patients); *id.*

---

[1] Via a December 9, 2025 email from Plaintiffs' counsel Michael Connolly, Plaintiffs provided this interrogatory in lieu of the one served November 26, 2025.

Confidential – Subject to Protective Order

¶14-15 (Dr. Morrell, statements at events); Dkt.27-6 ¶¶7-13 (Dr. Leswing, interactions with patients); and (2) publications in which individuals are misgendered and/or deadnamed. *See* Dkt.27-2 ¶¶15-18 (CPAN publications); Dkt.27-3 ¶¶15-18 (PKC publications); Dkt.27-5 ¶ 16 (Dr. Morrell, publications); Dkt.27-6 ¶¶14-15 (Dr. Leswing, publications). This response addresses each category of speech separately, first outlining the framework and then applying it to each Plaintiff.

**Interactions with Individuals**

The Division analyzes all charges of discrimination in a consistent and standard manner, regardless of protected class status, as outlined by C.R.S. § 24-34-306. The Division further builds off its knowledge base as it analyzes charges that raise similar allegations as prior cases. The Division has not found probable cause in any public accommodations case solely based upon a respondent place of public accommodation's failure to use an individual's chosen name and/or how the individual chooses to be addressed. Moreover, the complaints based on gender identity and/or gender expression that the Division has received and refer to statements made by employees have often alleged additional conduct. *See, e.g.*, Sullivan Suppl. Decl. Ex. A. The same holds true for complaints based on an employee of a place of public accommodation making verbal statements directed at an individual's race, religion, or any other protected trait in that they generally allege additional conduct. *See, e.g.*, CCRD1268-1298 (███████████████████████████████████████████████████████████████); CCRD402-436 (███████████████████████████████████████████████████████████████████████); CCRD1403-1565 (███████████████████████████████████████████████████████████████████)

3

Confidential – Subject to Protective Order

███████████████████████████████ ). The lack of complaints based on verbal statements alone highlights the difficulty of speculating about purely hypothetical propositions.

In general, a violation of C.R.S.§ 24-34-601(2)(a)'s provision providing that "[i]t is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation" requires three findings. First, the public accommodation must intentionally treat a customer or prospective customer differently based on their protected class status (this means, for example, that this threshold requirement is not met in cases of accidental misgendering or accidental deadnaming because they do not involve the intentional choice to treat the individual differently based on gender identity). Second, the customer must, as a subjective matter, experience the conduct at issue to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation because of the customer's gender identity. Third, the Division would have to determine that a reasonable person, under the circumstances, would experience the conduct to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on their gender identity. All three steps must be satisfied to establish a CADA violation—and the same analysis would apply to any complaint that a public accommodation's interactions with a customer and directed to that customer's protected class status denied that individual the full and equal enjoyment of the goods, services, facilities, privileges,

4

**4**

Confidential – Subject to Protective Order

advantages, or accommodations of the place of public accommodation.

To the extent the Division received a Complaint based on a public accommodation's failure to use an individual's chosen name and/or pronouns matching gender identity, the Division would be guided by its Intake & Investigations Manual, as well as the regulations governing CADA. The Intake & Investigations Manual provides that public accommodation violations occur when an individual "is denied 'full and equal enjoyment of a place of public accommodation.' This may include restricted access, harassing treatment, differential pricing, the posting or publishing discriminatory material, and more." Manual, at 11. Without any facts regarding the circumstances surrounding the hypothetical complained conduct, the most comparative conduct described by the interrogatory would be harassment. Titled "Sexual Orientation Harassment," 3 CCR 708-1-81.6 provides:

> Unlawful harassment is conduct that creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of sexual orientation. Prohibited conduct includes, but is not limited to, the following:
> (1) Asking unwelcome personal questions about an individual's sexual orientation;
>
> (2) Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation;
>
> (3) Using offensive names or terminology regarding an individual's sexual orientation;
>
> (4) Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun; or
>
> (5) Harassing, subjecting to differential treatment, discharging, demoting, or denying promotion opportunities or employment benefits to an individual because of open discussion or other communication or presentation related to an individual's gender expression, gender identity, or sexual orientation.

As provided in the regulation, intentional misgendering or deadnaming must rise to the

5

level of harassment to deny that individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation—i.e., it must create a hostile environment on the basis of sexual orientation.

This framework reflects that not every incidence of intentional misgendering or deadnaming amounts to harassment on the basis of gender identity. In other words, a place of public accommodation's failure or refusal to use an individual's chosen name and/or how the individual chooses to be addressed, by itself, is not *per se* unlawful discrimination under CADA. Any analysis would need to consider the full circumstances of the interaction between the customer and the place of public accommodation to determine whether a reasonable person, under the circumstances experienced by the complainant, would experience the interaction as harassment and/or would otherwise experience the full course of conduct as denying them full and equal enjoyment of the place of public accommodation's goods, services, facilities, privileges, advantages, or accommodations based on their gender identity. Relevant circumstances may include, for example:

1. The social context in which the conduct occurred;
2. Whether the conduct included indicia that the use was malicious, ill-willed, derogatory, insulting, demeaning, abusive, pejorative; or disparaging;
3. The frequency of the conduct with respect to the individual complainant;
4. Whether the conduct was severe or pervasive;
5. Whether the complainant asked the place of public accommodation to start or stop the alleged conduct (here, use of pronouns, names, or gendered language that is different from how the individual wants to be referred to), and how the place of public accommodation responded to such requests;
6. Whether the conduct caused a person to leave the place of public accommodation without making a purchase or enjoying the privileges, benefits, or advantages of the place of public accommodation which they had intended to use;
7. Whether the conduct caused a person to not attempt to patronize a place of public accommodation because of their protected trait(s);

6

**6**

Confidential – Subject to Protective Order

8.  Whether the conduct occurred in the context of other potentially discriminatory conduct, such as an actual denial of service or the use of slurs or epithets targeting a complainant's protected trait(s);

9.  Whether the place of public accommodation expressed a preference not to serve certain individuals or groups of individuals because of those individuals' protected traits; and

10. Whether the place of public accommodation had a history of discriminatory conduct.

Turning to application of this framework, CPAN, PKC, and Dr. Morrell when speaking in his personal capacity and outside this medical practice, are not "places of public accommodation." They do not offer any good, service, facility, privilege, advantage, or accommodation to the general public that would subject them to CADA's public accommodation provisions. None is a "place of business offering services or products to the public, such as restaurants, hotels, libraries, schools, hospitals, bars, etc." Manual, at 55 (citing C.R.S. § 24-34-601(1)). Specifically:

- Colorado Parent Advocacy Network (CPAN) is a 501(c)(4) organization that "advocates for educational excellence, school accountability, and parental rights and opposes policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives." *DE* Action, ECF No. 25, Am. Compl. ¶ 52; *see also DE* Action, ECF No. 27-2, Gimelshteyn Decl. ¶ 4 (describing CPAN as a "social advocacy organization organized under Colorado law"). CPAN advocates through "network- and coalition-building; investigative reporting; engagement on local, state, and national policies; disclosure of harmful local and statewide school policies; public education efforts including summits and information resources; direct support for families navigating complex systems; strategic communications and media outreach; advocacy, and, if necessary, litigation." *DE* Action, ECF No. 25, Am. Compl. ¶ 52.

- Protect Kids Colorado (PKC) is a "grassroots, 501(c)(4) organization devoted to protecting kids and strengthening families in Colorado." *DE* Action, ECF No. 25, Am. Compl. ¶ 75. PKC's activities include "coalition-building; advocacy; petitions and ballot initiatives; engagement on local, state, and national policies;

Confidential – Subject to Protective Order

educational campaigns; and, if necessary, litigation." *Id*.

CPAN and PKC are not places of public accommodation because these entities do not offer goods, services, facilities, privileges, advantages, or accommodations to the general public when they engage in lobbying, "coalition-building," or the other advocacy efforts identified by those Plaintiffs. And although they have held events at locations that are places of public accommodations (such as hotels and restaurants), they were simply customers and/or users of those spaces, not offering goods or services of those places. Further, Dr. Morrell does not offer any good, service, facility, privilege, advantage, or accommodation to the general public when he engages in public speaking, publications, or social media activities unrelated to his provision of health care services through his medical practice.

As to Drs. Morrell's and Leswing's interactions and statements within their medical practice regarding patients, there is insufficient information to answer this interrogatory, as the interrogatory does not describe the interactions with the patients in any detail or provide any other facts that would enable the Division and Commission Defendants to determine whether the facts amount to a violation of C.R.S. § 24-34-601(2)(a)'s provision providing that "[i]t is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation."

**Publications**

The Division does not seek out violations or solicit charges from prospective complainants. As a result and as a practical matter, the Division would not analyze the

8

8

Confidential – Subject to Protective Order

publications without receiving a complaint that includes an assertion by the complainant that the statement at issue communicates that the complainant would be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on a protected trait or that their patronage or presence at a place of public accommodation would be unwelcome, objectionable, unacceptable, or undesirable because of a protected trait.

The Division analyzes all charges of discrimination in a consistent and standard manner, regardless of protected class status, as outlined by C.R.S. § 24-34-306. The Division further builds off its knowledge base as it analyzes charges that raise similar allegations as prior cases. The Division has not received any complaints of discrimination based on a place of public accommodation's written communication regarding a failure to use an individual's chosen name and/or how the individual chooses to be addressed. In general, however, a written communication that expressly announces plans to deny full and equal enjoyment of goods, services, benefits or privileges of a place of public accommodation would violate these provisions. For example, a sign stating "Whites Only" would violate CADA because it states that certain persons will be denied service based on race and/or that they are unwelcome, objectionable, unacceptable or undesirable at the place of public accommodation because of their race.

In reviewing a complaint based on the Policy, the Division would be guided by the Intake and Investigations Manual, which provides as follows:

> To prevail on a claim of discriminatory communication of a refusal to provide the full and equal enjoyment of goods, services, benefits or privileges of a place of public accommodation, the evidence must show:
>
> (1) the Respondent is a place of public accommodation;

**9**

Confidential – Subject to Protective Order

(2) the Respondent directly or indirectly published, circulated, issued, displayed, posted or mailed a written, electronic or printed communication notice or advertisement;

(3) the notice or advertisement indicated that the full and equal enjoyment of goods, services, benefits or privileges provided by Respondent will be refused, withheld from or denied to a person or persons based on their protected class;
or

(4) the notice or advertisement indicated that the presence of a person or persons of a protected class is unwelcome, objectionable, unacceptable or undesirable at the Respondent's place of public accommodation.

Manual at 77.

These inquiries, and in particular (3) and (4), are viewed objectively. In other words, from the perspective of a reasonable person in the complainant's circumstances, the notice or advertisement must communicate that they would be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on a protected trait, or that their patronage or presence at a place of public accommodation would be unwelcome, objectionable, unacceptable, or undesirable because of a protected trait.

Applying this framework, CPAN, PKC, and Dr. Morrell when speaking in his personal capacity and outside his medical practice, are not "places of public accommodation" as described above. As to the written statements of the other Plaintiffs, the written statements do not state an intent to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any Plaintiff based on a protected trait or that their patronage or presence would be unwelcome, objectionable, unacceptable, or undesirable because of a protected trait. The written statements do not state, for example, that transgender individuals are not

**10**

welcome, that transgender individuals cannot purchase certain goods or receive certain services, or that transgender individuals will be charged more for goods or services.

Misgendering and deadnaming are not *per se* CADA violations—whether or when such conduct would violate CADA instead depends on context. Highlighting the fact-intensive nature of whether refusing to use an individuals' chosen name or pronouns, 3 CCR 708-1-81.6, titled "Sexual Orientation Harassment," provides:

> Unlawful harassment is conduct that creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of sexual orientation. Prohibited conduct includes, but is not limited to, the following:
>
> (1) Asking unwelcome personal questions about an individual's sexual orientation;
>
> (2) Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation;
>
> (3) Using offensive names or terminology regarding an individual's sexual orientation;
>
> (4) Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun; or
>
> (5) Harassing, subjecting to differential treatment, discharging, demoting, or denying promotion opportunities or employment benefits to an individual because of open discussion or other communication or presentation related to an individual's gender expression, gender identity, or sexual orientation.

As provided in the regulation, "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" reflects the accommodation's intentionally different treatment of individuals based on protected class status, but to be actionable, such misuse must rise to the level of harassment, i.e., it must create a hostile environment on the basis of sexual orientation, gender identity, gender expression, or other protected class status.

Although the publications may suggest and/or state an intent to treat individuals

11

**11**

Confidential – Subject to Protective Order

differently based on gender identity, the publications do not establish that their application will create an environment that is subjectively and objectively hostile to individuals based on their gender identity. As a result, the publications, standing alone, do not violate the various CADA provisions directed to written communications. Whether any Plaintiff ultimately interacts with individual based on those publications and whether such interactions violate the Accommodation Clause of C.R.S. § 24-34-601 would depend on the specific facts of the interaction.

Respectfully submitted this 23rd day of December, 2025.

PHILIP J. WEISER
Attorney General

For Defendants Aubrey C. Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly and Eric Artis:

*s/ Nora Q.E. Passamaneck*
Nora Q.E. Passamaneck
Senior Assistant Attorney General
Helen Norton
Deputy Solicitor General
Janna K. Fischer
Senior Assistant Attorney General
Dominick D. Schumacher
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
FAX: (720) 508-6032

**12**

Confidential – Subject to Protective Order

## VERIFICATION

        I, Aubrey Sullivan, a citizen of the United States and a resident of the State of Colorado, hereby state under penalty of perjury that the foregoing responses to the interrogatories and requests for production are true and correct to the best of my knowledge.

Executed this 23rd day of December, 2025 at Denver, Colorado.


                                        *s/ Aubrey Sullivan*
                                        Aubrey Sullivan

13

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| DEFENDING EDUCATION, *et al.*,<br><br>            *Plaintiffs*,<br><br>v.<br><br>AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,<br><br>            *Defendants*. | Case No. 1:25-cv-01572-RMR-KAS |

**PLAINTIFFS' OBJECTIONS AND RESPONSES
TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

Plaintiffs submit the following objections and responses to the Interrogatories from Defendants Aubrey Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly, and Eric Artis ("Defendants"). *See* Dkt. 31-1.

**GENERAL OBJECTIONS**

Plaintiffs make the following general objections to Defendants' Interrogatories, which apply to each request regardless whether the general objections are expressly incorporated into the specific objections below.

1.    Plaintiffs object to each interrogatory to the extent it calls for information that is protected from discovery by the attorney-client privilege; the work-product doctrine; or constitutional and associational privileges, including the First Amendment right to associational privacy of Plaintiffs and their members; or that are otherwise protected from disclosure under the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the relevant statutory or case law, or any other applicable privilege, be it state, federal, or otherwise.

1

**14**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2.      Inadvertent transmission of such information or document(s) shall not be deemed a waiver of any privilege, immunity, or right (constitutional, statutory, evidentiary, or otherwise), and Plaintiffs reserve all of their rights to seek the return, destruction, or other protection of such inadvertently transmitted information, including the rights identified in the parties' stipulated protective order, *see* Dkt. 49.

3.      Plaintiffs object to Defendants' definitions and instructions to the extent they seek to impose any requirements or obligations in addition to, or different from, those set forth in federal or state law, the Federal Rules of Civil Procedure, the Local Rules of this Court, any applicable orders of this Court, or any stipulation or agreement of the parties.

4.      Plaintiffs object to each request to the extent it asks Plaintiffs—or any of Plaintiffs' attorneys, associates, employers, employees, representatives, or other persons acting through Plaintiffs, on Plaintiffs' behalf, or subject to Plaintiffs' control—to analyze or identify documents or other information that is not within the actual or constructive possession, custody, or control of Plaintiffs or any of the persons enumerated in this paragraph. Plaintiffs object to each request to the extent it asks Plaintiffs (or the persons enumerated in this paragraph) to prepare any document or other information that does not already exist.

5.      Plaintiffs object to Defendants' definitions of "You" and "Your" in paragraph 17 to the extent that these definitions purport to include persons or entities other than Plaintiffs who are not parties to this action.

6.      Plaintiffs object to Defendants' definitions of "Defending Education," "Colorado Parent Advocacy Network," "Protect Kids Colorado," and "Do No Harm," and "Mountain West Dermatology" in paragraphs 18 through 22 to the extent that these definitions purport to include persons or entities other than Plaintiffs who are not parties to this action.

2

**15**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**16**

7.      Plaintiffs object to each interrogatory to the extent it calls for information that is in the public domain, and therefore of no greater burden for Defendants than Plaintiffs to obtain.

8.      Plaintiffs object to each interrogatory as overbroad, unduly burdensome, calling for information that is neither relevant to any issue in this action nor reasonably calculated to lead to the discovery of admissible evidence, and as an infringement of Plaintiffs and their members to associational privacy, to the extent each interrogatory seeks information about a Plaintiff's general membership, financial contributors, or other information unrelated to the standing of specific members that the Plaintiff relies upon for its associational standing.

9.      Plaintiffs object to each interrogatory to the extent it calls for legal conclusions, presents questions of pure law, calls for expert opinion, or exceeds the permissible number of interrogatories, including subparts.

10.     Plaintiffs object to each interrogatory as premature, overbroad, unduly burdensome, and improper, to the extent it seeks "all" evidence pertaining to "all" events, "all" complaints about misgendering and deadnaming, or all transgender patients treated by the plaintiff doctors, or otherwise purports to require Plaintiffs to marshal all evidence concerning any issue in dispute.

11.     Plaintiffs do not by these responses and objections waive any claim of privilege in whole or in part, or any right to object to any use of any information furnished by Plaintiffs.

3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

**Interrogatory No. 1**

As to Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, and Dr. Travis Morrell as to his speaking engagements, identify all events they operated and/or plan to operate and/or at which they have spoken and/or plan to speak in a place of public accommodation located in Colorado, including for each such event: (1) its date and location; (2) any advertising or marketing promoting the event, including social media posts; (3) the attendees; (4) a copy of all materials provided or made available to attendees, any schedules or agendas for the event, and any PowerPoint presentations shown at the event; (5) any payments collected for the event; (6) all contracts and/or agreements entered into with the place of public accommodation; and (7) all goods, services, facilities, privileges, advantages, or accommodations offered by them at the event.

**Response to Interrogatory No. 1**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks a response that identifies "all events" Plaintiffs have operated or spoken at in a place of public accommodation, as well as a list of all attendees and payments and "all materials," "all contracts and/or agreements," and "all goods, services, facilities, privileges, advantages, or accommodations" associated with such events. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it asks Plaintiffs to identify every time they have ever spoken or plan to speak in public. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks the requested information about Defending Education and Do No Harm because these organizations have standing through their individual members. Plaintiffs object to this interrogatory to the extent it calls for information, including the names or other identifying information of individuals who are Plaintiffs' members or who have attended Plaintiffs' events, that is protected by constitutional and associational privileges, including the First Amendment right to associational privacy. Plaintiffs object to this interrogatory to the extent

4

**17**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

it calls for Plaintiffs to produce information not in their possession, custody, control, or personal knowledge or information that is already in the public domain and therefore of no greater burden for Defendants to obtain. Plaintiffs object to this interrogatory on the grounds that the terms "goods, services, facilities, privileges, advantages, or accommodations" are vague and ambiguous. Plaintiffs object to this interrogatory to the extent it asks for a legal conclusion about the meaning of "place of public accommodation" or "goods, services, facilities, privileges, advantages, or accommodations." Plaintiffs object to this interrogatory as an attempt to exceed the permissible number of interrogatories through seven subparts, some with multiple subparts within subparts.

Subject to and without waiving its objections, Plaintiffs respond as follows:

**Defending Education.** Lori Gimelshteyn, the Executive Director of Colorado Parent Advocacy Network, and Erin Lee, the Executive Director of Protect Kids Colorado, are members of DE. Ms. Gimelshteyn attended each CPAN listed below. And Ms. Lee attended each PKC event listed below.

In addition, DE organizes, hosts, or (co-)sponsors many events around the country. For example, in Colorado, DE has co-sponsored events like the following. These events were open the general public unless otherwise noted.

| Event Title | Leadership Program of the Rockies Annual Retreat |
| --- | --- |
| Description of Event | DE co-sponsored the annual retreat for the Leadership Program of the Rockies, a nine-month program that trains leaders in America's founding principles. |
| Date and Location | February 17-18, 2023   The Broadmoor<br>1 Lake Ave.<br>Colorado Springs, CO 80906 |
| Advertising or Marketing | DE did not promote the retreat. The Leadership Program of the Rockies and other retreat co-sponsors promoted the event, but DE does not have a record of those materials. |
| Attendees | The retreat was limited to Leadership Program participants. Speakers and other guests also attended. DE does not have a record of attendance. |

18

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Materials provided at event | DE did not distribute any materials at the event. The Leadership Program may have distributed its own materials, but DE does not have a record of those materials. |
|---|---|
| Payments collected | DE recalls that Leadership Program participants pay a portion of the cost of their participation, but DE did not collect those payments and does not have a record of those payments. |
| Contracts | DE does not have a record of any contract between the Leadership Program and the venue. |
| Services, etc. offered | DE does not have a record of services, but recalls that the venue provided accommodations, a conference room facility for attendees, and food and beverages. |

| Event Title | Leadership Program of the Rockies Annual Retreat |
|---|---|
| Description of Event | DE co-sponsored the annual retreat for the Leadership Program of the Rockies, a nine-month program that trains leaders in America's founding principles. |
| Date and Location | February 16-17, 2024   The Broadmoor<br>1 Lake Ave.<br>Colorado Springs, CO 80906 |
| Advertising or Marketing | DE did not promote the retreat. The Leadership Program of the Rockies and other retreat co-sponsors promoted the event, but DE does not have a record of those materials. |
| Attendees | The retreat was limited to Leadership Program participants. Speakers and other guests also attended. DE does not have a record of attendance. |
| Materials provided at event | DE did not distribute any materials at the event. The Leadership Program may have distributed its own materials, but DE does not have a record of those materials. |
| Payments collected | DE recalls that Leadership Program participants pay a portion of the cost of their participation, but DE did not collect those payments and does not have a record of those payments. |
| Contracts | DE does not have a record of any contract between the Leadership Program and the venue. |
| Services, etc. offered | DE does not have a record of services, but recalls that the venue provided accommodations, a conference room facility for attendees, and food and beverages. |

| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
|---|---|
| Description of Event | DE co-sponsored the second event in CPAN's Rocky Mountain Summit series. The event highlighted the dangers of pediatric gender-affirming care. The event was led by one of DE's members, CPAN Executive Director |

6

**19**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|  | Lori Gimelshteyn, who also moderated the second of the event's two panels: a "Family Impact Panel." |
|---|---|
| Date and Location | April 6, 2025        The Inverness Denver<br>200 Inverness Dr. West<br>Englewood, CO 80112 |
| Advertising or Marketing | DE did not promote the retreat. CPAN and other co-sponsors promoted the event, but DE does not have a record of those advertisements. |
| Attendees | DE does not have a record of attendance but estimates that nearly 200 people attended in person. Others watched a livestream. |
| Materials provided at event | DE did not distribute materials at the event. CPAN and other co-sponsors distributed their own materials, but DE does not have a record of those materials. |
| Payments collected | The event was ticketed. DNH did not manage the sale or collection of tickets. |
| Contracts | CPAN contracted with the venue. DE does not have a record of the contract. |
| Services, etc. offered | DE recalls that the venue provided access to parking and a professional conference room facility for attendees. The hotel also provided catered food and beverages. Attendees also received printed materials from DNH and other co-sponsors, but DNH does not have a record of materials or services offered by other groups. |

DE plans to organize and/or (co-)sponsor additional public events in the future.

In addition to DE's own events, DE's members have attended, organized, and/or spoken at events in Colorado and elsewhere. DE personnel have, in their DE capacity, attended and/or spoken at non-DE events held in places of public accommodation in Colorado and elsewhere.

**Colorado Parent Advocacy Network.** CPAN is aware of the following past and future events. All events were open to the general public unless otherwise noted.

| Event Title | CPAN Official Launch Event |
|---|---|
| Description of Event | CPAN hosted its official launch event to introduce the organization to the public as a social welfare organization committed to restoring the parent's voice in education. The event also celebrated community leaders, educators, parents, and advocates who have made a tangible difference in the fight for academic excellence, transparency, and parental rights. |
| Date and Location | November 13, 2022    St. Thomas More Catholic Church<br>8035 S. Quebec St.<br>Centennial, CO 80112 |

**20**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Advertising or Marketing | CPAN promoted the event through social media, email campaigns, and a press release to local and statewide media outlets. |
| Attendees | 312 people reserved tickets through Eventbrite. |
| Materials provided at event | Attendees received a printed program with a schedule of events, speaker biographies, and a welcome message from CPAN Executive Director Lori Gimelshteyn. CPAN also distributed a one-page overview of CPAN's purpose and priorities, a flyer outlining opportunities to join and support the group, and a booklet highlighting the event's award recipients. <br><br> During the event, CPAN displayed a powerpoint presentation that highlighted the event's speakers and award recipients as well as CPAN's founding principles and policy goals. Two videos were also shown: America First Policy Institute's "American Dream" video and a trailer for a documentary entitled "Whose Children Are They?," both focusing on the themes of parental rights and educational integrity. <br><br> Attendees also received CPAN-branded literature, and members of the media received press packets. |
| Payments collected | Attendees registered through Eventbrite, but tickets were free. |
| Contracts | CPAN executed a Facility Usage License Agreement with the Archdiocese of Denver and secured a Certificate of Liability Insurance for the event. |
| Services, etc. offered | As noted above, attendees received printed materials, including a full agenda, speaker biographies, information about CPAN and its policy agenda. In addition, parking and facilities—including the event space and restrooms—were provided by the venue, and light refreshments were available. |

| | |
|---|---|
| Event Title | Power to the Parents Event |
| Description of Event | CPAN co-hosted this event bringing together parents, legal experts, policy leaders, and faith-based organizations to equip families to resist government overreach in education. The event featured a "Parental Rights Intensive," with keynote presentations including: "A Millennial Mom's Story," "Parent Pushback on Woke in Schools," and "Parental Rights: The Legal View." <br><br> The event also included two panel discussions: one with parents who discussed "Fighting Back Against School Overreach," and another with policy experts who discussed "Critical Advice for Parents." |
| Date and Location | March 12, 2023        St. Thomas More Catholic Church<br>                              8035 S. Quebec St.<br>                              Centennial, CO 80112 |
| Advertising or Marketing | CPAN was one of a few co-sponsoring groups who led promotional efforts for this event. Advertising included graphics on social media, email |

8

**21**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| | invitations and text messages to supporters, verbal invitations at CPAN's Educate & Inform events (see below), and word of mouth. |
| Attendees | CPAN estimates that 150 people attended, including parents, educators, concerned citizens, community leaders, faith-based leader, legal professionals, and policy experts. |
| Materials provided at event | The event focused on live interaction. Attendees received informational materials from other co-sponsoring organizations, but CPAN has no record of those materials and did not distribute any of its own materials. |
| Payments collected | Donations were accepted, but attendees were not required to purchase a ticket or register in advance. |
| Contracts | CPAN executed a Facility Usage License Agreement with the Archdiocese of Denver. |
| Services, etc. offered | Parking and facilities—including the event space and restrooms—were provided by the venue. |

| | |
|---|---|
| Event Title | CPAN Rally for Parent Rights to Oppose H.B. 23-1003 |
| Description of Event | CPAN hosted a rally on the west steps of the Colorado Capitol Building to oppose H.B. 23-1003, a bill that would authorize mental health screenings of children in schools without parental consent. The rally featured remarks from leading voices in the parental rights movement, including CPAN Executive Director Lori Gimelshteyn. Attendees were encouraged to bring homemade signs with messages like "Parents Know Best," "My Child, My Choice," and "Oppose H.B. 23-1003." |
| Date and Location | April 6, 2023          Capitol Building<br>                            200 E Colfax Ave.<br>                            Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through flyers on social media, email invitations and text messages to supporters, verbal invitations and flyers at CPAN's Educate & Inform events (see below), and word of mouth. |
| Attendees | CPAN estimates that nearly 200 people attended, including parents, educators, concerned citizens, community leaders, and legislators. |
| Materials provided at event | CPAN distributed printed materials outlining H.B. 23-1003's implications for parental rights, materials telling attendees how they could contact their legislators, and materials with general information about CPAN's advocacy efforts.<br><br>In addition to the in-person rally, CPAN hired a mobile digital truck that drove throughout the city of Denver on the day of the event with scrolling video content to raise awareness about H.B. 23-1003 and its threat to parental authority. |
| Payments collected | None |
| Contracts | CPAN executed a Facility Use Agreement with the Division of Capital Assets to reserve the west steps of the Colorado Capitol Building. As part of |

9

**22**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|  |  |
|---|---|
|  | this agreement, CPAN paid a $50 deposit to secure access to electricity for the event. |
| Services, etc. offered | Attendees received access to the Capitol Building steps and printed materials about H.B. 23-1003 and CPAN's advocacy work. Speakers received use of sound equipment. |

| | |
|---|---|
| Event Title | School Safety Summit |
| Description of Event | CPAN hosted this summit to address the urgent issue of violence in schools through commonsense conversation and community engagement. Attendees included survivors, bereaved family members, and safety experts.<br><br>Two panels were held. The first, "Hearing from the Voices of the Victims," featured testimony from students and parents impacted by school shootings. The second, "Guided Perspective from Those Providing Proven Resources," offered insights from security and training professionals. |
| Date and Location | September 10, 2023    St. Thomas More Catholic Church<br>8035 S. Quebec St.<br>Centennial, CO 80112 |
| Advertising or Marketing | CPAN promoted the event through flyers on social media, email invitations and text messages to supporters, verbal invitations and flyers at CPAN's Educate & Inform events (see below), and word of mouth. |
| Attendees | CPAN estimates that 250 people attended, including parents, educators, faith leaders, law enforcement professionals, public safety experts, community members and concerned citizens. |
| Materials provided at event | CPAN distributed a printed program that included a full schedule of events, speaker biographies, and an overview of panel topics. |
| Payments collected | Attendees purchased tickets both in advance and at the door, with seats available for $12, $15, and $18 depending on seat location. |
| Contracts | CPAN executed a Facility Usage License Agreement with the Archdiocese of Denver. As part of the agreement, CPAN paid a facility rental fee. The contract also required CPAN to hire two uniformed law enforcement officers for on-site security. |
| Services, etc. offered | Parking and facilities—including the event space and restrooms—were provided by the venue. CPAN also organized on-site security. And CPAN provided complimentary bottled water to attendees. |

| | |
|---|---|
| Event Title | Rally at Cherry Creek School Board Meeting |
| Description of Event | CPAN partnered with Turning Point USA and nationally recognized speaker Pastor John Amanchukwu to organize a rally just before the Cherry Creek School Board meeting. The rally was a direct response to the Cherry Creek School District's refusal to remove sexually explicit materials— |

10

**23**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| | including books entitled *Gender Queer* and *All Boys Aren't Blue*—from school libraries despite repeated requests for their removal.<br><br>Pastor Amanchukwu traveled to Colorado to speak on the harm caused by exposing children to obscene content in schools. The event garnered national attention, including a viral post by X account @libsoftiktok. |
| Date and Location | October 9, 2023     Prairie Middle School parking lot<br>12600 E. Jewell Ave.<br>Aurora, CO 80012 |
| Advertising or Marketing | CPAN promoted the event through a press release and targeted email outreach to CPAN supporters in the Cherry Creek School District. CPAN also relied on social media posts and word-of-mouth advertising.<br><br>Following the event, CPAN posted a video discussing the district's refusal to remove obscene materials from its libraries. |
| Attendees | CPAN estimates that 75 people attended, including parents, concerned citizens, faith leaders, and education advocates. Some attendees had children attending Cherry Creek schools; others were local residents alarmed by the district's decisions; others were supporters of Turning Point USA and/or Pastor Amanchukwu. |
| Materials provided at event | CPAN distributed a flyer entitled "Protect Kids – Support Teachers – Save Cherry Creek." The flyer outlined Cherry Creek's plummeting academic performance, its safety and security failures, and its political indoctrination and secretive gender transition plans for students. |
| Payments collected | None |
| Contracts | None |
| Services, etc. offered | None |

| | |
|---|---|
| Event Title | Gender Ideology Public Roundtable & Press Conference |
| Description of Event | CPAN partnered with allied organizations to invite detransitioners, parents, doctors, and legislators to a roundtable discussion in the Capitol and a press conference on the Capitol steps to discuss the harms caused by gender ideology. |
| Date and Location | February 28, 2024     Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event with graphics on social media, email invitations and text messages to supporters, verbal invitations at CPAN's Educate & Inform events (see below), and word of mouth. Other co-sponsoring organizations conducted their own advertising efforts, but CPAN does not have a record of those materials |

11

**24**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Attendees | CPAN estimates that 30 people attended, including parents, concerned citizens, educators, community advocates, and legislators. Several grassroots organizations attended as co-sponsors. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | The event organizers secured a Facility Use Agreement with the Division of Capital Assets to reserve the west steps of the Colorado Capitol Building for the press conference. An attending legislator also reserved an official meeting room inside the Capitol Building for the roundtable discussion. |
| Services, etc. offered | In addition to access to the Capitol Building space and facilities, CPAN provided lunch for attendees. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part I: Safeguarding Children from Gender-Affirming Care |
| Description of Event | The Summit was a landmark event organized by CPAN that brought together nationally recognized medical experts, patient advocates, journalists, and parents to raise awareness about the harms of pediatric gender-affirming care. The Summit provided a forum for open dialogue on the urgent need for ethical standards in healthcare and education regarding children who face rapid onset gender dysphoria.<br><br>The event featured a panel with medical experts, a parent advocate, a journalist, and a detransitioner. (The panel included PKC Executive Director Erin Lee and Dr. Travis Morrell and was moderated by CPAN Executive Director Lori Gimelshteyn.) Attendees also participated in a Q&A session with panelists. |
| Date and Location | April 7, 2024 The Inverness Denver<br>200 Inverness Drive West<br>Englewood, CO 80112 |
| Advertising or Marketing | CPAN promoted the event with graphics and educational content on social media, email invitations and text messages to supporters, and a press release. Partner organizations advertised with their own materials, but CPAN does not have a record of those materials. |
| Attendees | CPAN estimates that nearly 175 people attended, including parents, healthcare professionals, detransitioners and affected families, educators, policymakers and legislators, faith leaders, and representatives of allied organizations. |
| Materials provided at event | CPAN distributed a printed event program that included a schedule of events, speaker biographies, and panel descriptions. Additionally, a powerpoint presentation was displayed on-screen during portions of the event to highlight key themes and introduce speakers. |

12

**25**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|  | CPAN released a video recording of the event afterwards. |
|---|---|
| Payments collected | Attendees purchased tickets in advance and at the door. |
| Contracts | CPAN executed a contract with the Inverness Denver for use of the hotel's conference room facilities and audio/visual equipment. |
| Services, etc. offered | The venue provided access to parking and a professional conference room facility for attendees. Water was also available. Attendees also received printed materials. CPAN's partner organizations distributed their own materials and resources at tables at the event, although CPAN does not have a record of these materials. Attendees also had access to networking opportunities with speakers, professionals, and advocacy leaders. |

| Event Title | Unite for School Choice Celebration |
|---|---|
| Description of Event | CPAN sponsored a celebration on the west steps of the Capitol Building that brought together parents, students, educators, concerned citizens, and other grassroots organizations to support charter schools and educational freedom. The event was organized in response to H.B. 24-1363, which would have significantly hindered the autonomy of charter schools across Colorado. |
| Date and Location | April 10, 2024       Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through social media posts, emails to supporters, flyers, and word of mouth. |
| Attendees | CPAN estimates that nearly 150 people attended, including parents, students, educators and charter school leaders, community leaders, legislators, and other concerned citizens. |
| Materials provided at event | Attendees received pre-printed signs and posters supporting school choice. CPAN also distributed informational flyers informing attendees how to contact their legislators and oppose H.B. 24-1363. Some attendees also received CPAN-branded paper flyers to show support for school choice. |
| Payments collected | None |
| Contracts | CPAN received a permit from the Division of Capital Assets to use the west steps of the Capitol Building. |
| Services, etc. offered | None |

| Event Title | National School Choice Week Celebration |
|---|---|
| Description of Event | CPAN partnered with Parents United America and other allied organizations to host Colorado's annual National School Choice Week Celebration in downtown Denver. The event promoted educational freedom. The event began at First Baptist Church of Denver, where 165 middle and high school students participated in a program that discussed the continuing relevance of the Constitution. Then, a crowd gathered on the west steps of |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| | the Capitol Building for the main celebration, where students, parents, educators, and Governor Jared Polis delivered remarks highlighting the necessity of school choice. |
| Date and Location | January 28, 2025    First Baptist Church of Denver<br>1373 Grant St.<br>Denver, CO 80203<br><br>Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through social media graphics, as well as emails and text messages to supporters. Co-sponsoring groups promoted the event as well, but CPAN does not have a record of their promotional materials. |
| Attendees | CPAN estimates that 275 people attended, including parents, students, educators and charter school leaders, community leaders, and Governor Jared Polis. |
| Materials provided at event | CPAN distributed printed programs during the First Baptist Church portion of the event. The programs included a schedule of events, a speaker list, and talking points about school choice in Colorado. |
| Payments collected | None |
| Contracts | CPAN executed a contract with the First Baptist Church of Denver and secured a permit for use of the west steps of the Capitol Building. |
| Services, etc. offered | Attendees received National School Choice Week branded items, included scarves, stickers, and signs. Attendees were also provided access to First Baptist Church's facilities, including seating, restrooms, and a stage area for speakers. Attendees also made use of the west steps of the Capitol Building. |

| | |
|---|---|
| Event Title | United for Truth Luncheon |
| Description of Event | CPAN hosted a private, invitation-only luncheon for families, advocates, and organizations united in their commitment to protecting children from harmful medical practices. The luncheon was timed to coincide with the Colorado House of Representatives' hearing on H.B. 25-1068. Attendees shared stories of how they have been impacted by the prevalence of gender ideology in medicine and education. |
| Date and Location | February 5, 2025    Independence Institute<br>727 E. 16th Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | The luncheon was an invitation-only event. Invitations were extended through email and text message. |
| Attendees | CPAN estimates that 36 people attended, including parents, advocacy leaders, medical professionals, policy experts, legislative staff, and allied organizations. |

14

**27**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Materials provided at event | None |
| Payments collected | None |
| Contracts | CPAN executed a contract with the Independence Institute to secure the venue for a luncheon and use of the venue's facilities. |
| Services, etc. offered | CPAN provided a catered lunch and access to the venue's facilities, including parking, seating, and restrooms. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
| Description of Event | CPAN hosted the second summit in its Rocky Mountain Summit series. The event highlighted the dangers of pediatric gender-affirming care. The event included two panels. The first, "Medical, Legal, & Policy Perspectives," was moderated by Dr. Travis Morrell and included medical, policy, and legal experts. The second, a "Family Impact Panel," was moderated by CPAN Executive Director Lori Gimelshteyn and included families and clinical workers who have been impacted by so-called gender-affirming care. There was also a Q&A portion with panelists. |
| Date and Location | April 6, 2025        The Inverness Denver<br>200 Inverness Dr. West<br>Englewood, CO 80112 |
| Advertising or Marketing | CPAN promoted the event with graphics on social media, email invitations and text messages to supporters, and a press release. Partner organizations advertised with their own materials, but CPAN does not have a record of those materials. |
| Attendees | CPAN estimates that nearly 200 people attended in person, including parents, medical professionals, educators, policymakers, and community advocates. Others watched a livestream. |
| Materials provided at event | CPAN distributed a printed event program that included a welcome message, schedule of events, speaker biographies, and co-sponsors. CPAN also used digital materials to introduce speakers and co-sponsors. Co-sponsors distributed their own materials, but CPAN does not have a record of those materials. |
| Payments collected | Both in-person and livestream attendees purchased tickets in advance of the event. |
| Contracts | CPAN executed a contract with the Inverness Denver for use of the hotel's conference room facilities and audio/visual equipment. An addendum was signed to include a guest room block for attendees and panelists. |
| Services, etc. offered | The venue provided access to parking and a professional conference room facility for attendees, as well as a guest room block for attendees who booked a room at the hotel. The event also provided food and beverages. Attendees also received printed materials. CPAN's partner organizations distributed their own materials and resources at tables at the event, |

15

**28**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | although CPAN does not have a record of these materials. Attendees also had access to networking opportunities with speakers, professionals, and advocacy leaders. |
|---|---|

| Event Title | H.B. 25-1312 Press Conference |
|---|---|
| Description of Event | CPAN hosted a press conference to highlight the threat that H.B. 25-1312 poses to parental rights, free speech, and constitutional protections. The event featured remarks by CPAN Executive Director Lori Gimelshteyn along with other advocacy leaders. The event was co-sponsored by allied organizations, including Protect Kids Colorado.<br><br>The event also included testimony from parents who received support through CPAN's Incident Reporting Tool, which allows parents to submit reports of compelled speech, school safety concerns, controversial school lessons, and other dangers to Colorado youth. The parents explained how they lost custodial rights because they declined to affirm their children's gender identity declarations. CPAN later posted video of the parents' testimony—as well as Ms. Gimelshteyn's statements—to the organization's YouTube page.[1,2,3]<br><br>CPAN also announced that it had gathered nearly 35,000 petition signatures opposing H.B. 25-1312. |
| Date and Location | April 30, 2025          Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through social media graphics, emails, and text messages to supporters. Co-sponsoring groups also promoted the event, although CPAN does not have a record of those promotional materials. |
| Attendees | CPAN estimates that roughly 150 people attended, including members of the media, concerned parents, educators, faith leaders, and representatives of allied organizations. Others watched via livestream. |
| Materials provided at event | CPAN distributed a printed one-pager discussing "10 Reasons to Oppose H.B. 25-1312." CPAN also delivered boxes to members of the Colorado Senate containing petitions opposing H.B. 25-1312. Co-sponsoring organizations distributed their own materials, but CPAN does not have a record of those materials. |
| Payments collected | None |
| Contracts | CPAN secured a permit for use of the Capitol Building west steps from the Division of Capital Assets. |

---

[1] youtube.com/watch?v=f-ef7Kb9xlc
[2] youtube.com/watch?v=9OMdZYpEsyw
[3] youtube.com/watch?v=KzjVwdTyKgg

16

**29**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Services, etc. offered | CPAN provided printed informational materials and networking opportunities to attendees. CPAN Executive Director Lori Gimelshteyn and other co-sponsoring organization leaders made themselves available to members of the media for interviews. |

| | |
|---|---|
| Event Title | Press Conference on Soloman Galligan and H.B. 24-1034 |
| Description of Event | CPAN hosted a press conference in response to the 18th Judicial District Attorney's decision to dismiss all criminal charges against Soloman Galligan, a registered sex offender who attempted to kidnap an 11-year-old child from an elementary school. Despite video evidence and a criminal history, Galligan's charges were dropped under H.B. 24-1034 because he was deemed incompetent to stand trial. The press conference highlighted a disturbing statewide pattern in which violent offenders avoid criminal prosecution under Colorado's amended competency laws.<br><br>Speakers included CPAN Executive Director Lori Gimelshteyn along with a legislator, a law enforcement and safety expert, and a Colorado district attorney. Together, they encouraged the repeal of H.B. 24-1034. |
| Date and Location | July 23, 2025         Araphoe County Judicial Center<br>7325 S. Potomac St.<br>Centennial, CO 80112 |
| Advertising or Marketing | CPAN promoted the press conference through a press release, social media posts, emails, and CPAN's website. Co-sponsoring organizations promoted the event through their own materials, but CPAN does not have a record of those materials. |
| Attendees | CPAN estimates that 35 people attended, including victims and their families, parents, civic leaders, elected officials, law enforcement representatives, advocacy organizations, and members of the media. |
| Materials provided at event | CPAN distributed a flyer outlining the Galligan case and other examples of H.B. 24-1034's impact. |
| Payments collected | None |
| Contracts | None |
| Services, etc. offered | CPAN provided informational resources to attendees, including printed materials, expert speakers, and opportunities for media to interview speakers. The event also provided an opportunity for networking between community advocates, victims, and policymakers. |

| | |
|---|---|
| Event Title | CPAN Gilded Tribute Benefit Gala for Parental Rights & Educational Freedom |
| Description of Event | CPAN will host a gala to celebrate the organization's three years of advocacy for parental rights, school choice, and academic excellence. The event will also raise critical funds needed to sustain and expand the organization's |

17

**30**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| | efforts. The gala will feature a formal dinner, silent auction, awards ceremony, and VIP reception. |
| Date and Location | September 19, 2025     The Vehicle Vault<br>18301 Lincoln Meadows Pkwy<br>Parker, CO 80134 |
| Advertising or Marketing | CPAN is promoting the gala though social media posts, email campaigns, and through allied organizations. CPAN is also distributing printed flyers and personal invitations to potential donors and community leaders. |
| Attendees | CPAN expects attendees to include supporters, donors, elected officials, community leaders, educators, and advocacy partners from across Colorado. |
| Materials provided at event | CPAN plans to distribute printed event programs that include a schedule of events, sponsor recognitions, and auction item listings. CPAN will also distribute packets to sponsors and VIPs in advance. Attendees will also receive digital follow-up materials highlighting CPAN's mission, impact, and post-event fundraising results. |
| Payments collected | Attendees will purchase tickets in advance of the gala. Payments will also be collected for VIP packages, sponsorship commitments, and the silent auction. |
| Contracts | CPAN has entered into a rental agreement with the Vehicle Vault for exclusive use of its venue for the duration of the gala. |
| Services, etc. offered | CPAN intends to offer a formal dinner, beverages, access to exclusive silent auction items, public recognition and speaking opportunities for sponsors, and special seating and networking opportunities for VIP ticket holders. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part III: Confronting Institutional Failure to Protect Children from the Harms of Gender-Affirming Treatments |
| Description of Event | CPAN plans to host the third event in its Rocky Mountain Summit series. CPAN anticipates that the event will include panel discussions on the effects of "gender-affirming care." |
| Date and Location | April 2026 in Denver, CO, the specific date and location still to be determined. |
| Advertising or Marketing | This event has not yet been advertised or marketed. |
| Attendees | The event has not yet taken place. |
| Materials provided at event | Materials have not yet been prepared for or distributed for this event. |
| Payments collected | CPAN anticipates that it will sell tickets in advance and at the door, as with CPAN's previous Rocky Mountain Summit events. |
| Contracts | CPAN has not yet reserved a venue for this event. |
| Services, etc. offered | CPAN has not yet coordinated facilities, refreshments, accommodations, or other services to offer at the event. |

31

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CPAN plans to organize and/or (co-)sponsor additional public events in the future and is actively seeking to reserve space in places of public accommodation for those events.

In addition to the above events organized and (co-)sponsored by CPAN as an organization, CPAN's leadership frequently attends and/or speaks at non-CPAN events held in places of public accommodation. For example, Ms. Lori Gimelshteyn is frequently invited to speak to local civic, political, and grassroots organizations in her role as CPAN Executive Director. At these events, Ms. Gimelshteyn relies on a standardized "Educate & Inform" presentation. The presentation explains the erosion of parental authority in schools, the growing prevalence of ideological and political agendas—including gender ideology—in school curricula, the misuse of mental health and social-emotional learning frameworks, the danger of so-called gender-affirming care, and the lack of transparency in educational materials, and highlights CPAN's work to oppose these trends.

**Protect Kids Colorado.** PKC is aware of the following past and future events. All events were/are open to the general public unless otherwise noted.

| Event Title | Gender Ideology Public Roundtable & Press Conference |
|---|---|
| Description of Event | PKC partnered with allied organizations to invite detransitioners, parents, doctors, and legislators to a roundtable discussion in the Capitol and a press conference on the Capitol steps to discuss the harms caused by gender ideology. |
| Date and Location | February 28, 2024      Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC advertised the event through flyers on social media, text messages to supporters, and emails to state legislators. Other co-sponsoring organizations conducted their own advertising efforts, but PKC does not have a record of those materials. |
| Attendees | PKC estimates that 10-15 legislators, 25-30 members of the public, and a few members of the press attended. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | PKC applied for and obtained a permit from Division of Capital Assets to host its event on the west steps of the Capitol Building. |

19

32

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Services offered, etc. | In addition to access to the Capitol Building space and facilities, PKC provided lunch for attendees. |

| | |
|---|---|
| Event Title | Art Club Movie Showing |
| Description of Event | PKC hosted a screening of its documentary "Art Club," which highlights the threat of public school indoctrination and the transgender social contagion. The screening was accompanied by a Q&A with PKC Executive Director Erin Lee. The event was co-sponsored by the Denver University chapter of Turning Point USA. |
| Date and Location | April 10, 2024        Daniels College of Business<br>Denver University<br>2101 S. University Blvd.<br>Denver, CO 80208 |
| Advertising or Marketing | PKC and Turning Point promoted the event on social media and with flyers posted on campus. The flyers and social media posts indicated that the event was co-hosted by PKC and Turning Point. |
| Attendees | PKC estimates that 50-60 people were able to fit in the room for the event. Hundreds of others were outside of the room and the building, either due to capacity restrictions or because they wished to protest the event. |
| Materials provided at event | PKC distributed cards promoting the organization and supporting its girls-sports and parental-rights ballot initiatives. Turning Point distributed handouts promoting its own organization, but PKC does not have a record of those handouts. |
| Payments collected | None |
| Contracts | The venue was reserved by Turning Point in compliance with Denver University's procedures. |
| Services offered, etc. | PKC screened the film and allowed attendees to participate in a Q&A session with Erin lee. |

| | |
|---|---|
| Event Title | Save Girls Sport Rally |
| Description of Event | PKC co-sponsored a rally to protect sex-specific sports programs for girls and raise attention and support for 2023-2024 ballot measure #160, a PKC-backed measure to preserve girls sports leagues. The event was also sponsored by 1AMedia and Rocky Mountain Women's Network. PKC Executive Director Erin Lee spoke about the harms caused by biological males competing in female sports. |
| Date and Location | July 20, 2024        Capitol Building<br>200 E Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC and the event's other sponsors listed promoted the event on social media with materials that listed Erin Lee as a speaker and indicated that she is the "Founder of Protect Kids Colorado." |

**33**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Attendees | PKC estimates that 20-30 members of the public and members of the press attended. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | 1AMedia applied for and obtained a permit from Division of Capital Assets to host the event at the Capitol Building. PKC does not have a record of the contract. |
| Services offered, etc. | In addition to public speeches and access to the Capitol steps, the event provided petitions for attendees to sign in support of 2023-2024 ballot measure #160. |

| | |
|---|---|
| Event Title | PKC Signing & Notary Event |
| Description of Event | PKC hosted a signature-gathering event in support of 2023-2024 ballot measures #142 (parental notification requirement) and #160 (preserving sex-specific sports programs). PKC provided petitions for the public to sign and a public notary to notarize volunteers' petitions. PKC also distributed literature supporting the petition, and PKC Executive Director Erin Lee spoke in support of the proposed ballot measures. |
| Date and Location | July 30, 2024          In The Zone Sports Bar<br>15600 W 44th Ave.<br>Golden, CO 80403 |
| Advertising or Marketing | PKC promoted the event through flyers posted on social media. |
| Attendees | PKC estimates that 40-50 people attended the event to sign or drop off petitions, listen to Erin Lee's speech, socialize, and otherwise support the ballot measures. |
| Materials provided at event | PKC provided copies of the text of the proposed ballot measures, as well as petitions for supporters to sign. |
| Payments collected | PKC did not directly collect payments for the event. Attendees were able to purchase food and drinks from a cash bar. |
| Contracts | PKC agreed on terms—including the event's time, location, number of attendees, and menu—via text with the venue's manager. |
| Services offered, etc. | PKC provided petitions for attendees to sign as well as notary services. The event also offered a cash bar and food. |

| | |
|---|---|
| Event Title | PKC Signing & Notary Event |
| Description of Event | PKC hosted a signature-gathering event in support of 2023-2024 ballot measures #142 (parental notification requirement) and #160 (preserving sex-specific sports programs). PKC provided petitions for the public to sign and public notaries to notarize volunteers' petitions. PKC also distributed literature supporting the petition, and PKC leadership—including |

21

**34**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | Executive Director Erin Lee and PKC board members—spoke in support of the proposed ballot measures and in support of PKC's mission to protect Colorado children from dangerous gender ideology. |
|---|---|
| Date and Location | August 1, 2024    Wide Open Saloon 5607 US-85 Sedalia, CO 80135 |
| Advertising or Marketing | PKC promoted the event through flyers posted on social media and emails to PKC supporters. |
| Attendees | PKC estimates that 75-100 people attended the event to sign or drop off petitions, listen to Erin Lee's speech, socialize, and otherwise support the ballot measures. |
| Materials provided at event | PKC provided copies of the text of the proposed ballot measures, as well as petitions for supporters to sign. PKC also distributed thank-you cards and gift bags to volunteers. |
| Payments collected | PKC did not directly collect payments for the event. Attendees were able to purchase food and drinks from a cash bar. |
| Contracts | PKC agreed on terms—including the price, time, location, number of attendees, and use of the venue's audio system—via text with the venue's manager. |
| Services offered, etc. | PKC provided petitions for attendees to sign as well as notary services. PKC also distributed thank-you cards and gift bags to volunteers, as well as PKC-branded merchandise. The event also offered a cash bar and food. |

| Event Title | PKC Ballot Measure Press Conference |
|---|---|
| Description of Event | PKC board members and supporters assembled on the steps of the Capitol for a final update on 2023-2024 ballot measures #142 (parental notification requirement) and #160 (preserving sex-specific sports programs). In addition to PKC supporters, members of the press attended and reported on the event. |
| Date and Location | August 5, 2024    Capitol Building 200 E Colfax Ave. Denver, CO 80203 |
| Advertising or Marketing | PKC issued a press release promoting the event. |
| Attendees | PKC estimates that 10-15 PKC supporters and 2-3 members of the media attended. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | PKC applied for and obtained a permit from the Division of Capital Assets to host its event on the west steps of the Capitol Building. |
| Services offered, etc. | PKC Executive Director Erin Lee provided an update on the status of PKC's ballot initiatives. |

35

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Event Title | Stop The War On Children Rally |
|---|---|
| Description of Event | PKC co-sponsored a large rally at the Capitol Building with speakers from all over the country—parents of gender-confused children, detransitioners, legislators, and more—opposed to transgender ideology. The event was primarily sponsored by Gays Against Groomers. |
| Date and Location | October 5, 2024        Capitol Building<br>                        200 E. Colfax Ave.<br>                        Denver, CO 80203 |
| Advertising or Marketing | PKC and other co-sponsors promoted the event with a flyer distributed on social media and via email. The flyer listed PKC as a co-sponsor. |
| Attendees | PKC estimates that 40-50 members of the public attended. A separate counter-protest was held on the public sidewalk outside our event. |
| Materials provided at event | Each of the event's co-sponsors, including PKC, distributed free branded merchandise. |
| Payments collected | None |
| Contracts | Gays Against Groomers secured a permit to host the event at the Capitol Building. PKC does not have a record of the contract. |
| Services offered, etc. | Speeches delivered by event sponsors. |

| Event Title | *Lee v. Poudre* Press Conference |
|---|---|
| Description of Event | PKC hosted a press conference to update the public on the status of PKC Executive Director Erin Lee's personal lawsuit against Poudre School District. PKC then hosted a luncheon following the press conference. |
| Date and Location | January 21, 2025        Byron White Federal Courthouse<br>                        1823 Stout St.<br>                        Denver, CO 80257<br><br>                        Steuben's Uptown<br>                        523 E. 17th Ave.<br>                        Denver, CO 80203 |
| Advertising or Marketing | PKC promoted the event through emails and text messages to supporters. PKC also issued a press release. |
| Attendees | The press conference was open the public; the luncheon was by invitation only. PKC estimates that 20-30 members of the public attended either the press conference, the luncheon, or both. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | PKC obtained a permit from the United States General Services Administration to host the press conference at the Byron White courthouse. PKC |

23

**36**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|  | |
|---|---|
|  | also verbally contracted with Steuben's Uptown to reserve the restaurant's patio. |
| Services offered, etc. | Attendees received an update on Ms. Lee's lawsuit. Food was served at the luncheon as well. |

| | |
|---|---|
| Event Title | Save Girls Sports PKC Fundraising Event |
| Description of Event | PKC hosted a fundraiser in support of 2023-2024 ballot measure #160 (preserving sex-specific sports programs). The event was co-hosted by Gays Against Groomers and XX-XY Athletics. Representatives from each host organization spoke at the event, as did young female athletes affected by biological males participating in girls sports. |
| Date and Location | February 19, 2025       XX-XY Athletics<br>                              260 Josephine St., 4th Floor<br>                              Denver, CO 80206 |
| Advertising or Marketing | PKC promoted the event with flyers distributed on social media and via email. Gays Against Groomers and XX-XY Athletics also promoted the event, but PKC does not have a record of their promotional efforts. |
| Attendees | The event was open to the public, though pre-registration was required. PKC estimates that about 60 people attended the event. |
| Materials provided at event | Attendees were given items—like shirts and stickers—promoting the "Save Girls Sports" message. PKC also distributed cards promoting PKC and its girls-sports and child-gender-transition ballot measures. |
| Payments collected | Attendees were required to register in advance but were not required to pay for admission. The event featured a live auction, and XX-XY Athletics also sold some of its clothing products; 100% of auction proceeds and 15% of clothing sales went to PKC. |
| Contracts | None |
| Services offered, etc. | Attendees were able to purchase clothing products and participate in a live auction. Wine and food were served. |

| | |
|---|---|
| Event Title | H.B. 25-1312 Press Conference |
| Description of Event | PKC hosted a press conference to highlight the effects of H.B. 25-1312 on parental rights and free speech. The event was co-hosted by Colorado Parent Advocacy Network. |
| Date and Location | April 30, 2025           Capitol Building<br>                              200 E Colfax Ave.<br>                              Denver, CO 80203 |
| Advertising or Marketing | PKC issued a press release promoting the event. |
| Attendees | PKC estimates that more than 50 members of the public attended, including PKC and CPAN supporters, parents of transgender-identifying children, and members of the press. |

24

**37**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Materials provided at event | None |
|---|---|
| Payments collected | None |
| Contracts | Co-host CPAN secured a permit from the Division of Capital Assets to host its event on the west steps of the Capitol Building. |
| Services offered, etc. | None |

| Event Title | Giving Parents a Voice Townhall |
|---|---|
| Description of Event | PKC co-sponsored a town hall event to inform members of the public about Colorado House Bill 25-1312. The event was primarily sponsored by Moms for Liberty. PKC's Executive Director, Erin Lee, was a featured speaker and spoke about the harms caused by child gender transition. |
| Date and Location | May 1, 2025    Beck Recreation Center 800 Telluride St. Aurora, CO 80011 |
| Advertising or Marketing | PKC and other co-sponsors promoted the event with a flyer distributed on social media and via email. The flyer listed PKC as a co-sponsor. |
| Attendees | PKC estimates that 80-100 members of the public attended. |
| Materials provided at event | Each of the event's co-sponsors had a booth at the event. PKC, at its booth, distributed PKC-branded merchandise, informational flyers about the danger of transgender ideology, and cards promoting PKC and its girls-sports and child-gender-transition ballot initiatives |
| Payments collected | None |
| Contracts | Moms for Liberty contracted with the venue. PKC does not have a record of the contract. |
| Services offered, etc. | PKC and other event co-sponsors provided information about H.B. 25-1312 and an opportunity for an open Q&A session. |

PKC plans to organize and/or (co-)sponsor additional public events in the future and is actively seeking to reserve space in places of public accommodation for those events.

In addition to the above events organized and (co-)sponsored by PKC as an organization, PKC's leadership frequently attends and/or speaks at non-PKC events held in places of public accommodation. PKC's Executive Director, Erin Lee, has averaged one to two speaking engagements per week since founding PKC. These events are often held in places of public accommodation, such as restaurants, hotels, event centers, libraries, and other public buildings. At these events, Ms. Lee is usually introduced as an advocate for parental rights and as the founder of PKC. When speaking,

25

38

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Ms. Lee often relies on a powerpoint presentation that explores the harms caused by transgender ideology, and Ms. Lee frequently refers to transgender-identifying individuals using their birth names and/or biological pronouns when delivering the presentation.

In addition, PKC volunteers are often in public spaces—including gun shows, county fairs, concerts, sporting events, car shows, public parks, restaurants, grocery stores, hair salons, and sports bars—gathering signatures to support PKC-backed ballot measures. When PKC volunteers are collecting signatures on behalf of PKC, they wear visible PKC volunteer badges.

**Do No Harm.** Dr. Travis Morrell is a member of DNH, has spoken at public events, and intends to speak at public events in the future, as described below. Dr. Valeri Leswing and Mountain Pediatrics are also members of DNH.

In addition, DNH organizes, hosts, or (co-)sponsors many events around the country. For example, in Colorado, DNH has co-sponsored events like the following. This event was open to the public.

| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
| --- | --- |
| Description of Event | DNH co-sponsored the second event in CPAN's Rocky Mountain Summit series. The event highlighted the dangers of pediatric gender-affirming care. The event included two panels. One of those panels, "Medical, Legal, & Policy Perspectives," was moderated by DNH member Dr. Travis Morrell and included medical, policy, and legal experts. |
| Date and Location | April 6, 2025        The Inverness Denver<br>200 Inverness Dr. West<br>Englewood, CO 80112 |
| Advertising or Marketing | DNH posted about the Summit and their members' participation after the event.[4] CPAN and other co-sponsors also promoted the event, but DNH does not have a record of those advertisements. |
| Attendees | DNH does not have a record of attendance but estimates that nearly 200 people attended in person. Others watched a livestream. |
| Materials provided at event | DNH may have distributed a rack card with information about DNH's mission and opportunities to support its mission. CPAN and other co- |

---

[4] x.com/donoharm/status/1909274381101989994

26

**39**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| | sponsors distributed their own materials, but DNH does not have a record of those materials. |
| Payments collected | The event was ticketed. DNH did not manage the sale or collection of tickets. |
| Contracts | CPAN contracted with the venue. DNH does not have a record of the contract. |
| Services, etc. offered | DNH recalls that the venue provided access to parking and a professional conference room facility for attendees. The hotel also provided catered food and beverages. Attendees also received printed materials from DNH and other co-sponsors, but DNH does not have a record of materials or services offered by other groups. |

DNH plans to organize and/or (co-)sponsor additional public events in the future.

In addition to DNH's own events, DNH's members have attended, organized, and/or spoken at events in Colorado and elsewhere.

**Dr. Travis Morrell.** Dr. Morrell is aware of the following past and future events at which he spoke or intends to speak. All events were/are open to the general public unless otherwise noted.

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part I: Safeguarding Children from Gender-Affirming Care |
| Event Host | Colorado Parent Advocacy Network |
| Description of Event | Moderated panel discussion on the effects of "gender-affirming" treatments |
| Date and Location | April 7, 2024        The Inverness Denver<br>200 Inverness Drive West<br>Englewood, CO 80112 |
| Advertising or Marketing | Dr. Morrell recalls that the event was promoted through social media and other means, with materials that specifically identified Dr. Morrell as a speaker.[5] As a speaker, however, Dr. Morrell was not responsible for advertising or marketing the event. He does not have a record of any advertising or marketing materials not already in the public domain. |
| Attendees | Dr. Morrell was a speaker and did not track attendance. He estimates that roughly 100 people attended. |
| Materials provided at event | Dr. Morrell did not use or provide any materials for his portion of the event. He does not have a record of materials used or provided by other speakers or the event host. |
| Payments collected | The event was ticketed. As a speaker, Dr. Morrell did not collect payments or tickets. |

---

[5] x.com/CPANColorado/status/1770261143820337171

**40**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Contracts | Dr. Morrell recalls that the event host had a contract with the venue. But, as a speaker, Dr. Morrell did not sign any contracts and does not have a record of any contracts. |
| Services, etc. offered | Ticketed attendees had access to the event and to the venue itself: parking and a conference room facility at the Inverness Denver. Dr. Morrell also recalls that light refreshments were provided. |

| | |
|---|---|
| Event Title | Diversity without Division: Is It Possible? |
| Event Host | FAIR Colorado (Foundation Against Intolerance & Racism) |
| Description of Event | A moderated panel discussion to share insights on diversity, equity, and inclusion initiatives |
| Date and Location | September 12, 2024    Junior Achievement Free Enterprise Center<br>6500 Greenwood Plaza Blvd.,<br>Greenwood Village, CO 80111 |
| Advertising or Marketing | Dr. Morrell recalls that the event was promoted through social media. Dr. Morrell personally promoted the event through a post on X that specifically identified Dr. Morrell as a speaker.[6] He does not otherwise have a record of any advertising or marketing materials not already in the public domain. |
| Attendees | Dr. Morrell was a speaker and did not track attendance. He estimates that roughly 75 people attended. |
| Materials provided at event | Dr. Morrell did not use or provide any materials for his portion of the event. He does not have a record of materials used or provided by other speakers or the event host. |
| Payments collected | The event was ticketed. As a speaker, Dr. Morrell did not collect payments or tickets. |
| Contracts | Dr. Morrell believes the event host had a contract with the venue. But, as a speaker, Dr. Morrell did not sign any contracts and does not have a record of any contracts. |
| Services, etc. offered | The event offered seating for ticketed attendees, as well as light refreshments. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
| Event Host | Colorado Parent Advocacy Network |
| Description of Event | This event included two moderated panel discussions on the effects of "gender-affirming" treatments |
| Date and Location | April 6, 2025    The Inverness Denver<br>200 Inverness Drive West<br>Englewood, CO 80112 |

---

[6] x.com/MorrellMDmph/status/1826818974434169189

28

**41**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Advertising or Marketing | Dr. Morrell recalls that the event was promoted through social media and other means, with materials that specifically identified Dr. Morrell as a speaker. Dr. Morrell personally promoted the event through multiple posts on X.[7,8,9] He does not otherwise have a record of any advertising or marketing materials not already in the public domain. |
|---|---|
| Attendees | Dr. Morrell was a speaker and did not track attendance. He estimates that roughly 150 people attended the event in person, and others watched a livestream of the event. |
| Materials provided at event | Dr. Morrell distributed paper handouts with information about an organization he leads: Colorado Principled Physicians. Dr. Morrell recalls that other co-sponsoring organizations distributed materials, but he does not have a record of those materials. |
| Payments collected | The event was ticketed. As a speaker, Dr. Morrell did not collect payments or tickets. |
| Contracts | Dr. Morrell recalls that the event host had a contract with the venue. But, as a speaker, Dr. Morrell did not sign any contracts and does not have a record of any contracts. |
| Services, etc. offered | Ticketed attendees had access to the event and to the venue itself: parking and a conference room facility at the Inverness Denver. Dr. Morrell also recalls that light refreshments were provided. Tickets were also required for the live-streaming audience, both in and outside of Colorado. |

| Event Title | Rocky Mountain Summit Part III: Safeguarding Children from Gender-Affirming Treatment |
|---|---|
| Event Host | Colorado Parent Advocacy Network |
| Description of Event | This event will include panel discussions on the effects of "gender-affirming" treatments. |
| Date and Location | April 2026 in Denver, CO, the specific date and location still to be determined. |
| Advertising or Marketing | This event has not been advertised or marketed yet. Dr. Morrell anticipates that the event will be advertised and marketed similar to CPAN's previous "Rocky Mountain Summit" events. |
| Attendees | The event has not yet taken place. |
| Materials provided at event | Dr. Morrell has not prepared any materials to use or provide at the event. |
| Payments collected | To the best of Dr. Morrell's understanding, the event will be ticketed. As a speaker, Dr. Morrell does not plan to collect payments or tickets. |
| Contracts | Dr. Morrell anticipates that the event host will sign a contract with the venue. As a speaker, however, Dr. Morrell does not plan to sign any contracts. |

---

[7] x.com/MorrellMDmph/status/1907225349584478599

[8] x.com/MorrellMDmph/status/1908210234830807282

[9] x.com/MorrellMDmph/status/1902444732627689844

**42**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

43

| Services, etc. offered | Dr. Morrell anticipates that the event will have ticketed seating and light refreshments. |
|---|---|

Dr. Morrell plans to speak at additional public events in the future.

30

**43**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Interrogatory No. 2**

As to all Plaintiffs, identify all instances in which any person has complained about Plaintiffs' use of incorrect pronouns and deadnames of transgender individuals.

**Response to Interrogatory No. 2**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks a response that identifies "all instances" in which "any person" has complained about the use of certain words. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks the requested information about Defending Education and Do No Harm because these organizations have standing through their individual members. Plaintiffs object to this interrogatory on the grounds that the term "complained about" is vague and ambiguous. Plaintiffs object to this interrogatory to the extent it calls for Plaintiffs to produce information not in their possession, custody, control, or personal knowledge or information that is already in the public domain and therefore of no greater burden for Defendants to obtain. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Plaintiffs respond as follows:

**Defending Education**. DE's members in Colorado have received complaints and criticism for their use of pronouns and names and for their views on sex and gender. This includes CPAN Executive Director Lori Gimelshteyn and PKC Executive Director Erin Lee, as described below.

In addition, DE is frequently the target of complaint and criticism for its use of pronouns and names and for its views on sex and gender. For example, DE has received complaints and criticism like the following:

- On August 7, 2022, after DE filed a lawsuit in federal court challenging a school policy that required students and staff use preferred pronouns and chosen names and facilitated social

31

**44**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

transitioning of students without parental notification, a news outlet criticized DE's members "who can't accept the reality of being transgender." It accused DE of ignoring "the rights of transgender students protected under" state and federal civil rights laws and suggested there should be "consequences" for those, like DE's members, who refuse to speak using someone's preferred pronouns or chosen name.[10]

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[11]

- The Southern Poverty Law Center has declared DE a "hate group" based on its opposition to gender ideology in American schools.[12] The SPLC says DE "spew[s] homophobic and transphobic speech in the name of protecting their children's innocence, disregarding and disrespecting children in the LGBTQ community."[13]

- DE regularly receives hostile messages and comments from members of the public complaining about DE's opposition to gender ideology. These messages and comments attack DE and its leadership using terms like "bigots" and "dangerous extremists." One email told DE personnel, "YOU CAN GARGLE MY TRANS BALLS."

**Colorado Parent Advocacy Network.** To the best of its recollection, CPAN is aware of the following instances in which someone has complained about the use of pronouns and/or names of transgender individuals:

- CPAN held its official launch event on November 13, 2022. Before the event, the venue informed CPAN Executive Director Lori Gimelshteyn that it had received several emails from individuals urging the venue to cancel the event. According to the venue, these messages were ideological in nature and expressed disagreement with CPAN's stance on LGBTQ issues.

---

[10] Todd Dorman, *Linn-Mar lawsuit ignores rights of transgender kids*, The Gazette (archived Aug. 13, 2025), perma.cc/CRU3-5ZHA.

[11] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

[12] *2024 Hate Map – Virginia*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/9ZC4-VCZ4.

[13] *Assault on Inclusive Education and How We're Fighting Back*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/47KW-2HS7.

**45**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- Following CPAN's November 13, 2022 launch event, a transgender journalist who uses the name "Heidi Beedle" and "they" pronouns published a piece criticizing the event and CPAN's mission. The article described CPAN as an "anti-LGBTQ" organization and accused CPAN of associating with "transphobic" individuals.[14]

- Following CPAN's April 6, 2023 rally to oppose H.B. 23-1003, transgender journalist Heidi Beedle published an article critical of the rally. The article claimed that CPAN "often target[s] LGBTQ students in [its] activism."[15]

- In May 2023, CPAN Executive Director Lori Gimelshteyn received a "Thank You" card in the mail from the Satanic Temple, stating that a donation had been made in her name as a form of retaliation for her views.

- Before CPAN's September 10, 2024 School Safety Summit, the venue informed CPAN Executive Director Lori Gimelshteyn that it had received several hateful emails demanding that the event be cancelled. The emails accused CPAN of being a hate group because of its views on LGBTQ issues and parental rights. These messages prompted the venue to require CPAN to hire two uniformed law enforcement officers for on-site security as a condition of the venue rental.

- During CPAN's October 9, 2024 rally before a Cherry Creek School Board meeting, several individuals affiliated with a group known as the "Parasol Patrol," some of whom identify as transgender," were present and protested the rally. This group disrupted the event by driving vehicles through CPAN's crowd, using umbrellas to poke at attendees, and attempting to engage in verbal confrontation with attendees. After the rally, at the Board meeting itself, Parasol Patrol members filled the meeting room with signs and posters accusing CPAN of spreading misinformation about the content in Cherry Creek School District libraries.

- On April 6, 2025, at CPAN's Rocky Mountain Summit Part II, a group of more than 50 protesters gathered outside the venue. Many of the protesters wore rainbow attire and carried signs with slogans like, "Trans Rights Are Human Rights" and "Eliminate the TERFs." Before the Summit began, two of the protestors entered the venue. They began scanning the room and attempted to film the event space covertly. Police informed CPAN Executive Director Lori Gimelshteyn that the two protestors were behaving suspiciously. Ms. Gimelshteyn spoke to the protestors for approximately 15 minutes. They expressed disagreement with the substance of the Summit and complained that CPAN promoted voices that do not support gender-affirming care. The two protesters also stated that they disagreed with how CPAN and the Summit's speakers framed the issues of gender identity and pronoun usage.

---

[14] Heidi Beedle, *A New Conservative Group Uses Anti-LGBTQ Sentiment to Attack Colorado Public Schools*, Colorado Times Recorder (Dec. 1, 2022), perma.cc/YA3D-4DKA.
[15] Heidi Beedle, *'I'm a Pissed Off Grandma' – Republican Legislators Address Parent Rights Rally*, Colorado Times Recorder (Apr. 7, 2023), perma.cc/J497-3N56.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- On April 28, 2025, following CPAN's press conference opposing H.B. 25-1312—including its provisions regarding preferred pronouns and chosen names—CPAN Executive Director Lori Gimelshteyn attended the Colorado Senate Judiciary Committee hearing on the bill. When Ms. Gimelshteyn delivered testimony to the committee expressing opposition to the bill, several transgender individuals vocally snickered. One transgender individual spat in her hair. And when Ms. Gimelshteyn stepped out to use the restroom, several transgender individuals stood in her path in a manner she perceived as intimidating and designed to deter her from passing, though she was able to proceed past them. For her safety, Ms. Gimelshteyn had to be escorted from the Capitol Building to her vehicle by Capitol police after several transgender individuals again stood in her path in a manner she perceived as intimidating and designed to block her path. After this incident, Ms. Gimelshteyn filed a complaint with the Capitol police.

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[16]

- In addition, CPAN Executive Director Lori Gimelshteyn has received online harassment on many occasions as a result of her views on sex, gender ideology, and pronoun/name usage. She has received hostile comments threatening to protest her speaking engagements and disparaging her because she opposes gender-affirming treatment for minors. Several messages have also complained that Ms. Gimelshteyn and CPAN intentionally use supposedly incorrect pronouns or "deadnames" in public statements and marketing materials.

**Protect Kids Colorado.** To the best of its recollection, PKC is aware of the following instances in which someone has complained about the use of pronouns and/or names of transgender individuals:

- In May 2021, Ms. Kimberly Chambers, a subject of PKC's "Art Club" documentary and an activist who had previously spoken to PKC Executive Director Erin Lee's daughter, encouraged Poudre School District, where PKC Executive Director Erin Lee's daughter attended school, to consider performing a "well-child check" on Ms. Lee and her daughter because Ms. Chambers believed Ms. Lee was not sufficiently affirming of her child's purported gender identity.

- On another occasion, on February 22, 2024, Ms. Kimberly Chambers made a post on Facebook calling Ms. Lee a "#ParentalRights terroris[t]." The post accused "groups like

---

[16] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

**47**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**48**

#ProtectKidsColorado" of "child hate indoctrination" and "encourag[ing]" "physical, emotional, legislative, and fatal violence" against transgender-identifying youth. The post suggested that PKC and similar groups were complicit in the murder of "Nex Benedict," a transgender-identifying youth. The post "[t]hank[ed]" the Gay, Lesbian, & Straight Education Network "for holding [PKC] accountable."

- From the fall of 2023 through the Spring of 2024, Ms. Kimberly Chambers made a series of posts criticizing PKC's and Executive Director Erin Lee's advocacy, with the hashtag "#ForCLee," a reference to Ms. Lee's formerly gender-confused daughter.

- In March 2024, PKC Executive Director Erin Lee filed a report with the Federal Bureau of Investigation regarding death threats she had received because of her advocacy on gender ideology issues. The FBI followed up with Ms. Lee to ask for additional information.

- Leading up to PKC's April 10, 2024 screening of the "Art Club" documentary at Denver University, over 1,000 Coloradans, including a state legislator, signed an open letter to "denounce" the event and "call on … the University of Denver to not allow this event." The petition complained that PKC promotes "harmful rhetoric" and accused PKC of holding "anti-transgender and anti-science stances." Hundreds of protestors showed up at the event itself, where they verbally and physically harassed PKC Executive Director Erin Lee and other attendees. For example, protestors said that Ms. Lee was transphobic and accused her of misgendering transgender-identifying people. During the event, protestors sent Ms. Lee physical threats on Instagram. Ms. Lee needed Denver police to escort her safely to her vehicle and off campus. One of her hired bodyguards was injured.

- On April 13, 2024, PKC Executive Director Erin Lee spoke at a rally on the steps of the Colorado Capitol building organized by #DontMessWithOurKids. More than 30 transgender individuals stood on an adjacent sidewalk to protest the event. Several of the transgender protesters came into the crowd of rally attendees and disrupted Ms. Lee's speech. State police removed the protesters. In light of previous events—like the threatening conduct Ms. Lee suffered during PKC's April 10, 2024 event at Denver University—Ms. Lee felt she needed to, and did, hire private security for this event.

- On April 1, 2025, during a Colorado House Judiciary Committee hearing, Representative Yara Zokaie called PKC and other parental rights groups "hate groups" and compared them to the "KKK" because they opposed H.B. 25-1312's "chosen name" and "gender expression" provisions. Representative Zokaie doubled down on her complaint—again calling PKC and related groups "hateful" and the "KKK"—on April 4, 2025, during floor debates over H.B. 25-1312.

- On May 19, 2025, Bee Gonzalez, a Colorado mother, posted a video on TikTok directly targeting PKC's Executive Director, Erin Lee. Ms. Lee had previously posted on X about Ms. Gonzalez's child, a biological girl who was socially transitioned at school without the knowledge or consent of the child's father. Ms. Lee's post called the child a "little girl,"

35

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

referred to the child using female pronouns ("she" and "her"), and noted the child's so-called chosen name using scare quotes ("'Ollie'"). Ms. Lee explained that stories like this are why PKC opposes H.B. 25-1312. In her video, Ms. Gonzalez said that she was "publicly notifying … Erin Lee" that her "child's name is Ollie and their pronouns are they/them." Ms. Gonzalez insisted that Ms. Lee "not continue to publish things that intentionally misgender them." Ms. Gonzalez described Ms. Lee's posts as "atrocities" and threatened to take legal action against Ms. Lee if Ms. Lee continued to refer to the child with biologically accurate terms. Ms. Gonzalez also referred to Ms. Lee by name during public testimony in support of H.B. 25-1312 at a Colorado Senate Judiciary Committee hearing.

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs (including PKC) and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[17]

- In addition, PKC Executive Director Erin Lee has received dozens of messages over social media and in person threatening her life or wishing for her death because of her public stance on transgender ideology. Individuals displeased with her speech have publicly posted information about her children's schools and/or sent threatening messages to the schools. Individuals have also made comments online and in person Ms. Lee saying they would harass her church. Ms. Lee has also been "doxed." She has been stalked. And her home was broken into in May of 2023.

**Do No Harm**. DNH's members in Colorado have received complaints and criticism for their use of pronouns and names and for their views on sex and gender. This includes Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics, as described below.

In addition, DNH is frequently the target of complaint and criticism for its use of pronouns and names and for its views on sex and gender. For example, DNH has received complaints and criticism like the following:

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using

---

[17] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

36

**49**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[18]

- The Southern Poverty Law Center has declared DNH an "Anti-LGBTQ+ Hate Group."[19]

- DNH has routinely received hostile commentary from members of the public who have staunchly opposed the organization's mission to curtail the unscientific and individually harmful practice of so-called gender affirming care for minors. These opponents have repeatedly attacked Do No Harm for challenging their preferred narratives and language concerning youth-focused gender ideology. They have shared odious comments on the Do No Harm website and posted offensive and sometimes shocking statements on social media, declaring DNH a "transphobic" and "bigot[ed]" organization. One user on X stated that "Orgs like [DNH] should be shutdown and investigated for unethical practices." In addition, DNH staff have received mail at their personal residences with hostile messages like "You are the HARM."

- In addition, DNH's members in Colorado have received complaints and criticism for their use of pronouns and names and their views on sex and gender. This includes Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics, as described below.

**Dr. Travis Morrell**. To the best of his recollection, Dr. Morrell is aware of the following instances in which someone has complained about the use of pronouns and/or names of transgender individuals:

- In June 2024, the Colorado Medical Society voted on a proposal by Dr. Morrell to recognize that the definition of "female genital mutilation" includes some aspects of pediatric "gender-affirming" treatments, including "the alteration or removal of a minor's biologically healthy tissue that decreases potential innate adult functionality, and for which may involve the medical, hormonal, functional, or surgical treatments of gender dysphoria or gender incongruence." An assistant professor at the University of Colorado School of Medicine emailed his students, who would soon join Dr. Morrell in the medical profession, called Dr. Morrell's proposal "discriminatory and medically unconscionable," and encouraged the students to vote against the proposal.

- Also in June 2024, another professor at the University of Colorado School of Medicine emailed the leadership of the Colorado Medical Society to complain about Dr. Morrell's proposal

---

[18] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

[19] *Anti-LGBTQ*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/NK5D-S35A; *see also 2024 Hate Map – Virginia*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/9ZC4-VCZ4.

**50**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

regarding the definition of "female genital mutilation." The professor called the proposal "offensive," "deceptive," and "shameful." The professor called for the proposal to be "remove[d]" and "taken down." At least one member of the Colorado Medical Society's board of directors "[t]otally agree[d] with [those] sentiments" and indicated she would share the professor's complaint with other board members.

- On June 20, 2024, in a comment exchange on X regarding a post that highlighted the damage that gender-affirming care can do to a patient's reproductive abilities, a Colorado-based LGBTQIA+ activist organization told Dr. Morrell that he should "[b]e careful preaching" his views on the dangers of gender-affirming care "in Colorado" because "we have an active ban on conversion therapy" and Dr. Morrell "[w]ouldn't want an investigation …."

- On March 15, 2025, Dr. Morrell testified in favor of A.B. 104 (a proposed ban on gender-transition medical treatments for minors) in the Wisconsin State Assembly Committee on Health, Aging, and Long-Term Care. While testifying, Dr. Morrell was interrupted with cries of "Nazi" by an individual that Dr. Morrell believes was a transgender-identifying biological male. Wisconsin state police were required to keep the peace while Dr. Morrell was speaking, and at least one protester was removed by state policy shortly before or after Dr. Morrell's testimony.

- Dr. Morrell spoke at Colorado Parent Advocacy Network's Rocky Mountain Summit Part II on April 6, 2025. Medical professionals who attended Dr. Morrell's panel at the event were supposed to receive continuing medical education credits, approved by the Christian Medical and Dental Association. Before the event took place, however, activists filed complaints with the Accreditation Council on Continuing Medical Education, complaining that the event organizers and speakers did not support so-called "gender-affirming care." The complainants sought to "flood [ACCME's] inbox and hold [the Summit speakers] accountable for their dangerous propaganda."[20] ACCME subsequently contacted CMDA to raise concerns about the "content validity" of Dr. Morrell's panel, and CMDA decided to "withhold credit for this event" so as to not "jeopardize [its] accreditation status with the ACCME."[21]

- Also leading up to the Rocky Mountain Summit Part II on April 6, 2025, activists encouraged people online to contact the venue—the Inverness Denver—and "voice [their] displeasure" and call on the Inverness to cancel the event. The activists complained that the event hosts supposedly "tortur[e] LGBT children" and that such beliefs are "not acceptable in Denver."[22]

- On April 6, 2025, at the Rocky Mountain Summit Part II itself, at least two individuals left the event during Dr. Morrell's panel. The two individuals were a father and his child who identifies as transgender. Before leaving, the father and child spoke with event staff and disagreed with

---

[20] *File a complaint against this BS propaganda*, Reddit (Apr. 1, 2025), bit.ly/3JekEvD.

[21] Valerie Richardson, *Organizer cites bias after losing CME credit for class on harms of 'gender-affirming care'*, The Washington Times (archived Aug. 14, 2025), bit.ly/45q9mM4.

[22] *CPAN – Anti LGBT hate group event in Denver*, Reddit (Apr. 2, 2025), bit.ly/4oxy9qB.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**52**

the views they expected Dr. Morrell and the other panelists to express. In addition, roughly 40-60 protestors were outside the event venue—the Inverness Denver—during the event.

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[23]

- Multiple people have left negative Google reviews for Dr. Morrell's practice, at least some of whom never received treatment from Dr. Morrell or otherwise visited his practice. A number of these reviews specifically complain about Dr. Morrell's views on sex and gender. For example, "Not safe for LGBTQ+ patients or POC, stay away"; "This dude is incredibly bigoted please do not use this horrible human's services"; "Not a safe physician for lgbt patients."[24]



---

[23] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

[24] perma.cc/UR6K-EZ8Y

53

# PLACEHOLDER

Original page to be filed under restriction

53

54

# **PLACEHOLDER**

Original page to be filed under restriction

54

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**55**

**Interrogatory No. 3**

As to Drs. Travis Morrell and Valeri Leswing's treatment of transgender patients, identify (1) the number of transgender patients each doctor has seen per year for each year since 2009, and (2) the number of patients that indicated they did not feel welcome in light of their use of pronouns and names of patients.

**Response to Interrogatory No. 3**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks information about all transgender patients Drs. Morrell and Leswing have treated. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks certain information dating back to 2009. Plaintiffs object to this interrogatory on the grounds that the terms "did not feel welcome" and "has seen" are vague and ambiguous. Plaintiffs object to this interrogatory to the extent it seeks information not in Plaintiffs' possession, custody, control, or personal knowledge. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules. Plaintiffs object to this interrogatory as an attempt to exceed the permissible number of interrogatories through two subparts.

Subject to and without waiving its objections, Plaintiffs respond as follows:

**Dr. Travis Morrell**

**(1)** Dr. Morrell does not ask for or keep records of his patients' gender identity. Nor does he keep records of whether a patient does or does not have gender dysphoria. Moreover, the number and type of patients Dr. Morrell treats in a given year varies based on the year, his clinical responsibilities, cultural trends, and other factors. To the best of his recollection:

From 2010 to 2011, Dr. Morrell worked as an obstetrics-gynecology resident physician at Loma Linda University Medical Center. He saw zero transgender patients in that time.

42

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**56**

From 2011 to 2012, Dr. Morrell continued in his role as an obstetrics-gynecology resident physician at the LLU Medical Center. In this time period, when on surgical rotations, Dr. Morrell saw approximately 1-3 patients per year who identified as "transsexual." (The term "transgender" was not widely used at the time.)

From 2012 to 2013, Dr. Morrell worked as a family medicine and preventive medicine resident physician at the LLU Medical Center. He saw 0-2 patients per year who identified as "transsexual."

From 2013 to 2014, Dr. Morrell worked as a family medicine and preventive medicine resident physician at the LLU Health Education Consortium. He saw 3-6 patients per year who identified as "transsexual."

From 2014 to 2017, Dr. Morrell trained as a dermatology resident at LLU Health. He saw 0-3 patients per year who identified as "transgender."

From 2017 to 2018, Dr. Morrell underwent advanced fellowship training at the University of Massachusetts and had limited direct interactions with patients.

Dr. Morrell joined his current practice, Mountain West Dermatology, in 2018. Since then, he has seen 1-4 patients per year who identify as "transgender."

**(2)** Before 2021, Dr. Morrell held the view that using an individual's preferred pronouns and/or chosen name was appropriate as a matter of politeness and because he believed that so-called gender-affirming treatments were sought mostly by consenting adults. He therefore generally addressed individuals, including his patients, using their preferred pronouns and/or chosen name. And no patients indicated they felt unwelcome due to his use of pronouns and/or names.

Dr. Morrell's views changed, however, as medical professionals in the United States increasingly prescribed so-called gender-affirming treatments for minors. Dr. Morrell had witnessed the harms of such treatment for adults, and the increased risk of harm and lack of clinical justification for

43

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**57**

developing youth was immediately apparent to Dr. Morrell. Dr. Morrell came to believe that social transition, including the use of non-biological pronouns and names, harms individuals by reinforcing false beliefs and expectations about their bodies. Therefore, in the years since 2021, Dr. Morrell has refrained from addressing individuals, including his patients, using non-biological preferred pronouns and/or chosen names. When he has addressed or referred to individuals using pronouns and/or names, he has done so using biologically accurate pronouns and birth names.

Dr. Morrell enjoys treating all of his patients and endeavors to maintain positive and amicable relationships with them, regardless of their sex or gender identity. As such, none of Dr. Morrell's patients have told him that his use of biologically accurate pronouns and birth names—or his non-use of preferred pronouns and/or chosen names—makes them feel "unwelcome." He has, however, been the target of multiple negative reviews on Google that specifically complain about his views on sex and gender.

### Dr. Valeri Leswing

**(1)** Dr. Leswing does not ask for or keep records of her patients' gender identity. Nor does she keep records of whether a patient does or does not have gender dysphoria. To the best of her recollection, Dr. Leswing estimates that she treats somewhere between two and ten transgender patients each year.

**(2)** Dr. Leswing ensures that all of her patients feel welcome and cared for in her practice. This includes any and all patients who experience gender dysphoria. Moreover, not all patients who leave Mountain Pediatrics specifically state their reasons for leaving. To the best of Dr. Leswing's recollection, however, 5-10 families have left her practice after explicitly complaining that Dr. Leswing does not provide so-called gender-affirming care.

44

**Interrogatory No. 4**

As to Dr. Travis Morrell, describe the corporate structure of Mountain West Dermatology and his relationship to it, including (1) the contractual relationship between Mountain West Dermatology and its dermatologists, including any agreements between Dr. Travis Morrell and Mountain West Dermatology; (2) the number of professionals that are part of Mountain West Dermatology; and (3) any referral practice between the professionals that are part of Mountain West Dermatology.

**Response to Interrogatory No. 4**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case, and seeking irrelevant information. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules. Plaintiffs object to this interrogatory as an attempt to exceed the permissible number of interrogatories through three subparts.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

**(1)** Mountain West Dermatology's physicians each own an equal share of the practice. Each physician's compensation is based on the money collected from each physician's own work, minus the physician's fair share of expenses. Like all of the physicians at Mountain West Dermatology, Dr. Morrell has signed an employment agreement with Mountain West Dermatology setting out, among other terms, his compensation and responsibilities as an employee of the practice.

**(2)** Mountain West Dermatology has nine physicians who work at, and are equal partners in, the practice.

**(3)** Each physician at Mountain West Dermatology has a panel of patients who generally return to that particular physician for follow-up visits. Mountain West Dermatology has no policy or practice requiring its physicians to refer to one another. Physicians do refer patients to one another, but the decision to refer, and to whom, is up to the individual physician and his or her best medical judgment. For example, one physician in the practice might refer to another if a patient's treatment

45

**58**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

59

requires another physician's specific professional skills. But in the absence of such particularized need,

it is unusual for physicians in Mountain West Dermatology to see one another's patients.

59

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**60**

**Supplemental Interrogatory No. 1**

Describe Mountain West Dermatology P.C.'s practices and/or policies in assigning patients to and/or referring patients between the medical providers in Mountain West Dermatology P.C., including to assign, reassign, and/or refer patients to or from Dr. Travis Morrell because of his use of incorrect pronouns and deadnames of transgender individuals.

**Response to Supplemental Interrogatory No. 1**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case, and seeking irrelevant information. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

Dr. Morrell believes this interrogatory is offensive and misplaced. As a physician, Dr. Morrell first and foremost wants to provide care for *all* of his patients, regardless of whether they share his views on sex and gender. Moreover, because Dr. Morrell relies on his practice for a living, he works hard to develop a steady stream of patients (both returning and new) that he can rely on for continued business. He does not want to send those patients to other physicians unless doing so is in a patient's best medical interests. As such, neither Dr. Morrell nor Mountain West Dermatology seeks to reassign or refer his patients to other physicians, either within or outside of Mountain West Dermatology.

No patients have been assigned, reassigned, and/or referred to or from Dr. Morrell because of his use of biological pronouns or birth names. Mountain West Dermatology does not have a policy and/or practice in place requiring referrals, or dictating a process for referrals, on account of a physician's pronoun or name usage or in any other circumstances.

47

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**61**

**Supplemental Interrogatory No. 2**

Describe any instances in which any person has complained to any employee, representative, or provider at Mountain West Dermatology P.C. about Dr. Travis Morrell's use of incorrect pronouns and deadnames of transgender individuals, including any actions you took in response to such complaint.

**Response to Supplemental Interrogatory No. 2**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case. Plaintiffs object to this interrogatory on the grounds that the term "complained" is vague and ambiguous. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

No person has complained to an employee, representative, or provider at Mountain West Dermatology about Dr. Morrell's use of biological pronouns or birth names. Dr. Morrell has, however, received reviews on Google complaining about his views on sex and gender.

48

**61**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**62**

**Supplemental Interrogatory No. 3**

Describe any services and/or treatments offered by Dr. Travis Morrell that cannot be provided by another physician in Mountain West Dermatology P.C.'s practice, and any instances where a patient could not receive care from the practice due to the patient being unwilling to be treated by Dr. Travis Morrell due to his policy regarding transgender patients.

**Response to Supplemental Interrogatory No. 3**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case, and seeking irrelevant information. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

Though all physicians at Mountain West Dermatology are licensed to provide the full array of dermatological services, many patients seek out or are referred to Dr. Morrell because he is the only fellowship-trained and board-certified dermatopathologist at Mountain West. As such, Dr. Morrell handles Mountain West Dermatology's most challenging cases involving dermatopathology and re-lated procedures. He is the only physician at Mountain West who is able to evaluate biopsy specimens for most diagnoses, including the most serious dermatological diagnoses such as melanoma. Dr. Mor-rell receives multiple biopsy specimens on a daily basis that are sent to him because they cannot be interpreted by other physicians. To his knowledge, Dr. Morrell is the only physician within a 2- to 4-hour drive who regularly provides these services.

No patient has been denied or otherwise not received care from Mountain West Dermatology due to Dr. Morrell's beliefs about sex and gender or his use of biological pronouns or birth names.

63

*As to Interrogatory Answers Regarding Defending Education:*

Signed under penalty of perjury this __13__ day of August, 2025.

_____
Sarah Perry
On behalf of Defending Education

63

64

*As to Interrogatory Answers Regarding Colorado Parent Advocacy Network:*

Signed under penalty of perjury this __15th__ day of August, 2025.


_____
Lori Gimelshteyn
On behalf of Colorado Parent Advocacy Network

**64**

*As to Interrogatory Answers Regarding Protect Kids Colorado:*

Signed under penalty of perjury this 14th day of August, 2025.

Erin Lee
On behalf of Protect Kids Colorado

66

*As to Interrogatory Answers Regarding Do No Harm:*

Signed under penalty of perjury this __14__ day
of August, 2025.

_____
Kristina Rasmussen
On behalf of Do No Harm

66

67

*As to Interrogatory Answers Regarding Dr. Travis Morrell:*

Signed under penalty of perjury this \_\_\_\_ day
of August, 2025.

_____
Travis Morrell, M.D., M.P.H.

**67**

*As to Interrogatory Answers Regarding Dr. Valeri Leswing and Mountain Pediatrics:*

Signed under penalty of perjury this _11th_ day of August, 2025.

Valeri Leswing, D.O.
On her own behalf and on behalf of Mountain Pediatrics

**68**

69

*As to Objections:*

Respectfully submitted on August 15, 2025,

/s/ J. Michael Connolly
J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

*Counsel for Plaintiffs*

70

## CERTIFICATE OF SERVICE

I certify that on August 15, 2025, I emailed the foregoing to counsel for the Defendants.

*/s/ J. Michael Connolly*

**70**

**71**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

      *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, *et al.*,

      *Defendants*.

Case No. 1:25-cv-01572-RMR-MDB

**SUPPLEMENTAL DECLARATION OF LORI GIMELSHTEYN**

1.     I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.     I am the Executive Director of the Colorado Parent Advocacy Network ("CPAN"). In my role as Executive Director, I run the organization on a day-to-day basis and am its lead spokesperson.

3.     As explained in my previous declaration, CPAN is a statewide, grassroots, 501(c)(4) non-profit social advocacy organization organized under Colorado law. CPAN advocates for, among other things, educational excellence, school accountability, and parental rights and opposes policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives.

1

4.     CPAN regularly hosts meetings, summits, and other events in furtherance of its mission. Many of those events are catalogued in Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories. Additionally, since Plaintiffs submitted their interrogatory responses, CPAN has hosted or co-hosted several additional events in places of public accommodation, including:

a.     CPAN's Gilded Tribute Benefit Gala, hosted at The Vehicle Vault, a museum and event space, in Parker, CO, on September 19, 2025;

b.     a Parliamentary Operations Training, hosted at the offices of the Independence Institute in Denver, CO, on January 2 and 3, 2026;

c.     the Constitution Connection Program for middle- and high-school students, hosted at the First Baptist Church in Denver, CO, on January 27, 2026; and

d.     Colorado's National School Choice Week Celebration, hosted on the West Steps of the Colorado State Capitol in Denver, CO, on January 27, 2026.

5.     As Plaintiffs' interrogatory responses indicated, CPAN also planned to host its third annual "Rocky Mountain Summit" in April 2026 in Denver, CO. As its theme, the Summit was going to address the "Institutional Failure to Protect Children from the Harms of Gender-Affirming Treatments." I anticipated hosting this year's Summit at the same location as previous Summits: The Inverness Denver hotel in Englewood, CO.

6.     Upon further consideration, however, CPAN has decided not to host the 2026 Rocky Mountain Summit. The Summit, in line with its theme, would feature conversations on a variety of issues relating to transgender identity, including the harm caused

2

**72**

by "preferred pronouns," "chosen names," and other so-called gender-affirming language. As such, it is possible that speakers and/or other attendees at the Summit would refer to transgender-identifying individuals using biologically accurate pronouns and birth names that conflict with those individuals' self-professed gender identity or gender expression.

7. The annual Rocky Mountain Summit, moreover, is usually CPAN's most publicized event and garners significant community interest. As such, and because Colorado law as amended by H.B. 25-1312 threatens to punish so-called misgendering and deadnaming, I fear that CPAN, the Summit's speakers, and I would be subjected to discrimination complaints, investigated by the Colorado Civil Rights Division, and/or face financial or equitable penalties if we host the 2026 Summit as planned.

8. But for Colorado law, CPAN would proceed with its plans to host the 2026 Rocky Mountain Summit.

9. In previous years, CPAN required Rocky Mountain Summit attendees to purchase tickets for entry to the event. And CPAN anticipated selling tickets for the 2026 Rocky Mountain Summit as well. The annual Summit, moreover, is generally one of CPAN's most well-attended events, with many ticket-buyers. As such, the cancellation of the 2026 Summit represents a significant loss of funding for CPAN.

10. Over the next few months, CPAN intends to reduce its normal quantity of public events and focus on fundraising efforts. CPAN hopes to raise enough funds over the next few months to hire a dedicated fundraiser and possibly additional staff. CPAN anticipates returning to a regular schedule of public events in support of its mission after completing its fundraising efforts.

3

**73**

74

11.     Though CPAN will reduce its normal schedule of events over the next few months, I anticipate that it will continue to host events in places of public accommodation in connection with its fundraising efforts. I anticipate that at least some of these events will be open to the public and will include speakers who discuss the importance of CPAN's work opposing gender ideology and so-called gender-affirming care. In addition, I plan to continue visiting and speaking to local civic and political groups about the dangers of gender ideology and gender-affirming care. On average, I have one or two such speaking engagements each month, and I anticipate maintaining that frequency.

74

75

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on February __9__, 2026.

_Lori A. Gimelshteyn_
Lori Gimelshteyn

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

     *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, *et al.*,

     *Defendants*.

Case No. 1:25-cv-01572-RMR-MDB

**SECOND SUPPLEMENTAL DECLARATION OF DR. VALERI LESWING**

1.  I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.  I am a licensed physician in the State of Colorado and a practicing pediatrician. I own and operate my own medical practice—Mountain Pediatrics—in Evergreen, CO. My practice focuses on providing complete pediatric care for children and young adults. I am the practice's sole owner and physician.

3.  As explained in my first supplemental declaration (from November 13, 2025), after my two children left home to attend out-of-state colleges in August 2024, I decided to travel more frequently for personal trips and to visit my children. Accordingly, I planned to adjust Mountain Pediatrics' staff and hours of operation and use a new office space on a flexible basis to allow for greater freedom in my schedule.

1

**76**

4. Since I submitted my first supplemental declaration, Mountain Pediatrics has completed the transition to a new schedule, location, and format for patient visits. Specifically:

a. I am now treating patients both in person and through telehealth appointments. For in-person appointments, I am using a new office space located in the same complex as Mountain Pediatrics' previous office.

b. I began seeing patients in person in Mountain Pediatrics' new office space and conducted my first telehealth appointments the week of February 2, 2026. I have additional in-person and telehealth appointments scheduled for the future. Although I have transitioned to a more flexible schedule, I anticipate that, moving forward, I will spend at least one day treating patients in person and at least one day conducting telehealth appointments most weeks.

c. Mountain Pediatrics continues to employ an office manager to assist me with billing, handling patient records, and other administrative tasks.

5. On February 1, 2026, I updated Mountain Pediatrics' website to reflect the practice's new schedule and location. *See* www.mountainpeds.com/visits. The updated website also explains that I am now seeing patients both in person and through telehealth visits. Visitors are able to schedule both in-person and telehealth appointments using the website.

6. I continue to be available to treat existing patients, and I have appointments scheduled with existing patients in the near future. I also continue to accept new patients and have already conducted one telehealth appointment with a new patient.

2

77

7.      Although I have shifted to a more flexible schedule and now treat patients both in person and through telehealth appointments, I maintain an active practice with the same scope of treatment, providing complete pediatric care for children and young adults from newborns to patients up to 25 years old. My views, fears, and intentions outlined in my original declaration (from June 11, 2025) thus remain the same.

8.      I still anticipate treating transgender-identifying, gender-dysphoric, and gender-questioning patients in the future. Both I and Mountain Pediatrics remain members of Do No Harm, and I understand my practice remains subject to Colorado's laws governing places of public accommodation.

9.      I continue to believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity, and I want to exercise my fundamental constitutional right to speak in a manner that reflects those views to best serve the medical needs of all my patients. But, because Colorado law as amended by H.B. 25-1312 threatens to punish so-called deadnaming and misgendering, I remain unable to address or refer to individuals in my medical practice using biologically accurate terms inconsistent with an individual's supposed gender identity or otherwise speak consistently with my belief that sex is determined at birth and immutable. I continue to fear that I will be targeted, harassed, reported, and/or investigated based on my speech.

10.     I also still want to publish materials expressing my belief that sex is fixed at birth and immutable and that it is wrong and medically harmful to address or refer to someone using non-biological pronouns, chosen names, or other terms. For example, I still want to post a statement on Mountain Pediatrics' Facebook page explaining to

3

78

79

potential patients that, because I have an obligation as a physician not to harm my patients, I will not refer to them using biologically inaccurate terms like preferred pronouns and chosen names. I would also like to publish on the Facebook page a review of relevant medical literature discussing the harms of so-called gender-affirming care and the importance of affirming children's biological sex. But I must refrain from publishing such materials because of Colorado law.

4

79

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge.

Executed on February 9th, 2026.

_____
Valeri Leswing, D.O.

**80**

81

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

------------------------------------------------------

ZOOM DEPOSITION OF LORI GIMELSHTEYN
August 22, 2025

------------------------------------------------------

Plaintiffs:

DEFENDING EDUCATION, et al.,

v.

Defendants:

AUBREY C. SULLIVAN, et al.

------------------------------------------------------

APPEARANCES:

        CONSOVOY MCCARTHY, PLLC
            By J. Michael Connolly, Esq.
               Paul Draper, Esq.
               1600 Wilson Boulevard, Suite 700
               Arlington, Virginia 22209
                  Appearing via Zoom on behalf of
                  Plaintiffs

        COLORADO ATTORNEY GENERAL'S OFFICE
            By Nora Q.E. Passamaneck
               Senior Assistant Attorney General
               Janna K. Fischer
               Senior Assistant Attorney General
               Dominick D. Schumacher
              Assistant Attorney General
               1300 Broadway, 10th Floor
               Denver, Colorado 80203
                  Appearing via Zoom on behalf of
                  Defendants CCRD, Sergio Cordova,
                  Geta Asfaw, Mayuko Fieweger,
                  Daniel S. Ward, Jade R. Kelly,
                  and Eric Artis

81

APPEARANCES (continued):

      COLORADO ATTORNEY GENERAL'S OFFICE
         By Lane Towery
           Assistant Attorney General
           1300 Broadway, 10th Floor
           Denver, Colorado 80203
             Appearing via Zoom on behalf of
             Colorado Attorney General

Also present:  Sarah Bomgardner

82

Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom deposition of LORI GIMELSHTEYN, called by Defendants, was taken on Friday, August 22, 2025, commencing at 9:05 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

I N D E X

DEPOSITION OF LORI GIMELSHTEYN

EXAMINATION BY:                                        PAGE

    Ms. Passamaneck                                        5

    Mr. Connolly                                        138


|          |                                      | INITIAL |
| EXHIBITS |                                      | REFERENCE |
|----------|--------------------------------------|-----------|
| Exhibit 1 | Declaration of Lori Gimelshteyn | 24 |
| Exhibit 2 | Plaintiffs Objections and Responses to Defendants First Set of Interrogatories | 26 |
| Exhibit 3 | Photograph at Prairie Middle School parking lot at CPAN rally, DE_000192 | 57 |
| Exhibit 4 | A Guilded Tribute Benefit Gala advertisement, DE_000166 | 64 |
| Exhibit 5 | Educate and Inform PowerPoint presentation, DE_000180 | 71 |

83

|  |  | INITIAL |
|---|---|---|
| **EXHIBITS (continued)** |  | **REFERENCE** |
| **Exhibit 6** | **Educate and Inform PowerPoint presentation, DE_000180, native version** | 78 |
| **Exhibit 7** | **Press Release, Colorado Parent Advocacy Network Official Launch Event, DE_000007** | 117 |
| **Exhibit 8** | **Power to the Parents Event advertisement, DE_000025** | 117 |

84

Educate and Inform program that CPAN offers?

A.    Yes.

Q.    And what is that?

A.    It is a series of -- it's a PowerPoint presentation.

Q.    And do they get a certificate for participating in a presentation on this?

A.    No.

Q.    Does CPAN have any physical location that is open to the public?

A.    No.

Q.    I'd like to turn your attention to paragraph 10 of your declaration, and you state, "CPAN hosts meetings, summits, and other events in places of public accommodation."  Do you see that?

A.    I do.

Q.    What did you mean in using the term "places of public accommodation"?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A.    So I'm not an attorney, but places of public accommodation include churches, bars, restaurants, hotels.  Sometimes we rent rooms.  We have contracts with a variety of organizations that

85

are public in order to host our events.

Q.    (BY MS. PASSAMANECK)   You agree that CPAN itself is not a place to eat, drink, sleep, or rest, correct?

MR. CONNOLLY:   Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)   And you agree that CPAN itself is not a sporting or recreational area or facility, correct?

MR. CONNOLLY:   Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)   CPAN is not a public transportation facility, correct?

MR. CONNOLLY:   Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)   CPAN is not a barbershop or bathhouse, correct?

MR. CONNOLLY:   Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)   CPAN is not a campsite or trailer camp?

MR. CONNOLLY:   Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)   CPAN is not a mortuary, undertaking parlor, or cemetery?

86

you also held a rally at the Prairie Middle School

parking lot for the Cherry Creek School Board

Meeting, correct?

A.    Yes.

Q.    And that is on pages 10 to 11 of

Exhibit 2 in case you want to refresh your

recollection regarding that event.

A.    Thank you.  Yes.

Q.    Now, it lists that no contracts were

obtained for this event.  Do you see that?

A.    Yes.

Q.    You had no permit to hold a rally at the

Prairie Middle School parking lot, correct?

A.    Yes.

Q.    It's fair to say that you kind of

organized, everyone showed up, but it wasn't a --

actually, strike that.

Anyone passing the parking lot could

listen to your event, correct?

A.    Yes.

Q.    You couldn't control who could listen and

attend your event, correct?

A.    Yes.

Q.    And, in fact, there were a number of

protesters at this event, correct?

87

A.    Yes.

Q.    What is the Parasol Patrol?

A.    From my understanding, the Parasol Patrol is an organization of individuals that claim to defend individuals who identify as transgender.

Q.    I'm going to see if sharing my screen is easier for you as opposed to putting something in the chat, but let me know; and if not, I can put it in the chat.  I just want to make sure that we don't lose you.

So I'd like to mark as Exhibit 3 an image bearing the numbers DE_000192.

(Exhibit 3 was marked.)

Q.    (BY MS. PASSAMANECK)  Are you familiar with this image?

A.    Yes.

Q.    What does this image depict?

A.    This is an image of the parasols, the rainbow umbrellas that the organization members carry, and from my understanding, they use the parasols as a shield.

Q.    Was this image taken at the Prairie Middle School parking lot rally that CPAN held?

A.    Yes.

Q.    I will stop sharing my screen in case it

88

on this, but if you'd like you may download what I've marked as Exhibit 4 and put in the chat, which is DE_000166.

A.    Thank you.  I'll download it and open it.

Yes, that is an advertisement.

Q.    This event you are planning is not open to the public, correct?

A.    Yes, it is open to the public if they purchase tickets.

Q.    How much is a ticket to the Guilded Tribute Benefit Gala?

A.    We have different levels, but a general admission ticket is $125.

Q.    Okay.  And you are also planning the Rocky Mountain Summit Part III, correct?

A.    Yes.

Q.    Do you have a general time frame for when you are planning to hold this event?

A.    Our goal would be to host it in 2026, in April of 2026, but right now we are concerned that we could be unable to host this event because of current law.

Q.    Okay.  You don't have the same concerns about the Guilded Tribute Benefit Gala, correct?

MR. CONNOLLY:  Objection; form.

**89**

A.    Yes.

Q.    (BY MS. PASSAMANECK)  And why is that?

MR. CONNOLLY:  Objection; form.

A.    The Rocky Mountain Summit on Safeguarding Children From Gender-Affirming Treatment Part III, which we have titled "Confronting Institutional Failure to Protect Children from the Harms of Gender-Affirming Treatments," will require people to reference individuals' birth names and biological pronouns, and it would greatly hinder our panel discussion to not be able to do that.

Q.    (BY MS. PASSAMANECK)  You are not planning -- actually, strike that.

So for the gala, you do not foresee having to use pronouns consistent with gender identity and/or chosen names; is that fair?

A.    We have --

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A.    Can you repeat the question or restate the question?

Q.    (BY MS. PASSAMANECK)  Sure.  You stated that you were concerned about the Summit Part III, but not the gala; is that fair?

MR. CONNOLLY:  Objection; form.

**90**

MR. CONNOLLY:  Objection; form.

A.    Correct.

Q.    (BY MS. PASSAMANECK)  Do you use this Educate and Inform presentation at any CPAN events?

A.    Yes.

Q.    Okay.  Feel free to take your time and go through the document, but I also know that you said you're very familiar with it.  When I went through this, I didn't see any slide that misgendered an individual; is that fair?

MR. CONNOLLY:  Objection; form.

Lori, if you need to take your time to look through the document to confirm this, please do.

A.    There is not a slide that specifically addresses that.

Q.    (BY MS. PASSAMANECK)  And is there a slide that specifically addresses pronoun usage?

MR. CONNOLLY:  Objection; form.

A.    There are -- there are slides that reference pronouns, and then my oral presentation does address that.

Q.    (BY MS. PASSAMANECK)  Which slides are you referring to?

MR. CONNOLLY:  Objection; form.

**91**

A.    So it would be Slide Number 3.

Q.    (BY MS. PASSAMANECK)  And that is --

A.    Slide Number 3, beginning with "Plummeting Academics" and ending with, "Hidden Use of Gender Transition Plans."

And I'm going to go through each slide.

Q.    Sure.

A.    Just a moment.

I believe Slide 2 is a video.  That is our main video for our organization that also addresses it.  Let's see here.

I would have to reference Slide 13.  I'm not sure which video this is.  Sometimes it changes, but we do have videos that do -- I would say that Slide 13 is going to be related to DEI, just because Slides 12 and 14 are related to DEI.

Slide 16, which is the Gender Unicorn poster that is posted in schools across the state from elementary to high school, does absolutely lead into oral discussion and questions and answers on biological pronouns, private spaces, males and female athletics.

Also, on Slide 17, when we talk about social emotional learning, this is also an opportunity during our oral presentation to talk

**92**

specifically about gender ideology.

Slide 18, which is a sampling of the first five questions on the Healthy Kids Colorado Survey that is administered to middle-schoolers, this particular form is for middle-schoolers, it's also administered in high school, where right away after the first two questions, the questions talk about gender identity, transgender, and sexuality for children between the ages of 10 to 13, and this does have an oral component of the presentation that does dive into gender identity.

I would have to look to see what the video is in my PowerPoint for Slide 20.  I'm not sure what that video is off the top of my head, but it could relate.

And then Slide 21, which is a QR code for our most recent Rocky Mountain Summit, that also has an oral component where we talk about gender identity pronouns, birth names, private spaces, male and female athletics, et cetera.

Q.   Because you've referenced a number of videos in this, I'm going to drop into the chat and I'll just mark as Exhibit 6 the native PowerPoint that we received.  It is, for the record, 215 -- over 215 megabytes, so I don't know whether or not

**93**

A.   Yes.

Q.   That video did not misgender any individual, correct?

MR. CONNOLLY:  Objection.

A.   Not to my knowledge.

Sorry.

MR. CONNOLLY:  Objection; form.

Q.   (BY MS. PASSAMANECK)  That video did not discuss the use of pronouns to match gender identity, correct?

MR. CONNOLLY:  Objection; form.

A.   Not in the video.

Q.   (BY MS. PASSAMANECK)  Okay.  Are there any other videos or audio we should -- you would like to listen to in this presentation?

A.   Yes.  I believe I've gone through all the audio and video and will clarify that these videos do oftentimes lead into conversation on pronouns -- biological pronouns and birth names and gender identity.

Q.   Okay.  I'd like to explore that a little more.

You can bring down your screen if you'd like.  It may help the audio.

During this presentation, do you deadname

**94**

any particular individuals?

A.    I will call people by their birth name.

Q.    Okay.  Are those people that are in the audience, or are these individuals that are known in the public?

MR. CONNOLLY:  Objection; form.

A.    These are individuals known in the public.

Q.    (BY MS. PASSAMANECK)  Can you provide an example?

MR. CONNOLLY:  Objection; form.

A.    Yes.  For example, I would say Representative Brian Titone, who self identifies as a transgender woman and goes by the name Brianna Titone.

Q.    (BY MS. PASSAMANECK)  Okay.  Anyone else?

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)  Who?

A.    Kevin Smotherman, who identifies as a transgender woman and goes by the name of Vivian Smotherman.

Q.    Any other examples?

A.    Yes.  I will reference children by their biological birth names and pronouns.

**95**

Q.    And those are children that are known in the public?

A.    Yes and no. -- well, yes.  Every reference that I make in an event is something that is known to the public that was released either through court records or media, and the families have given permission for me to discuss.

Q.    Okay.  Have you ever deadnamed somebody who was in the audience, to your knowledge?

MR. CONNOLLY:  Objection; form.

A.    Not to my knowledge.

Q.    (BY MS. PASSAMANECK)  Okay.  Have you ever -- so we talked about deadnaming.

Let's talk about misgendering.  What, if anything, do you discuss about use of pronouns to match gender identity in providing this presentation?

MR. CONNOLLY:  Objection; form.

A.    I apologize.  Can we go back to my answer on the last question?

Q.    (BY MS. PASSAMANECK)  Sure.

A.    I do believe -- I didn't necessarily know that there was this particular person who identifies as transgender was in the audience, but this particular person is a journalist that writes

**96**

for the Colorado Times Recorder, and I may have referenced him in my remarks by his birth name instead of as the name that he goes by now, which is Heidi Beedle.

Q.   Okay.  And so just to make sure I understand, at a CPAN event, this reporter either was or may have been in the audience?

A.   Yes.

MR. CONNOLLY:  Objection; form.

A.   Sorry.  Yes.

Q.   (BY MS. PASSAMANECK)  And did that reporter correct you in your reference to them by their birth name?

A.   No.

Q.   Did the reporter leave after you had used their birth name?

A.   Not to my knowledge.

Q.   Okay.  So we've talked about deadnaming.

I'd like to talk about use of pronouns to match gender identity.  In providing -- in giving this presentation, do you discuss use of pronouns?

A.   Yes.

Q.   And what do you say?

A.   That it is our organization's knowledge that sex is determined at birth and is immutable,

97

and so we talk about people being compelled -- especially students in a classroom being compelled to lie if there is someone who identifies as transgender, and how that is a violation of their constitutional right of free speech.

Q.    Do you encourage individuals to use birth -- strike that.

Do you encourage the audience members to use pronouns matching sex at birth?

A.    Yes.  We do tell people that it is cruel to tell a child that they were born in the wrong body, and that they should use their biological pronouns.

Q.    Your example was specific to an individual.  My question is a little more broader. Do you encourage audience members to misgender transgender individuals?

A.    We encourage our audience members to use the birth names and biological pronouns of children.

Q.    How about adults?

MR. CONNOLLY:  Objection; form.

A.    I don't have any recollection of telling or informing people that they should use birth names or biological pronouns for adults.  Our work

**98**

in any way?

MR. CONNOLLY:  Objection; form.

A.    Not to my knowledge.

Q.    (BY MS. PASSAMANECK)  Okay.  Did you insult Representative Titone for being transgender?

MR. CONNOLLY:  Objection; form.

A.    I did not, not to my knowledge.

Q.    (BY MS. PASSAMANECK)  Okay.  Did anyone tell you they were offended by your reference to Representative Titone using their birth name?

A.    Sometimes we receive comments on our social media accounts, and many of our venues where we host events receive emails indicating that our speech is unacceptable and that they should cancel our events because we will use birth names and biological pronouns.

Q.    Okay.  Those complaints are prior to an event --

MR. CONNOLLY:  Objection; form.

Q.    (BY MS. PASSAMANECK)  -- or about what occurred at an event?

A.    Those --

MR. CONNOLLY:  Sorry.  Lori, just a reminder to pause a little to give me time to say my objection, please.

**99**

Q.    (BY MS. PASSAMANECK)  The next bullet, the last one on page 33, describes protests in relation to CPAN's Rocky Mountain Summit Part II, correct?

A.    Yes.

Q.    And they were carrying signs like "Trans Rights Are Human Rights" and "Eliminate the TERFs," correct?

A.    Yes, according to people that took images and observed the protesters as they were driving into the venue.

Q.    I apologize.  I'm not trying to be offensive.  I don't know what the term "TERFs" means.  Do you know what that means?

A.    I do.

Q.    And what is that a reference to?

A.    Trans-exclusionary radical feminists.

Q.    You agree that the term TERFs is derogatory?

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)  Okay.  It's fair to say that these signs are broader than protesting simply CPAN's use of pronouns to match sex at birth and deadnaming, correct?

**100**

MR. CONNOLLY:  Objection; form.

A.    I believe that it is inclusive of using people's birth names and biological pronouns.

Q.    (BY MS. PASSAMANECK)  It states that you spoke to the protesters for approximately 15 minutes.  Is that true?

A.    I -- two protesters entered the venue, and I was alerted by security because they were acting suspiciously, trying to record the event. They were sweating.  They were looking around.

And so I took the opportunity to sit -- well, to meet with them, and they shared their disagreement with the summit being hosted, and they ended up staying.  They both paid for a ticket, and they stayed for the event for approximately 20 minutes, and then left.

Q.    Their complaints about the summit were regarding the content of gender-affirming care and the discussion of trans issues generally, not just misgendering and deadnaming, correct?

MR. CONNOLLY:  Objection.

A.    It was -- sorry, I keep doing that.

MR. CONNOLLY:  Objection; form.

A.    It was inclusive of misgendering and -- as they stated in the conversation.  We actually

**101**

had a conversation where they accused me of misgendering, and I indicated that we use biological birth names and -- we use birth names and biological pronouns when discussing children with rapid onset gender dysphoria.

Q. (BY MS. PASSAMANECK) Were their complaints inclusive of but broader than simply misgendering and deadnaming?

MR. CONNOLLY: Objection; form. Objection; vague.

A. Can you restate that?

Q. (BY MS. PASSAMANECK) Sure. You had a discussion with these individuals for 15 minutes, and at least in the interrogatory response, you state that -- the interrogatory response states that they complained that CPAN promoted voices that do not support gender-affirming care.

And so my question is do you agree that their complaints were not limited to misgendering and deadnaming, but were broader, to include at least CPAN's position on gender-affirming care?

MR. CONNOLLY: Objection; form.

A. Yes. It was inclusive of using people's birth names and biological pronouns, and more broad to include our stance that gender-affirming

**102**

A.    I have been notified that venues have received complaints.  I have received comments on social media in reference to using individuals' birth names and biological pronouns, as well as for my views opposing gender-affirming practices on minor children.

Q.    (BY MS. PASSAMANECK)  In your answer you added not just simply misgendering or deadnaming, but the issue of gender-affirming care.

My question is limited to whether you have received a complaint from an individual at an event that you deadnamed or misgendered someone?

MR. CONNOLLY:  Objection.

A.    So you're saying at an event?

Q.    (BY MS. PASSAMANECK)  Correct.

MR. CONNOLLY:  Objection; form. Objection; asked and answered.

A.    So if you are saying at an event have I received a complaint, the answer is yes.  When those two protesters at the Rocky Mountain Summit Part II came and spoke to me, they specifically addressed with me my choice to use speech to use biological pronouns and to address people by their birth name, and they termed it as misgendering and deadnaming.

**103**

Q.    (BY MS. PASSAMANECK)   And we discussed
that event in the interrogatory response, correct?

A.    Correct.

Q.    Okay.   And you described those
individuals as protesters, correct?

A.    Yes.

Q.    You also mentioned that you've received
many complaints, but they are so voluminous you
were not able to collect all of them; is that fair?

MR. CONNOLLY:   Objection; form.

A.    Yes.   Sorry.   Yes, and many are oral as
well.

Q.    (BY MS. PASSAMANECK)   Okay.   Other than
those two individuals who were protesting at one of
your events, are there any other instances in which
someone complained to you solely about you
deadnaming or misgendering an individual?

MR. CONNOLLY:   Objection; form.
Objection; asked and answered.

A.    Are you asking at an event or before an
event or after an event?

Q.    (BY MS. PASSAMANECK)   Let's start with at
an event.

MR. CONNOLLY:   Objection; form.

A.    At the event, the one instance that I

**104**

disclosed to you in a prior question.

Q.    (BY MS. PASSAMANECK)   No other examples though, correct?

A.    I have no other examples at an event where an individual complained to me directly that I was using biological pronouns or birth names.

Q.    Have you received any complaints after an event about your misgendering and deadnaming of individuals at the event?

A.    Yes.

MR. CONNOLLY:   Objection; form.

A.    Sorry.   Yes.

Q.    (BY MS. PASSAMANECK)   Thank you.

Were any of those complaints limited to your misgendering and deadnaming, or were they broader and inclusive of the speech generally?

MR. CONNOLLY:   Objection; form.

A.    Yes.   In articles that are written, and also in online comments.

Q.    (BY MS. PASSAMANECK)   What articles are you referring to?   Are they the ones that we discussed in looking at CPAN's response to Interrogatory Number 2?

A.    Yes.

Q.    Online comments.   Sitting here today, can

**105**

you identify any online comment that complained about CPAN's misgendering and deadnaming at an event?

MR. CONNOLLY:  Objection; form.

A.    I have read through thousands and thousands of comments.  I can't state verbatim what those comments were, but alluding to the use of biological pronouns and birth names as bigotry and discrimination.

Q.    (BY MS. PASSAMANECK)  Okay.  I only have what you produced to me, so that's -- that is the problem.

When you refer to transgender individuals using their birth names and pronouns matching their sex at birth, are you intending to put them down?

MR. CONNOLLY:  Objection; form.

A.    No.  I'm attempting to speak the truth.

Q.    (BY MS. PASSAMANECK)  You're not intending to insult them, correct?

A.    No.

MR. CONNOLLY:  Objection; form.

Q.    (BY MS. PASSAMANECK)  You're not intending to harass them by using their birth names and sex at birth, correct?

MR. CONNOLLY:  Objection; form.

**106**

the future."  Do you see that?

A.    I do.

Q.    Okay.  You state, For example, at our last event, a transgender-identifying individual showed up at our event and told me he had come because he was concerned about -- concerned that we were not going to represent the perspective of the transgender community at our event.  Do you see that?

A.    Yes.

Q.    What event are you referring to?

A.    The Rocky Mountain Summit Part II this year.

Q.    And so he was -- strike that.

His complaint was not that CPAN was misgendering and deadnaming individuals, correct?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A.    His complaint was inclusive of that. This was one of the two individual protesters that I have discussed in prior answers.

Q.    (BY MS. PASSAMANECK)  Okay.  And then you state a little further down, "At the same event, two different parents each brought one of their children.  One child identifies as transgender and

**107**

the other identifies as nonbinary."

Did you interact with either of these parents or their children?

A. Yes.

Q. With both of them or just one?

MR. CONNOLLY: Objection; form.

A. I interacted with both parents and both children.

Q. (BY MS. PASSAMANECK) Okay. Let's start with parent one, let's say. Tell me what your interaction was.

A. I greeted them. I knew that they were in attendance. I welcomed them. And I spoke to the parents' child using the child's birth name and that it was nice to formally meet this child and that I hoped that the child would gain some perspective from the panel discussions.

Q. And what did the child say in response?

A. The child just responded with gratitude, just, Thanks. There wasn't much conversation from the child.

Q. Okay. Did the parent correct you for using the child's birth name?

A. No.

Q. Is it fair to say that the parent uses --

**108**

strike that.

Do you know whether that parent uses the birth name of that child in referring to that child?

MR. CONNOLLY:  Objection; form.

A.   The parent used the birth name of that child when talking with me.  I am not aware of how that parent addresses that child at home.

Q.   (BY MS. PASSAMANECK)  Okay.  Tell me about the second -- the interaction with the other parent and child.

A.   It was very similar.  I addressed the parent, hugged the parent.  I acknowledged the child and welcomed the child to the event.

Q.   And what did the -- what, if anything, did the child say in response?

A.   The child just nodded.

Q.   Did you use particular pronouns with the child?

A.   I cannot recall.  I don't believe so, but I can't say for sure.

Q.   You agree that when two people are talking to each other, the use of pronouns kind of falls to the wayside?

MR. CONNOLLY:  Objection; form.

**109**

We just talked about instances in which transgender individuals have attended CPAN events as described in paragraph 13 of your declaration, correct?

A.    Yes.

Q.    Setting aside protesters, are there any other instances that you recall sitting here today of transgender individuals attending CPAN events?

MR. CONNOLLY:  Objection; form.

A.    Yes.  I have observed individuals that identify as transgender at our events.

Q.    (BY MS. PASSAMANECK)  And have you interacted with any of those individuals?

A.    Can you clarify?

Q.    Did you speak with any of them?

A.    I know that at the Senate Judiciary Committee on 1312, that hearing, I was kind of forced into interacting with several people who do identify as transgender, as they were kind of physically blocking access to the restroom.  So I had to politely request, you know, Excuse me, may I please get by, so it was more just general conversation.

Q.    Okay.  That senate hearing was not a CPAN event, correct?

**110**

A.    We did host a press conference on the west steps of the Capitol that day, and there were these individuals.  Several individuals were present at the press conference, and later, from my perspective, were using intimidation tactics to make me feel uncomfortable.

Q.    So these protesters that were at this event, correct?

A.    I would say that they disagree with our organization's views.  They were not actively protesting at the event.  They were present at the event.

Q.    And how did you know those individuals were transgender?

A.    Just from observation.

Q.    Do you ever -- strike that.

You state that you knew these individuals were transgender from observation.  When you were interacting with someone -- actually, strike that.

Have you ever interacted with someone that you believe is transgender but don't have confirmation?

MR. CONNOLLY:  Objection; form.

A.    Can you explain what you mean by "confirmation"?

111

it impossible for CPAN and our leadership to effectively exercise our constitutionally protected right to speak in a manner that reflects our sincere belief that sex is immutable and fixed at birth."

Is that a true statement?

A.   Yes.

Q.   Prior to House Bill 25-1312, did you believe you were violating any Colorado law in your speech?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A.   I am not an attorney, nor am I -- have I gone through all of the state statutes, but prior to this bill becoming law, I did not believe we were violating any state statute.

Q.   (BY MS. PASSAMANECK)  The last sentence of paragraph 20 of your declaration, you state, "I understand the Colorado Civil Rights Division has also adopted regulations that prohibit, quote, unlawful harassment, unquote, which is -- it defines to include, quote, deliberately misusing an individual's preferred name, form of address, or gender-related pronoun."  Do you see that?

112

A.    I never read the statute prior to lobbying against 1312, and I cannot remember the bill number for the changes to CADA that created this circumstance for individuals that identify as transgender being discriminated against if people call them by their birth names or biological pronouns, but when I became aware that this was in place, I immediately silenced myself.

Q.    (BY MS. PASSAMANECK)  What is the "it" that you're referring to?  Are you referring to the regulation or House Bill 25-1312?

A.    The --

MR. CONNOLLY:  Objection.

THE DEPONENT:  I'm getting tired.  Sorry, guys.  Go ahead.  What was the objection?

MR. CONNOLLY:  Objection; form.

A.    Can you repeat the question again?

Q.    (BY MS. PASSAMANECK)  In your answer you said, Once I became aware of it, I immediately silenced myself, and my question is what is the "it"?  Is it the House Bill 25-1312 or the regulation that you're referring to in that answer?

A.    I'm --

MR. CONNOLLY:  Objection; form.

THE DEPONENT:  Sorry.  I might need to

**113**

take a break here.

A.   I am referencing -- it was 1312 that really grabbed my attention.  And, you know, I'm not an attorney.  I'm not a legislator.  And reading through all of these regulations and these bills is an overwhelming task for an attorney, never mind someone who is not an attorney.

But I became quite alarmed when 1312 was on the floor, and then this other bill, I cannot remember the number of it, that added discrimination protections for individuals who identify as transgender.  And I realized that I really needed to prohibit my speech and really make sure that I was in alignment, especially when Governor Polis signed these bills into law.

MR. CONNOLLY:  We have been going for about an hour now.  Can we take a break?

MS. PASSAMANECK:  I would love just a few more questions to finish up this line, and then we'll be very close to being done.

But it's up to you, Ms. Gimelshteyn.  Would you like a break now?

MR. CONNOLLY:  She did ask for a break, and she's having trouble with the objections.  We've been going an hour, so I would prefer it.  I

**114**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

-------------------------------------------------

ZOOM DEPOSITION OF ERIN LEE            August 21, 2025

-------------------------------------------------

Plaintiffs:

DEFENDING EDUCATION, et al.,

v.

Defendants:

AUBREY C. SULLIVAN, et al.

-------------------------------------------------

APPEARANCES:

       CONSOVOY MCCARTHY, PLLC
             By J. Michael Connolly, Esq.
                Paul Draper, Esq.
                1600 Wilson Boulevard, Suite 700
                Arlington, Virginia 22209
                   Appearing via Zoom on behalf of
                   Plaintiffs

       COLORADO ATTORNEY GENERAL'S OFFICE
             By Nora Q.E. Passamaneck
                Senior Assistant Attorney General
                Janna K. Fischer
                Senior Assistant Attorney General
                Dominick D. Schumacher
                Assistant Attorney General
                1300 Broadway, 10th Floor
                Denver, Colorado 80203
                   Appearing via Zoom on behalf of
                   Defendants CCRD, Sergio Cordova,
                   Geta Asfaw, Mayuko Fieweger,
                   Daniel S. Ward, Jade R. Kelly,
                   and Eric Artis

115

APPEARANCES (continued):

　　　COLORADO ATTORNEY GENERAL'S OFFICE
　　　　　By Talia Kraemer
　　　　　　Assistant Attorney General
　　　　　　1300 Broadway, 10th Floor
　　　　　　Denver, Colorado 80203
　　　　　　　Appearing via Zoom on behalf of
　　　　　　　Colorado Attorney General

**116**

Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom deposition of ERIN LEE, called by Defendants, was taken on Thursday, August 21, 2025, commencing at 9:05 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

                        I N D E X

DEPOSITION OF ERIN LEE

EXAMINATION BY:                                    PAGE

    Ms. Passamaneck                                  5

|            |                                  | INITIAL |
| EXHIBITS   |                                  | REFERENCE |
| Exhibit 1  | Declaration of Erin Lee          | 19 |
| Exhibit 2  | Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories | 37 |
| Exhibit 3  | Movie Screening: Art Club with Erin Lee flyer | 44 |
| Exhibit 4  | Protect Girls Sports in Colorado flyer | 56 |
| Exhibit 5  | Text messages between Erin Lee and Jennifer Sey re: Andres Bissonette Gutierrez | 57 |
| Exhibit 6  | Giving Parents a Voice Town Hall flyer | 60 |

**117**

| EXHIBITS (continued) | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 7 | (Not used.) | |
| Exhibit 8 | Colorado Federation of Republican Women District 8 Meeting, August 12, 2023, flyer | 63 |
| Exhibit 9 | Art Club PowerPoint presentation | 67 |
| Exhibit 10 | Notice of Parker Conservatives Meeting, September 4, 2024 | 65 |
| Exhibit 11 | TikTok video, Bee Gonzalez | 95 |

118

A     I'm not sure I understand that question either.  We have this lawsuit, but I don't believe outside of this we've utilized the court system, no.

Q     (BY MS. PASSAMANECK)  Did you bring this action to help promote PKC's mission of protecting kids and strengthening families in Colorado?

MR. CONNOLLY:  Objection; form.

THE DEPONENT:  Am I allowed to answer?

Q     (BY MS. PASSAMANECK)  Yes.

A     We brought this lawsuit to protect our ability to speak the truth in order to protect kids and strengthen families in Colorado.

Q     What do you mean by "speak the truth"?

A     Biological truth, male and female.

Q     And, in particular, PKC wishes to refer to individuals according to their sex at birth and names given at birth; is that a fair statement?

A     That's correct.

Q     At paragraph 4 of your declaration, Exhibit 1, the second sentence, you state the mission of PKC is to restore the principle that parents have a fundamental right to make decisions about their children's well-being and education. Is that a correct statement?

**119**

to give a yes or no answer.  I do not believe it's kind or loving to tell a child that they were born in the wrong body or that something is fundamentally wrong with them and needs to be changed.

Q    If a child tells their parent, Listen, I want my name now to be River instead of Joe, is it okay for the parent to call that child River?

MR. CONNOLLY:  Objection; form.

A    I'll say, again, that's not an easy yes or no answer.  There's too much nuance.  I do not believe it's kind or loving or right to tell a child that they are not their biological sex.

Q    (BY MS. PASSAMANECK)  So the difference is about it being tied to biological sex as opposed to categories of names that might be nicknames or other names that aren't tied to a name that does not reflect biological sex; is that fair?

MR. CONNOLLY:  Objection; form.

A    That's correct.  Children go by nicknames.  But, again, I don't believe it's kind or right to push a child into believing they are the opposite sex or rejecting their biological sex.

Q    (BY MS. PASSAMANECK)  In paragraph 4 of your declaration, in particular, the last sentence,

**120**

MR. CONNOLLY:  Objection; form.

A    Correct.  Although we are present all over the state all the time.  So no set physical location, but we frequent lots of public spaces all over the state through my advocacy and the volunteers of PKC.

Q    (BY MS. PASSAMANECK)  Understood.  We'll get to the actual events.  But there's no single location, correct?

MR. CONNOLLY:  Objection; form.

A    Correct.

Q    (BY MS. PASSAMANECK)  Okay.  Let's look at paragraph 10 of your declaration.  Let me know when you're there.

A    Okay.

Q    It says, "PKC hosts meetings and other events in places of public accommodation."  Do you see that?

A    Yep.  Yes.

Q    When you included this sentence, what did you mean by a place of public accommodation?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A    I'm not an attorney nor did I define

**121**

public accommodation in statute.  But we host meetings in public spaces where anyone is welcome to attend.

Q    (BY MS. PASSAMANECK)  So that's what you meant when you wrote the words, "PKC hosts meetings and other events in places of public accommodation"?

MR. CONNOLLY:  Objection; form.

A    Correct, yes.  We only host meetings in places -- public places where anyone is welcome to attend.

Q    (BY MS. PASSAMANECK)  Okay.  The last sentence you state -- of paragraph 10, you state, "For example, in July and August of 2024, PKC leased space in Denver-area restaurants to host signature-gathering events in support of its ballot initiatives.  PKC publicized these events on social media."  Do you see that?

A    Yeah.  Yes.

Q    Why did you choose these two events to highlight in this paragraph?

MR. CONNOLLY:  Objection; attorney-client privilege.  I instruct the witness not to answer.

Q    (BY MS. PASSAMANECK)  I assume you're taking your attorney's counsel not to answer my

**122**

educational institution, correct?

MR. CONNOLLY:  Objection; form.

A    We are not a physical educational institution, but we are an institution that promotes education.

Q    (BY MS. PASSAMANECK)  And as an institution that provides education, you have no physical location, correct?

MR. CONNOLLY:  Objection; form.

A    We do have a physical address, but not out of which we are educating people, correct.

Q    (BY MS. PASSAMANECK)  Thank you.  And PKC is not a public building, park, arena, theater, hall, auditorium, museum, library, exhibit, or public facility of any kind, whether indoor or outdoor?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked a legal conclusion.

A    That is correct, but we do operate in all of these places.

Q    (BY MS. PASSAMANECK)  Understood.  But you're not any of those facilities, correct?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked

**123**

you have it.  I would just like you to identify whether this is the flyer for that event.

A    Yes, that's the flyer.

Q    Okay.  And so this was an event cosponsored by the Denver University Chapter of Turning Point?

A    That's correct.

Q    As a cosponsor, what was PKC's role as opposed to Turning Point's role?

MR. CONNOLLY:  Objection; form.

A    We shared equal responsibility of publicizing the event to garner attendance, but Protect Kids Colorado was the sole speaker at the event showing the film, and then myself and our chairman, Kevin Lundberg, speaking.

Q    Turning Point reserved the venue at the University of Denver, correct?

MR. CONNOLLY:  Objection; form.

A    Correct.  A University of Denver student reserved that space, and then we were actually moved to a different room because of threats made against the event.

Q    (BY MS. PASSAMANECK)  Because a Denver University student reserved the room, you can't speak to the terms and conditions placed on the

**124**

reservation, correct?

MR. CONNOLLY:  Objection; form.

A     Correct, although I did communicate with the -- I believe he was the head of the College of Business prior to the event about expectations.

Q     (BY MS. PASSAMANECK)  Do you know whether Turning Point was able to reserve the space only because it was a Denver University organization?

A     I am not sure.

Q     And we've already discussed this, but the documentary Art Club is about you and your family, correct?

A     For the most part, yes, that's the main theme of the film.

Q     Does PKC own the rights to the movie?

A     No.  I guess I own the rights to the movie, although our chairman, Kevin Lundberg, is the filmmaker.  And so it was a project that he and I did together, again, as a means to educate the public on the issues that PKC represents.

Q     And was this event open to the public or only students?

MR. CONNOLLY:  Objection; form.

A     This event was open to the entire public, and we did have lots of people come who were not

**125**

Denver University students.

Q    (BY MS. PASSAMANECK)  And it was a free event, correct?

A    Correct.

Q    Did people need to RSVP for the event?

A    People did RSVP for the event; there was a link for them to do so.  But it was not a requirement.  That was just for us to gauge potential attendance.  And as it turned out, there were way more people than who RSVPed.

Q    And, in fact, there were a number of protesters that came to this event, correct?

A    Correct.  There were hundreds of protesters.

Q    Focusing on the event itself, you weren't engaged in any commercial activity in showing this movie, correct?

MR. CONNOLLY:  Objection to the extent the witness is being asked for a legal conclusion.

A    I don't believe so.  We just showed the film and gave speeches.

Q    (BY MS. PASSAMANECK)  The protesters that were at this event, it's fair to say they weren't there to have an open discussion about PKC's mission; is that fair?

**126**

MR. CONNOLLY:  Objection.  Objection; form.

A    That is correct.  There was a petition that was circulated that was actually signed by Colorado legislators and others to prevent my ability to speak at that event, and hundreds showed up.  They were outside the window, outside the door, outside the building yelling at me.

Q    (BY MS. PASSAMANECK)  They weren't there to receive any goods or information from PKC by attending this event, correct?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked for a legal conclusion.

A    I would say not commercial goods, but the people who were in the room did watch the film and engage in my conversation.

Q    (BY MS. PASSAMANECK)  I'm talking about the protesters, the hundreds of folks that were demonstrating outside and, I saw the video, I think also inside the room at certain points.  The protesters weren't there to obtain information from PKC, right?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.  Objection to the

**127**

extent the witness is being asked for a legal

conclusion.

A    I don't know that I can really speak to their intent in being there.  But I can say the people who were in the room did, again, watch the film and engage with our information-sharing.

Q    (BY MS. PASSAMANECK)  Okay.  You also held -- we talked briefly about the two events that you held at restaurants, correct?

A    Yes.

Q    And those are included on pages 20 to 21. Do you see that?

A    Yes.

Q    That's the Save Girls Sports Rally and the PKC Signing and Notary Event, right?

A    Yes.

MR. CONNOLLY:  I'm sorry, did you mean pages 21 and 22?

MS. PASSAMANECK:  Are you looking at the PDF pages or -- I'm looking at the number on the printed copy.

MR. CONNOLLY:  Yeah, and the one I have starts with In The Zone Sports Bar on page 21 and then Wide Open Saloon on page 22.

MS. PASSAMANECK:  Oh, you are absolutely

**128**

goes on, but, yes, they do provide that.

Q    Okay.  Thank you.  We're going to flip around a little bit.  I'll get the pages correct. Going to the interrogatory responses, Exhibit 2, I just want to direct your attention to paragraph -- page 25.

A    Okay.

Q    The last paragraph on page 25 references your speaking engagements, and the last sentence, which starts on page 25 with, "When speaking," and it goes on to 26, states that you often rely on a PowerPoint presentation that explores the harms caused by transgender ideology, and then, "Ms. Lee frequently refers to transgender-identifying individuals using their birth names and/or biological pronouns when delivering the presentation."  Do you see that?

A    Yes.

MS. PASSAMANECK:  I am going to drop into the chat -- I'm pausing just because I've taken my exhibits out of order.  So I'll ask Lisa to mark the exhibit I just dropped into the chat as the next exhibit in line.  I believe we are at --

Oh, Ms. Lee, were you holding up a number of fingers?

**129**

This should be Exhibit 9 to Ms. Lee's deposition.

(Exhibit 9 was marked.)

Q    (BY MS. PASSAMANECK)  Let me know when you've had a chance to open up Exhibit 9.  It's a larger exhibit.

A    Okay.  I have it open.

MR. CONNOLLY:  Just for the record, so the file name of this is Exhibit 7, but you are -- you want the court reporter to mark this as Exhibit 9?

MS. PASSAMANECK:  Correct.  I should have listed these all as tabs so we wouldn't have this issue.  This is what happens when you take things out of order in your outline.  So ignore my PDF names if that's okay.  We'll call this Exhibit 9.

Q    (BY MS. PASSAMANECK)  My question for you, Ms. Lee, is whether this is the presentation that you were referring to in this interrogatory response?

A    Yes.

Q    Do you also use this presentation for PKC events?

A    I have used portions of these slides for PKC-sponsored events, yes.

**130**

Q    Now, I understand in the interrogatory response it states that, "Ms. Lee frequently refers to transgender-identifying individuals using their birth names and/or biological pronouns when delivering the presentation."  My question for you is I didn't see any slides that themselves refer to transgender-identifying individuals by birth names or pronouns; is that correct?

A    Correct.  That's correct.

Q    Is there a particular slide or slides in which you refer to transgender-identifying individuals using their birth names and their biological pronouns?

A    Yes.

MR. CONNOLLY:  Ms. Lee, if you need to take your time to review the PDF, please feel free to do so.

A    Yes.  Slide 7, there's an individual who goes by the name of Simon Wellington who was involved in the grooming and harming of my child in her public classroom.  This person, at the time they were in my daughter's classroom, went by the name Charlie, and Charlie is a female, and I only refer to Charlie as Charlie when describing what happened to my daughter using Slide 7.

**131**

Q    (BY MS. PASSAMANECK)  And just to make sure we're on the same page, is Slide 7 the one with the title "(GROOMERS CONT'D)"?

A    Correct, yes.  The first three images are Simon, whom I call Charlie.

Q    Okay.  Has this individual ever attended one of your talks?

A    Yes.

Q    And have you called them out during this slide?

A    I don't believe Charlie was present when I used slides, so this would not have been applicable to them.  But I do believe I referred to them as Charlie openly in my talk.

Q    Other than referring to this individual, are there any other times you refer to transgender-identifying individuals using their birth names and/or their biological pronouns in this presentation?

A    Yes.  Slide 8 is a video that includes our school board president in the background, and I do reference that she has a trans-identified son. I do not -- I'm sorry, a trans-identified daughter. I do not refer to her daughter as her son.

Q    And you provide that qualifier as

**132**

trans-identifying son to identify that, although the sex at birth is -- I'm going to get this mixed up, I apologize -- is female and they present as male?

A    Correct.

Q    Any other slides?

A    I'm sorry.  It's very confusing.  She's a trans-identified daughter who now identifies as a son, and I refer to that person as her daughter.

Q    Okay.  Just to make sure the record is clear then, I just want to make sure, in that Slide 8 you were referring to a child who identifies as male, but was born female?

A    Correct, and I believe adult child.

Q    And you were only referring to them by gender, not name or anything else?

A    Correct.

Q    Okay.  In what context are you bringing that up, beyond saying this individual has a child that is transgender?

MR. CONNOLLY:  Objection; form.

A    On that particular slide, that's the extent, just, You'll see in the background our school board president, who has a daughter who now identifies as a male or has a trans-identified

**133**

daughter.

Q     To your knowledge, has that individual, either the mother or the trans child of that mother, attended your events?

A     Not to my knowledge, but could be.

Q     And how did you become aware of this individual?

A     I became aware upon a conversation with the school board president.

Q     Okay.  Any other slides in which you refer to transgender-identifying individuals?

A     Yes.  So Slide 11, when I -- sorry.

Q     If you don't mind, tell me the slide and the title, just so we're on the same page.

A     Slide 11, Existing Colorado Laws to Know & Understand.

Q     Thank you.  And tell me the context in which you refer to transgender-identifying individuals in this slide.

A     Sure.  Several things.  When discussing House Bill 24-1039, "Non-Legal Name Change," I always reference a conversation I had with the bill sponsor, Senator Janice Marchman, where I pressed her, What if five-year-old Billy wants to be Sally, and the parents say, Don't transition my child?

**134**

And her response was, Then we will respect Sally's wishes. So it's a hypothetical situation, but I refer to this child as Billy, not Sally.

The other is House Bill 24-1071, Tiara's Law. Tiara is a man named Duane, and I would prefer when describing this law to say that Tiara is a man named Duane, and I specifically say, This man runs a child drag ring in Colorado Springs where he pimps out children to dance sexually for adults for tips.

And the reason that's so important is that Duane is a convicted felon. His record is under the name Duane Kelley. His record includes lewd behavior with children and assault. And I feel it's very important to inform my community that this man with a criminal record under the name Duane has been put on a pedestal to pass this law to enable him to erase his criminal history. So that's one where it's really imperative that I can inform my community of Duane Kelley's criminal history.

Q     And is Duane Kelley still in prison?

A     No.

Q     Has this individual attended your talks before?

**135**

A    Yes.  Duane has been present at a rally at the capitol.

Q    And did you interact with this individual?

A    I did not, no, but members of PKC did.

Q    And what was that interaction, if you were told or saw?

A    Not positive.

Q    Could you describe what occurred?

A    Yes.  For example, when this law was being heard in the legislature, there was an altercation between one of our proponents on our Girls Sports initiative, Rich Guggenheim, who referred to Duane as Duane in the Colorado, I believe it was a house committee hearing, it could have been a senate committee hearing, I don't recall, where Rich was then silenced and kicked out of the committee for refusing to call Duane Tiara. I believe this was at the time that Rich was a named proponent on our ballot initiative.

Q    That was at the capitol that that occurred?

A    Correct.

Q    So both individuals had the right to be there and voice their opinions, correct?

**136**

A    In my opinion, yes.

Q    Any other instances that you can recall sitting here in which you would use this presentation and refer to transgender-identifying individuals?

A    Yes, two things.  So Slide 13, Lessons from the Colorado Department of Ed for First Grade, when I describe Sylvia and Marsha start a revolution, I refer to them as transvestite men -- and I honestly don't know if they're living or not anymore, but I refer to them as transvestite men who run a prostitution operation for children.

Q    Okay.  And what else?

A    And then Slide 14, 2025 Leg Update, when I reference House Bill 25-1309, and I go through who sponsored that bill, I refer to Representative Brian Titone, who goes by Brianna.

Q    And has Representative Titone attended any of your events?

A    Not to my knowledge.

Q    Marching on.  Any others?

A    I don't believe so in these slides.  I will say one other person that I often refer to that's not referenced in the slides is a reporter by the name of Sean Beedle, who goes by Heidi, who

**137**

has been present at my events, and I do refer to him as Sean.

Q    Okay.  Other than the fact of misgendering, is there any other content or -- actually, strike that.

Beyond the fact of referring to an individual by their biological sex, are you providing any commentary about that decision?

MR. CONNOLLY:  Objection; form.

A    I mean, when I talk about Tiara's Law and Duane Kelley, I'm pretty explicit that it's imperative that people understand his name that is attached to his criminal history.

Q    (BY MS. PASSAMANECK)  You are not commenting that all transgender individuals, for example, are sexual predators, though?

MR. CONNOLLY:  Objection; form.

A    No.

Q    (BY MS. PASSAMANECK)  And you're not making any references to transgender individuals, generally, and their characteristics?

MR. CONNOLLY:  Objection; form. Objection; misstates the testimony.

A    No.  But if you look at slide -- let me pull it up here -- Slide 16, How to Protect &

138

Inoculate the Children in your Life, when I go over bullet point Number 4, I will always say that there are only two sexes, male and female; that you cannot change your sex; and that it's imperative that you teach your children that they could not have been born in the wrong body; they cannot change their sex.

Q    (BY MS. PASSAMANECK)  And that's your opinion about biological sex, generally.  It's not a judgment on transgender individuals; is that fair?

MR. CONNOLLY:  Objection; form.

A    That's a hard question to answer.  It's my opinion, but it's a biological fact.

Q    (BY MS. PASSAMANECK)  Okay.  If you haven't gotten confused with all the exhibits, let's turn back to Exhibit 2, which is the interrogatory responses.

A    I've got it.

Q    Okay.  And on page 25 -- Michael will hold this to me, so I want to make sure that I get the page correct.  Yes, on page 5, the first sentence after the chart states, "PKC plans to organize and/or (co-)sponsor additional public events in the future and is actively seeking to

**139**

with your child, not the mere fact they are transgender, correct?

MR. CONNOLLY:  Objection; form.

A    That's correct.

Q    (BY MS. PASSAMANECK)  In paragraph 3 (sic) of your declaration, Exhibit 1, you state that an individual who you know to identify as transgender came to your event at a recreation center.

A    I'm sorry, I'm not following.  On the declaration, which page was that or which paragraph?

Q    Paragraph 13.  And I did paraphrase, but I'll read it.  The last sentence states, "For example, a few weeks ago we sponsored an event at a recreation center that was open to the public.  An individual who I know to identify as transgender came to the event."  Do you see that?

A    Yes.

Q    Was this the Give Parents a Voice Town Hall that you're referring to?

A    Yes.

Q    And how did you know the individual was transgender?

A    I am familiar with Sean Beedle.  He is a

**140**

reporter from the Colorado Times Recorder who has frequently attended our events and frequently posted about me and written articles about Protect Kids Colorado.

Q    Okay.  So the individual was there in a reporting context?

MR. CONNOLLY:  Objection; form.

A    I can't say for certain what -- what his intent was being there.  I don't believe an article came out as a result of his attendance.

Q    (BY MS. PASSAMANECK)  Did you interact with the reporter?

A    I did.

Q    Tell me what occurred.

A    It was a very friendly interaction.  I believe, and I'm not certain if I did it when I was onstage with the microphone or after I had finished speaking, but I did reference that Sean Beedle was in the room for others to hear.  And it just so happened my husband was sitting next to him in the crowd, unknowingly.  And so we had a very cordial, brief interaction saying hello.

Q    Just so I understand the sequence of events, you saw the reporter in the audience.  You referred to him and said, Hey, this reporter, you

**141**

referred to him by his birth name, is present.  And then subsequently he had a friendly interaction with your husband; is that a fair summary?

MR. CONNOLLY:  Objection; form.

THE COURT REPORTER:  I didn't hear the answer.  I'm sorry.  Did you answer that question?

THE DEPONENT:  I didn't.

A    Correct.  Brief, a very, very brief interaction with my husband.

Q    (BY MS. PASSAMANECK)  Did this individual leave after you had used their birth name?

A    I want to say he stayed for a few minutes after that occurred.

Q    Did he correct you in using his birth name?

A    Did not.

Q    So other than this instance with this reporter and outside of protesters, can you identify any other instances in which a transgender individual attended one of your events?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A    That's a really hard question to answer because I don't assume anyone's sex.  So is it possible transgender individuals have been in the

**142**

crowd?  Very possible.  That's just a tough one to answer.  Yes, I assume there have been transgender individuals at nearly every event that we've had, but I have not called them out by name from the stage.

Q    (BY MS. PASSAMANECK)  So I understand that you want to use birth names and pronouns consistent with an individual's birth sex.  How does that work when you don't assume the sex of an individual?

MR. CONNOLLY:  Objection; form.

A    Good question.  If I know the individual is transgender, again, I -- it is against my firmly held beliefs to further that belief that they were born in the wrong body and can change their sex.

Q    (BY MS. PASSAMANECK)  In interacting with someone, are you planning to ask about their birth names and sex at birth?

MR. CONNOLLY:  Objection; form.

A    I mean, not typically a question I lead with, no.  But, for example, our legislator, reporters, people who I'm directly involved with in my children's school, especially people who I know as their birth sex who then change their name and pronouns, I do not wish to have to adhere to that

**143**

change.

Q    (BY MS. PASSAMANECK)  Have you ever interacted with someone you believed was transgender but did not have verification of that fact?

A    Yes.

Q    And in that context, have you explained your belief that you should be using birth names and sex at birth such that could they verify what you should be using with them?

MR. CONNOLLY:  Objection; form.

A    I have not asked them to verify, but, yes.  I mean, for example I gave a speech at a school board meeting in my neighboring school district, and there was another person who was in the same lineup as me who was proudly proclaiming that they were transgender, and I did not feel comfortable using that female name.

Q    (BY MS. PASSAMANECK)  And what did you say to that individual or about that individual?

MR. CONNOLLY:  Objection.

A    To them directly, I believe I said something to the effect of, Respectfully, I'm not going to use that name.  I don't think it's kind or loving to further that mentality.

144

Q    (BY MS. PASSAMANECK)   Did you ask for a name to refer to them as?

A    No, because I already had their name in the lineup of speeches, so that had already been called.

Q    Did you ask for a name you could refer to them as?

A    No.

Q    Turning back to interrogatory number -- the interrogatory responses.  There's a second interrogatory that has some PKC information.  Let me go to the page so I can direct you, but if you would pull up Exhibit 2.

A    Okay.

Q    And on page 31, there's an interrogatory, it's labeled Number 2, and it says, "As to all Plaintiffs, identify all instances in which any person has complained about Plaintiffs' use of incorrect pronouns and deadnames of transgender individuals."  Do you see that?

A    Yes.

Q    Okay.  And starting on page 34, there's Protect Kids Colorado that states, "To the best of its recollection, PKC is aware of the following instances in which someone has complained about the

**145**

use of pronouns and/or names of transgender individuals," and there's a bulleted list.  Are you familiar -- have you seen this list before?

A    Yes.

Q    I'm not asking for any attorney interactions in making this list, but I assume these events involved you?

A    Correct.

Q    In reading these events -- and we can go line by line, but I'm going to see if I can ask some summary questions.  In my review of these, none of these complaints are about PKC's misgendering or deadnaming an individual on its own, that there were other things involved in these complaints; is that fair?

MR. CONNOLLY:  Objection; form.

Ms. Lee, if you need to -- since she's summarizing, if you need to review the bullets, feel free to do so.

A    So I can -- there are several points where people are upset by me in my PKC capacity misgendering and deadnaming.  For example, Bee Gonzalez.

Q    (BY MS. PASSAMANECK)  Now, in particular, that's a bullet at the bottom of page 35 where Bee

**146**

Gonzalez posted a video on TikTok.  And my understanding is that there is a custody issue between Ms. Gonzalez and her husband, and the child is kind of stuck in the middle; is that fair?

MR. CONNOLLY:  Objection; form.

A    That's correct.

Q    (BY MS. PASSAMANECK)  This TikTok wasn't stemming from any event that you had held; is that fair?

MR. CONNOLLY:  Objection; form.

A    Well, this -- not necessarily.  This stemmed from Ms. Gonzalez's child's attendance at a CPAN event where PKC was present and my daughter and I spoke, and also my Twitter account, and my public testimony for 1312.

Q    (BY MS. PASSAMANECK)  And so it's fair to say Ms. Gonzalez -- let me back up.

The interaction -- strike that.

Ms. Gonzalez isn't upset simply that you referred to her child using birth name, but also the transition of that child, correct?

MR. CONNOLLY:  Objection; form.
Objection; misstates testimony.

A    I'm not sure I understand the question, but my understanding as I watched the video is it

**147**

was entirely related to me using -- referring to her child as a girl, as her daughter, and not using the correct names and pronouns.

Q    (BY MS. PASSAMANECK)  So CPAN had an event in which Bee and her child were present -- and I see you shaking your head, so I'll stop.

A    CPAN had an event in which Bee's child and her father were present.

Q    Okay.  And the child's father wants the child to go by birth name and sex, correct?

MR. CONNOLLY:  Objection; form.

A    Correct.

Q    (BY MS. PASSAMANECK)  And Bee's mother -- sorry, the mother disagrees and wants the child to be referred to by their new name, correct?

A    That's my understanding.

Q    And so it's your testimony that Ms. Gonzalez's TikTok was only about the fact that you had misgendered her child?

MR. CONNOLLY:  Objection; form.

A    That's how I interpreted it, yes.

Q    (BY MS. PASSAMANECK)  She had also appeared in the video, and you can tell me if you disagree -- I don't want us to have to watch the whole video together -- seems upset about you

**148**

referring to her child at all; is that fair?

MR. CONNOLLY:  Objection; form.

Ms. Lee, if you cannot remember, we can watch the video as well and -- or, sorry.  I guess I won't -- if the video -- if you need the video to refresh your recollection, you may ask Ms. Passamaneck for it.

A    I think that would be most appropriate. Again, I only recollect her referring to me misgendering and deadnaming.  That's where the threat of lawsuit came from.

Q    (BY MS. PASSAMANECK)  Didn't she also refer to the fact that -- let me strike that.

Didn't she also intimate that your story with your oldest child and the ex-husband's story with their child was very similar?

MR. CONNOLLY:  Same objection.  In addition, objection; form.

A    I do recall her saying something to the effect of how convenient that he met you and now his story is your story.  But it might be beneficial to watch the clip.

Q    (BY MS. PASSAMANECK)  Okay.  You agree that people are very passionate and emotional about their children?

**149**

A    Yes.

MS. PASSAMANECK:  Why don't we take a break and go off the record.

MR. CONNOLLY:  Sounds good.

(Break taken.)

Q    (BY MS. PASSAMANECK)  Ms. Lee, I want to get the order of operations.  We were talking about a woman, Bee Gonzalez, who has a transgender child. Do you recall that, our discussion previously?

A    Yes.

Q    Okay.  And I understand that Ms. Lee (sic) made a TikTok complaining about your reference to her child using birth name and sex, correct?

A    Ms. Gonzalez did, yes.

Q    Thank you.  Ms. Gonzalez did.  Did that TikTok occur before or after her child attended a CPAN event which PKC was also at?

MR. CONNOLLY:  Objection; form.

A    After.

Q    (BY MS. PASSAMANECK)  Okay.  So the order of operations is the child's father took her to this event, Ms. Gonzalez was upset about hearing of the event and made this TikTok; is that fair?

MR. CONNOLLY:  Objection; form.

**150**

A    I actually have no idea how she felt about her child attending the event.  But in my understanding, the video was just referencing me referring to her child incorrectly.

MS. PASSAMANECK:  Okay.  Let's mark as Exhibit 11 a video that was produced to us labeled DE_000303.

(Exhibit 11 was marked.)

Q    (BY MS. PASSAMANECK)  Let me know if you're able to open it, Ms. Lee.  If not, I can play it on my computer.  It's a rather large document -- or, rather, video.

A    It opened, yes.

Q    Okay.  Before playing it, is this the TikTok video that you are referring to?

A    Yes.

Q    Okay.  I am going to see if I can't share my screen and play it through my computer for us all to be able to see it and be on the same page, sound good?

A    Yes.

Q    Okay.  Just so you're aware, the reason we put things into the chat as well is I want to make sure the court reporter has it for the record.

Okay.  I'm going to play this, and then

**151**

Q    Ms. Gonzalez referenced a number of social media posts you had made either referencing or discussing her child.  What were those social media posts?

A    To my recollection, I only ever made the one post that she shared in that video referencing a family -- is it Family Institute of Illinois article that the ex-husband, Dustin Gonzalez, was quoted and I was quoted in as well.  I don't believe I've ever made any post before or after that particular one on X.

Q    It's fair to say she does not want you discussing her child in the public?

MR. CONNOLLY:  Objection; form.

A    I would say that's fair to say.

Q    (BY MS. PASSAMANECK)  And she was upset that you had mentioned her child at all?

MR. CONNOLLY:  Objection; form.

A    I perceive that as she was upset I referenced her child as a girl, as a daughter, as I do my child and my daughter.  That's why she made that reference.

Q    (BY MS. PASSAMANECK)  But she told you not to speak about her child, right?

MR. CONNOLLY:  Objection.

**152**

A    Correct.

Q    (BY MS. PASSAMANECK)  So while she mentioned the pronouns and name, she's telling you not to mention her child whatsoever?

MR. CONNOLLY:  Objection; form.

A    I believe she said if you continue to refer to my child or do what you do to your daughter to my daughter, then she'll see me in court, and what I do to my daughter is accurately sex her.

Q    (BY MS. PASSAMANECK)  Beyond accurately sexing your child, you have provided some services to help your child.  I don't want to get into details of your child, but I just want to make sure we're not just misgendering here.  There was a transition issue here; is that fair?

MR. CONNOLLY:  Objection; form.

A    My child was secretly transitioned, and I did not go along with her new name and pronouns. So I didn't actually -- I didn't provide any services to my daughter outside of counseling, which the counselors are legally required to affirm my child's gender confusion, and I objected to that.  I'm not sure what she means by doing to her daughter what I do to mine other than accurately

**153**

referring to her by her biological sex.

Q    (BY MS. PASSAMANECK)  Does misgendering, in your use of the word, simply involve using different pronouns and names as opposed to a larger set of interactions, especially in the child context?

MR. CONNOLLY:  Objection; form.

A    I'm not sure I understand the question. But I think it's important for me to note that I don't believe in gendering.  There are two biological sexes, male and female.  There are now seemingly infinite genders, but I don't acknowledge that.  I just believe that there are two sexes.

Q    (BY MS. PASSAMANECK)  But with Ms. Gonzalez's child, when she says, "Don't speak about my child," that's also a reference to the transition of that child, not just the decision to use different pronouns and names, correct?

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.

A    I'm not sure how to answer that.  I really perceive this situation as she does not want me to call her daughter her daughter or to reference Dustin's child as a daughter.  All I've really done in reference to talking about them is

**154**

talk about this transition in that one post.

Q    (BY MS. PASSAMANECK)  Based on that video, do you think she's fine with you discussing her child at all?

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.

A    Based on that video, no.  But, again, the only time I've ever referenced her child is referring to that child's transition to the opposite sex -- or non-binary, it seems.  She said they -- they/them.

Q    (BY MS. PASSAMANECK)  So it's the transition, not just the fact of what name and pronouns to use?

MR. CONNOLLY:  Objection; form. Objection; vague.  Objection; misstates testimony.

A    Transition in this case is just the use of name and pronoun.  This child has been socially transitioned, which is just referring to them as the opposite sex and a different name and pronoun. So in my opinion, that's -- transition is synonymous with just names and pronouns in this case.

Q    Transitioning can involve more than just use of pronouns, though, correct, and name?

**155**

Q    (BY MS. PASSAMANECK)  So other than children that are in the public, you would not reference or discuss specific children as a matter of privacy; is that fair?

MR. CONNOLLY:  Objection; form.

A    Correct.  I've only ever referenced children of the parents that have come to Protect Kids Colorado for support.

Q    (BY MS. PASSAMANECK)  We were discussing complaints about misgendering that were listed in Exhibit 2, Interrogatory Number 2, on pages 34 through 36, and you had identified the interaction with Ms. Gonzalez as an event where there was a complaint about misgendering.

Since I don't want to summarize, I just want to walk through these.  Do you have the document open?

A    I do.

Q    The first one is an incident with an individual named Ms. Chambers, correct?

A    Correct.

Q    Okay.  That incident was not about misgendering alone, correct?

MR. CONNOLLY:  Objection; form.

A    I cannot interpret what drove them to

**156**

involve Child Protective Services on my family, but it's my understanding it's entirely related to my unwillingness to call my daughter my son.

Q     (BY MS. PASSAMANECK)  Okay.  And this incident did not stem from any misgendering at any PKC event, correct?

A     That's correct.

MR. CONNOLLY:  Objection; form.

Q     (BY MS. PASSAMANECK)  The second bullet about February 22nd, 2024, is also regarding Ms. Chambers, correct?

A     Correct.

Q     And that complaint was not about any misgendering that occurred at a specific PKC event, correct?

MR. CONNOLLY:  Objection; form.

A     Correct.  I believe it was in reference to -- it was more general, I think, our unwillingness to acknowledge transgender children.

Q     (BY MS. PASSAMANECK)  Okay.  The fourth bullet, which is from the fall of 2023 to spring of 2024, again, it's regarding Ms. Chambers.  That series of events and posts was not specific to any misgendering by PKC at any specific event, correct?

MR. CONNOLLY:  Objection; form.

**157**

A    Correct.  That was in reference to me not gendering my child the way this woman wanted me to.

Q    (BY MS. PASSAMANECK)  The March 2024 incident in which you reported death threats, those death threats were not specific to any misgendering at a specific PKC event?

MR. CONNOLLY:  Objection; form.

A    They were in reference to my presence and speech and showing the Art Club film, which in their perception could be misgendering my child and others.  So I can't say for certain, but I do believe that my unwillingness to transition my own child and call my daughter Chloe by the name Toby, as we describe in that film, led to those death threats.

(Ms. Passamaneck disconnected from Zoom.)

THE COURT REPORTER:  Should we go off the record for a minute?

MR. CONNOLLY:  Yes.

(Break taken.)

(Ms. Passamaneck reconnected to Zoom.)

MS. PASSAMANECK:  Just to get us back aligned, would the court reporter please read back the last question?

(The last question was read.)

**158**

Q    (BY MS. PASSAMANECK)   Would you answer that question, Ms. Lee?

A    Yes.  It was April 2024, for the record, that event.  I do believe that the death threats were tied to my unwillingness to call my daughter my son, to refer to my child as a boy.  There were protesters in the room who made horrific comments to my husband and myself, that we were bad parents, that we deserve to die.  So I can say with -- actually with certainty that at least some of the death threats were tied to my unwillingness to call my daughter my son.

Q    Those death threats were not only because of your refusal to call your daughter your son, but rather your advocacy on gender ideology issues, correct?

MR. CONNOLLY:  Objection; form.  Objection; misstates testimony.

A    I can't say for certain but that's possible.

Q    (BY MS. PASSAMANECK)   Well, this bullet states, "In March 2024, PKC Executive Director Erin Lee filed a report with the Federal Bureau of Investigation regarding the death threats she had received because of her advocacy on gender ideology

**159**

issues."  Is that a correct statement?

A    That's correct.

Q    So it's not just a matter of misgendering, but it is gender ideology; is that fair?

MR. CONNOLLY:  Objection; form.

A    That's fair to say, yes.  The April 2024 threats, as I said, I can confirm that some of them were directly related to misgendering my own child.

Q    (BY MS. PASSAMANECK)  Your misgendering of your child was not at a specific PKC event, though.  That was a reference to how you were raising your child; is that fair?

MR. CONNOLLY:  Objection; form.

A    In April 2024, as we were showing the Art Club film and I gave a speech afterwards at Denver University, yes.  That was explicitly -- at least one of the death threats I received that day were in relation to me not transitioning my child, not calling her my son.

Q    (BY MS. PASSAMANECK)  Okay.  I'm looking at the bullet that says, "In March 2024."  You keep mentioning April 2024.  I'm guessing you may have gotten death threats in both March and April; is that fair?

**160**

A    Correct.

Q    Okay.  I just want to make sure we're talking about the same series of events, because the next bullet talks about the screening where you were told that you were transphobic and also accused of misgendering transgender-identifying people.  Again, these objections and protests were about your gender ideology, not limited to the fact of misgendering an individual; is that fair?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A    Not limited to that, but definitely included my unwillingness to transition my daughter and call her my son.

Q    (BY MS. PASSAMANECK)  Okay.  Is it fair to say that -- other than the Bee Gonzalez event, which we discussed and looked at the video, are there any complaints you received that are specific to only misgendering or deadnaming at a PKC event?

MR. CONNOLLY:  Objection; form.

A    I guess I wonder your interpretation of complaints.  I have certainly gotten social media messages in response to me using inaccurate names and pronouns at PKC events, but I'm not sure what constitutes a complaint.

**161**

Q    (BY MS. PASSAMANECK)  What social media post -- what complaint have you received on social media about misgendering at an event?  Let's start with that.

A    Good question.  I received a slew after that April 10th, 2024, event, and I know in person at the event people did raise the complaint that I was misgendering and deadnaming.

Q    Those individuals that were protesting were there to protest, though, correct?

MR. CONNOLLY:  Objection; form.

A    I can't assume their intent in being there.  There were people who sat in the room quietly and watched the film who still raised a complaint afterwards.

Q    (BY MS. PASSAMANECK)  Other than Ms. Gonzalez, have you received any complaint specific to an interaction you had with an individual at a PKC event?

MR. CONNOLLY:  Objection; form.

A    I don't recall at the moment.  I have to say that I've been just barraged with hatred and death threats, so I don't remember them all.  I couldn't screenshot them all.

Q    (BY MS. PASSAMANECK)  It is difficult --

**162**

what I'm trying to do is focus in on complaints due to your speech at a PKC event, and I understand that there were protesters.

My question is whether your -- in a PKC event, someone stood up and said, Hey, listening to this, I'm offended; I'm leaving?

MR. CONNOLLY:  Objection; form.

A    No, I don't believe so, not -- not off the top of my mind.

Q    (BY MS. PASSAMANECK)  You agree that you're free to share your opinions on gender identity with anyone who will listen, right?

MR. CONNOLLY:  Objection; form. Objection to the extent you are asking the witness for a legal conclusion.

A    I'm not an attorney, but I can say that prior to 1312, I felt pretty confident that I had the right to speak my opinions on gender ideology. Since the bill, my speech has been chilled.  I do mental gymnastics to try to avoid saying the wrong thing and getting myself in trouble.  So, no, since the passing of 1312, I do not feel like I'm free to speak my full opinions on gender ideology.

Q    We've walked through a fair amount of speech in which you have either -- you talked about

**163**

gender at events or individuals at events.  What speech are you afraid you can no longer do at events in light of HB 25-1312?

MR. CONNOLLY:  Objection; form.

A    For example, I help many parents who are -- like Dustin Gonzalez who are in the shoes that I've been in where their child has been transitioned to the opposite sex, and that's not their wish for their child, and I often speak about those parents.  But it has become really difficult.

In Dustin's case, for example, I believe his child is his daughter, and it's very hard when speaking publicly about the parents that I help just trying to say "child" instead of "daughter," or trying to avoid using those names, when I feel like it's really important for people to understand all the elements of what's happening with that family, that that is, in fact, his daughter that has been turned into his son.

So that's an example, the families that I help that I do publicly speak about with their permission; that, and the presentation that we went through, my slides.  There are times where it's imperative that I inform the public about transgender-identified individuals and their birth

**164**

names.  Duane Kelley, for example, where I think it's imperative for people to understand his criminal history, where I don't feel like I can properly inform the public of that biological legal name, which they have a right to know.

Q    (BY MS. PASSAMANECK)  You're aware that prior to HB 25-1312, Colorado law recognized gender expression as a protected status, right?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A    I'm not an attorney and I'm not intimately familiar with every facet of existing Colorado statute, no.  I'm keenly aware, now that 1312 has been passed, what the parameters around speech are in Colorado.

Q    (BY MS. PASSAMANECK)  Would you turn to paragraph 20 of your declaration, Exhibit 1.  The very last sentence that runs from pages 6 to 7 states, "I understand the Colorado Civil Rights Division has also adopted regulations that prohibit unlawful harassment, which is defined to include deliberately misusing an individual's preferred name, form of address, or gender-related pronoun." Do you see that?

**165**

A    That's fair to say.

Q    (BY MS. PASSAMANECK)  Would you have changed any of your prior speeches if you had been aware of this regulation?

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.  Objection to the extent the witness is asked to state a legal conclusion.

A    And I'm not an attorney, but I am, again, very keenly aware of the implications of 1312, especially as they've been expressed to me by people like Bee Gonzalez.  So 1312 is the point at which I really felt as though like my speech has been chilled.

Q    (BY MS. PASSAMANECK)  So is it fair to say that prior to HB 25-1312, you felt comfortable in saying all the things that we have been discussing today?

MR. CONNOLLY:  Objection; form.

A    That's correct.

Q    (BY MS. PASSAMANECK)  Okay.  And it was only after HB 25-1312 defined "gender expression" to include chosen name and other terms by which an individual chooses to be addressed that you became concerned about your language?

**166**

MR. CONNOLLY:  Objection; form.

A    That's correct.  Now, I have received criticism and threats prior to 1312, but that was definitely the point at which I didn't feel like I could speak openly anymore.

Q    (BY MS. PASSAMANECK)  Is it your belief that failure to use an individual's chosen name or other terms by which an individual chooses to be addressed is now a violation of Colorado law?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A    I'm not an attorney, but as I interpret 1312, yes, I am forbade from using accurate biological sex and pronouns.

Q    (BY MS. PASSAMANECK)  If the CCRD, the Colorado -- you're familiar with the CCRD, correct?

A    Yes.

Q    It's easier than saying it all out loud. Let me start again.  If the CCRD stated that the failure to use an individual's chosen name or other terms by which an individual chooses to be addressed is not a per se violation of Colorado law, would you still be concerned about your language?

**167**

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.  Objection to the extent the witness is being asked to state a legal conclusion.

A    I don't know if I fully understand the question.  Would you mind --

Q    (BY MS. PASSAMANECK)  Sure.  If the CCRD stated that the failure to use an individual's chosen name or use terms by which an individual chooses to be addressed is not a per se violation, so the CCRD says it's got to be something more, any use of this is not a per se violation, would you still be concerned about suit?

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.  Objection to the extent the witness is being asked to state a legal conclusion.

A    I don't know what per se violation means, but I certainly do feel as though I am not able to say those things and that I am at risk of a lawsuit.  And as someone who has watched the Jack Phillips case, the Lorie Smith case here in Colorado, I know that these laws and regulations are applied towards law-abiding citizens like myself, so I probably would feel as though I'm not

**168**

able to speak the truth.

Q    (BY MS. PASSAMANECK)  You're aware that people sue each other for all sorts of reasons, right?

MR. CONNOLLY:  Objection; form.

A    Sure.

Q    (BY MS. PASSAMANECK)  Sometimes people bring lawsuits without a basis; is that fair?

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.

A    I honestly don't know.  I am not an attorney.  I have brought a lawsuit, and it certainly was justified and had a basis for bringing that suit, but I -- it's possible.

Q    (BY MS. PASSAMANECK)  Well, looking at paragraph 22 of your declaration, you state, "HB 25-1312 punishes those who deadname or misgender with investigations, lawsuits, and fines."  Do you see that?

A    Yes.

Q    Are you aware of anyone who has been investigated for deadnaming or misgendering?

MR. CONNOLLY:  Objection; form.

A    No, I'm not aware.  Again, referencing Jack Phillips, I know he has been pursued by a

**169**

transgender individual, and refused to bake the cake, and was challenged on that issue.  So as not a lawyer, I don't know exactly what all that entails, but I know that there have been Coloradans pursued for not being willing to call someone by their chosen.

Q    You're talking about the Masterpiece case, correct?

A    Correct.

Q    And that was a baker who refused to make a wedding cake for a gay couple, correct?

MR. CONNOLLY:  Objection; form.

A    I'm referencing his unwillingness to bake a cake for a transgender individual's new name and pronouns.

Q    (BY MS. PASSAMANECK)  The lawsuit and the investigation was about the refusal to offer the service of baking a cake, though, correct?

MR. CONNOLLY:  Objection; form.  Objection; vague.  Objection; asked and answered.

A    I have not read the ins and outs of the pursuit.  I've only seen it from Jack Phillips's standpoint that he has struggled tremendously because people have pursued him with these violations.

**170**

Q    (BY MS. PASSAMANECK)  PKC is not refusing to offer services to anyone, right?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A    Correct.  But PKC would refuse to call someone by their chosen name and pronouns if that does not align with their biological sex, much like Jack Phillips refused to call them that on the cake.

Q    (BY MS. PASSAMANECK)  You're not refusing to give a pamphlet to a transgender individual, correct?

MR. CONNOLLY:  Objection; form.

A    That's correct.

Q    (BY MS. PASSAMANECK)  You wouldn't refuse entry of a transgender individual to one of your events, correct?

MR. CONNOLLY:  Objection; form.

A    Correct, unless it was closed to press and that individual was a member of the press.

Q    (BY MS. PASSAMANECK)  But all individuals are welcome at PKC events except for press?

A    Or disrupters, that's correct.

Q    Protesters, in general, are excluded,

**171**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

------------------------------------------------

ZOOM DEPOSITION OF TRAVIS MORRELL, M.D., MPH
August 25, 2025

------------------------------------------------

Plaintiffs:

DEFENDING EDUCATION, et al.,

v.

Defendants:

AUBREY C. SULLIVAN, et al.

------------------------------------------------

APPEARANCES:

    CONSOVOY MCCARTHY, PLLC
        By J. Michael Connolly, Esq.
           Paul Draper, Esq.
           1600 Wilson Boulevard, Suite 700
           Arlington, Virginia 22209
             Appearing via Zoom on behalf of
             Plaintiffs

    COLORADO ATTORNEY GENERAL'S OFFICE
        By Janna K. Fischer
           Senior Assistant Attorney General
           Nora Q.E. Passamaneck
           Senior Assistant Attorney General
           Dominick D. Schumacher
           Assistant Attorney General
           1300 Broadway, 10th Floor
           Denver, Colorado 80203
             Appearing via Zoom on behalf of
             Defendants CCRD, Sergio Cordova,
             Geta Asfaw, Mayuko Fieweger,
             Daniel S. Ward, Jade R. Kelly,
             and Eric Artis

**172**

APPEARANCES (continued):

    COLORADO ATTORNEY GENERAL'S OFFICE
        By Talia Kraemer
          Assistant Attorney General
          1300 Broadway, 10th Floor
          Denver, Colorado 80203
            Appearing via Zoom on behalf of
            Colorado Attorney General

**173**

Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom deposition of TRAVIS MORRELL, M.D., MPH, called by Defendants, was taken on Monday, August 25, 2025, commencing at 9:03 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

I N D E X

DEPOSITION OF TRAVIS MORRELL, M.D., MPH

EXAMINATION BY:                                    PAGE

    Ms. Fischer                                      5


                                               INITIAL
EXHIBITS                                      REFERENCE

Exhibit 1    Declaration of Dr. Travis           20
             Morrell

Exhibit 2    Plaintiffs' Objections and          32
             Responses to Defendants'
             First Set of Interrogatories

Exhibit 3    Article in Restoring America:       73
             Medical schools have
             embraced radicalism, by Travis
             Morrell, September 26, 2024

Exhibit 4    Article in The Publica:             87
             Exclusive: Trans Activist
             Medical Students Override
             Colorado Medical Society Vote
             Against "Gender Affirming"
             Surgery for Minors, June 14, 2024

174

|                   |                                              | INITIAL REFERENCE |
|-------------------|----------------------------------------------|-------------------|
| EXHIBITS (continued) |                                           |                   |
| Exhibit 5         | Social media exchange                        | 91                |
| Exhibit 6         | Dr. Morrell's website                        | 116               |
| Exhibit 7         | Amended Employment and Compensation Agreement (2022) | 119        |

**175**

Q    (BY MS. FISCHER)  Looking back at paragraph 14, you state that you regularly speak and write on the issues of sex and gender as they relate to the medical profession; is that accurate?

A    Yes.

Q    How many total publications do you have on the issues of sex and gender as they relate to the medical profession?

A    I'm not sure.

Q    Can you give a ballpark estimate?

A    Yeah, let's see.  As far as publications, I mean, do you include social media?  Do you include academic publications?  Do you include popular publications?  Maybe you can clarify the question.

Q    Okay.  Let's break it down.  Ballpark, how many academic publications on the issues of sex and gender as they relate to the medical profession?

A    So I have presented a few oral presentations -- or poster presentations, I should say, at conference.  I have published probably one on sex with the -- publication --

THE COURT REPORTER:  I'm sorry, which publication?

**176**

A    I've published a -- I have published at least one article on sex or genitals, I guess, or the reproductive system in the Green Journal, which is the top journal of both obstetrics and gynecology.  I have published on sex and gender in the medical profession in The Wall Street Journal. I have published on equity and inclusion in the DC Examiner.

I have published -- or I have written letters to the editor to, like, Colorado -- at least one Colorado paper.  I have attempted other times in Colorado, in addition to podcasts, social media, and public speaking.

Q    (BY MS. FISCHER)  Did you get paid for any of these publications?

A    The Wall Street Journal pays everyone who -- I think they pay everyone as a routine practice.  It wasn't negotiated or anything.  They just -- they send you a check.  I don't think I got paid -- no, I didn't.  I don't remember getting paid for any of the others.  I don't think I did.

Q    And have you published these articles in your own name?

A    I think everything that I talked to you about was in my own name.  I've additionally

**177**

contributed either anonymously or edited or as a group or, you know, reviewed, or whatever, probably, I'm sure, countless articles on this topic and other topics.  I can't imagine.

Q    And did you write any of these articles at the request of someone else?

        MR. CONNOLLY:  Objection; form.

A    I mean, I wanted to write all of the articles that I've written.

Q    (BY MS. FISCHER)  But has anybody ever asked you specifically to write one?

A    I mean, every -- I mean, lots of articles come up with -- people have an idea.  Your professor has an idea.  It's -- I don't know that -- I don't know that I've ever been approached like, Hey, will you write this article, and then write the article.

        Lots of articles, academically or popularly, come up in discussions.  I don't -- I've never been -- I've never been asked to write an article -- I've never been directly asked to write an article.

Q    And have you written any articles on behalf of Mountain West?

A    No.

**178**

Q    Have you written any articles on behalf of CPP?

A    I have written articles -- like, I have written at least I can think of one letter to the editor for a Colorado newspaper that I wrote, and I recognized my association with them, but I don't know -- I don't know -- nobody asked me to write it for them.  I don't know what that means.

Q    And which Colorado newspaper did you write that letter to the editor to?

A    The one I'm thinking of is the Grand Junction Sentinel.

Q    How many speaking engagements have you had on the issues of sex and gender as they relate to the medical profession?

A    Well, you earlier asked me about testimony, which has been on this topic.  And then in my declaration, I believe -- is it okay if I review the declaration as I answer this question, or would you rather I not?

Q    You can review the declaration.

A    Well, I don't know.  But I just -- I have spoken -- the main ones I think of are last April, this April, and we intend to next April, speak on this topic, this topic being pediatric

**179**

gender-affirming care.  I've spoken on kind of associated topics, like equity and inclusion, at other times, such as at the Denver Tech Center last September.

Q    Okay.  And we'll get to the ones you've listed in your declaration.  Did you get paid for your time at these speaking engagements?

A    No.  I --

Q    Did you take --

A    Go ahead.  Sorry.

Q    No.  Go ahead and finish.

A    I -- I may have gotten some, like, transportation reimbursement to maybe the FAIR one in September last year, maybe, like, reimbursement, but no payment or honorarium.

Q    And did you pay money to participate at these speaking engagements?

A    No.

Q    And did you speak in your personal capacity?

A    Yes.

Q    So not on behalf of Mountain West?

A    So you've asked -- I feel like you've asked that question in different angles, different times.  I've never spoken publicly about Mountain

**180**

Q    And then if you go up one to page 53, to clarify, you did not sign on behalf of Do No Harm, correct?

A    That is correct.

Q    It's signed by Kristina Rasmussen?

A    Yes.

Q    And who is that?

A    Kristina Rasmussen is, I believe, the executive director of Do No Harm.

Q    Have you met her?

A    Yes.

MS. FISCHER:  And, Lisa, I'm going to mark this as Exhibit 2.

(Exhibit 2 was marked.)

Q    (BY MS. FISCHER)  I'm going to ask you to go all the way up to page 4 of Exhibit 2, Dr. Morrell.  Just let me know when you're there.

A    I'm on page 4 of Exhibit 2.

Q    Okay.  Interrogatory Number 1 here asks about all the events at which you spoke; is that accurate?

A    I mean, it says, Dr. Morrell and his speaking engagements, all events they operated or plan to operate and/or which they have spoken or plan to speak in a place of public accommodation

**181**

located in Colorado.

Q    Okay.  And I'm going to take you down to page 27 where the document includes information on events at which you have spoken, as opposed to other plaintiffs in this case.  Just let me know when you're there.

A    I'm on page 27.

Q    Okay.  And if you scroll down a bit, it lists three events at which you've already spoken; is that correct?

A    Let's see.  It lists April 2024, September 2024, and April 2025.

Q    And there's an additional planned for April 2026; is that accurate?

A    That is correct.

Q    And is it your belief that all three of these past events were held at places of public accommodation?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A    I'm not an attorney, but I believe these are places of public accommodation.

Q    (BY MS. FISCHER)  I'm going to ask about the first event listed, the Rocky Mountain Summit

**182**

Q     You write there that it's your belief that affirming an individual's nonbiological gender identity or gender expression is harmful to the individual because it encourages them to believe a falsehood about themselves and discourages them from seeking proper care to address their gender dysphoria; is that accurate?

A     To clarify, on my page 3, paragraph 9, that's not what it says.

Q     Okay.

A     Mine says, "Plaintiffs' object to each interrogatory to the extent it calls for a legal conclusion."

Q     Wrong document.  I'm looking at Exhibit 1, not Exhibit 2.

A     Do you think I can close -- okay.  I'm going to --

Q     You can either close it or minimize it. I may ask you to open it again.

A     Paragraph -- sorry, page 3, paragraph 9?

Q     Yes, of Exhibit 1.

A     Yes, that is correct.  And I do believe that affirming someone's nonbiological gender identity is harmful to them.

Q     So what is the falsehood that a person

**183**

believes in using nonbiological gender identity or gender expression?

MR. CONNOLLY:  Objection; form.

A    The falsehood that a person believes -- there's actually quite a few, and one is that the -- that someone can -- can change sex or gender, and many -- or that they can have a disembodied gender identity in the wrong body.

It affirms the idea that they could change their secondary sexual traits or other physical things about them and that it will, number one, make them feel better.  Number two, be safe. Number three, that there's a low risk of regret. Number four, again, especially for kids, that it will decrease risk of suicide.  Number five, that they are at a high risk of suicide and they must do that, that there's urgency to it.  Number six, that they will have a healthy working body after this.

Patients I have -- as you know if you've read my declaration, I've taken care of, at the time, patients self-identified as transsexual patients, and I prescribed them hormones.  I've helped assist in making a new vagina in a man surgically and published or presented on this at a conference.  I've been very much trying to kind of

184

support them in this.

And I was surprised that every single patient had serious side effects.  And these are commonly not disclosed, and patients are sold a very falsely cheery -- very falsely cheery picture of what will happen when they go down, first, a social transition or social confirmation, and then medical and surgical confirmation.

It's very harmful to them, and medicine has done an extreme disservice.  In fact, I have in the past have done an extreme disservice to patients for treating this metaphysical belief as something that medicine can address with these treatments.

Q    (BY MS. FISCHER)  And what do you consider proper care to address their gender dysphoria?

A    I think proper care would be to reach out to properly qualified therapists and physicians who will not go against all medical -- all medical wisdom, that we don't affirm -- we don't try to damage healthy bodies to align with a false belief about oneself.

We don't do that for -- I would be doing malpractice if I affirmed an anorexic's identity as

185

overweight or needing to lose weight.  I would be doing malpractice for body dysmorphic patients if their appearance was normal and they wanted a medical or surgical change.  I would be doing malpractice to -- that's very much -- I would be doing malpractice to false pregnancy patients who I have treated in the past who were sure they had a pregnancy if I performed a C-section on them.

And this is the only area of medicine where doctors align with a false belief, and then use medicine and surgery in risky and harmful ways, and those are some of the harms.

Q   So is it malpractice to use someone's chosen name?

MR. CONNOLLY:  Objection to form. Objection to the extent the witness is being asked to state a legal conclusion.

A   I think it is harmful to the individual to encourage a false belief about themselves, just as it would be harmful to tell an anorexic that they need to lose weight.

Q   (BY MS. FISCHER)  Is it malpractice to use someone's pronouns matching their gender identity?

MR. CONNOLLY:  Objection; form.

**186**

Objection to the extent the witness is being asked to state a legal conclusion.

A     I don't feel comfortable defining malpractice, as I'm not an attorney.  But I do think it is harmful to affirm a patient's false -- their gender expression if it differs from their actual sex, including with pronouns, false -- incorrect pronouns or a name.

Q     (BY MS. FISCHER)  Dr. Morrell, are you qualified as a psychiatrist?

A     No.

Q     As a psychologist?

MR. CONNOLLY:  Objection; form.

A     I said -- I'll repeat.  I'm sorry.  No.

Q     (BY MS. FISCHER)  Any of the other five mental health certifications that Colorado offers?

MR. CONNOLLY:  Objection; form.

A     No.

Q     (BY MS. FISCHER)  Now, getting back to your speaking engagement at the Rocky Mountain Summit Part I, did you share your beliefs with the audience?

A     Well --

MR. CONNOLLY:  Objection.  Objection; form.

**187**

A    So, yeah.  As a doctor, I believe that real empathy follows evidence.  And so if I'm encouraging someone down a road that's going to hurt them, then, yes, I would be harming them.

I think the reason -- the first reason that I began speaking up on this was I was aware of the sexual and pelvic dysfunction that follows from gender-affirming treatments in adults; but I rationalized it because these were adults, they were choosing it, and that was okay.

But when I realized this was being done to kids, and I realized that many kids would grow up.  We know that from the Diagnostic and Statistical Manual Five, Text Revision, published in 2022, we know that most kids with gender dysphoria self-resolve, meaning their gender discomfort goes away, by the time they reach adulthood, and that's without medicine and surgery.  And we've known that for decades.  So we know that the alternative of doing no medicine and surgery and not affirming their pronouns and name actually works great for helping them get rid of their gender dysphoria.

However, we also know that the treatments that are done do cause high rates of published

188

pelvic and sexual dysfunction.  WPATH president, now former president, I believe, Dr. Bowers, stated that Dr. Bowers is not aware of any boy treated with puberty blockers and cross-sex hormones, according to the way that Colorado Medicaid pays for it, which is at Tanner Stage 2, which is the beginning of puberty -- Dr. Bowers, the WPATH president, that's the World Professional Association of Transgender Health, who's written the so-called medical guidelines for this that other organizations imitate -- Dr. Bowers says Dr. Bowers is not aware of any boy that has gone through what Colorado Medicaid gives for gender dysphoria having a sexual ability as an adult.

So I'm thinking many of these boys who get the full treatment will have a micropenis, will have the inability to orgasm or enjoy their relationships, and will not be able to reproduce if they so choose.  And I personally am troubled by this.

Again, I very much love and care for my patients who consider themselves transgender, who have gender dysphoria, and I want them to be able to, like some of these adult transgender patients, doctors -- Dr. Bowers, Dr. Levine -- who were able

**189**

to have kids as an adult before they made that decision.  And the kids that Colorado is doing this to, many of them may not have that option.

And I feel very horrible that my profession is doing that to those kids who have gender dysphoria.  And I also feel horrible for most of these kids who would have self-resolved without our intervention.  I feel horrible that many of these kids, most of whom we know grow up and are gay or lesbian, many of these gay guys who will not be able to have sex with their partner, not be able to emotionally bond with their partners.  I think that's a tragedy.

And so, yeah, because of this great concern and compassion for my patients and other patients with gender dysphoria or consider themselves transgender, because I want them to have the most options for a healthy life, I can't encourage them or support them in something that has these known harms.

Q    So is it your belief that transgender people are dysfunctional?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A    That is -- I don't believe that's what

**190**

specifically at that event?

    A    I don't know.  It's the type of thing I would do.

    Q    To the best of your recollection, did you knowingly use a transgender person's birth name?

            MR. CONNOLLY:  Objection; form.  Objection; asked and answered.

    A    I don't remember all the things I said in that meeting, but it's the kind of thing that I do and would do.

    Q    (BY MS. FISCHER)  And would you also use pronouns to refer to a transgender person that the person doesn't use?

            MR. CONNOLLY:  Objection; form.

    A    So prior to the signing of 1312, it was typical for me in my practice to speak more naturally and use correct pronouns, meaning their biological pronouns, when needed.

    Q    (BY MS. FISCHER)  Were any transgender people at the Rocky Mountain Summit Part I that you were aware of?

            MR. CONNOLLY:  Objection; form.

    A    I don't know.  I know that they were at -- I know that there were people who considered themselves transgender at Part II.  It's very

**191**

matching gender identity?

A    Prior to HB 25-1312, it wouldn't be appropriate to say I had a desire to do that.  I simply did that.

Q    Did you share your belief at Diversity Without Division that affirming an individual's nonbiological gender identity or gender expression is harmful to the individual?

A    I don't recall what was said during that event in detail, but that is the type of thing that I would say is integrally tied into the harms of gender-affirming treatment.

Q    Did you discuss any transgender people specifically at Diversity Without Division?

A    I don't recall.  If it came up in the context like it did in our conversation earlier, I would have spoken naturally about their actual birth names and accurate biological pronouns.

Q    When you spoke at Diversity Without Division, did you knowingly use a transgender person's birth name or pronouns the person doesn't use?

A    It's certainly the type of thing I would have done.

Q    What would have been your intent in doing

**192**

that?

A    Well, as you earlier questioned me and I spoke about the harms of gender-affirming treatment, it's often very -- I think it's enlightening to people whose mind is open to hear how the biggest, most aggressive activists for pediatric gender-affirming treatment are -- have openly or -- have openly talked about the harms, or it has come out in other ways, such as the Alabama court case with the WPATH files.

Some of the leading activists in gender-affirming treatment are well aware that kids' identity is not stable.  And so, obviously, treatments that they receive when they are younger, they'll have those harms when they are older, but they won't have the matching gender identity, because everyone's gender -- everyone's identity is somewhat fluid.  And so they spoke openly about that.  Dr. Bowers has spoken on video about the lifelong risk of inability to have sex, orgasm, reproduce for young boys and men that get on some of these treatments.

So it's very -- I think it can be helpful to listen to what the other side is saying.  And so when you quote someone or refer to someone's

**193**

statement, it's natural, and if not required --
it's definitely natural to refer to them by name,
and it would be unnatural to use their false
pronouns, especially if there is anyone in the
audience -- which they're at all of these events;
there's always someone in the audience who has at
least a child who has been affected by this.  And
it would be wrong to not -- to damage those
parents' understanding and to not -- and to use the
fake pronouns for a belief that neither I have nor
those parents; or if there are transgender people
in the audience, it would be wrong to signal that
their false belief can be accurately addressed by
medical or surgical transition when it can't.  That
would be directly harmful to my listeners who
identify as transgender.

So that is why it would be very natural
and common for me to reference two doctors, as
already came in our conversations, why I would use
their biological pronouns in that conversation.

Q    So can you give an example of somebody
that you would refer to by a deadname in these
conversations?

MR. CONNOLLY:  Objection; form.
Objection; vague.

**194**

Q    So moving on to the next event listed, Rocky Mountain Summit Part II.

A    Yes.

Q    And this event was held on April 6, 2025?

A    Yes.

Q    And this event was cosponsored by Do No Harm; is that correct?

A    Yeah.  Do No Harm was a -- yeah.  I don't know what class of sponsor they were, but they did help sponsor the event.

Q    Were you involved in organizing this event?

A    I was involved in planning the first expert panel.

Q    Were you involved in arranging for event space to hold this event?

A    No.

Q    Were tickets sold to this event?

A    Yes.

Q    Could anyone buy a ticket?

A    Yes.

Q    Are you aware of anyone being turned away?

A    I'm not aware of anyone being turned away.

**195**

why they left?

A    Well, in my understanding, it was related to the discussion that we were having, not related to them being late for someplace or something.  My understanding was that it was related to the discussion, the speech.

Q    And how did you come by that understanding?

A    By speaking -- by people that had spoken with them talking to me.

Q    And who were those people?

A    As I recall, it was Lori Gimelshteyn, who was the organizer of the event.

Q    Do you believe that your speech that you give is appropriate for children?

MR. CONNOLLY:  Objection; form. Objection to the extent -- no.  Objection; form.

A    I use professional language, and I think that I don't -- I don't seek out children.  I wouldn't -- if I'm at an event and a parent brings their adult or minor child, I would not stop them from that if I was --

Q    (BY MS. FISCHER)  Did you promote or advertise Rocky Mountain Summit Part II?

A    I shared -- I shared posts on X regarding

**196**

it.  I probably -- I mean, I probably, almost certainly, spoke on the radio on related topics and, if given the chance, would have, you know, mentioned it on the website or something like that.

Q    (BY MS. FISCHER)  What radio stations?

A    In Denver, maybe -- I don't remember the names of radio stations.  I could -- I think KOZ is one.  I've spoken on KOA once, and a couple other radio stations.  Maybe KHOW.  I don't remember which ones were before this event or after this event.

Q    What age would you say is appropriate for the speech you gave at Rocky Mountain Summit Part II?

MR. CONNOLLY:  Objection; form. Objection; vague.

A    Well, if it's -- you know, one of our -- I mean, right now, I think people are telling their kids at any age that they are born in the wrong body.  So I think by telling kids that they are healthy and normal and that things will get better, it's appropriate for any age child to hear.  Of course, I think -- so I think that's appropriate.

I would have to go -- I would have to know everything that was said in the program to say

**197**

therapists and doctors and parents.

That was -- that was definitely a key part of the event -- or let's say a part.  It was a long event.  In fact, we specifically invited an attorney to come and at least speak to this a little bit.

So, yes, we definitely spoke about 1312 and its intent to restrict speech.

Q    (BY MS. FISCHER)  Did you speak about your belief that affirming an individual's nonbiological gender identity or gender expression is harmful to the individual?

MR. CONNOLLY:  Objection; form.

A    Yeah.  So the purpose of the event and the prior event was to speak about the harms of gender-affirming treatment, and gender identity is intrinsically tied into that as a false justification and as a way to promote social transition, which leads down this harmful road.

So, yes, these are the kinds of things that I would have talked about, and we -- yes, these are the kinds of things we talked about and, in the context of 1312, its restriction on speech.

Q    (BY MS. FISCHER)  Did you discuss any

**198**

transgender people specifically at Rocky Mountain Summit Part II?

A    I don't recall.  It seems -- it's definitely the type of thing I would have done. Dr. -- the news about Dr. Levine taking away kind of the safety mechanism of age limits for medicines and procedures was sort of fresh; it seems likely that would have come up.  I can't say specifically.

Q    Were there any transgender people at this event of which you were aware?

A    Okay.  So we're still talking about April 6, 2025, Rocky Mountain Summit Part II?

Q    Yes.  I'm sorry.

A    Okay.  So there was at least -- at least one kid who desisted, at least one Colorado adult who considered herself transgender until, I believe, a few weeks or so before that.  There was -- like I said, there was the parent and youth, who I believe the family considered that youth to be transgender.  And then there was, I think, 40 or 60 protesters out front that had been organized online against it that I'm assuming that some portion of them were identified as transgender.

Q    Did you speak to any of these protesters?

A    I did not speak -- so I didn't speak to

**199**

any of those protesters.  I did have at least -- I mean, there were things online about the event, including I was emailed by an organized protest -- protester/activist in the days leading to the event, and the -- these protesters organized online and were able to get a national accrediting body to remove our previously duly-granted continuing medical education.  So there was some interaction, but I didn't go out directly and speak personally to them that day, no.

Q    So you had no face-to-face interaction with the protesters?

MR. CONNOLLY:  Objection; form.

A    With the protesters, yeah, we had -- we actually had to pay for police officers to -- in our venue.  So I don't think we had protesters, like, actively protesting face-to-face unless I were to walk or drive out to the front.

Q    (BY MS. FISCHER)  And did you walk or drive out to the front?

A    Not during the time that the protesters were there.

Q    Going back to Exhibit 2, there's one additional event listed on page 29, the Rocky Mountain Summit Part III, and it says that's

**200**

scheduled for April 2026?

A    Yes.

Q    So it has not happened yet?

A    That is in the future, yes.

Q    And as far as you're aware, is this event planned to be similar to Rocky Mountain Summit Parts I and II?

A    I think it will be similar.

Q    And are you involved in planning this event?

A    Yes.

Q    Are you involved in reserving space for the event?

A    I anticipate that I will help, yes.

Q    Are you planning to sell tickets to this event?

A    Yes.

Q    Are you planning to open -- are you planning -- scratch that.

Will tickets be sold to anyone who wants one?

A    Yes.  And could we take a break for, like, ten minutes or so?

Q    Yeah.  Let me just wrap up asking about this event, and then we can take a break.  It

**201**

shouldn't be much longer.

Do you plan to advertise the Rocky Mountain Summit Part III?

A    I anticipate that CPAN will take the lead.  I anticipate that I will, you know, speak on radio or on social media about the event.  Every year it gets bigger, so it's possible that I will take a larger role in advertising it, but probably -- but I anticipate it will be a lot similar to previous events.

Q    Is the level of your participation in planning Rocky Mountain Summit Part III more than Parts I and II?

MR. CONNOLLY:  Objection; form.

A    I anticipate that it will grow, yes.

Q    (BY MS. FISCHER)  What's the planned content of your speaking engagements?

A    Well, we will have experts from different fields speak about the harms of gender-affirming treatment.  It will probably focus even more on the ideas behind it, such as we're talking about now.  Pronouns and names will probably be more of a focus, and kind of the social and other pressures, legal pressures surrounding it.

But it will be talking about the harms of

**202**

2024"?

Q    Correct.  So what is the Colorado Medical Society?

A    The Colorado Medical Society is a great organization.  It's a nonprofit professional society or professional organization in Colorado and it represents Colorado physicians.

Q    And this paragraph refers to a vote on a proposal that you put forward?

A    Yes.

Q    That the medical society voted against; is that right?

MR. CONNOLLY:  Objection; form.

A    The medical -- the paid physician members voted for it.  The unpaid medical students voted against it, and the board of trustees voted against it.

Q    (BY MS. FISCHER)  And I'm dropping Exhibit 4 into the chat.  It will probably take a minute for it to load, and you can go ahead and open that up, please.

A    Yes, I have that open.

Q    Okay.  Exhibit 4 appears to be a newspaper article from something called The Publica.  Do you recognize that?

**203**

A    Yes.

Q    And this was produced by your attorneys in this litigation?

MR. CONNOLLY:  Objection; form.

Q    (BY MS. FISCHER)  Is that accurate?  I'm sorry.  Did you give this to your attorneys to produce?

A    I certainly would have.  It looks like a file from me.

MS. FISCHER:  Ms. Dague, I'm going to mark this as Exhibit 4.

(Exhibit 4 was marked.)

Q    (BY MS. FISCHER)  And, Dr. Morrell, does this article reference the vote that you referred to in the interrogatory response?

A    Yes.  Well, I'd have to go back to -- yes.  Yes, we just read that.  This is the one, yes.

Q    Okay.  Do you need a minute to review it?

A    If you ask me a question about it, I would probably need to review it.

Q    What is The Publica?

A    It is an online news site.

Q    And I'll give you a minute to look through this.  There's a reference to an internal

**204**

source on page 2 of the document.  So that's the page -- there's a number in the bottom right corner called a Bates number.  It ends in 236.

A    I see it.

Q    There's a reference to, "According to an internal source," on the last full paragraph on that page.

A    Yes.

Q    Are you that internal source?

MR. CONNOLLY:  Hang on.  Sorry.  There may be issues of journalism and reporting confidentiality and that sort of thing.  I think if you're going to -- if you're going to persist in this question, I might need to have a conversation with Dr. Morrell on this.

MS. FISCHER:  All right.  I'll withdraw that question.

Q    (BY MS. FISCHER)  Dr. Morrell, did you talk to a reporter for this article?

A    I believe I was -- let's see.  I was quoted in the article.

Q    And this article, does it mention using someone's birth name rather than their chosen name?

A    Well, I would have to read the article. Again, this is prior to 1312 when that was not an

**205**

issue.  However -- an issue legally.  However, I am being attacked as discriminatory and unconscionable for -- for the policy, which did talk about social transitioning, which is one way we refer to using the pronouns of -- the false pronouns and name.  So it's related.

I'd have to read the whole article.  I don't see any at this moment.

Q    I'm going to ask you to look at the page ending in Bates 238.  It's page 4 of the PDF.

A    Yes, I'm at page 238.

Q    And do you see the kind of black box in the middle?

A    Yes.

Q    And that box, if you look at kind of the left-hand column, the last paragraph in the left-hand column, this email states, "I was recently made aware that CMS is currently voting on a proposal to characterize gender-affirming care in minors as female genital mutilation."  Do you see that?

A    I do.

Q    And also this email isn't referencing names or pronouns, correct?

MR. CONNOLLY:  Sorry.  Did you say is not

**206**

referencing?

MS. FISCHER:  Is not referencing.

A     The author is referencing a large document that addresses social and medical transition for minors.

Q     (BY MS. FISCHER)  So the sentence here doesn't refer to names or pronouns, correct?

MR. CONNOLLY:  Objection; form.

A     This sentence is referring to a proposal, and his concise summary of it does not reference pronouns.

Q     (BY MS. FISCHER)  Turning back to Exhibit 2.

A     Yes.

Q     The paragraph starting, "Also in June 2024," does that refer to this same proposal you put forth to the Colorado Medical --

A     Yes.

Q     Let me finish -- to the Colorado Medical Society?

A     Yes.

Q     And now, the next bullet down, beginning, "On June 20, 2024," referring to a comment exchange on X --

A     Yes.

**207**

Q    -- to your recollection, was this complaint about chosen names or pronouns?

MR. CONNOLLY:  Objection; form.

A    So -- so that's interesting that you point this one out.  So, yes, this person, a Colorado-based activist, is specifically implying to threaten me with Colorado laws regarding speech about gender identity.  So it's the same subject to me, although pronouns were not named in this tweet.

Q    (BY MS. FISCHER)  I'm going to ask you to open up Exhibit 5 which is in the chat.

A    Yes, I have it.

(Exhibit 5 was marked.)

Q    (BY MS. FISCHER)  So is this the social media exchange you referenced on June 20th, 2024?

A    This is, yes.

Q    I'll give you a minute to look at it. Let me know when you've reviewed it.

A    Yeah.  Is there something specific you want me to look for?

Q    Not yet.

A    Okay.  Yes.  Thank you.  I've reviewed it.

Q    Okay.  And so this exchange doesn't talk specifically about names and pronouns, correct?

**208**

MR. CONNOLLY:  Objection; form.

A     I don't think that's accurate.  The -- the reference to conversion therapy and wanting an investigation is a reference to Colorado bill HB 19-1129, which, as I understand it, and I'm not an attorney -- which, as I understand it, says that licensed clinicians in Colorado are not allowed to affirm a patient's actual birth sex and actual biological sex, which is done with someone's name and pronouns.

And that's what the person is threatening me about and threatening to either start an investigation with -- that bill, I believe, as I understand it, references the Colorado Civil Rights Commission, which is my current fear and concern, or -- that's what I believe they meant, because they are referencing conversion therapy in context. They also might be referencing the Medical Board, or DORA, which, as you may know, investigates all complaints.

So I don't know which they are threatening me with.  I think it's the Civil Rights Commission.  And it's about conversion therapy, so they're speaking about social transition, which is pronouns and names.

**209**

Q      It states that on March 15th, 2025, you were interrupted with cries of "Nazi" when you testified in front of the Wisconsin state legislature, correct?

A      Yes.

Q      So this person was also attending -- sorry.  This person that you reference in the bullet was also attending the hearing?

A      Yes.

MR. CONNOLLY:  Objection; form.

Q      (BY MS. FISCHER)  And did you interact directly with this protester?

A      No, except for them yelling during my speech.

Q      Did you speak to them face-to-face?

A      I spoke to some protesters face-to-face. I did not speak to that protester face-to-face.

Q      And was your testimony to the Wisconsin state legislature specific to use of names or pronouns?

MR. CONNOLLY:  Objection; form.

A      Any speaking about gender-affirming treatment includes addressing social transition; social transition includes names and pronouns.  So that would have been the subject at hand.  I don't

**210**

know if the word "pronoun" was specifically used.

Q    (BY MS. FISCHER)  Now, you say in this paragraph that you were interrupted with cries by an individual that you believe was a transgender-identifying biological male, correct?

A    Yes.

Q    What did you base that belief on?

A    Well, afterwards, there were -- I was sitting next to a very friendly protester, and I was sitting next to other people that were testifying in agreement with me and disagreement. And so that was what I gathered from reports after the -- after the fact, later that day.  And I heard a masculine voice saying something very loudly while I was presenting.

Q    So what made you say the voice was masculine?

A    I think that's general knowledge, a general experience in humans.

Q    So moving on to the next bullet beginning, "Dr. Morrell spoke at Colorado Parent Advocacy Network's Rocky Mountain Summit Part II." This references the fact that your panel did not receive continuing medical education credits, correct?

211

A     Yeah.  We actually did get it formally approved with -- we actually went through the standard process and got it formally approved.  But after organized online activism, in a very unusual move, it was revoked ahead of the meeting.

Q     Was the revocation about the use of names and pronouns?

A     It was about -- I mean, you could look on Reddit or whatever and see what they were talking about, but yeah, it was about my views on gender identity.

Q     But it was broader than just names and pronouns?

MR. CONNOLLY:  Objection; form.

A     As -- am I a witness or testifying?  I don't know the language.  As I've testified or as I've stated, the gender-affirming -- no one does gender-affirming treatment to somebody that's not using -- who doesn't also have different beliefs about gender identity and often different pronouns and names.  So this is an integral topic.

Q     (BY MS. FISCHER)  So moving on to the next bullet, which begins, "Also leading up to the Rocky Mountain Summit Part II," that refers to complaints that the venue received that the beliefs

**212**

of your panelists were not acceptable in Denver?

A    Yes.

Q    And was that complaint specifically about the use of names and pronouns?

MR. CONNOLLY:  Objection; form.

A    Again, these complaints are that we are not respecting their identity and then encouraging gender-affirming treatment.  So, yes, it's concerning names and pronouns.

Q    (BY MS. FISCHER)  And the next bullet, I think we've maybe talked about this already, refers to two individuals at the Rocky Mountain Summit Part II.  And that was the parent and child that left during or after your talk?

A    Yes.

Q    And then the second to last bullet refers to an article a Colorado newspaper published on August 7, 2025, and that was about the filing of this lawsuit, correct?

A    Yes.

Q    And then the final bullet refers to negative Google reviews left for your practice?

A    Yes.

Q    Now, are any of these reviews specific to your treatment of a particular patient?

**213**

A    So, no.  To my knowledge, I've never received negative reviews from my treatment of a specific patient.  These reviews have been in response to my public actions on this topic.

Q    Have you ever seen a patient's name you recognize on a Google review that refers to your -- let me strike that.

Have you ever seen a patient's name on a negative Google review of your practice that you recognized?

A    Again, I don't know if just standard practice and professional rules and standards of confidentiality allow me to answer that, I'm told.

But that being said, I can tell you that, to my knowledge, all of the negative reviews -- none of the negative reviews on mine are my patients, and some of the negative reviews, I not only know they are not my patients; I can tie them to a specific event by their name related to my public actions.

Q    Okay.  So going back to Exhibit 1, your declaration.  I'm going to call your attention to Exhibit C, which is on the very last page of the declaration.  It's numbered 16.

A    Exhibit C.  Got it.

**214**

encouraged to prescribe these medicines even for kids.  And I was very early on that, I would say, prescribing it for adults.  So I did that.

And then more recently, I have been the dermatologist for such patients, and I very much care for these patients.  I have good rapport and take care of their dermatologic health needs.

Q    You used the past tense in paragraph 6. Do you have a preference not to treat transgender patients going forward?

A    Absolutely not.  I am merely assenting to the fact that in the past, present, and future, I did have and expect to care for, with expertise and compassion and a positive rapport, my patients who identify as transgender.

Q    Do you believe you can treat a transgender patient without sharing your beliefs as to why you will not use chosen names and pronouns matching gender identity?

MR. CONNOLLY:  Objection; form.

A    Well, as you may know, doctors of any specialty are expected, or sometimes required, sometimes encouraged by Medicare and the government, to address patients' general health. So we've been at times required or expected or

**215**

encouraged to check on patients' flu vaccine status or their smoking status and see where they are at on stopping smoking for that information, whether or not that's in our personal -- our emphasis or practice.  So, yeah.

And then for the patient individually, if I as a doctor am affirming a false belief, whether it's false pregnancy, false ability to transition, false body image or body dysmorphia problems, those are all things that, as a physician, I ethically can't affirm for a patient.

Q    (BY MS. FISCHER)  Do you understand that a transgender patient may not want to see you given your belief that they're delusional for believing that he or she can change or have changed his or her gender?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A    Yeah, it's quite a -- quite a way to phrase it.  I think if you have experience clinically, you see that you build quite strong bonds with patients, sometimes in just seconds upon meeting them, sometimes over time.

And patients -- we understand that patients are big and physicians are big and there's

**216**

more to life than just someone's gender identity as is stated.  And so I don't boil anyone down to simply their gender identity, and I think -- so patients so far, we have mutual respect and I have compassion for them.

Q    (BY MS. FISCHER)  Do you make your policy of using chosen name -- or, sorry -- your policy of not using chosen names and pronouns known to your patients?

MR. CONNOLLY:  Objection; form.

A    I don't -- well, I mean, I think anyone who googles me could find out my personal beliefs on this subject, if that's helpful.

Q    (BY MS. FISCHER)  But do you make your policy known to your patients?

MR. CONNOLLY:  Objection; form. Objection; asked and answered.

A    I -- I don't know.  Do you want to specify, or do you want me just to ramble?

Q    (BY MS. FISCHER)  Let me ask you this. Do you tell your transgender patients that you will only use their birth names?

A    So in human conversation, it doesn't proceed like legal -- legal consent.  So ideas and relationships build over time.  And so, you know --

**217**

A    I don't know if -- I don't think I always do anything.  But as far as a patient -- you see people multiple times, and so it would depend on the setting.

Q    (BY MS. FISCHER)  Would you agree that you don't want to be confrontational with your patients?

MR. CONNOLLY:  Objection; form.

A    I don't seek out confrontation for confrontation's sake.  Unfortunately, as a doctor, sometimes I have to have difficult conversations with people.  I have patients or -- and sometimes it's a brief statement or sometimes I'll have a conversation.  But some very personal issues that -- alcohol use has come up recently.  Smoking, whatever, that's health-related.

I unfortunately sometimes have to have these conversations, or at least I can't enable or -- at the very least, I can't enable or encourage poor health decisions when somebody is seeing me as a physician.

Q    (BY MS. FISCHER)  Is it possible to interact with a patient without using any pronouns?

A    It depends on the duration of the visit and what's going on.  If I'm taking care of -- as

218

you know, transgender identity is heavily culturally influenced and is much more heavily skewed in young people.

And so my young patients on -- for example, if somebody is on an acne treatment, and we have to do a pregnancy test or something like that, and we're doing more, we're talking with a medical assistant and maybe talking with a parent or a friend or something like that, it becomes increasingly difficult to not -- you would use -- at a certain point you're going to use pronouns and people's name in a visit.

Q    (BY MS. FISCHER)  I'm going to ask you to open Exhibit 6, which is in the chat.  Just let me know when you've had a chance to scroll through and look at it.

A    Yeah.  Exhibit 6, yes.

Q    Is this a website advertising your practice?

A    No.  This is a website advertising the fact that I offer consultancy.

Q    Did you create this website?

A    Yes.

MS. FISCHER:  Ms. Dague, we're going to mark this one as Exhibit 6.

**219**

were on Sunday.  I don't practice on Sunday.  I did -- yeah.  I've taken off the Monday after, at least the Monday morning, if not all day.  And then for the other one, it was during the week, so I would have had to take time off.  So, yes, I would have to.

Q    So you've done it a couple times.  Any more than that?

A    Well, I would have to say, I mean, those are the speaking engagements that I recall, and so when I -- so, yeah.  If they are outside of this area, I would have to.  I don't -- I don't -- I don't remember other times.

Q    Has anybody at Mountain West ever said you were taking too much time off?

A    No.

Q    I'm going to ask you to scroll to Section 9.1, which is on the page ending in Bates 221.

A    Got it.

Q    And it continues onto the next page.  So this contract states events that would terminate your employment; is that accurate?

A    Termination events, yes.

Q    And in Section 9.1.5, it discusses involuntary termination, when your employer might

**220**

decide you needed to part ways?

A    That's correct.

Q    And just looking at these causes, none of them include just the receipt of a discrimination complaint, correct?

MR. CONNOLLY:  Objection; form.

Dr. Morrell, if you need to take the time to review, please do so.

A    So my understanding is that if I was found to be discriminating against someone or to receive censure from a governing board, like the Colorado Civil Rights Commission, my impression is that could, directly for some of these or indirectly for others, lead to involuntary termination.

Q    (BY MS. FISCHER)  But does it state anywhere that just the receipt of a complaint is cause?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion about the nature of this contract.

A    Yeah.  Again, I would ask you or Mike to explain it to me, I guess.

But my fear when I look at this is there

**221**

are several areas here that seem like it could include complaints.  (i), unsatisfactory quality of medical practice as determined.  (g) engaging in unethical conduct.  The idea of discrimination could be considered, I'm assuming, unethical.  It seems like -- not to mention the restriction of medical license in the State of Colorado in (a).

So I'd say I have fears regarding 1312 on several of those points that you're pointing out.

Q    (BY MS. FISCHER)  Would you agree that not every complaint brought to the Colorado Medical Board is founded?

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.

A    Yeah.  I would have to speculate and also go off of hearsay, so -- but my personal understanding is that Colorado has the -- whereas some states, like California, kind of filter out complaints, Colorado's DORA does not filter out complaints and investigates them.

And I am aware of physicians that I know that actively practice in Colorado who have had unfounded complaints, and it cost them several thousand dollars, and they were, you know -- and they were -- they reported to me that they were put

**222**

A    I mean, again, there are articles I've written on websites and social media posts that technically you can access through the web.  So I don't want to -- you're aware -- I think you're aware of all of it.

You're asking me if I've, first of all -- I don't remember the question.  Was the question as a physician or was the question I don't want to see patients?  What was your question?  Sorry.

Q    (BY MS. FISCHER)  The question is whether -- the original question was whether your bio or any of your online materials say you won't treat a transgender patient.

A    There's no material that says that anywhere, because that's not the case.  I care about any patient.

Q    We've talked about your social media posts and your publications today.  Would it be fair to say that your views on sex and gender are publicly known?

A    I think so.

Q    So a prospective patient would be able to find them through a Google search?

A    If they're -- yeah, I think that they could, uh-huh, yeah.

**223**

Q    And is it correct that you have treated transgender patients in dermatology within the last year?

A    Yes.

Q    And at all times have you used their birth names and the pronouns that match their sex at birth?

A    Yes.

Q    And without providing any identifying details, have you discussed your policy to use birth names and sex at birth with any of your current transgender patients?

MR. CONNOLLY:  Objection; form.

A    So, I'm sorry, you used this word "policy" before, and I'm not familiar with the technical meaning of it.  But if you mean my personal practice or my personal -- professional beliefs regarding it, my personal ethic regarding it, I believe it's self-evident, just as you noticed earlier when I referenced two doctors without using their so-called preferred chosen name or pronouns.  You picked up on it, and I think other people, I'm assuming, do as well.

But I don't consider it -- but I don't have, like, a written -- I don't have a written

**224**

policy at work, if that helps answer your question.

Q    (BY MS. FISCHER)  Sitting here, can you recall any discussion you had with a transgender patient regarding your use of pronouns and birth names?

MR. CONNOLLY:  Objection; form.

A    So far to this point, we've focused on their main concerns or whatever is going on in their life or their general -- their general whole self and well-being or their dermatologic problem, and so we haven't had any, to this point, kind of confrontation.

Q    (BY MS. FISCHER)  Do you avoid using pronouns directly with your patient?

A    Well --

MR. CONNOLLY:  Objection.  Objection; form.  Objection to the extent the witness is being asked a legal conclusion.

A    Could you repeat the question, please?

Q    (BY MS. FISCHER)  Do you avoid using pronouns directly with your patients?

MR. CONNOLLY:  Same objection.

A    Well, I do use biologically appropriate pronouns and birth names with my patients.

**225**

Following 1312, I am definitely going to avoid this for fear of the Civil Rights Commission or other lawsuits.

Q    (BY MS. FISCHER)  So what -- speaking about past conversations, what is the context in which you would use a patient's pronouns matching their sex at birth as opposed to pronouns that they've introduced themselves with?

MR. CONNOLLY:  Objection; form.

A    So if I were to order a pregnancy test for a patient and perform it in my office, I might say to the patient's parent or friend or to the medical assistant, which I always have a medical assistant in the room, I would say, Could you please run her pregnancy test; and it would not only be potentially a harmful lie, but also nonsensical for me to say it any other way.

If I were to perform a biopsy on the genitals, for example, of a male's penis, I am going to say, Be careful to get his specimen to the lab or refer to it, again, with appropriate biological pronouns.  It would be quite nonsensical to refer to a penis as belonging to some other sex.

Q    (BY MS. FISCHER)  Have you ever had a

**226**

with a dozen -- I don't know, five, six, multiple others at different times, even during just this past year, not to mention over a longer period of time.  So there's some coworkership.

Q    (BY MS. FISCHER)  Do you agree that your views on sex and gender do not affect your treatment of transgender patients?

MR. CONNOLLY:  Objection; form.

A    Well, I think, as I've indicated, if someone were to come to me and say, Hey, this weekend, I, you know, had 42 beers and, you know, I'm on this medicine, or whatever, or not, or if I were to have a patient say, you know -- and I do have patients with basically body dysmorphia, have some kind of concern about something about their face that's normal, or if they were anorexic or something and they thought they had to lose more weight, it would be wrong for me to be, like, Yeah, that's cool that you had 48 beers, or, Yeah, your nose really is too big and crooked, or, Yeah, you really do need to lose a few pounds, or, I hope you do well on your weight loss goals.

That's not innocuous to go along with false beliefs in medicine, especially if I'm wearing scrubs and a white coat and introduce

**227**

myself as a doctor in a clinic.  I can't do that.

So the same goes to gender identity.  So, yeah, my beliefs on gender identity definitely affect my treatment.  In fact, I think it's better treatment for patients with gender dysphoria to not affirm false beliefs.  So it definitely does affect my care, but in my belief, it makes it better.

Q    (BY MS. FISCHER)  Do you agree that your views of sex and gender do not impact whether patients feel welcome at Mountain West?

MR. CONNOLLY:  Objection; form. Objection; vague.

A    Yeah.  I'm fortunate that, overall, patients still have remained with me or to my knowledge remained with me, and I hope that continues to be the case.  I would like that to be the case.  I like taking care of them.  Whether this is -- they see this as a quirk or a minus point, but overall I'm still worth it or what, I don't know.  I haven't interrogated them, and I can't speculate completely to their beliefs.

Q    (BY MS. FISCHER)  I'm going to switch gears and ask you about House Bill 25-1312, which is the subject of this lawsuit.  I'm going to ask you to go back to Exhibit 1, which is your

**228**

declaration, and go to paragraph 18, which is on page 6 of the document.

A Yeah, I see that.

Q In that paragraph you state, "Colorado's public accommodation laws as amended by House Bill 25-1312 makes it impossible for me to effectively exercise my constitutionally protected right to speak in a manner that reflects my beliefs"; is that accurate?

A Yes.

Q Is it fair to say that prior to the passage of 1312, you did not believe that you were violating Colorado's law?

MR. CONNOLLY: Objection to the extent the witness is being asked to state a legal conclusion.

A To my knowledge, before 1312, this law, 1312, did not exist. So, to my knowledge, the way that I practiced was okay in Colorado prior to 1312, and my understanding is that going forward, it's not.

Q (BY MS. FISCHER) So it's your belief, looking at the next paragraph, that it was only after 1312 redefined gender expression to include the use of a chosen name or other terms by which an

individual chooses to be addressed that you're now concerned about your speech?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A    I think how it reads reflects my views that 1312 redefines gender expression in connection with someone's gender identity, and that I am afraid to be considered discriminatory or unlawful for speaking my beliefs about reality and good medical practice with patients.

Q    (BY MS. FISCHER)  So your concern about Colorado's law is specifically 1312's definition of gender expression to include the use of a chosen name or other terms by which an individual chooses to be addressed?

MR. CONNOLLY:  Objection; form.

A    Well, again, I am not an attorney, so I can't probably accurately interpret 1312.  But to my understanding, 1312 redefines gender expression, includes chosen name, forms of address, pronouns related to gender expressing, and, therefore, I'm afraid that I'm going to be considered discriminatory and unlawful and receive harm -- financial harm, reputational harm, monetary damage,

**230**

potentially lose my -- lose patients or lose my job.

So, yes, I'm afraid of all those things from 1312, specifically.

Q    (BY MS. FISCHER)  Can you give an example of a discussion you had with a patient before the passage of House Bill 25-1312 that you would not now have?

A    Yeah.

MR. CONNOLLY:  Objection; form.

A    I mean, I gave examples which are from -- they are from the practice and the type of patient and the things that -- the conversations that we've had.  So I wouldn't want to say, you know -- I would like to be able to -- I don't want to say names, but I want to say, Janna, we're going to run your pregnancy test now, or to my assistant, Lisa -- I just don't want to use the patient name -- but, Lisa, please take the pregnancy test to the lab for her, or something like that.

Those are examples that I understand would be just a few examples of the way that 1312 would restrict my speech and put me at risk of basically legal or financial harm.

Q    (BY MS. FISCHER)  Can you give an example

**231**

of something that you have said at a speaking engagement that you would not now say since the passage of House Bill 25-1312?

A   Yeah.  I think, again, if I were to say -- I guess I'm going to break 1312.  Do I get the sensation to break it while I'm here?  This isn't a public accommodation, I guess?  I don't know, but I guess.

Yeah.  If I were to say, Dr. Bowers was able to have children.  Dr. Levine was able to have children, but he had children, and now he's taken that ability away from kids by removing age limits that are there for safety for pediatric gender-affirming care.  That would be one example. Or Representative Brian Titone says that men can breastfeed; but that's not safe for your baby and it's not something that a boy or male should expect to be able to do after receiving medicines.

That's -- so those are two examples of names and pronouns that I would say that I'm afraid that I can't say anymore.

Q   Are you aware that prior to the passage of House Bill 25-1312, Colorado law recognized gender expression as a protected status?

MR. CONNOLLY:  Objection; form.

**232**

Objection to the extent the witness is being asked to state a legal conclusion.

A    My knowledge of Colorado Antidiscrimination Act and the Colorado Civil Rights Commission prior to 1312 was limited probably to basically it being used as a way to pick on people with alternate beliefs, like Jack Phillips at the Masterpiece Cakeshop, who I understand has multiple times had customers approach him and go through hundreds of thousands of dollars in legal fees or whatever just because he has different beliefs.

My fear is that with 1312, I'll be used in the same way.  As we've said, I'm publicly known, and I've been picked on on the internet as far as groups of organized activism against me successfully.  Groups have organized Google-bombing my reviews successfully.  So I'm concerned that I'll have a patient probably, whether legitimately in their view or purposefully just to injure me, make such a complaint about me in reference to 1312.

Before 1312, I, again, was not -- I had general knowledge that CODA and CCRC was used against people with biological beliefs, but I

**233**

A    Jack Phillips, Master Shop Cake --
Masterpiece Cakeshop.  It's been to the Supreme
Court, and the courts have said use him for
reeducation.

Q    And was that case about deadnaming and
misgendering?

A    I believe it was not.  But I believe that
there is a second case where it was about his
desire not to make a cake for a person who
identified as transgender for a gender reveal, so,
I mean, a very similar issue.

Q    But that person was being denied service,
right?  You said he refused to make a cake?

MR. CONNOLLY:  Objection; form.
Objection to the extent the witness is being asked
to state a legal conclusion.

A    In my understanding, it was for his
deeply held belief, just as I also have a deeply
held belief, that's directly attacked by 1312.

Q    (BY MS. FISCHER)  Are you aware of anyone
other than Jack Phillips who has been sued under
1312?

A    I am not.

Q    Anybody who has been fined?

MR. CONNOLLY:  Objection; form.

**234**

A    I mean, this is a new -- a new law, and I am not aware of it.

Q    (BY MS. FISCHER)  As paragraph 25 of your declaration, and paragraph 25 is on the top of page 9, you state, "HB 25-1312's punishments for disfavored speech also mean that I must refrain from publishing materials that refer to individuals by using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression"; is that accurate?

A    Yes.

Q    Tell me what you would like to publish that you believe House Bill 25-1312 prevents you from publishing?  Can you give me an example?

MR. CONNOLLY:  Objection; form.

A    Yeah.  I think it's the same forms of speech that we've previously addressed, biologically accurate pronouns and birth names. That would be my concern.

Q    (BY MS. FISCHER)  Is the speech you are worried about broader than pronouns and birth names?

MR. CONNOLLY:  Objection; form.

A    I mean, I speak frequently on gender identity expression and affirming treatments, and

**235**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

-------------------------------------------------

ZOOM DEPOSITION OF VALERI LESWING, D.O.
August 27, 2025

-------------------------------------------------

Plaintiffs:

DEFENDING EDUCATION, et al.,

v.

Defendants:

AUBREY C. SULLIVAN, et al.

-------------------------------------------------

APPEARANCES:

        CONSOVOY MCCARTHY, PLLC
             By J. Michael Connolly, Esq.
                Paul Draper, Esq.
                1600 Wilson Boulevard, Suite 700
                Arlington, Virginia 22209
                  Appearing via Zoom on behalf of
                  Plaintiffs

        COLORADO ATTORNEY GENERAL'S OFFICE
             By Dominick D. Schumacher
                Assistant Attorney General
                Janna K. Fischer
                Senior Assistant Attorney General
                Nora Q.E. Passamaneck
                Senior Assistant Attorney General
                1300 Broadway, 10th Floor
                Denver, Colorado 80203
                  Appearing via Zoom on behalf of
                  Defendants CCRD, Sergio Cordova,
                  Geta Asfaw, Mayuko Fieweger,
                  Daniel S. Ward, Jade R. Kelly,
                  and Eric Artis

**236**

APPEARANCES (continued):

COLORADO ATTORNEY GENERAL'S OFFICE
By Lane Towery
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, Colorado 80203
Appearing via Zoom on behalf of
Colorado Attorney General

Also present:  Sarah Bomgardner

**237**

Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom deposition of VALERI LESWING, D.O., called by Defendants, was taken on Wednesday, August 27, 2025, commencing at 1:02 p.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

I N D E X

DEPOSITION OF VALERI LESWING, D.O.

EXAMINATION BY:                                       PAGE

     Mr. Schumacher                                      4


                                                      INITIAL
EXHIBITS                                             REFERENCE

Exhibit 1    Plaintiffs' Objections and              29
             Responses to Defendants'
             First Set of Interrogatories

Exhibit 2    Declaration of Dr. Valeri               85
             Leswing

**238**

them.

Q    Do you still treat any elderly patients?

A    I routinely give families flu vaccines, so we do routinely do that, but it is not my standard to treat adults.

Q    Do you ever provide any kind of care where a patient would stay overnight?

A    No.

Q    I wanted to ask some questions about your patient population and folks that you've treated in the past, and I'll just start by saying I don't want to get any protected patient information.  I don't want to put you in -- I'm not trying to put you in any kind of ethical bind.  So all my questions, I'm looking for answers without any identifying information.

My first one is, generally, have you ever treated a patient who identifies as transgender?

A    Yes.

Q    And have you ever treated patients who, in your professional opinion, have gender dysphoria?

A    Yes.

Q    Could you describe in your own words what gender dysphoria is?

**239**

wouldn't need treatment because you would be perfectly happy with how you were.

Q    If a person identified as trans had gender dysphoria and did not grow out of the self-identification of being transgender by adulthood, so let's say by 25 or 30, would gender-affirming care possibly be appropriate at that juncture?

MR. CONNOLLY:  Objection; form.

A    I don't treat adults, so it's hard to say what would be the best treatment for an adult in that situation.  Yeah, I'm not -- I don't know the adult literature.  It's very different than pediatrics.

Q    (BY MR. SCHUMACHER)  We've talked a little bit about your declining to use preferred names or pronouns connected with a gender identity or gender expression that does not match a person's sex at birth.  Do you do the same in your personal life, so outside of the clinical context?

MR. CONNOLLY:  Objection; form.

A    Yes.

Q    (BY MR. SCHUMACHER)  So if you knew somebody socially that wanted to transition or had transitioned to a new gender and adopted a new name

**240**

to reflect their new gender identity, you would continue to refer to them using their old name?

MR. CONNOLLY:  Objection; form.

A    I would probably try to not refer to them, but if I needed to, I would use their old name.

Q    (BY MR. SCHUMACHER)  Why would you try to avoid referring to them using a name?

MR. CONNOLLY:  Objection; form.

A    In my social life, I'm not trying to treat people.  They are not asking me for a medical opinion on their personal state, and, in general, I'm not going around trying to cause unnecessary offense.

Q    (BY MR. SCHUMACHER)  Would it be fair to say, then, that, when you choose not to use a pronoun associated with a new gender identity or choose not to use a name associated with a new gender identity, that it is not your intent to denigrate anybody?

MR. CONNOLLY:  Objection; form.

A    There are a lot of like negatives in there.  I'm not quite sure where you went with that.

Q    (BY MR. SCHUMACHER)  Sure.  I can restate

**241**

Q     Do you have a preference not to treat patients because they are transgender or nonbinary?

A     No.

Q     Have you ever treated patients without using their pronouns or names at all regardless of what those pronouns or names are?

MR. CONNOLLY:  Objection; form.

A     What do you mean?

Q     (BY MR. SCHUMACHER)  Sure.  I'll just represent that I have interactions with folks all the time where I don't use their name, maybe I don't know their name, or I don't use a pronoun to describe them.  Does that ever happen in the context of your medical practice?

MR. CONNOLLY:  Objection; form.

A     It does.  It's not common, though.

Q     (BY MR. SCHUMACHER)  Let's say that you have a patient who is transgender or nonbinary, but comes into your practice for some other reason having nothing to do with their gender identity or gender expression.  Do you feel like you can treat their medical issue without any discussion of gender?

MR. CONNOLLY:  Objection; form.

A     It's very hard to treat someone's

**242**

biological health without recognizing their biological health.  Your UTI may have nothing to do with your identity, but the fact that you're female makes your UTI a very significant different risk than if you were male.

And so while it's not relevant for treating a UTI whether you are trans or not, your biological identity is very significant, and the vast majority of medicine is that way.

Q     (BY MR. SCHUMACHER)  And so let's say I came in with a, we'll call it garden-variety injury, maybe a sprained ankle.  Would it be possible to treat that without any discussion of gender?

MR. CONNOLLY:  Objection; form. Objection; asked and answered.

A     So you, being an adult, that may be the case.  But, universally, when I'm treating young men for injuries, the risk of reinjury is significantly higher than when I'm treating young women.  They are just more aggressive, and they are much less likely to sit still and hang out.

And so the biological gender is always relevant, although it's not relevant whether they are trans or not.

**243**

A    No, not to my knowledge.

Q    To your knowledge, have any of the patients we've discussed today filed complaints with the Colorado Civil Rights Division, or CCRD?

A    Not to my knowledge.

Q    To your knowledge, have any of the patients we've discussed today filed complaints with any other organization?

A    Not to my knowledge.

Q    Your practice of only using pronouns and names associated with one's sex at birth, is that -- strike that.

Your practice of only using names and pronouns associated with sex at birth, has that always been how you operate?

A    Yes.

Q    And do you still only use names and pronouns associated with somebody's sex at birth?

A    Since the recent law, I've felt compelled to not use either.

Q    And when you use the term "since the recent law," are you talking about House Bill 25-1312, which was passed in approximately May of 2025?

A    Yes.

**244**

Q    So since May of 2025, you have felt compelled to not use names or pronouns?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A    When I'm dealing with patients who I'm unsure of, I just have to refer to them generically as "the patient" instead of being able to talk to them like you would in polite conversation with their name, how are you doing.  It has to be something more generic.

Q    (BY MR. SCHUMACHER)  Are you afraid to use a legal name on someone's medical records?

MR. CONNOLLY:  Objection; form.

A    I'm concerned that the State will come after me if I refer appropriately to the patient in a chart by their biological sex or naturally by their biological pronouns, including using their given birth name.

MR. CONNOLLY:  Dr. Leswing, are you okay? Do you need to take a break?

THE DEPONENT:  (Shook head.)

MR. CONNOLLY:  Okay.

Q    (BY MR. SCHUMACHER)  Can you explain a little bit more about your concern that the State will come after you?

**245**

A    It's unquestionable that in the State of Colorado, people have been targeted for their views on trans issues.  And knowing that I've been in this community for a long time and knowing that the community knows how strongly I feel about not harming children, it's not at all inconceivable that I would be directly and actively targeted by somebody who didn't come in to actually seek care, but by somebody who came in to make a point of backing me into a position where I have to choose between doing what I think is deeply harmful for their child or following some bizarre speech code that the State has decided is critical.

Q    Who are you concerned specifically would target you?

A    Any family or parent who wanted to be the person that made themself famous by making a stand for what they consider are trans rights.

Q    What about HB 25-1312 makes you believe that you're now likely to be targeted?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A    Even if I wasn't directly targeted, if a family came in and they want me to call their

**246**

ten-year-old boy a girl, they want me to refer to them as a girl, and I find that to be harmful directly to them, I feel now forced to refer to them androgynously as "the patient" so that the family doesn't have the ability to seek punitive legal action in the civil rights department in the State of Colorado because I spoke honestly with them about what I thought was right for their child.

Q    (BY MR. SCHUMACHER)  And it's your belief that HB 25-1312 puts you at that risk?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A    Yes.

Q    (BY MR. SCHUMACHER)  Is it fair to say that you did not feel at risk before HB 25-1312 was passed?

A    Yes.

Q    Have you seen any transgender patients since May of 2025?

A    Not that I know of.

Q    And you say that you feel like you might be targeted by somebody who knows your views on the topic of gender.  How would somebody know what your

**247**

materials?

A    I've considered doing a formal review on Facebook under my Mountain Pediatrics page, reviewing the literature for people so they can see it, and openly having a discussion there.

Q    How long have you been planning to or considering publishing those materials?

A    Probably two or three years.

Q    Have you made any progress on writing these materials?

A    I stopped considering that as much after the law was passed, because I think it will lead to further anger in people who disagree with me.

Q    Did you start writing those materials?

A    Generally when I write, I kind of spend a lot of time thinking about it in my head, and then I kind of write it all in one big spree.  And so I haven't actually written anything.  I've just contemplated how I would do it.

Q    And it's your belief that in the current climate, it would be controversial, and folks might be upset with you about publishing it?

A    Correct.

Q    And for that reason, you have decided not to go forward and publish it?

248

A    Correct.

Q    And the Facebook page you want to publish it on, that's Mountain Pediatrics' Facebook page?

A    Correct.

Q    That's not your personal page.  That's completely controlled by Mountain Pediatrics, right?

A    I don't have a personal page, so, yes.

Q    Looking at paragraph 15, which references an internal Exhibit A that can be found on page 11 of this PDF, you discuss wanting to publish a statement on Mountain Pediatrics' page regarding gender ideology, preferred pronouns, and chosen names; is that right?

A    Correct.

Q    How long have you wanted to publish this statement?

A    Probably six, nine, ten months, something like that.

Q    And why have you not done so?

A    I don't want to generate further angst and anger in my community.

Q    And your goal with the statement that you want to publish is to inform potential patients that you're not going to use preferred pronouns or

**249**

chosen names that don't match a patient's

biological sex, correct?

A    Correct.

Q    Do you have any other similar policies or

disclaimers on Mountain Pediatrics' Facebook page?

A    I don't know what you mean by "similar."

Q    Sure.  Do you announce any other of

Mountain Pediatrics' policies on the Facebook page?

A    I review my thoughts on current medical

concerns, such that, like, the last page I think

you see there, I'm talking about the concern of

measles in the community.  And so I give people my

thoughts on, you know, You don't need to worry

about getting measles in the community if you're

vaccinated, et cetera.  I don't think your infant

needs an early vaccine at this time.  We're

watching the measles epidemic in Colorado closely.

So I do use the Facebook page to inform

the community of what my thoughts are on different

medical concerns.

Q    So thinking about the materials that you

said you wanted to publish in paragraph 14 and this

potential Facebook statement in paragraph 15, are

these meant to be advertisements for your practice?

A    I don't -- I don't see them as

**250**

associated with sex at birth?

A    Yes.

Q    Is there anything more than that?

MR. CONNOLLY:  Objection; form.

A    I think speaking forthrightly means always being honest in your communication.

Q    (BY MR. SCHUMACHER)  Is it your concern that this law will force you to be dishonest in your communication?

A    100 percent.

Q    How so?

A    The law is an attempt to compel me to use somebody's chosen pronouns, which is dishonest in the face of their biology, and it harms them.

Q    You can go ahead and close this exhibit, which I'll mark as Exhibit 2.

(Exhibit 2 was marked.)

Q    (BY MR. SCHUMACHER)  Are you familiar with the organization Do No Harm?

A    Yes.

Q    And is it okay if I refer to that organization as DNH?

A    Sure.

Q    If you don't mind, could you go back to Exhibit 1, page 37?

**251**



<      **Parasol Patrol**      💬   🔍

**Posts**    **About**    **Videos**    **More ▾**

**Parasol Patrol**      •••
5h · 🌐

\*\*\*CALL TO ACTION\*\*\*
MONDAY OCTOBER 9TH
AURORA COLORADO
6:30PM

From a parent, "Queer advocacy opportunity
<TONIGHT> (Monday, 10/9/23):

A far-right, conservative, anti-queer group is
planning to attend our Cherry Creek School
board meeting Monday at 7pm at Overland
High School (Aurora, CO). They are
specifically targeting LGBTQ-inclusive school
policies and are anticipating national coverage
to hype their agenda. If you live in Colorado,
we would greatly appreciate you showing up
to our school board meeting to support our
queer kids and families...

...Please share and attend if you can."



**SPLASH Staff** @splashnoco · 15m    ...
@MorrellMDmph did you have additional
questions?
A tad bit of advice…. Be careful preaching in
Colorado, we have an active ban on
conversion therapy because it's harmful to
young people and your beliefs tap that line.
Wouldn't want an investigation…

💬 1          ⟲          ♡          📊 7          🔖  ⬆



**Travis Morrell, MD MPH** ✔    ...
@MorrellMDmph

Do you have a name, or do you only threaten
people anonymously?

Medicine/surgery harming the reproductive
abilities of future gay, lesbian, or straight adults
is a real crime.

As a physician, I have an oath to do no harm. The
oath doesn't go away because you threaten.

**253**
DE_000259

# Re: Feedback from Dr. Drew Updike

From    Kate <kate_alfano@cms.org>

To      LYNN PARRY<nurvdr@mac.com>

CC      Diversity, Equity and Inclusion Committee<dei_committee@cms.org>

Date    Monday, June 10th, 2024 at 2:58 PM

You're right, Dr. Parry. Voting is open until June 13 (the day before the Board meeting), per the Central Line process.

> On Jun 10, 2024, at 2:36 PM, LYNN PARRY <nurvdr@mac.com> wrote:
>
> I have just posted this for the Board. The response to Central Line has been slow. I absolutely think the opportunity to vote needs to be reopened until the day before the Board meets.
>
> Lp
>
>> On Jun 10, 2024, at 8:46 AM, Kate Alfano <kate_alfano@cms.org> wrote:
>>
>> Dear Doctors:
>> I am forwarding the email thread below at Dr. Quarles's request.
>>
>> Kate
>>
>>> Begin forwarded message:
>>>
>>> **From:** Leto Quarles <letoquarlesmd@gmail.com>
>>> **Subject: Fwd: Your vote needed on policy proposals**
>>> **Date:** June 9, 2024 at 4:07:19 PM MDT
>>> **To:** Kate Alfano <kate_alfano@cms.org>
>>>
>>> Kate, the email settings don't seem to let me forward this whole email thread (included below) directly to our DEI committee email group – would you mind sharing with the DEI committee crew as an affirming reminder that we're not alone in the fight and there are some awesome docs across CMS membership ready to step up as allies, too?
>>> Thanks!
>>>
>>>
>>> ---------- Forwarded message ---------

**254**

From: **Drew Updike** <drewupdike@gmail.com>
Date: Sun, Jun 9, 2024, 3:50 PM
Subject: Your vote needed on policy proposals
To: Leto Quarles <letoquarlesmd@gmail.com>
Cc: Kate Alfano <kate_alfano@cms.org>, <chet_seward@cms.org>

Hi Leto,

Thank you for quick response, and considerate words!

Yes, please feel free to share my feedback with the CMS BOD, staff, author of this proposal, and any interested parties.

I may also share my sentiments with the Denver Post in the interim, regarding Dr. Morrell's weaponization of medicine, intentionally during Pride Month. It's deceptive by the author, and it is disappointing that it comes from a physician who is in a privileged place of power.

I know that its appearance in CL is c/w the current, well intentioned process in place to solicit member input; and it is at no fault of CMS, the staff, or the BOD.

But it is a shameful and overt use of our members' communication tool, and it should be taken down.

Thank you!

Drew

On Sunday, June 9, 2024, Leto Quarles <letoquarlesmd@gmail.com> wrote:

> Hi Drew,
> Thank you.
> Totally agree with your sentiments.
> Also, to fill you in on the process, Central Line proposals come directly (unedited by CMS staff) from the CMS Member(s) who are proposing them. So that's why the language reads the way it is. May I have your permission to read your comment verbatim at the CMS BOD meeting this coming week when we discuss the Central Line proposals and membership feedback?
> Thanks!
> Leto
>
> --
> "I have loved the stars too fondly to be fearful of the night." ~ *Galileo Galilei*

**255**

On Sun, Jun 9, 2024 at 12:34 PM Drew Updike <drewupdike@gmail.com> wrote:

Hi Kate,

I felt like reaching out to you & Dr. Quarle directly would be best way to address this.

The central line proposal attached is clinically offensive and misleading - its title conflates two medically unrelated topics.

Gender affirmative therapy & genital mutilation are medical separate entities. The author of this CL proposal is intentionally conflating them for political reasons.

I believe the results of the "survey" are a result of people's reflexive, negative-association with the intentionally-framed subject line.

I strong urge CMS to remove and reassign a subject more honest with the content of the proposal.

Thank you,

Drew Updike MD, MPH, FACP

On Saturday, June 8, 2024, Colorado Medical Society <membership@cms.org> wrote:

Some members using Google Chrome are experiencing issues viewing links on CMS.org. We recommend using a different Internet browser such as Safari if you receive an error message, or refreshing your browser. Thank you for your patience.



**Central Line proposal**

Dear Dr. Updike:

Three policy proposals will be considered by the Colorado Medical Society Board of Directors on June 14, 2024, and your input is needed.

The following personalized link will log you into Central Line to vote and comment on the proposals: [personalized link removed to prevent unauthorized use]

Please be sure to vote by June 13, 2024, and do not share your link as it is associated

**256**

with your member account.

Thank you for using CMS Central Line.



&lt;Message to my fellow Board Members for 6-14-2024.docx&gt;

**257**

DE_000234



**Parasol Patrol Colorado Chat**

Wanted to give you all a heads up that Turning Point is sponsoring this event at DU with a transphobic speaker. I'm a DU student and Turning Point has harassed diverse student groups in the past, including starting a fight with the Native Student Alliance. Would it be possible for us to show LGBTQ+ students at DU tha their community supports them?

11:05


docs.google.com

← Transgender Support Sign-...

Jeremy Haefner, Chancellor, University of Denver
Mary Clark, Provost & Executive Vice Chancellor, University of Denver
Marti McCaleb, Associate Vice Chancellor of Equal Opportunity and Title IX and Title IX Coordinator at DU, University of Denver

We, the undersigned members of the University of Denver staff, students, campus workers, faculty, and alumni, are writing to express our deep concern regarding the upcoming event hosted by Turning Point USA on April 10th, featuring Erin Lee from Protect Kids Colorado. While we recognize the importance of fostering diverse perspectives and encouraging robust dialogue on our campus, we cannot condone the dissemination of harmful rhetoric that perpetuates discrimination and undermines the well-being of marginalized communities.

As an institution committed to inclusivity and diversity, it is imperative that we denounce any efforts to promote hateful stereotypes or propagate misinformation, especially when it comes to issues affecting transgender individuals. The recent surge in anti-LGBTQ legislation across the country, with a staggering 484 anti-LGBTQ bills in state legislatures in 2024 alone so far being tracked by the ACLU, underscores the urgency of our responsibility to stand in solidarity with our transgender peers and allies.

According to the US Trans Survey of 2015, transgender students face pervasive harassment in various forms, both in person and online. Shockingly, 1 in 20 individuals surveyed reported being physically assaulted as a result of their gender identity. These alarming statistics paint a grim picture of the daily struggles and threats faced by transgender individuals, particularly in educational settings.

Furthermore, it is crucial to acknowledge the barriers

**259**

← Transgender Support Sign-...

Furthermore, it is crucial to acknowledge the barriers that transgender individuals encounter in pursuing higher education. Due to rampant harassment and discrimination, very few transgender individuals make it to college, depriving them of the opportunity to access vital resources and opportunities for personal and professional growth.

Turning Point USA's promotion of harmful rhetoric and association with Protect Kids Colorado, an organization known for its anti-transgender and anti-science stances, is deeply troubling. By perpetuating harmful stereotypes and fostering an environment of fear and discrimination, Turning Point USA is complicit in perpetuating systemic barriers that restrict access to life-saving gender-affirming healthcare, restroom accommodations, and parental rights for transgender individuals and their families.

As members of the University of Denver community, we call on Turning Point USA to reconsider their decision to host this event and to prioritize the well-being and safety of all students. We call on the larger University of Denver campus to protest this event and the University of Denver to not allow this event or future events which violate the DU Honor Code to go forward. We urge our fellow community members to join us in condemning hate speech and standing in solidarity with transgender individuals in our pursuit of a more equitable and inclusive campus environment.

**Signatories:**

1. Shoshana McClarence, PhD candidate in the Joint Doctoral Program in Religious Studies, and Staff in Anderson Academic Commons
2. David C. Kemp, PhD student in the Joint Doctoral Program in Religious Studies, and student staff in the Anderson Academic Commons and JDP
3. Nicole Cortez Nevarez, staff at the Anderson

DE_000282



 

**Gwen** ›
geistwen_



# Gwen

geistwen_

65 followers · 194 posts

You don't follow each other on Instagram

**View profile**

YESTERDAY 9:37 PM

 Antifa agent here. Stop posting sensitive information immediately or you will be silenced.

**262**

DE_000433



263
DE_000429

 **Gnowknayme** @Gnowknayme · 7h

Replying to @Erin4Parents @COBeeMama and @KyleClark

Hey Erin!





**Nicole Solas Domestic Terrorist!** ✔
@Nicoletta0602

This is a public school employee publicly threatening legal action because @Erin4Parents and I exposed her emails keeping secrets from parents.

Please sue lol

twitter.com/mgrosstaylor/s...



**Marlena Gross-Taylor** ✔
@mgrosstaylor

🛑 It's hard enough navigating racism, etc. at work as the only #blackwoman in leadership there, but having to also deal with racist, discriminatory news media & the bots/sick people it empowers is crazy. ✅ My personal legal team is involved. No one deserves this treatment.

 **Fox News** ✔ @FoxNews · 05 Mar
Elementary school's private emails show secret plans to defy parents' wishes on transitioning their child fxn.ws/3YpOOzH

**266**
DE_000453

On Fri, May 7, 2021 at 9:09 AM Riep, Jenna - WEL <jriep@psdschools.org> wrote:

Hey Kimberly,

Sorry I am just responding, this has been a lot to process. The family has reached out the school a couple times this week, we are trying to get to a good place with them.

I really appreciate you taking the time to write thoughtful response. Thank you so much for your support and time, I'd love to get some advice sometime this summer on how I can best support students if something like this happens again.

Thanks again,

Jenna Riep
Art Teacher
she/her/hers
Wellington Middle School
jriep@psdschools.org

From: Kimberly Chambers <kimberly@splashnoco.org>
Sent: Friday, May 7, 2021 9:19 AM
To: Riep, Jenna - WEL <jriep@psdschools.org>
Subject: Re: Requesting content for Wellington Middle program

Absolutely!
As needed, you have a strong ally in our Board of Education, who can help your admin with responses and base them on the Equal Access Act where parents don't have to approve which clubs and activities their children participate in (which will probably be the next attempt by this parent). Kristen Draper has been briefed on this parents' outreach and she is ready to respond if anyone needs it. She is very available to you via email, even if you/Admin just want advice, and has fielded all of the other middle schools as they began GSA's and pushed through these barriers.
If there is additional work that I can do on my side, please let me know, how this is handled will set a precedence for other parents as they hear about it, so a strong first allyship is key.

Have you been able to check in with ██████ to make sure she is okay?

On Fri, May 7, 2021 at 9:45 AM Riep, Jenna - WEL <jriep@psdschools.org> wrote:

Thanks so much, I will keep her Kristen's in mind if anything else arises. Unfortunately, ██████ hasn't been in school since all this started, so I am not sure how they are doing.

I will reach out if anything else comes up, again, thank you so much for your support!

Jenna Riep
Art Teacher
she/her/hers
Wellington Middle School
jriep@psdschools.org

From:      Kimberly Chambers <kimberly@splashnoco.org>
Subject:   Re: Requesting content for Wellington Middle program
To:        Riep, Jenna - WEL <jriep@psdschools.org>
Sent:      May 7, 2021 4:00 PM (UTC+00:00)

If that persists, you'll want to talk to admin about doing a well-child check or whatever is within the policies of the school. In one former extreme case, a parent had been so concerned that their child wasn't allowed to leave home without family until they [reportedly] decided this "gender identity" was "nonsense". That parent was an attorney, so that was an overreach, and the parent was very focused on how it would affect their career if they had a trans child. That 13-year old was moved from Liberty Commons to a private boarding school out of state (where they ended up staying until they turned 18 last year and moved back to NoCo fully out of the closet much to their dad's dismay). It was learned after a school presentation and then subsequent back-to-back suicide attempts that I was alerted to by their friends and called in to have checks made at home. We never got this parent communication, so it is likely different this time, but keeping whatever type of communication that is within school policies open is a good idea.

It's a lot of work being an ally in these situations, but it's rewarding in the end. I have requested to join the Wellington community group right after our session but haven't been admitted as of yet.
Thanks again.

**Kimberly Chambers**
**(she/her/hers) what's this?**
**Director, SPLASH Youth of Northern Colorado**
**SplashNoCo.org/support**
**Find us anywhere online with #splashnoco**



# RESUME

**March 25, 2024**

Group Code: CPAN
Sales Mgr: Christy Scrivner
Service Mgr: Jessica Gregory

Group Name:   Colorado Parent Advocacy Network
Post As:      Colorado Parent Advocacy Network
Address:      ████████████████

Contact:      Ms. Lori Gimelshteyn
Telephone:    ████████████

**Arrival:** Sunday, April 7, 2024
**Departure:** Sunday, April 7, 2024

**Check-in Time:**   4:00 p.m.
**Check-out Time:**  11:00 a.m.

| GUESTROOMS | | DATES → | 4/6 | 4/7 | | | | | | # of Rooms | Rate per Room |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Individual Guest – Single | Contracted | | 0 | 0 | | | | | | | |
| | Pick Up | | S | S | | | | | | S | $150 |

*All rates are per person per day.* Please contact your Conference Services Manager **72 Working Hours** prior to your function with your expected attendance. Set or attendance may be reduced; however, billing will reflect original contracted number.

# PROGRAM

**Group Name:** Colorado Parent Advocacy Network
**Group Code:** CPAN
**Post As:** Colorado Parent Advocacy Network
**Contact:** Ms. Lori Gimelshteyn

| Date | Time | Function | Room | Setup | AGR | Rental | BEO # |
|------|------|----------|------|-------|-----|--------|-------|
| Sun, 04/07/24 | 2:00 PM - 5:00 PM | Setup | Pikes Peak | Theater | | | 166639 |
| Sun, 04/07/24 | 2:30 PM - 5:00 PM | Meeting | Pikes Peak | Theater | 250 | $2,000.00 | 166639 |
| Sun, 04/07/24 | 2:30 PM - 5:00 PM | Registration | Peak Foyer | Registration | | $.00 | 166639 |

| | |
|---|---|
| Front Office: | Reservations made by individual call in. All charges individual pay.<br><br>The following reservations are room and tax to master incidentals individual pay. Each guest has their own own room but all rooms have the same confirmation #.<br><br>Confirmation # is 3488433218<br>Mitchell Cole 4/6-4/8 (Q2)<br>Erin Lee 4/6-4/8 (Q2)<br>Dr. Travis Morrell 4/6-4/8 (Q2)<br>Mary Margaret Oloham 4/6-4/8 (K1)<br>Eddie Waldrep 4/6-4/8 (Q2)<br><br>Should guests decide to valet there is a $12 per day fee. |
| Client Areas of Importance | |
| Guest Services: | No requests at this time |
| Bell Desk/Valet/Parking: | No requests at this time |
| Food & Beverage Outlets: | |
| Housekeeping: | No requests at this time |
| Property Operations: | No requests at this time |
| Security: | No requests at this time |
| Accounting: | |
| Concessions: | |

Other Notes:

## BILLING INFORMATION

Please forward invoice to:
Colorado Parent Advocacy Network
Ms. Lori Gimelshteyn

██████████████

## SHIPPING/RECEIVING

Please address all packages to:
Colorado Parent Advocacy Network
ATTN: Jessica Gregory
The Inverness Denver, a Hilton Golf & Spa Resort
200 Inverness Drive West
Englewood, CO  80112

**269**

DE_000082

Acceptance of Conference Details

_____

Authorized Signature                    Date

**270**
DE_000083

## The Inverness Denver, a Hilton Golf & Spa Resort

200 Inverness Drive West, Englewood, CO 80112
Phone: 303-799-5800

**Banquet Event Order**

BEO #: 166639
Page 1 of 1
Date Printed: 3/25/2024

Local Catering

THE INVERNESS
DENVER
A HILTON GOLF & SPA RESORT

| Post As: | Colorado Parent Advocacy Network | | Event Date: | Sunday, April 07, 2024 |
|---|---|---|---|---|
| Account: | Colorado Parent Advocacy Network | | Contact: | Lori Gimelshteyn |
| Address: | ▮▮▮▮▮▮▮▮ | | Phone: | ▮▮▮▮▮▮▮▮ |
| | | | Email: | |
| | | | Onsite Contact: | |
| | | | Onsite Phone: | |
| Master Account #: | CPAN | | Catering Manager: | Jessica Gregory |
| | | | Phone: | 303.397.7029 |
| | | | Email: | jgregory@invernessdenver.com |

| Event Time | Event Name | Room | Setup | Agr | Gtd | Set | Rental |
|---|---|---|---|---|---|---|---|
| 2:00 PM - 5:00 PM | Setup | Pikes Peak | Theater | | | | |
| 2:30 PM - 5:00 PM | Meeting | Pikes Peak | Theater | 250 | 250 | | $ 2,000.00 |
| 2:30 PM - 5:00 PM | Registration | Peak Foyer | Registration | | | | $ .00 |

## Menu

### Beverage

## Room Setup

**Meeting | Pikes Peak | 2:30 PM - 5:00 PM**

Directional Sign
PEAK FOYER
( 2 ) 6ft Tables with ( 4 ) Chairs at the bottom of the stairs for Registration

PIKES PEAK
Theater set up for ( 250 )

8 x 18 stage at the front of the room
Podium
( 2 ) 6ft Tables with ( 3 ) chairs each on the stage

( 5 ) 6ft Tables with ( 2 ) chairs in the back of the room for sponsors

Water Station in the Room

## Multimedia

**Meeting | Pikes Peak | 2:30 PM - 5:00 PM**

AV Arranged through Encore Global, Tony Nolan
Quote # 4018-
Set to include

## Special Instructions

## Billing Instructions

**Meeting | Pikes Peak | 2:30 PM - 5:00 PM**

Final guarantee and estimated charges due 4/1
All charges to master
Payment by credit card

All meeting room, food and beverage, audio-visual and related services are subject to applicable taxes (currently 4.25%) in effect on the date(s) of the event and subject to change without notice. Prior to the application of any taxes, all meeting room, food and beverage, audio-visual and related services will be subject to a 25% administrative charge. Please note that the administrative charge is not a gratuity or tip and, accordingly, is subject to all applicable taxes. A portion of this charge (currently 12.00% of food & beverage sales) will be distributed directly to food & beverage staff as additional compensation for their services, while the remainder will be applied to costs and/or expenses other than employee wages.

Organization Authorized Signature                    Date

The Inverness, a Hilton Golf & Spa Resort                    Date
Approval

BEO #: 166639
Page 1 of 1
Date Printed: 3/25/2024

**271**

# INVERNESS
DENVER
A HILTON GOLF & SPA RESORT

**The Inverness Denver, a Hilton Golf & Spa Resort**
200 Inverness Drive West, Englewood, CO 80112
Phone: 303-799-5800

## Booking Check

| Post As: | Colorado Parent Advocacy Network | | Event Dates: | April 7, 2024 - April 7, 2024 |
|---|---|---|---|---|
| Account: | Colorado Parent Advocacy Network | | Contact: | Lori Gimelshteyn |
| Address: | ███████████ | | Phone: | ███████████ |
| | | | Email: | |
| | | | Onsite Contact: | |
| | | | Onsite Phone: | |
| Master Account #: | CPAN | | Sales Manager: | Christy Scrivner |

| Event Date | Event Time | Room | Event Name | Setup | Agr | Gtd | BEO # |
|---|---|---|---|---|---|---|---|
| Sun, 04/07/2024 | 2:00 PM - 5:00 PM | Pikes Peak | Setup | Theater | | | 166639 |
| Sun, 04/07/2024 | 2:30 PM - 5:00 PM | Pikes Peak | Meeting | Theater | 250 | 250 | 166639 |
| Sun, 04/07/2024 | 2:30 PM - 5:00 PM | Peak Foyer | **Registration** | Registration | | | 166639 |

**Sunday, April 07, 2024**

### Events

| Qty | Name | Value | Subtotal | Combined Tax | Service Charge | Total |
|---|---|---|---|---|---|---|
| 1 | Pikes Peak | $ 2,000.00 | $ 2,000.00 | $ 106.25 | $ 500.00 | $ 2,606.25 |

### Daily Total

| | | Subtotal | Combined Tax | Service Charge | Total |
|---|---|---|---|---|---|
| | Events | $ 2,000.00 | $ 106.25 | $ 500.00 | $ 2,606.25 |

### Deposit Summary

| Payment, USD 500.00 | ($ 500.00) |
|---|---|
| | Subtotal | $ 500.00 |

### Summary All Charges

| | Subtotal | Combined Tax | Service Charge | Total |
|---|---|---|---|---|
| Guestrooms | $ .00 | $ .00 | $ .00 | $ .00 |
| Events | $ 2,000.00 | $ 106.25 | $ 500.00 | $ 2,606.25 |
| Subtotal | $ 2,000.00 | $ 106.25 | $ 500.00 | $ 2,606.25 |
| Less Deposit | | | | ($ 500.00) |
| **Grand Total** | | | | **$ 2,106.25** |

Organization Authorized Signature                    Date

**272**
DE_000085

**From:**

**Rachel Willis**

Vehicle Vault

Venue

(303) 626-8920

[email protected] (/cdn-cgi/l/email-protection)



| Bill To: | Kimberly W |
|---|---|
| | [email protected] (/cdn-cgi/l/email-protection) |
| Project: | CPAN Benefit Gala |
| Type | Non-Profit |
| Date | Sep 19, 2025 |
| Time | 3:00 pm - 11:00 pm |
| Location | Vehicle Vault, 18301 Lincoln Meadows Pkwy, Parker, CO 80134, USA |

# CPAN BENEFIT GALA PROPOSAL

## Version 4

### PROPOSAL

| | QTY | UNIT | PRICE | SVC | TAX | TOTAL |
|---|---|---|---|---|---|---|
| **Gallery Floor Package** | | | | | | $0 |
| Pre Event Set Up Time: 3:00 P.M - 6:00 P.M. <br> Event Time: 6:00 P.M. - 10:00 P.M. <br> Post Event Tear Down Time: 10:00 P.M. - 11:00 P.M. <br> Capacity: Gallery Floor - 500 seated (700 standing) <br> Size: 6,000 sq ft <br> **Includes Wi-Fi, multiple power sources. | | | | | | |
| ♣ **Hourly Rental** | 8.0 | hour | $640.00 | | | $5,120.00 |
| Per hour space rental (5 hour minimum). <br> Total hours to represent set-up, event and tear down hours needed. <br> 20% nonprofit discount reflected from the original rate of $800 per hour | | | | | | |

**273**

DE_000500

| | QTY | UNIT | PRICE | SVC | TAX | TOTAL |
|---|---|---|---|---|---|---|
| ♣ **Janitorial Fee** | 0.0 | item | $500.00 | | | |
| Applied to event that does not contract with a Vehicle Vault approved food and beverage vendor | | | | | | |
| ♣ **Event Security** | 5.0 | item | $150.00 | | | $750.00 |
| Required for all Gallery Floor Events | | | | | | |
| Two Total Officers | | | | | | |
| One officer per 150 guests at a rate of $75 per hour per officer for the duration of the event plus half an hour before the event and half an hour after | | | | | | |
| ♣ **5' Round Tables** | | | | | | |
| Included in your rental - 35 Available | | | | | | |
| ♣ **8' Banquet Tables** | | | | | | |
| Included in your rental - 7 Available | | | | | | |
| ♣ **6' Banquet Tables** | | | | | | |
| Included in your rental - 6 Available | | | | | | |
| ♣ **2.5' Cabaret Tables (Tall/Short Stems)** | | | | | | |
| Included in your rental - 20 Available | | | | | | |
| ♣ **Crystal Chiavari Chairs with Black Pads** | | | | | | |
| Included in your rental - 300 Available | | | | | | |
| ♣ **Tire Tables** | | | | | | |
| Included in your rental - 4 Available | | | | | | |
| **Rescheduling Fee** | 1.0 | | $1,024.00 | | | $1,024.00 |
| Rescheduling event date within 90 days of 5/9/25 | | | | | | |

| | | |
|---|---|---|
| **Subtotal:** | | **$6,894.00** |
| **Total Amount:** | | **$6,894.00** |

**PAYMENT PLAN**

1.  $2,935.00          Oct 21, 2024          #389233-000102          PAID # 389233-000102

2.  $3,959.00          Aug 19, 2025          #389233-000103          UNPAID

**274**

DE_000501

Total Amount:    **$6,894.00**

**275**

**CONTRACT**

DE_000502

# Event Addendum

## I. EVENT INFORMATION

Event Name: CPAN Benefit Gala

Event Date:September 19, 2025

Space(s) Rented:Gallery Floor

Number of Attendees not to exceed:  300

Client Name:Lori Gimelshteyn

Client Company (If applicable): Colorado Parent Advocacy Network

Client Phone Number ███████

Client Email Address[email protected] (/cdn-cgi/l/email-protection)

Designated Contract Signee (if different than Client Name): Lori Gimelshteyn

Designated Contract Signee Email Address (if different than Client Email Address): [email protected] (/cdn-cgi/l/email-protection)

## II. Details of Facility Rental

Total Rental Hours: Eight

Pre-Event Set Up Time: 3:00 P.M. - 6:00 P.M.

Event Time 6:00 P.M. - 10:00 P.M.

Post Event Tear Down Time:10:00 P.M. - 11:00 P.M.

Rented Space(s) Cost: $6144

## III. *Security* Required for all Gallery Floor Events

Total Security Fee:$750

## IV. Total Charges

Total Cost:6,894.00

*Includes Facility Rental, any additional items from the proposal and security.

## V. Payment Schedule

First Payment Total Cost 2,935.00

Due: Oct 15, 2024

Remaining  Balance:3,959.00

Due:Aug 19, 2025

# Vehicle Vault Event Contract

Upon execution of this Event  Contract (the  "Contract"), Vehicle Vault agrees to provide Client (as named in Event Addendum) use of the Vehicle Vault facility for the purpose of Client hosting an event (the "Event") as described in the Addendum and under the terms and conditions set forth herein. The Contract's effective date is the date when both parties have executed it.

**Event Addendum:** Vehicle Vault and Client have completed the Vehicle Vault Event Addendum, which sets forth the times, location, anticipated items, event details, and cost of and services to be provided by Vehicle Vault.

**Payment:** Client shall pay Vehicle Vault for all amounts due and owing as listed under the Total Charges and according to the Payment Schedule as defined in the Addendum. Other payment terms are included as follows:

1.

    In the event of any additional charges due to damages, hours, and/or services exceeding total charges, Vehicle Vault will send Client an invoice within 7 days which Client agrees to pay such additional charges within 30 days after the date of such invoice.

2.

    Vehicle Vault accepts checks, and all major credit cards. Checks are to be made out to Vehicle Vault.

3.

    Any unpaid balance within 30 days of the event may be subject to late fees in the amount of 18% per annum, accrued monthly, or event being canceled.

**Rescheduling:** All Event reschedule requests shall be submitted to Vehicle Vault in writing and Client shall be responsible for a Rescheduling Fee as defined herein. Rescheduling this Event requires Client acceptance and execution of a revised Event Contract containing the Reschedule Date and other terms contained therein. Acceptance of the Reschedule Date by Vehicle Vault shall be subject to facility availability and shall not be greater than 18 months from the date of written request by Client to reschedule, unless agreed to in writing by Vehicle Vault at its sole discretion. If the Client is unable to request a specific Reschedule Date, then the parties will execute a Rescheduling Memorandum of Agreement until the Reschedule Date may be determined and agreed upon. Client is responsible for accepting and executing any Rescheduling Memorandum of Agreement or revised Event Contract and remitting any applicable

**277**

DE_000504

reschedule fee payment within seven (7) days of receipt. Failure of Client to accept and execute the Rescheduling Memorandum of Agreement or revised Event Contract within the seven (7) day period may result in cancellation of the event and a Cancellation Fee will be applied as defined in the Cancellation section below.

*Rescheduling Fees:*

- If Client reschedules the Event more than one year prior to the current Event Date, Client will be responsible for a 5% fee of the Total Charges as set forth in the Event Addendum.

- If Client reschedules the Event between more than six months and one year prior to the current Event Date, Client will be responsible for a 10% fee of the Total Charges as set forth in the Event Addendum.

- If Client reschedules the Event between more than 90 days and six months prior to the current Event Date, Client will be responsible for a 15% fee of the Total Charges as set forth in the Event Addendum..

- If Client reschedules the Event within 90 days of the current Event Date, Client will be responsible for a 20% fee of the Total Charges as set forth in the Event Addendum.

**Cancellation:** All Event cancellations shall be submitted to Vehicle Vault in writing and Client shall be responsible for a Cancellation Fee as defined herein.

- If Client cancels the Event more than 90 days prior to the Event Date, Client will be responsible for 25% of the Total Charges as set forth in the Event Addendum.

- If Client cancels the Event between 31 and 90 days prior to the Event Date, Client will be responsible for 50% of the Total Charges as set forth in the Event Addendum.

**278**

DE_000505

- If Client cancels the Event less than 31 days prior to the Event Date, Client will be responsible for 100% of the Total Charges as set forth in the Event Addendum.

- If Client is due a refund for any balance remaining from monies paid less the Cancellation Fee, Vehicle Vault will reimburse Client no later than 30 days after the date of Cancellation.

**Performance:** The performance of the Contract by either party is excused for acts of God, war, government regulations, disasters, strikes, civil disorder, or any other emergency making it illegal or impossible to provide the facilities or to hold the Event. Performance is not excused in advance due to anticipation of the possibility of one or more of these conditions potentially occurring. Neither is performance excused due to lack of attendance at Event. In the event Vehicle Vault is unable to perform under the Contract for any reason other than the excused reasons listed above, then Client's only recourse shall be the option to either (a) receive a refund of all monies paid to date, less any costs of performance incurred by Vehicle Vault, or (b) reschedule the same event for a future available date, at no additional cost to the Client. In any event, Client shall not be entitled to any other damages, whether direct or indirect, incidental or consequential, which include, but are not limited to, costs of advertising, invitations, entertainment, catering or travel expenses. In the event Client is unable to perform under the Contract for any reason other than the excused reasons listed above, then Client shall be responsible for immediate payment of all monies due under the Contract unless Client requests to reschedule the Event according to the terms outlined under the Rescheduling section above.

Notwithstanding the foregoing, the Parties acknowledge that at the time of execution of the Contract, due to the potential public health threat of the COVID-19 pandemic, COVID-19 related guidance and directives from Federal, state and local government agencies (the "Directives") have been issued and are periodically being updated. The Parties further acknowledge that as of the time of execution of the Contract, the actual impact of the Directives upon the Event is unknown.

Client hereby agrees that if the Event, as defined in the Contract, is unable to be executed as planned due to the Directives, Client shall:

a.

waive any claim force majeure under the Performance section herein;

b.

work diligently and in good faith with Vehicle Vault to reschedule the event as per the Rescheduling section herein; and,

**279**

DE_000506

c.

If unable to reschedule the event and a cancellation is requested by Client, that the provisions of the Cancellation section of the Contract shall apply without exception.

**Damage to Venue: Client is responsible for all damages, expenses, and losses including theft and property loss to the Vehicle Vault facility related to the Event, whether such damage is caused by Client, Client's guests, invitees, representatives or vendors. If such damage occurs, Client shall pay Vehicle Vault the actual cost to repair or replace the damage, plus a twenty percent (20%) administrative fee.**

**Third Party Or Authorized Agent**: If this Contract, Addendum or any other legally binding agreement, including agreement to pay, is to be executed for the Client by another party, including a third party agent or planner, Client shall provide Vehicle Vault, at the time of execution of the agreement being signed, with a letter identifying the third party and authorizing him/her to act on Client's behalf. Failure to provide such authorization shall render any such agreement as null and void until such authorization is provided by Client and accepted by Vehicle Vault. Additionally, written authorization must be provided for any person(s) other than the signer of this agreement who may be authorized to give direction or make decisions on behalf of Client in regard to the planning and details of the Event.

**Event Occupancy:** Preceding Event, Client must contact Vehicle Vault immediately for approval of changes in the Number of Attendees defined in the Event Addendum. Final attendee count is due to Vehicle Vault no later than seven (7) days prior to Event Date.

The safety of our clients, guests, vendors and staff is our primary concern. Due to strict regulations issued by the appropriate authorities, Vehicle Vault requires that Clients adhere to all such regulations as well as agree to limit the Event's total attendees to comply with all occupancy and attendee limits.

If the actual number of guest attendees exceeds the Number of Attendees set forth on the Event Addendum, Client assumes all responsibility and liability for any violation of such regulations, including exceeding occupancy and attendee limits. In addition, if actual attendee count exceeds capacities of spaces rented in the Event Addendum, Client agrees to be responsible for resolving any such regulatory violation to comply with occupancy limits.

**Food and Beverage:** All food and beverages that are brought into Vehicle Vault must be prepared by a licensed establishment, restaurant, or vendor in accordance with the Colorado Department of Public Health and Environment. Vehicle Vault has the right to refuse any food or beverage items that will be served at your event.

**Vendors:** All vendors must be from Vehicle Vault's list of Approved Vendors unless Vehicle Vault, at its sole discretion, provides prior written consent. Any non-approved under consideration shall be required to execute a One Day Vendor Contract with Vehicle Vault prior to receiving consent.

In addition, full-service staffing is required for all Gallery Floor events. If such full-service staffing is not included by vendors contracted for the Event, then Client shall contract from Vehicle Vault's Approved Vendor list to meet this requirement.

At any time, Vehicle Vault may require a copy of the Vendor's business license, most recent health inspection and contracts between Client and Vendor. Client agrees to assist to ensure that Vehicle Vault receives such documentation in a timely fashion.

Additionally, all vendors or other suppliers of services ("Vendor(s)") which have contracted with Client for the Event must meet with Vehicle Vault no later than 30 days prior to the Event Date to coordinate delivery times, loading areas, set-up locations, and pick-up schedule. Vehicle Vault does NOT and will NOT provide staff, carts, hand trucks, ladders or other items to move or set supplies or equipment. Entry into the Vehicle Vault facility for Pre-Event Set Up Time may begin in

**280**

DE_000507

accordance with the Event Addendum. Long-term parking for Vendor staff is not allowed in loading area but is available in designated areas of the Vehicle Vault parking lot. All vendors and their items must be cleared from Vehicle Vault in accordance with the Post Event Tear Down Time in the Event Addendum. Client may be responsible for additional charges if vendors are on premises outside of the Event Addendum times.

**Alcoholic Beverage Services: Alcohol may not be served on premises by any other vendor or persons than the approved Vendor for Alcohol Services as designated on the Vendor Detail Worksheet for the Event. An approved Vendor for Alcohol Services shall only use staff who are TIPS trained and certified. All alcohol service shall end 30 minutes prior to event end time. Where required by local ordinance, Client is solely responsible for applying and obtaining a special event permit through the Town of Parker and no vendor shall provide or serve liquor if such required permit has not been obtained by Client. Vendor agrees to adhere to all local and state statutes and regulations in regard to Alcoholic Beverage Services and further agrees that Vehicle Vault is not responsible for providing such services, nor does Vehicle Vault guarantee that Client will be able to receive any permits or approvals as may be required by law.**

**Rental Services**: Vehicle Vault has rental inventory for use during the event as listed within the Event Proposal. Should the event require additional quantities or items not in Vehicle Vault's inventory it will be at the client's expense to secure such items through a rental partner who shall be required to execute a One Day Vendor Contract with Vehicle Vault prior to receiving consent to work on premise.

**Parking**: Vehicle Vault offers complimentary on-site, self-parking on the property. Please note cars may not be parked in non-paved areas or Outdoor Plaza without written approval.

**Animals**: Live animals are not allowed on the Vehicle Vault property except for legally recognized service animals.

**Safety & Security**: Client, attendees and Vendors, all are permitted access only to the contracted spaces unless otherwise agreed upon by Vehicle Vault. If the event takes place on the Gallery floor, a flat rate for security will be charged, based on size and time of the event. Vehicle Vault is not responsible for any lost or stolen items.

**General Guidelines: Amplified music and sound volume levels must be kept at a level agreed to by Vehicle Vault at its sole discretion. Client agrees that the cars and sets at Vehicle Vault are for display purposes only. Client, Vendors and attendees are not permitted to touch, climb in/on, or in any way compromise the vehicles. Cars on display at time of Event are at the sole discretion of Vehicle Vault unless otherwise documented and approved in advance by Vehicle Vault.**

**Insurance Requirements**: Any registered entity (Client and all Vendors) associated with an event must provide Vehicle Vault with a Certificate of Insurance. The following information MUST BE INCLUDED ON THE CLIENT'S AND VENDOR'S certificate of general liability

1.

   Vehicle Vault shall be named as an additional insured.

2.

   The policy must be primary and Non-Contributory.

3.

**281**

DE_000508

The policy must be insured at a minimum of $1 million for each occurrence.

**Decorations:** No decorations or other items shall be posted, nailed, screwed, glued or otherwise attached to the walls, floors or other parts of the Vehicle Vault facility, building, furniture or surrounding areas without Vehicle Vault's permission. The use of the following items is prohibited inside the building and restricted outside:

· Pyrotechnics

· Combustible materials

· Fog/Steam Machines

· Glitter

· Confetti

· Bubbles

· Rice

· Birdseed

· Other items that Vehicle Vault may determine to be unacceptable at its sole discretion.

Additionally, all open flames must be securely contained completely in a glass container.

Please contact a Vehicle Vault representative for authorization for outdoor use. All decorations, supplies, promotional items, rental equipment, and other items must be removed immediately following the Event. Vehicle Vault is not responsible for any materials or equipment left at the Vehicle Vault facility. In the event the Vehicle Vault facility requires to be cleaned due to an Event, beyond normal clean up requirements, Vehicle Vault may charge the Client an additional cleaning fee.

**Smoking:** Smoking in any form, including but not limited to electronic, vapor, cigarettes, cigars or pipes, regardless of the material being used, is prohibited inside any of the Vehicle Vault buildings. Smoking is allowed in outside areas where designated receptacles are provided.

**Compliance with Laws**: Client shall comply with, and hereby accepts full and complete responsibility for ensuring compliance by its representatives, agents, Vendors, invitees, and guests with, all federal, state and local laws, regulations, health and executive orders in connection with the Event. Vehicle Vault shall comply with all federal, state and local laws, regulations, health and executive orders in connection with the Event.

**Enforcement**: In the event of any breach of the Addendum by Client, Client shall be liable for all costs of collection, including attorney fees incurred by Vehicle Vault. In the event, any party brings a lawsuit seeking enforcement of the Addendum, exclusive jurisdiction and venue shall be in the District or County Court for the County of Douglas, State of Colorado.

**Indemnification:** Client shall indemnify, hold harmless and defend Vehicle Vault from any liability, costs and all expenses incurred, including attorney fees, relating to any claims asserted against Vehicle Vault in connection with the Event. Vehicle Vault shall indemnify, hold harmless and defend Client from any liability, costs and all expenses incurred, including attorney fees, relating to any claims asserted against Client in connection with the Event which arises from Vehicle Vault's gross negligence or willful misconduct.

DE_000509

**Advertising:** Vehicle Vault exclusively maintains all rights to the use of its logo, name, and address in relation to all Marketing and Printed Materials. Any and all such Materials must be approved in advance by Vehicle Vault, and if not approved may be subject to legal action. Vehicle Vault maintains the right to document all events for use in Marketing materials and promotional items.

**Changes, Additions, Modifications**: This is the entire agreement between the parties and any prior agreements either oral or written are deemed void, and the Addendum cannot be changed or amended except by written amendment notification acknowledged and agreed upon signed by both parties.

**Acceptance:** Upon execution by both parties, this Addendum constitutes a binding contract between Vehicle Vault and Client. The individuals signing below represent that each is authorized to bind his or her party to the Addendum.

*Rachel Willis*

Rachel Willis                                              Oct 22, 2024

*Lori A. Gimelshteyn*

Lori Gimelshteyn                                          Oct 21, 2024

[email protected] (/cdn-cgi/l/email-protection) | www.vehiclevaultco.com | 3036268920 | 18301 Lincoln Meadows Parkway, Parker, CO 80134

**283**

## APPLICATION/PERMIT FOR USE OF SPACE IN PUBLIC BUILDINGS AND GROUNDS

**OMB Control Number: 3090-0044**
**Expiration Date: 5/31/2025**

Public reporting burden of this collection of information is estimated to average 20 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Facilities Management and Services Programs (PM), GSA Public Buildings Service, Washington, DC 20405.

**INSTRUCTIONS:** This form allows the Applicant to request the use of federally owned property in accordance with 40 U.S.C. § 581(h) and Federal Management Regulation 41 C.F.R. part 102-74, subpart D. The Applicant must accurately describe the proposed use and, if approved, the form will serve as the permit for that use. Please submit the form to the federal property manager responsible for the property.

Note: If the proposed use is a farmers market, the Applicant must confer with the Federal property manager and regional counsel to determine whether a permit (GSA 3453); a license (GSA 1582); or an outlease is the appropriate vehicle for the specific circumstances of each market.

### PART I - APPLICATION

#### APPLICANT

| FIRST NAME | MIDDLE | LAST NAME | MAILING ADDRESS |
|---|---|---|---|
| Erin | | Lee | STREET ▮▮▮ |
| TELEPHONE NUMBER | EXTENSION | E-MAIL ADDRESS | CITY ▮▮▮  STATE CO  ZIP CODE ▮▮▮ |
| ▮▮▮ | | ▮▮▮ | |

#### SPONSOR, PROMOTER OR CONDUCTOR OF PROPOSED ACTIVITY

| NAME OF PERSON OR ORGANIZATION | MAILING ADDRESS |
|---|---|
| Erin Lee | STREET ▮▮▮ |

| TELEPHONE NUMBER | | | | | | | |
|---|---|---|---|---|---|---|---|
| AREA CODE | PHONE | | EXTENSION | CITY ▮▮▮ | STATE CO | ZIP CODE ▮▮▮ | |
| ▮▮▮ | ▮▮▮ | | | | | | |

#### SUPERVISION OF/AND RESPONSIBILITY FOR THE PROPOSED ACTIVITY

| NAME OF PERSON | MAILING ADDRESS |
|---|---|
| Erin Lee | STREET ▮▮▮ |

| TELEPHONE NUMBER | | | | | | |
|---|---|---|---|---|---|---|
| AREA CODE | PHONE | EXTENSION | CITY ▮▮▮ | STATE CO | ZIP CODE | |
| ▮▮▮ | ▮▮▮ | | | | | |

**DESCRIPTION OF PROPOSED ACTIVITY**

Brief press conference with America First Policy Institute and Illumine Law counsel, representing plaintiffs Lee and Jurich familes in Case 24-1254. Case oral argument is at 9AM in Courtroom IV. Counsel and plaintiffs would like to hold a presser on the courthouse main (southeast) steps immediately following oral argument. Some press and cameras may be present.

| PROPOSED BUILDING | PROPOSED AREA |
|---|---|
| Byron White Courhouse | Main entrance (southeast side, Stout Street) |

| PROPOSED DATES AND HOURS DURING WHICH THE ACTIVITY IS TO BE CARRIED OUT | | | APPROXIMATE NUMBER OF PERSONS TO BE ENGAGED IN THIS ACTIVITY (*If known*) |
|---|---|---|---|
| FROM | TO | HOURS | |
| 1/21/25 | 1/21/25 | 8AM-10:30AM | 20-30 |

**IMPORTANT:** If applicant purports to represent an organization, a letter or other documentation that the applicant has authority to represent that organization is required to be submitted with this form.

APPLICANTS PROPOSING TO ENGAGE IN THE SOLICITATION OF FUNDS MUST CHECK ONE OF THE FOLLOWING STATEMENTS:

I HEREBY CERTIFY THAT:

☐ I represent and will be soliciting funds for the sole benefit of a religion or religious group;

☐ My organization has received an official Internal Revenue Service (IRS) ruling or letter of determination stating that the organization or its parent organization qualifies for tax-exempt status under 26 U.S.C. 501(c)(3), (c)(4), or (c)(5); or

☐ My organization has applied to the IRS for a determination of tax-exempt status under 26 U.S.C. 501(c)(3), (c)(4), or (c)(5), and that the IRS has not yet issued a final administrative ruling or determination of such status.

**CERTIFICATION:** I CERTIFY that the above information is true and correct.

| SIGNATURE OF APPLICANT | DATE SIGNED |
|---|---|
| *EL* | 01/12/2025 |

### PART II - PERMIT (*TO BE COMPLETED BY GSA ONLY*)

DESIGNATED BUILDING AND AREA, ACTUAL DATES AND HOURS, FOR WHICH ACTIVITY APPROVED

| BUILDING | AREA | FROM | TO | HOURS |
|---|---|---|---|---|
| Byron White US Courthouse | Main Plaza and front steps | 1/21/2025 | 1/21/2025 | 8:30 am - 1:30 pm |

GSA APPROVING OFFICIAL

| SIGNATURE | | NAME OF OFFICIAL | DATE SIGNED |
|---|---|---|---|
| Shelly Baxter | Digitally signed by Shelly Baxter<br>DN: C=US, E=shelly.baxter@gsa.gov,<br>CN=Shelly Baxter<br>Reason: I am approving this document<br>Date: 2025.01.13 14:16:04-07'00' | Shelly Baxter, GSA Bldg Manager | |

**GENERAL SERVICES ADMINISTRATION**

**GSA 3453 (REV. 1/2016)**

**284**
DE_000461

## PART III - CONDITIONS

By submitting this form, Applicant agrees to the following terms and conditions:

Applicant will conduct the proposed activity strictly in accordance with the description of the activity in this permit.

Applicant must submit, as part of this permit, a copy, sample or accurate description of any materials proposed for distribution at the event.

Unless otherwise agreed to, in writing, by GSA and incorporated into this permit, the Applicant assumes all responsibility for, and costs and expenses associated with, clean-up of the grounds, providing trash containers and disposal of trash, as well as any additional security, electrical and water or related services needed to support the activity.  Portable restroom facilities may be authorized, at Applicant's sole cost and expense, if Applicant arranges for the removal before the beginning of the next business day.

GSA will neither store nor assume any responsibility for any materials that are used for an event.

By signing the permit application and without the need for further documentation, Applicant hereby indemnifies and saves harmless the United States, its agents and employees, in both their personal and official capacities, against any and all loss, damage, claim, or liability whatsoever, due to personal injury or death, or damage to property of the Federal Government or others, directly or indirectly, due to the exercise by Applicant of the privilege granted by this permit, or any act or omission of Applicant, including failure to comply with the obligations of this permit.

In keeping with federal policy regarding retention of records associated with federal contracts and the like, GSA will retain a copy of the permit for three (3) years from the date of issuance.

Special terms and conditions related to this permit are listed below (and continued on the following page(s), if necessary):

| SIGNATURE OF APPLICANT | DATE SIGNED |
|---|---|
| | 01/12/2025 |

If the request to use federal space is denied or an issued permit is cancelled, the Applicant may appeal within 5 calendar days of the notification of disapproval or cancellation to the GSA Regional Administrator or his/her designee.  For more information about how to request the use of Federal property under 40 U.S.C. § 581(h) and Federal Management Regulation 41 C.F.R. part 102-74, subpart D, please contact GSA's Office of Facilities Management and Services Programs (PM), 1800 F Street, NW, Washington, DC 20405 or visit www.gsa.gov

GSA 3453 (REV. 1/2016) **BACK**

**285**

DE_000462



# The Colorado Parent Advocacy Network

#ATCPANWECAN

## OUR VISION:

CPAN is a collaborative statewide network in which parents, educators, and concerned citizens are purposefully working together to secure parental rights & restore a rigorous, non-political, safe and fulfilling educational experience for all students. This is achieved through a culture of accountability for academic excellence, accessibility to school choice, school lesson transparency, and partnerships with families.

Learn more at WWW.COLORADOPARENTS.ORG

286

- **Plummeting Academics**

- **Alarming Safety Issues**

- **Controversial Curricula**

- **HIDDEN Use of Gender Transition Plans**

288

# Valedictorian



289



**290**

# Alarming
# Safety Issues

291



**292**

# Controversial Curriculum

293

# Beyond Diversity/Courageous Conversations

**WHAT IS IT:**  Beyond Diversity/Courageous Conversations is the professional development curriculum used in CCSD under the guise of Culturally Responsive Education.



**White Culture + White Privilege + White Oppression+ White Racism  = WHITENESS**

**COLOR**  Primary, Presence, Positioning
"White Privilege"
Stages of Avoidance: Ignorance to Competing Victimization

**CULTURE**  Being, Feeling and Acting White
"White Racial Bonding"
Avoidance | Individualism | Universality | De-Contextualization

**CONSCIOUSNESS**  Thinking and Reasoning White
"White Racial Identity Development"
Color-Blindness | Guilt/Shame | Anger | Helplessness | Anti-Racist

**295**

# SOME ASPECTS AND ASSUMPTIONS OF WHITE CULTURE IN THE UNITED STATES

While different individuals might not practice or accept all of these traits, they are common characteristics of most U.S. White people most of the time.

## RUGGED INDIVIDUALISM
- Self-reliance
- Individual is primary unit
- Independence and autonomy highly valued and rewarded
- Individuals assumed to be in control of their environment—"You get what you deserve"

## COMPETITION
- Be #1
- Win at all costs
- Winner-loser dichotomy
- Action oriented
- Master and control nature
- Must always "do something" about a situation
- Aggressiveness and extroversion
- Decision-Making
- Majority rules (when whites have power)
- Hierarchical

## JUSTICE
- Based on English common law
- Protect property and entitlements
- Intent counts

## COMMUNICATION
- *The King's English* rules
- Written tradition
- Avoid conflict, intimacy
- Don't show emotion
- Don't discuss personal life
- Be polite

## HOLIDAYS
- Based on Christian religions
- Based on white history and male leaders

## HISTORY
- Based on northern European immigrants' experiences in the United States
- Heavy focus on the British Empire
- Primacy of Western (Greek, Roman) and Judeo-Christian tradition

## PROTESTANT WORK ETHIC
- Hard work is the key to success
- Work before play
- "If you didn't meet your goals, you didn't work hard enough."

## EMPHASIS ON SCIENTIFIC METHOD
- Objective, rational, linear thinking
- Cause-and-effect relationships
- Quantitative emphasis

## STATUS, POWER AND AUTHORITY
- Wealth = worth
- Heavy value on ownership of goods, space, property
- Your job is how you are
- Respect authority

## TIME
- Adherence to rigid time schedules
- Time viewed as a commodity

## FUTURE ORIENTATION
- Plan for future
- Delayed gratification
- Progress is always best
- "Tomorrow will be better."

## FAMILY STRUCTURE
- Nuclear family (father, mother, 2.3 children) is the ideal social unit
- Husband is breadwinner and head of household
- Wife is homemaker and subordinate to husband
- Children should have own rooms, be independent

## AESTHETICS
- Based on European culture
- Woman's beauty based on blonde, thin—Barbie doll
- Man's attractiveness based on economic status, power, intellect
- Steak and potatoes; "bland is best"

## RELIGION
- Christianity is the norm
- Anything other than Judeo-Christian tradition is foreign
- No tolerance for deviation from single God concept

JUDITH H. KATZ ©1990. THE KALEEL JAMISON CONSULTING GROUP, INC. ALL RIGHTS RESERVED



W 61

296

# Middle School Principal's Commitment

**Middle School Commitment**

Our collective commitment, as Middle School leaders, is to examine and deepen our understanding of race and the impact that it has on our students and within our school communities.

We commit to interrupt the role and presence of whiteness as we identify and disrupt biases and the marginalization of students. We will foster and engage in authentic relationships that ensure high-level learning for every student, especially the success of our Black, Brown, and Indigenous students.

SOURCE:  Board of Ed Study Session on 9/13/19

file:///C:/Users/color/Desktop/BLMS/Beyond%20Diversity/MS%20Discipline%20Data%20Sept%2013%202019.pdf

297



298

# Curriculum-Why is your favorite hobby racist?



*“Mom, you don’t understand,
I HAVE to think a different way at school.”*

299

# Overland High School 9th Grade English Teacher



The same Overland High School English teacher shared his POLITICAL opinion with 9th graders about President Donald Trump.
*"Donald Trump was polarizing. Racists loved him.  The rest of us decent people found him horrific."*



**300**

# LGBTQIA+ AFFIRMATION
# Gender Support & Transition Plans



301

# SEL...do you know?

**WHAT IS IT:** Social Emotional Learning (SEL) is a system used by schools to transform the educational system by placing focus on YOUR child's attitudes, morals, values and beliefs instead of spending valuable time focused on academic excellence in math, language arts, science and social studies. **We believe that this is the parents right and role and that schools need to remain focused on core education and addressing the academic gap for ALL students.**

**HOW IS IT DELIVERED**: Schools are utilizing a series of materials to accomplish this including but not limited to:  Second Step Curriculum, FastBridge and the use of various surveys, questionnaires and "specials" classes disguised as a means to create "resilient, caring, empathetic and confident" children.  In actuality, SEL is emotionally manipulating YOUR child using benign language as a cover for delivering the CRT ideology, social justice, gender ideology, and sexual orientation into **YOUR** child's education.



302

# Say what?

**SAMPLE QUESTIONS ON THE HEALTHY KIDS SURVEY FOR MIDDLE SCHOOLERS:**





**https://bit.ly/3tvmJbX**

**1. How old are you?**
A. 10 years old or younger
B. 11 years old
C. 12 years old
D. 13 years old
E. 14 years old
F. 15 years old
G. 16 years old or older

**2. In what grade are you?**
A. 6th grade
B. 7th grade
C. 8th grade
D. Ungraded or other grade

**3. What is your gender identity?**
A. Female
B. Male
C. Genderqueer/Nonbinary
D. I do not know my gender identity (questioning)
E. I have a different identity

**4. Some people describe themselves as transgender when their sex at birth does not match the way they think or feel about their gender. Are you transgender?**
A. No, I am not transgender
B. Yes, I am transgender
C. I am not sure if I am transgender
D. I do not know what this question is asking

**5. Which of the following best describes you?**
A. Heterosexual (straight)
B. Gay or lesbian
C. Bisexual
D. Asexual
E. I describe my sexual identity some other way
F. I am not sure about my sexual identity (questioning)
G. I do not know what this question is asking

**303**

# Say what?

**SAMPLE QUESTIONS ON THE HEALTHY KIDS SURVEY FOR MIDDLE SCHOOLERS:**



**71. How old were you when you had sexual intercourse for the first time?**
A. I have never had sexual intercourse
B. 8 years old or younger
C. 9 years old
D. 10 years old
E. 11 years old
F. 12 years old
G. 13 years old or older

**72. Did you drink alcohol or use drugs before you had sexual intercourse the last time?**
A. I have never had sexual intercourse
B. Yes
C. No

**73. The last time you had sexual intercourse, did you or your partner use a condom?**
A. I have never had sexual intercourse
B. Yes
C. No

## Remember these questions are for middle schoolers.

304



**306**



308















#atCPANwecan

309



ART CLUB: WHAT IS HAPPENING IN OUR STATE???

Presented by: Erin Lee

310

# OUR STORY...



311

# OUR STORY...



312

# ...WHAT I'VE FOUND IN MY OWN SCHOOL DISTRICT







313

# SCHOOL BASED HEALTH CENTERS



314

# THE GROOMERS IN MY CHILD'S CLASSROOM



315

# (GROOMERS CONT'D)







316

# "NEARLY HALF OF KIDS IN LARIMER COUNTY ARE LGBTQ"



317

# THIS IS A SPIRITUAL BATTLE FOR OUR CHILDREN



318

# HOW DID WE GET HERE?

- Public Schools

- Higher Ed

- The Teachers Union

- Outside Influences ($$$, Mental Health Systems, NGO's, Universities, Social Services)

- Laws

319

# EXISTING CO LAWS TO KNOW & UNDERSTAND

- **HB 19-1120**: 12-year-olds control mental healthcare (NO parent knowledge/consent)

- **HB 19-1129**: Ban on "conversion therapy" – Must affirm gender confused kids

- **HB 19-1032:** Comprehensive Sexuality Education

- **HB 23-1003**: Mandates mental health screening for all 6th – 12TH Graders & iMatter

- **HB 24-1039**: "Non Legal Name Change" – Forces *all* teachers to socially transition children

- **HB 24-1170**: Foster bill of rights (forces transitioning of children)

- **HB 24-1071**: Allows transgender felons to legally change name ("Tiara's Law")

- **Senate Bills 188, 189 and 190**: Made CO a trans & abortion sanctuary, forced us to pay for it, and attacked Crisis Pregnancy Centers

- **HB 19-1192:** Mandated teaching "minorities" (must include LGBTQ) starting in 1st grade

320

# NEW COLORADO SOCIAL STUDIES STANDARDS



## The Revision Process

In revising the standards, the Colorado Department of Education began with the solicitation of public input on the revision process and engaged external experts to provide analyses of current standards in relation to national and international models. A committee of Colorado educators was selected from a pool of applicants to be part of the social studies review and revision committee.

In addition to responding to public feedback on the 2018 version of the Colorado Academic Standards for social studies, the social studies standards review and revision committee was required to implement and respond to new legislative requirements for the standards.

- *House Bill 19-1192: History, Culture, and Civil Government in Education Commission* recommendations. This bill requires that the recommendations from this commission be considered during the standards review process.
- *House Bill 20-1336: Holocaust and Genocide Studies.* This bill required the State Board to adopt standards for Holocaust and genocide by July 2021.
- *House Bill 21-1200: Revise Financial Literacy Standards.* This bill required the inclusion of new topics in the personal financial literacy standards.
- *House Bill 21-1103: Media Literacy Standards.* This bill required the review process to consider the recommendations of the Media Literacy Advisory Committee established under House Bill 19-1110.
- *Senate Bill 21-067: Strengthening Civics Education.* This bill required the inclusion of specific topics in the civics standards.

### A Note About LGBTQ References

The purpose of House Bill 19-1192 was to ensure that the history, culture and social contributions of minority groups, including African Americans, Latinos, Indigenous peoples, Asian Americans, Hawaiian/Pacific Islanders, and lesbian, gay, bisexual, and transgender individuals were recognized in Colorado's history and civics standards.

The requirement to teach about the history, culture and social contributions of lesbian, gay, bisexual, and transgender individuals is not an obligation to teach comprehensive human sexuality education which is optional under state law (C.R.S. 22-1-128). The inclusion of diverse narratives in history and civics is intended to provide a broad understanding about the stories of all groups and individuals who have contributed to the development and enduring legacies of the United States. Furthermore, it is important that all children in classrooms across Colorado feel respected, included, and are treated with dignity. The social studies standards are premised on this common value.



321

# LESSONS FROM THE CO DEPT OF ED FOR **FIRST GRADE**



322

# 2025 LEG UPDATE:

- **HB 25-1312**: Stripping parental rights, forcing gender transition, compelling speech, and attacking churches, schools & businesses

- **HB 25-1309**: forces us all of us to pay for transgender-affirming procedures. Makes Testosterone Rx's secret

- **SB 25-129**: Trans Sanctuary state law

- **SB 25-183**: Tax-payer funded abortions

- **HB 25-1239**: Changed CADA – added penalties for "misgendering"

323

# WHAT CAN WE DO ABOUT IT?

#1: Educate yourself and TALK ABOUT IT!

#2: Get the kids out of government schools – Homeschool, Private, Classical/Core Knowledge Charter

#3: Research (CORA), Ask Questions, Expose, Lawfare

#4: Show Up! – School Boards, Statehouse, Protests, Volunteer In the Schools

#5: Get Involved – Mom 4 Liberty, Protect Kids Colorado, Grandparents4Kids, Moms4Liberty, … start programs through your church!

***Grandparents: You have an equally important role to play!***

324

# HOW TO PROTECT & INOCULATE THE CHILDREN IN YOUR LIFE!

4 Things to tell your children *early* and *often*

#1 – Safe adults do NOT ask you to keep secrets

#2 – No one should ask you to label yourself

#3 – Trust your gut! (& YOU have the authority to remove yourself)

#4 – God doesn't make mistakes

325

YOU CAN FOLLOW ME @

 For Parental Rights (Erin4Parents on X)

Watch & Share the film! ArtClubMovie.com

Get Involved >> Sign up at ProtectKidsColorado.org

Follow #DontMessWithOurKids and #AMillionWomen

326

# PROTECT KIDS COLORADO



327







328



**329**

# QUESTIONS/DISCUSSION

| Bates | Description | Link |
|---|---|---|
| DE_000275 | Erin Lee being escorted out of the venue under the protection of police after protesters prevented a PKC event from proceeding at Denver University. | https://archive.org/details/a-13978-0001-001013 |
| DE_000269 | Speech by Colorado State Representative targeting Erin Lee and encouraging people to confront PKC volunteers. | https://archive.org/details/a-13978-0001-001033 |
| DE_000303 | TikTok video by mother of transgender child threatening legal action against Erin Lee for misgendering and deadnaming the child. | https://archive.org/details/a-13978-0001-001034 |
| DE_000440 | Floor speech by a Colorado State Representative who sponsored H.B. 25-1312, calling groups that opposed the bill's passage "hate groups." | https://archive.org/details/a-13978-0001-001209 |

331

Confidential – Subject to Protective Order

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-01668-RMR-MDB

COMMITTEE OF FIVE, INC. d/b/a XX-XY ATHLETICS,

    *Plaintiff,*

vs.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in
her official capacity;
SERGIO RAUDEL CORDOVA, GETA ASFAW, MAYUKO
FIEWEGER, DANIEL S. WARD, JADE ROSE KELLY, and
ERIC ARTIS, as members of the Colorado Civil Rights Commission,
in their official capacities; and
PHIL WEISER, Colorado Attorney General, in his official capacity;

    *Defendants.*

---

**DIVISION AND COMMISSION DEFENDANTS' FIRST SUPPLEMENTAL
RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION**

---

Defendants Aubrey Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger,

Daniel S. Ward, Jade R. Kelly, and Eric Artis, in their official capacities (the "Division

and Commission Defendants") hereby provide their supplemental responses to

Plaintiff's First Set of Interrogatories and Requests for Production.

**INTERROGATORIES**

1.      Please specify whether in your view it violates the Publication Clause,

Unwelcome Clause, Denial Advertisement Clause, Discriminatory Advertisement

Clause, or Unwelcome Advertisement Clause for Plaintiff to publish its Pronoun

Statement provided as Exhibit A of Complaint. Please explain why or why not.

**OBJECTIONS**: Division and Commission Defendants object to the extent that this

request calls for a legal conclusion. Division and Commission Defendants further

1

**332**

object to the extent that this request calls for speculation about how the statement in Exhibit A would impact a member of the public. Pursuant to and without waiving any objection, Division and Commission Defendants provide the following responses.

**RESPONSE**: There is insufficient information to answer this interrogatory, particularly in the absence of any complaint or complainant, much less information on how such policy will actually be applied in practice. C.R.S. § 24-34-305(3) prohibits the Division or Commission from concluding that discrimination has occurred unless evidence uncovered in an investigation demonstrates that discrimination did occur.

Determining whether the proffered statement violates any of the clauses referenced in this particular interrogatory would require assessment of a complainant's claim that the statement, both subjectively and in a manner that is objectively reasonable, indicated that they would be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on gender identity or gender expression or that their patronage or presence at a place of public accommodation would be unwelcome, objectionable, unacceptable, or undesirable because of gender identity. This is a highly contextual and fact-specific inquiry—and one that is entirely speculative absent a complainant.

**SUPPLEMENTAL RESPONSE**: Subject to the foregoing objections, no, the act of publishing the Pronoun Policy does not, in and of itself, violate the identified clauses. In explaining why the act of publishing the Pronoun Policy does not, in and of itself, violate the identified clauses, this response first outlines the applicable framework and then addresses the Pronoun Policy.

The Division does not seek out violations or solicit charges from prospective complainants. As a result and as a practical matter, the Division would not analyze the

2

**333**

Confidential – Subject to Protective Order

Policy without receiving a complaint that includes an assertion by the complainant that the statement at issue communicates that the complainant would be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on a protected trait or that their patronage or presence at a place of public accommodation would be unwelcome, objectionable, unacceptable, or undesirable because of a protected trait.

The Division analyzes all charges of discrimination in a consistent and standard manner, regardless of protected class status, as outlined by C.R.S. § 24-34-306. The Division further builds off its knowledge base as it analyzes charges that raise similar allegations as prior cases. The Division has not received any complaints of discrimination based on a place of public accommodation's written communication similar to Plaintiff's Policy. In general, however, a written communication that expressly announces plans to deny full and equal enjoyment of goods, services, benefits or privileges of a place of public accommodation would violate these provisions. For example, a sign stating "Whites Only" would violate CADA because it states that certain persons will be denied service based on race and/or that they are unwelcome, objectionable, unacceptable or undesirable at the place of public accommodation because of their race.

In reviewing a complaint based on the Policy, the Division would be guided by the Intake and Investigations Manual, which provides as follows:

> To prevail on a claim of discriminatory communication of a refusal to provide the full and equal enjoyment of goods, services, benefits or privileges of a place of public accommodation, the evidence must show:
>
> (1) the Respondent is a place of public accommodation;
>
> (2) the Respondent directly or indirectly published, circulated, issued, displayed, posted or mailed a written, electronic or printed

3

**334**

Confidential – Subject to Protective Order

communication notice or advertisement;

(3) the notice or advertisement indicated that the full and equal enjoyment of goods, services, benefits or privileges provided by Respondent will be refused, withheld from or denied to a person or persons based on their protected class;
or

(4) the notice or advertisement indicated that the presence of a person or persons of a protected class is unwelcome, objectionable, unacceptable or undesirable at the Respondent's place of public accommodation.

Manual at 77.

These inquiries, and in particular (3) and (4), are viewed objectively. In other words, from the perspective of a reasonable person in the complainant's circumstances, the notice or advertisement must communicate that they would be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on a protected trait, or that their patronage or presence at a place of public accommodation would be unwelcome, objectionable, unacceptable, or undesirable because of a protected trait.

Applying this framework, the Policy provides:

> We believe that men and women are different; sex is binary, biological, and immutable; and women deserve to be champions of their own sports.  Thus, we refer to all individuals—including customers, prospective customers, visitors to our events and pop-up stores, athletes, and public figures—using biologically accurate language.  This includes birth names if we know them and biologically accurate pronouns.
> . . .
>
> We will not knowingly use biologically inaccurate language—not names, not pronouns, not honorifics, nor anything else.  While we will happily sell our products to anyone, we will decline any and all requests from customers, prospective customers, or anyone else to use biologically inaccurate language.  And we will continue to use language that is biologically accurate, no matter who it offends or who declines to buy from use because of it.

4

**335**

Confidential – Subject to Protective Order

Compl. Ex. A.

The Policy does not state that XX-XY intends to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of XX-XY based on a protected trait or that their patronage or presence at XX-XY would be unwelcome, objectionable, unacceptable, or undesirable because of a protected trait. The Policy does not state, for example, that transgender individuals are not welcome at any XX-XY location, that transgender individuals cannot purchase certain goods, or that transgender individuals will be charged more for XX-XY's goods. Rather, according to its terms, XX-XY's Policy states that XX-XY "will happily sell our products to anyone."

Misgendering and deadnaming are not *per se* CADA violations—whether or when such conduct would violate CADA instead depends on context. Highlighting the fact-intensive nature of whether refusing to use an individuals' chosen name or pronouns, 3 CCR 708-1-81.6, titled "Sexual Orientation Harassment," provides:

> Unlawful harassment is conduct that creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of sexual orientation. Prohibited conduct includes, but is not limited to, the following:
>
> (1) Asking unwelcome personal questions about an individual's sexual orientation;
>
> (2) Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation;
>
> (3) Using offensive names or terminology regarding an individual's sexual orientation;
>
> (4) Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun; or
>
> (5) Harassing, subjecting to differential treatment, discharging, demoting, or denying promotion opportunities or employment benefits to an individual because of open

5

**336**

Confidential – Subject to Protective Order

discussion or other communication or presentation related to an individual's gender expression, gender identity, or sexual orientation.

As provided in the regulation, "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" reflects the accommodation's intentionally different treatment of individuals based on protected class status, but to be actionable, such misuse must rise to the level of harassment, i.e., it must create a hostile environment on the basis of sexual orientation, gender identity, gender expression, or other protected class status.

By stating that XX-XY will not "knowingly use biologically inaccurate language," XX-XY is asserting an intent to treat individuals differently based on gender identity (and even that intent is conditional on the XX-XY knowing that an individual is transgender). The Policy does not, however, establish that its application will create an environment that is subjectively and objectively hostile to individuals based on their gender identity. As a result, the Policy, standing alone, does not violate the various CADA provisions directed to written communications. Whether and how XX-XY ultimately applies the Policy to an individual and whether such interactions violate the Accommodation Clause of C.R.S. § 24-34-601 would depend on the specific facts of the interaction.

3. Please specify whether in your view it violates the Denial Clause for a place of public accommodation to knowingly misgender or deadname a prospective customer in accordance with the policy set forth in the Pronoun Statement and explain why or why not. If you contend that additional facts are needed to know whether such a scenario would violate the Denial Clause, please identify specifically what additional facts are needed, why, and how they affect the analysis.

6

**337**

Confidential – Subject to Protective Order

**OBJECTIONS**: Division and Commission Defendants object to the extent that this request calls for a legal conclusion. Division and Commission Defendants further object to the extent that this request calls for speculation about additional facts which are not present but, if they were to become present, might establish a violation of CADA. C.R.S. § 24-34-305(3) prohibits the Division or Commission from presuming that some conduct violates CADA without developing evidence through an investigation. Division and Commission Defendants further object to the extent that "prospective customer" is vague. Division and Commission Defendants' response will assume that "prospective customer" is someone who is trying to avail themselves of a good, service, facility, privilege, or advantage of a place of public accommodation, or an individual who a business reasonably believes is likely to seek out the same. Pursuant to and without waiving any objection, Division and Commission Defendants provide the following response.

**RESPONSE**: There is not enough information to answer this question. Whether using a name or pronoun that is not an individual's chosen name or pronoun amounts to a denial of the full and equal enjoyment of any good, service, facility, privilege, or advantage of a place of public accommodation is highly contextual. An accidental use of a pronoun, name, or salutation that does not comport with an individual's gender identity or gender expression does not demonstrate intent to treat individuals differently based on gender identity, so does not meet the threshold test. For a CADA violation to occur under the Denial Clause, an individual who has been intentionally addressed by an incorrect name, pronoun, or salutation based on their protected class status would also have to experience, both subjectively and in a manner that is objectively reasonable, the denial of full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public

7

338

accommodation—a necessarily fact-specific determination that requires, as a threshold matter, an actual complainant.

**SUPPLEMENTAL RESPONSE**: There is insufficient information to answer this interrogatory, as the interrogatory does not describe the interaction between the customer and the employee in any detail or provide any other facts that would enable the Division and Commission Defendants to determine whether the facts amount to a violation of C.R.S. § 24-34-601(2)(a)'s provision providing that "[i]t is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation."

The Division analyzes all charges of discrimination in a consistent and standard manner, regardless of protected class status, as outlined by C.R.S. § 24-34-306. The Division further builds off its knowledge base as it analyzes charges that raise similar allegations as prior cases. The Division has not found probable cause in any public accommodations case based upon a respondent place of public accommodation's failure to use an individual's chosen name and/or how the individual chooses to be addressed. Moreover, the complaints based on gender identity and/or gender expression that the Division has received and refer to statements made by employees have often alleged additional conduct. *See, e.g.*, Sullivan Suppl. Decl. Ex. A. The same holds true for complaints based on an employee of a place of public accommodation making verbal statements directed at an individual's race, religion, or any other protected trait in that they generally allege additional conduct. *See, e.g.*, CCRD1268-

8

**339**

Confidential – Subject to Protective Order

1298 (█████████████████████████████████████████████████

█████████████████████████████████████); CCRD402-436

(█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████); CCRD1403-1565 (███████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████). The lack of complaints based on verbal statements alone

highlights the difficulty of speculating about purely hypothetical propositions.

In general, a violation of C.R.S.§ 24-34-601(2)(a)'s provision providing that "[i]t is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation" requires three findings. First, the public accommodation must intentionally treat a customer or prospective customer differently based on their protected class status (this means, for example, that this threshold requirement is not met in cases of accidental misgendering or accidental deadnaming because they do not involve the intentional choice to treat the individual differently based on gender identity). Second, the customer must, as a subjective matter, experience the conduct at issue to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation because of the customer's gender identity. Third, the Division would have to determine that a reasonable person, under the circumstances, would experience the conduct to be a

340

Confidential – Subject to Protective Order

denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on their gender identity. All three steps must be satisfied to establish a CADA violation—and the same analysis would apply to any complaint that a public accommodation's interactions with a customer and directed to that customer's protected class status denied that individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation.

To the extent the Division received a Complaint based on a public accommodation's failure to use an individual's chosen name and/or pronouns matching gender identity, the Division would be guided by its Intake & Investigations Manual, as well as the regulations governing CADA. The Intake & Investigations Manual provides that public accommodation violations occur when an individual "is denied 'full and equal enjoyment of a place of public accommodation.' This may include restricted access, harassing treatment, differential pricing, the posting or publishing discriminatory material, and more." Manual, at 11. Without any facts regarding the circumstances surrounding the hypothetical complained conduct, the most comparative conduct described by the interrogatory would be harassment. Titled "Sexual Orientation Harassment," 3 CCR 708-1-81.6 provides:

> Unlawful harassment is conduct that creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of sexual orientation. Prohibited conduct includes, but is not limited to, the following:
> (2) Asking unwelcome personal questions about an individual's sexual orientation;
>
> (2) Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation;
>
> (3) Using offensive names or terminology regarding an individual's sexual orientation;

10

341

Confidential – Subject to Protective Order

> (4) Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun; or
>
> (5) Harassing, subjecting to differential treatment, discharging, demoting, or denying promotion opportunities or employment benefits to an individual because of open discussion or other communication or presentation related to an individual's gender expression, gender identity, or sexual orientation.

As provided in the regulation, intentional misgendering or deadnaming must rise to the level of harassment to deny that individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation—i.e., it must create a hostile environment on the basis of sexual orientation.

This framework reflects that not every incidence of intentional misgendering or deadnaming amounts to harassment on the basis of gender identity. In other words, a place of public accommodation's failure or refusal to use an individual's chosen name and/or how the individual chooses to be addressed, by itself, is not *per se* unlawful discrimination under CADA. Any analysis would need to consider the full circumstances of the interaction between the customer and the place of public accommodation to determine whether a reasonable person, under the circumstances experienced by the complainant, would experience the interaction as harassment and/or would otherwise experience the full course of conduct as denying them full and equal enjoyment of the place of public accommodation's goods, services, facilities, privileges, advantages, or accommodations based on their gender identity. Relevant circumstances may include, for example:

1. The social context in which the conduct occurred;
2. Whether the conduct included indicia that the use was malicious, ill-willed, derogatory, insulting, demeaning, abusive, pejorative; or disparaging;
3. The frequency of the conduct with respect to the individual complainant;
4. Whether the conduct was severe or pervasive;

11

**342**

Confidential – Subject to Protective Order

5.  Whether the complainant asked the place of public accommodation to start or stop the alleged conduct (here, use of pronouns, names, or gendered language that is different from how the individual wants to be referred to), and how the place of public accommodation responded to such requests;

6.  Whether the conduct caused a person to leave the place of public accommodation without making a purchase or enjoying the privileges, benefits, or advantages of the place of public accommodation which they had intended to use;

7.  Whether the conduct caused a person to not attempt to patronize a place of public accommodation because of their protected trait(s);

8.  Whether the conduct occurred in the context of other potentially discriminatory conduct, such as an actual denial of service or the use of slurs or epithets targeting a complainant's protected trait(s);

9.  Whether the place of public accommodation expressed a preference not to serve certain individuals or groups of individuals because of those individuals' protected traits; and

10. Whether the place of public accommodation had a history of discriminatory conduct.

Respectfully submitted this 23rd day of December, 2025,

PHILIP J. WEISER
Attorney General

For Defendants Aubrey C. Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly and Eric Artis:

s/ Nora Q.E. Passamaneck
Nora Q.E. Passamaneck
Senior Assistant Attorney General
Helen Norton
Deputy Solicitor General
Janna K. Fischer
Senior Assistant Attorney General
Dominick D. Schumacher
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
FAX: (720) 508-6032

**343**

Confidential – Subject to Protective Order

## VERIFICATION

I, Aubrey Sullivan, a citizen of the United States and a resident of the State of Colorado, hereby state under penalty of perjury that the foregoing supplemental responses to the interrogatories and requests for production are true and correct to the best of my knowledge.

Executed this 23rd day of December, 2025 at Denver, Colorado.


*s/ Aubrey Sullivan*
Aubrey Sullivan

Confidential – Subject to Protective Order

13

**344**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-01668

COMMITTEE OF FIVE, INC. d/b/a XX-XY ATHLETICS,

    *Plaintiff,*

vs.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights
Division, in her official capacity;
SERGIO RAUDEL CORDOVA, GETA ASFAW, MAYUKO
FIEWEGER, DANIEL S. WARD, JADE ROSE KELLY, and
ERIC ARTIS, as members of the Colorado Civil Rights
Commission, in their official capacities; and
PHIL WEISER, Colorado Attorney General, in his official
capacity;

    *Defendants.*

---

## PLAINTIFF'S SUPPLEMENTAL RESPONSES TO CCRD AND COMMISSION DEFENDANTS' FIRST SET OF WRITTEN DISCOVERY REQUESTS

---

Plaintiff XX-XY Athletics submits the following supplemental responses to CCRD and Commission Defendants' discovery requests pursuant to Judge Prose's order at ECF No. 58. Plaintiff makes this supplemental response without conceding the relevance or materiality of any discovery request and without prejudice to their right to object to admissibility at trial with respect to the subject matter of any discovery request. The word usage and sentence structure are those of the attorneys who drafted these responses.

1

**345**

## DEFINITIONS

1.      The connectives "and" and "or" shall be construed either conjunctively or disjunctively whenever appropriate in order to bring within the scope of these Interrogatories and Requests for Production all responsive facts and documents which might otherwise be construed to be outside of their scope.

2.      The singular form of a word shall be interpreted as plural and the plural form of a word shall be interpreted as singular whenever appropriate in order to bring within the scope of these Interrogatories and Requests for Production, which might otherwise be construed to be outside of their scope.

3.      "Document" or "documentation" shall mean any handwritten, typewritten, printed, recorded, or graphic material in any form, including originals, copies, and drafts, including without limitation, any correspondence, minutes of meetings, written memoranda or communications, e-mail, text messages, social media posts, transcripts of testimony, studies, reports, notes, notebooks, telephone message slips, diaries, computer diskettes or printouts, contracts, work papers, books, bookkeeping entries, bills, invoices, calendar entries, microfilm or microfiche, together with all other items which are subject to request for production pursuant to the Federal Rules of Civil Procedure.

4.      "You" or "Your" shall include and refer to, in addition to Plaintiff, XX-XY Athletics, all agents, servants, employees, representatives, officers, governing boards or committees, and others who are in possession of or who may have obtained information for or on behalf of Plaintiff.

**RESPONSE: Plaintiff objects to this definition to the extent that it asks Plaintiff to answer on behalf of "all agents," "servants," "employees,"**

2

**346**

and "representatives" as those individuals may have knowledge outside the knowledge or control of the owners of the company. Plaintiff will answer these discovery requests to the best of the owners' knowledge.

## INTERROGATORIES

1.    Describe each pop-up shop You have operated and/or plan to operate in Colorado, including: (1) its date(s) and location; (2) any advertising or marketing promoting the event, including social media posts; (3) all contracts and/or agreements entered into with any place of public accommodation where the pop-up was located; and (4) how individuals were permitted to attend such event (e.g., through ticket, attendance at host event, etc.).

**OBJECTION: Plaintiff objects to this interrogatory to the extent that it seeks "any advertising or marketing promoting the event, including social media posts." Plaintiff objects to this request on the grounds that it seeks information that is not within Plaintiff's possession, custody, or control. Plaintiff also objects to this request on the grounds that public advertisements are equally available to Defendants as they are to Plaintiff. Plaintiff will provide advertising and marketing materials for the events to the extent that it is aware of them.**

RESPONSE:

Past Pop-Up Shops:

a.  **May 2, 2024: Clayton Hotel, Denver, Colorado. XX-XY held the pop-up shop alongside an event hosted by Canopy Advisory Group. Canopy Advisory Group sent invites to the speaking event, but the pop-up shop was in an open area of the hotel and open to the public.**

3

**347**

b. May 13, 2024: Private home in Denver, Colorado. XX-XY held the pop-up shop alongside an International Women's Forum event, and the pop-up shop was open to the event attendees.

c. June 20, 2024: Private home in Denver, Colorado. XX-XY held the pop-up shop alongside an International Women's Forum event, and the pop-up shop was open to the event attendees.

d. June 22, 2024: Private home in Denver, Colorado. XX-XY held the pop-up shop alongside a Ladies 4 Liberty event, and the pop-up shop was open to the event attendees.

e. July 8–9, 2024: Sheraton Hotel, Downtown Denver, Colorado. XX-XY held the pop-up shop alongside the Freedom Foundation Teacher's Summit. A ticket purchase was required to attend the summit, but the pop-up shop was in an open area of the hotel and open to the public. Tickets to attend the summit were available to the public for purchase.

f. August 17, 2024: The Booty Shop, Lone Tree, Colorado. XX-XY held the pop-up shop alongside the pilates studio's grand opening. The pilates studio, its grand opening, and the pop-up shop were open to the public.

g. August 22, 2025: The Woodlands Event Venue, Jefferson County, Colorado. XX-XY held the pop-up shop alongside the Jefferson County Kids Gala, and the pop-up shop was open to event attendees. A ticket purchase was required to attend the gala. Tickets to attend the gala were available to the public for purchase.

4

348

h.  August 24, 2024: Park Hyatt, Beaver Creek, CO. XX-XY held the pop-up shop alongside the Steamboat Institute Annual Freedom Conference. A ticket purchase was required to attend the conference, but the pop-up shop was in an open area of the hotel and open to the public.

i.  September 12, 2024: Junior Achievement Rocky Mountain Main Office, 6500 Greenwood Plaza Blvd, Greenwood Village, Colorado. XX-XY held the pop-up shop alongside a Foundation Against Intolerance and Racism event. The event and the pop-up shop were open to the public, and neither required a ticket to attend.

j.  September 22, 2024: Forge Event Center, Loveland Colorado. XX-XY held the pop-up shop alongside a Freedom Foundation Town Hall. The event and the town hall were open to the public, and neither required a ticket to attend.

k.  January 29, 2025: XX-XY Athletics Offices, Denver, Colorado. XX-XY held a spring launch event and a pop-up shop. The event and the pop-up shop were open to invitees.

l.  February 19, 2025: XX-XY Athletics Offices, Denver, Colorado. XX-XY held the pop-up shop as part of a shopping event and fundraiser with Gays Against Groomers and Protect Kids Colorado. The event and the pop-up shop were open to invitees.

m. April 6, 2025: Hilton, Englewood, Colorado. XX-XY held the pop-up shop alongside a Rocky Mountain Summit Series on Safeguarding Children from Gender-Affirming Treatment, and the pop-up shop was accessible to event attendees. A ticket purchase was required to

5

**349**

attend the summit. Tickets to attend the gala were available to the public for purchase.

n. April 24, 2025: Private home in Littleton, Colorado. XX-XY held the pop-up shop as part of a shopping event and fundraiser with the International Women's Foundation. The event and the pop-up shop were open to invitees.

o. May 1, 2025: Beck Recreation Center, Aurora, Colorado. XX-XY held the pop-up shop alongside a Moms for Liberty Townhall. The event and the pop-up shop were open to the public, and neither required a ticket to attend. Moms for Liberty advertised for the event on Instagram and its website. Those posts are included at XXXY000056–63.

p. May 3, 2025: Embassy Suites, Colorado Springs, Colorado. XX-XY held the pop-up shop alongside a Colorado Chapter of Republican Women event. The event and the pop-up shop were open to members of the Colorado Chapter of Republican Women.

q. May 30 through June 1, 2025: Spartan Race, Fort Carson, Colorado. XX-XY held the pop-up shop alongside the race. While a registration fee was required to participate in the race, the event and the pop-up shop were open to the public, and neither required a ticket to attend.

r. June 21, 2025: Denver Marriot West, Golden, Colorado. XX-XY held the pop-up shop alongside an event hosted by Rocky Mountain Voice, and the pop-up shop was accessible to event attendees. A ticket purchase was required to attend the summit. Tickets to attend the gala were available to the public for purchase.

6

350

s. June 22, 2025: West steps of the Colorado State Capitol, Denver, Colorado. XX-XY held a pop-up shop alongside an event held by First Amendment Media. The event and the pop-up shop were open to the public, and neither required a ticket to attend. A representative of First Amendment Media advertised the presence of XX-XY's pop-up shop at the event on Instagram. A copy of the Instagram post is included at XXXY000055.

t. August 7, 2025: The Woodlands Event Venue, Jefferson County, Colorado. XX-XY will held a pop-up shop alongside the Jefferson County Kids Gala, and the pop-up shop was open to event attendees. A ticket purchase was required to attend the gala. Tickets to attend the gala are available to the public for purchase.

u. August 22–23, 2025: Park Hyatt, Beaver Creek, CO. XX-XY held the pop-up shop alongside the Steamboat Institute Annual Freedom Conference. A ticket purchase was required to attend the conference, but the pop-up shop was in an open area of the hotel and open to the public.

v. September 5, 2025: St. Thomas More Catholic Church, Centennial, Colorado. XX-XY held the event alongside a Protect Kids Colorado Save Girls' Sports ballot initiative. The event and the pop-up shop were open to the public, and neither required a ticket to attend. Protect Kids Colorado advertised XX-XY's presence at the event on Instagram. That Instagram post is included at XXXY000053.

w. September 10, 2025: Rock Bottom Brewery, Lone Tree, Colorado. XX-XY held the pop-up shop alongside a Douglas County Citizenry event.

7

**351**

The event and the pop-up shop were open to the public, and neither required a ticket to attend. Protect Kids Colorado advertised Jennifer Sey's presence at the event on X. That X post is included at XXXY000054.

**Scheduled Pop-Up Shops:**

a. **October 9–12, 2025: Retreat Venue, Colorado Springs, Colorado. XX-XY will hold a pop-up shop alongside the Teneo Network retreat, and the pop-up shop will be open to retreat attendees. Membership in the Teneo Network and a retreat reservation will be required to attend the retreat and visit the pop-up shop.**

b. **March 2026: Location TBD, either Loveland or Red Rocks, Colorado. XX-XY will hold a pop-up shop alongside a 50 for the Fallen event. The event and pop-up shop will be open to the public.**

**Plaintiff has not entered into any written contracts to host its pop-up shops at these events. Instead, it has only hosted pop-up shops upon the personal invitation of the event hosts.**

2.      Describe all instances in which You, in interacting with an individual, refused to use an individual's chosen names and/or how they choose to be addressed, including how You determined that individual's birth name and/or sex at birth, and whether that individual asked You to use their chosen name, pronouns, or title corresponding to their gender identity instead of a name, pronoun, or title associated with their biological sex. For each instance identified in response to this Interrogatory, further identify the relationship of the individual or person to You, including whether they were a customer or potential customer, whether they complained to You about Your refusal to use their chosen names and/or how they

8

**352**

choose to be addressed, and/or whether they purchased goods after Your refusal to use their chosen names. and/or how they choose to be addressed.

**RESPONSE: Based on the language of the interrogatory and discussions with counsel, Plaintiff understands this to ask only about instances in which a representative of Plaintiff was directly interacting with the person whose chosen names or pronouns were not used, such as in person or by person-to-person email, and Plaintiff is answering based on that understanding. While Plaintiff frequently uses biologically accurate pronouns and titles and given names when referring to transgender-identifying individuals through marketing materials, social media posts, and during public appearances, Plaintiff is not aware of any instance in which it refused to use an individual's chosen name and/or how the individual chose to be addressed when directly interacting with that individual.**

**Jennifer Sey has communicated to an individual, in an online discussion about an XX-XY Athletics advertisement, her belief that individuals who identify as "trans-girls" are not girls. On September 5, 2025, Jennifer Sey posted an XX-XY Athletics video advertisement on X. Among other things, the video stated, "Shout out to all the Tomboys Because there's no right way Or wrong way To be a girl." An X user with the username Rosy Boa commented on Sey's post, "You're correct. There is no right way to be a girl. Except you say trans girl's aren't girls. So clearly there is a right way to you." Sey responded to the comment, "They aren't girls. They are boys. Dressed like girls." Rosy Boa responded, "Exactly, they don't count as girls to you. Only the ones that you think are the right**

9

**353**

kind of girl are girls in your mind." Sey responded, "They aren't girls. It's not about 'right kind of girls.' It's a biological reality. A factual statement. They can dress however they want, I don't care. Wear makeup. Do their nails. But they aren't girls and should not be in girls' sports and spaces. AND the tomboys in the ad -- the sporty, competitive, maybe even aggressive tomboys – aren't boys. Having more stereotypically masculine qualities does not make a girl a boy." This discussion is included at XXXY000006–08.

SUPPLEMENTAL RESPONSE: Upon further reflection, Plaintiff recalls additional instances where Jennifer Sey, acting as Plaintiff's representative, refused to use a customer's chosen pronouns. These occurred outside of Colorado and so did not come immediately to mind in the context of this case.

Plaintiff hosted a pop-up shop at FreedomFest in Palm Springs, California, on June 11–14, 2025. During that conference, libertarian influencer Sara Higdon, who identifies as transgender, interviewed Jennifer Sey for the media outlet "Free the People." Sey first met Higdon through social media after discovering that Higdon supported the XX-XY Athletics brand. Higdon identifies as female and requests that others refer to him with feminine pronouns and titles. Even though Sey was aware of Higdon's request, she stated to Higdon, "I will not use . . . what they would say are correct pronouns. . . .  I use . . . biologically correct language." The interview is available here: https://bit.ly/3JbzEuJ. Higdon is an XX-XY Athletics customer and has posted content online wearing XX-XY Athletics apparel. Some examples are available here: https://bit.ly/47gi3Ll,

354

**https://bit.ly/47OVFsA, https://bit.ly/3Ljxutr. Higdon purchased XX-XY Athletics apparel at the FreedomFest pop-up shop, where he hosted the interview with Sey.**

**Plaintiff also became acquainted with transgender activist and educator Buck Angel after discovering that she was an XX-XY Athletics customer and supporter of the brand. Angel has supported the brand in posts like the following: https://bit.ly/4hw04E2. After speaking on social media, Jennifer Sey met Angel in person in Los Angeles, California, around September 2024, to discuss Jen's positions on certain issues affecting transgender-identifying individuals. Angel has stated publicly her request for people to refer to her with masculine pronouns, while Sey has explained that she only uses biologically accurate pronouns. Despite the disagreement, after meeting in person, Angel hosted Sey for an interview on her YouTube channel in September 2024. During the interview, Sey reiterated the importance of using biologically accurate language when referring to transgender-identifying individuals. That interview is available here: https://bit.ly/47Noy8v.**

3.    Identify all complaints outside of social media that You have received for refusing to use an individual's chosen name and/or how they choose to be addressed, whether orally, in writing, or as a charge of discrimination filed against you with the Colorado Civil Rights Division.

**RESPONSE:**

a. **In June, 2024, Plaintiff opened an account on TikTok. Shortly after opening the account, Plaintiff shared its first ad on the platform, included at XXXY000014. The ad depicted an image of a boy who**

11

**355**

identified as a girl spiking a volleyball, and it referred to him as male. TikTok informed XX-XY that the post violated its "hate speech" policies that banned "deadnaming" and "misgendering." Because of this alleged violation, TikTok permanently suspended XX-XY from posting any further advertisements. XX-XY's account was disabled from posting ads on TikTok until February 2025. But since then, TikTok has still removed the large majority of ads posted by XX-XY for violating its policies. XX-XY filed a complaint with the Federal Trade Commission because of the suspension, which is included at XXXY000032–37. Sey also documented the cancellation in a Substack post, which is included at XXXY000039–46.

b. On May 30 through June 1, 2025, XX-XY hosted a pop-up shop at the Spartan Race in Fort Carson, Colorado. Multiple race attendees complained to the organizers of the event about Plaintiff's presence there because of the company's public positions. The organizers informed the attendees who complained that they believed women's sports should be for women.

c. In late 2024, Meta removed a post from Plaintiff's Facebook account that included a graphic with the text "Introducing the only athletic brand that stands up for women's sports." The caption read, "Stand with us. Check us out @thetruthfits.com #SaveWomensSports." XX-XY included this instance in its FTC complaint, which is included at XXXY000032–37.

d. In November 2024, Peer 150, a networking group for top human resources executives, asked Jennifer Sey to speak as CEO of XX-XY

12

**356**

at one of its events for corporate professionals. Sey was scheduled to participate in a question-and-answer session called "Unfiltered — Championing Performance, Merit and the Power of Diverse Thought." After Peer 150 publicized Sey's attendance, numerous individuals threatened not to attend the event, cancel their memberships with Peer 150, and/or pull sponsorship of the event. After receiving these complaints, Peer 150 uninvited Sey from the event. Sey wrote a piece published by the New York Post about the cancellation, which is included at XXXY000047–52.

e. Jennifer Sey and her husband receive several calls a week on their personal cell phones from a member of the public complaining about Sey's public commentary, including her use of biologically accurate language and given names when referring to transgender-identifying individuals. Sey and her husband began receiving such calls in May 2024. The caller often leaves extended voicemails complaining about Sey and XX-XY Athletics' positions, hurling insults, and threatening physical harm. On June 5, 2024, Sey and her husband installed special software on their phones to block such calls because of their threatening nature. Sey explained about these calls in a Substack post, which is included at XXXY000079–88.

f. On November 1, 2024, an unidentified individual sent an email to XX-XY Athletics with the subject line, "KILL ALL WHITE TRAILER TRASH STRAGGOTS! #KAMALA2024!💙 💙 💙 💙 💙 TRANS LIVES MATTER KILL AND HANG ALL DIRTY WHITE BROKE ASSS NIGGER CRACKER BITCHES ROT IN HELL YOU FUGLY ASS

13

**357**

HEBOON LOSER APE ." The email consisted of a multi-page diatribe against Plaintiff, threatening to kill Jennifer Sey for her public commentary about women's sports. For example, the email stated, "BITCHES ARE FAKE WOMEN ONLY TRANS WOMEN ARE REAL," "HANG YOURSELF AND SLIT YOUR WRISTS YOU CLOWN LMAOO UR PATHETIC T SHIRT IS GOING TO TAKE AWAY TRANS RIGHTS CRY HARDER BITCH!," "HOPE YOUR PATHETIC FUGLY ASS GARBAGE BAG CROTCH GOBLIN OF A MUTANT WHITE TRASH LOSER 'bAby' GETS RUN OVER ID RUN BOTH OF YOU OVER AND BACK UP HAHA ITS GONNA IGNORE YOU AND CUT YOU OFF PATHETIC WHITE TRASH BIGOT LOSER GO SLIT YOUR WRISTS FUCKING RETARD ASS BITCH!" The email also included images with the messages, "Kill All Whites," "Kill All White PPL," "KILL ALL THE WHITE MAN," along with several other racist and threatening messages. A copy of this email is included at XXXY000064–78. Around the same time that XX-XY received this message, Jennifer Sey received numerous similarly threatening phone calls, and she received around 100 comments on one of her Substack posts with similarly threatening messages. She has since blocked the Substack user from commenting on her posts and has installed software to block the threatening phone calls. The Federal Bureau of Investigation is currently investigating these threatening messages.

g. On February 20, 2025, a person who identified himself as "Luigi" sent XX-XY Athletics an email stating, "It would be a shame if you were to die in a fire." A copy of this message is included at XXXY000001–02.

14

358

h. On February 27, 2025, a person who identified herself as "Jane Driver" sent XX-XY Athletics an email stating, "I genuinely hope you kill yourself like every single day I am praying with all of my might you get the courage to just put us all out of our misery and dome yourself. fucking scum rat you deserve nothing and to only feel paint." A copy of this message is included at XXXY000003–04.

i. On September 5, 2025, a person who went by the name "YouAreImmoralFilth" sent XX-XY Athletics an email stating, "Enjoy rotting in hell, you anti-science, anti-American, anti-decency vermin. Newsflash, trans people aren't the problem with sports or this country, you are. And saying that all men have xy chromosomes and never xy, and vice versa, is simply wrong. Prevenient people like Jazz Jennings from playing soccer is what misogynists like you filth do. I can't wait until this country makes punching Nazies in the nose great again[.]" A copy of this message is included at XXXY000005.

## REQUESTS FOR PRODUCTION

1. One copy of a representative sample of advertising and/or marketing materials that You have published since 2024 in which You deadnamed or misgendered an individual.

**RESPONSE: Responsive documents are produced at Bates XXXY000009–31.**

15

**359**

Respectfully submitted this 30th day of October, 2025,


s/ Henry W. Frampton, IV
Henry W. Frampton, IV (S.C. Bar No. 75314)
Jonathan A. Scruggs (Ariz. Bar No. 030505)
Mercer Martin (Ariz. Bar No. 038138)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org
hframpton@ADFlegal.org
mmartin@ADFlegal.org

Katherine C. Yarger (Co. Bar. No. 40387)
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
(512) 693-8350
(512) 727-4755 (facsimile)
katie@lkcfirm.com

Mary Elizabeth Miller (DC Bar No. 252694)
Shannon G. Denmark(DC Bar No. 1617283)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
(512) 727-4755 (facsimile)
mary@lkcfirm.com
shannon@lkcfirm.com


Andrew B. Davis (Tex. Bar No. 24082898)
Joshua P. Morrow (Tex. Bar No. 24106345)
Alexis Swartz (Tex. Bar. No. 24122045)
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350

16

**360**

(512) 727-4755 (facsimile)
andrew@lkcfirm.com
josh@lkcfirm.com
alexis@lkcfirm.com

*Counsel for Plaintiff*

17

**361**

## VERIFICATION

I, Jennifer Sey, a citizen of the United States and a resident of the State of Colorado, acting on behalf of XX-XY Athletics, in my capacity as CEO of XX-XY Athletics, hereby state under penalty of perjury that the foregoing responses to the interrogatories and requests for production are true and correct to the best of my knowledge.

Executed this 30th day of October, 2025, at Denver, Colorado.

_____
Jennifer Sey

18

**362**

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2025, I served a copy of the foregoing to

the following counsel of record for Defendants:


Nora Q.E. Passamaneck
Helen Norton
Janna K. Fischer
Dominick D. Schumacher
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
FAX: (720) 508-6032
nora.passamaneck@coag.gov
helen.norton@coag.gov
janna.fischer@coag.gov
dominick.schumacher@coag.gov


*s/ Henry W. Frampton, IV*
Henry W. Frampton, IV

19

**363**

| Bates # | Link |
|---|---|
| XXXY 000006-8 | https://x.com/JenniferSey/status/1963733386146754876 |
| XXXY 000009 | https://www.instagram.com/reel/DJ-1IgqtvkV/?utm_source+ig_web_copy_link |
| XXXY 000010 | https://www.instagram.com/reel/DKK7OjwugSJ/?Utm_source=ig_web_copy_link |
| XXXY 000011 | https://www.instagram.com/reel/DJx3Gt-tVMG/?utm_source=ig_web_copy_link |
| XXXY 000012 | https://www.facebook.com/reel/666794652714686 |
| XXXY 000013 | https://youtu.be/9Mu2_9-t4Dw?si=8q4EWIY5fI5p8g7s |
| XXXY 000014 | https://youtu.be/0HYRsFNbm3o?si=1cogb4hh1CxCcspx |
| XXXY 000015 | https://www.facebook.com/reel/1065353398855253 |
| XXXY 000016 | https://www.instagram.com/reel/DKpqEOryvyW/?utm_source=ig_web_copy_link |
| XXXY 000017 | https://www.instagram.com/reel/DJkqf4vtT61/?utm_source=ig_web_copy_link |
| XXXY 000018 | https://www.instagram.com/reel/DJmu57OO-HF/?utm_source=ig_web_copy_link |
| XXXY 000019 | https://www.instagram.com/reel/DI_jt5VtSt2/?utm_source=ig_web_copy_link |
| XXXY 000020 | https://www.facebook.com/reel/465032349262719 |
| XXXY 000021 | https://www.facebook.com/reel/1051592049896895 |
| XXXY 000022 | https://www.instagram.com/reel/DOP3HwJDDs3/?utm_source=ig_web_copy_link |
| XXXY 000023 | https://www.instagram.com/reel/DJ46oxEu1o_/?utm_source=ig_web_copy_link |
| XXXY 000024 | https://x.com/xx_xyathletics/status/1906808685721964922 |
| XXXY 000025 | https://x.com/xx_xyathletics/status/1907049407863828502 |
| XXXY 000026 | https://x.com/xx_xyathletics/status/1944101945553170497 |
| XXXY 000027 | https://perma.cc/U5AU-ZQCJ |
| XXXY 000028 | https://x.com/xx_xyathletics/status/1931021038134960626 |
| XXXY 000029 | https://x.com/xx_xyathletics/status/1930977099910705263 |
| XXXY 000030 | https://x.com/xx_xyathletics/status/1930287340557074607 |
| XXXY 000031 | https://x.com/xx_xyathletics/status/1909583643015782605 |
| XXXY 000038-46 | https://jennifersey.substack.com/p/add-meta-and-comcast-to-the-list |
| XXXY 000047-52 | https://nypost.com/2025/03/19/opinion/i-just-got-kicked-off-a-diverse-thought-panel-for-wrongthink-corporate-dei-lives-on/ |
| XXXY 000053 | https://www.instagram.com/p/DOCWndtEaTZ/?utm_source=ig_web_copy_link |

**364**

| XXXY 000054 | https://x.com/ProtectKidsCO/status/1965144273168609679 |
|---|---|
| XXXY 000055 | https://www.instagram.com/reel/DLHHy_oMcTi/?utm_source=ig_web_copy_link |
| XXXY 000056 | https://www.instagram.com/p/DIjsvQ1sKsv/?utm_source=ig_web_copy_link |
| XXXY 000057-63 | https://perma.cc/B8VR-RFAN |
| XXXY 000079-88 | https://open.substack.com/pub/jennifersey/p/the-uncomfortable-fit-and-guilt-by?utm_campaign=post&utm_medium=web |

XXXY000090

**365**

**From:** Djt (XX-XY Athletics) <orders@xx-xyathletics.com>
**Sent:** Thursday, February 20, 2025 11:31 PM
**To:** Josh Sims <jsims@xx-xyathletics.com>; Christopher LeBlanc <cleblanc@xx-xyathletics.com>; Brooke Reed <breed@xx-xyathletics.com>; Ashley Audino <AAudino@xx-xyathletics.com>
**Subject:** [XX-XY Athletics] New customer message on February 20, 2025 at 11:31 pm

A ticket (#4239) by Djt has been received. It is unassigned.

**366**



You received a new message from your online store's contact form.

**Country Code:**
US

**New customer message on %{creation_date}:**
Safety first

**Name:**
Luigi

**Email:**
djt@thebiggestloser.com

**Phone Number:**

**Order Number:**

**Message:**
It would be a shame if you were to die in a fire.

New    Ticket #4239

| Requester | | Assignee |
|---|---|---|
| Djt | | Unassigned |

| | |
|---|---|
| CCs | - |
| Followers | - |
| Group | Support |
| Organization | - |
| Brand | XX-XY Athletics |
| Type | Ticket |
| Channel | By Mail |
| Priority | - |

View in Support

This email is a service from XX-XY Athletics. Delivered by Zendesk

**From:** Squarespace <form-submission@squarespace.info>
**Date:** February 27, 2025 at 2:30:56 PM MST
**To:** daniel@seyeverything.com
**Subject: Form Submission - Website Contact Form**
**Reply-To:** jjdrives@gmail.com

Sent via form submission from *Jennifer Sey*

**Name:** Jane Driver

**Email:** jjdrives@gmail.com

**Phone:** (212) 456-3946

**Please select the nature of your inquiry?:** General Inquiry

**Additional Information:** I genuinely hope you kill yourself like every single day I am praying with all of my might you get the courage to just put us all out of our misery and dome yourself. fucking scum rat you deserve nothing and to only feel paint.

Manage Submissions

1

XXXY000003
**368**

Does this submission look like spam? Report it here.

2

XXXY000004 **369**



XXXY000005

**370**



XXXY000006

**371**





**Link:** https://x.com/JenniferSey/status/1963733386146754876



**Link:** https://www.instagram.com/reel/DJ-1IgqtvkV/?
utm_source=ig_web_copy_link

XXXY000009

**374**



**Link:** https://www.instagram.com/reel/DKK7OjwugSJ/?
utm_source=ig_web_copy_link



**Link:** https://www.instagram.com/reel/DJx3Gt-tVMG/?
utm_source=ig_web_copy_link



**Link:** https://www.facebook.com/reel/666794652714686

XXXY000012

**377**



**Stephanie Turner Takes A Knee Against Male**

XX-XY Athletics
3.38K subscribers

Subscribe

👍 127   👎   ↗ Share   🔖 Save   •••



2.3K views  5 months ago   #RealWomenRock
"It will probably, at least for a moment, destroy my life." - Stephanie Turner

**Link:** https://youtu.be/9Mu2_9-t4Dw?si=8q4EWIY5fI5p8g7s



**Watch Our Launch Ad, "Stand Up"**

**XX-XY Athletics**
3.38K subscribers

Subscribe

1.9K    Share    Save    ...

**159K views  1 year ago**  #TheTruthFits
We believe women deserve the opportunities that sports, and single sex spaces provide.

**Link:** https://youtu.be/0HYRsFNbm3o?si=1cogb4hh1CxCcspx

XXXY000014

**379**



**Link:** https://www.facebook.com/reel/1065353398855253

XXXY000015



**Link:** https://www.instagram.com/reel/DKpqEOryvyW/?utm_source=ig_web_copy_link



**Link:** https://www.instagram.com/reel/DJkqf4vtT61/?
utm_source=ig_web_copy_link

XXXY000017

**382**



**Link:** https://www.instagram.com/reel/DJmu57OO-HF/?
utm_source=ig_web_copy_link



**Link:** https://www.instagram.com/reel/DI_jt5VtSt2/?utm_source=ig_web_copy_link

XXXY000019

**384**



**Link:** https://www.facebook.com/reel/465032349262719



**Link:** https://www.facebook.com/reel/1051592049896895

XXXY000021



**Link:** https://www.instagram.com/reel/DOP3HwJDDs3/?
utm_source=ig_web_copy_link



**Link:** https://www.instagram.com/reel/DJ46oxEu1o_/?
utm_source=ig_web_copy_link



**Link:** https://x.com/xx_xyathletics/status/1906808685721964922

XXXY000024

**389**



**Link:** https://x.com/xx_xyathletics/status/1907049407863828502

**390**



**Link:** https://x.com/xx_xyathletics/status/1944101945553170497

XXXY000026



### 16-Year-Old Oregon Girl Shares Experience Competing Against Boys



**Link:** https://perma.cc/U5AU-ZQCJ

XXXY000027

**392**



**Link:** https://x.com/xx_xyathletics/status/1931021038134960626



**Link:** https://x.com/xx_xyathletics/status/1930977099910705263

XXXY000029

**394**



**Link:** https://x.com/xx_xyathletics/status/1930287340557074607



**Link:** https://x.com/xx_xyathletics/status/1909583643015782605



I am a USA champion gymnast (1986), producer of the 2020 Emmy-award winning documentary film, "Athlete A" on Netflix and founder and CEO of XX-XY Athletics. I founded XX-XY Athletics, the first athletic brand to stand up for women's sports in March 2024.

Since its founding, my company has been at the wrong end of Meta and TikTok's unfair business practices - including blocking, demonetizing, and banning the brand from advertising.

When we are restricted in how we can advertise this puts us at a significant disadvantage as we are not actually competing in a free market - we are being deliberately handicapped by the ideologically captured platforms manipulating an anticompetitive market.

The bias always goes in one direction, encouraging woke messaging and boosting the businesses that play along. Which of course creates the false impression that there is no demand for non-woke businesses. But there is. Our business shows that. And yet, we are fighting an uphill battle to reach likely buyers.

Below is a summary of Meta and TikTok blocking access to commerce based on our views, including activities that take place outside those platforms.

## TikTok

Given that 50% of Americans under 30 use Tik Tok, and they favor it over Instagram, Facebook and Twitter/X, the platform is a key factor in reaching a wider audience and increasing brand recognition for newly formed brands.

In the last year, women's sports have experienced an unprecedented surge in visibility on TikTok. By its own measurement, the number of posts on TikTok using the hashtag #womenssports jumped 170% between 2023 and 2024.

This correlates with the boom my brand -- an athletic apparel brand primarily targeting women -- is a part of. As a start-up athletic brand with the unique mission of standing up for female athletes and protecting the integrity of women's sports, a mainstream view held by 80% of Americans according to a recent New York Times/Ipsos survey, we are uniquely positioned to engage with currently competing young athletes with content about women's sports. But TikTok won't allow it.

We first attempted to reach a younger audience on the app on June 18, 2024, just three months after we launched, posting our introductory video called Stand Up. The ad is an exhortation to young female athletes to stand up for the protection of women's sports. The ad stated the fact that males are stronger than females and males competing against women is unfair and can be dangerous for women. We used a real-life example to show

1

XXXY000032
**397**



this. And we encourage women and girls to stand up for themselves. And yes, in doing so, not to be cowed by those who would call them bigots.

For that, TikTok permanently suspended XX-XY Athletics as an advertiser. And permanently handicapped our business, preventing us from reaching a coveted Gen Z audience. TikTok decided we were bigots furthering hate speech on the platform, therefore needed to be silenced. Exactly what we warned about in the ad.

In late July, a TikTok ad representative said that the brand violated their clause around "hate speech," specifically for furthering "hateful ideologies" against a "protected group."

On August 28, TikTok's policy team avoided directly answering whether the brand's organic posts were suppressed. They stated that their ad policy bans content they labeled hateful, and since the *Stand Up* ad was shared on the brand's homepage, that also made the content bannable.

We couldn't advertise during the Olympics when Imane Khelif became the most-searched athlete of the year, or during the U.S. Open when Aryna Sabalenka's fitness coach wore our hat courtside.  We were locked out and unable to reach likely buyers during worldwide sports moments.

TikTok is denying the brand the ability to reach our target market, with a high affinity for our content. In March 2024, Tik Tok released a study citing the platform's importance in the growth of small businesses. The study, conducted by Oxford Economics, found that small businesses on TikTok generated nearly $15 billion in revenue in the US in 2023 through paid advertising and marketing.

But this critical channel for small businesses was closed to our business.

2

XXXY000033
398



After a summer of enforced silence, Senators Marsha Blackburn of Tennessee and Joni Ernst of Iowa sent a letter to TikTok CEO Shou Zi Chew just before October 10, 2024:

*"In your notification to the company informing them of the ban, TikTok labeled the content offensive and, later, hate speech," the senators wrote. "The advertisement deemed hateful by TikTok was simply a celebration of female achievement — using a real-life example — and encouraged young women to 'be honest' and 'be brave.'"*

*"Supporting young women should never be offensive, and it is telling that TikTok would consider a celebration of our girls in sports as worthy of being banned. There is nothing controversial or hateful about the fact that men and women have biological differences, and any argument to the contrary is simply an attack on our nation's women and girls."*

This February, our "Real Girls Rock" ad went viral, securing 20M+ views and dominating online conversation for a week, partly in thanks to strong women worldwide, including J.K. Rowling, Megyn Kelly, Sage Steele and Martina Navratilova sharing the ad.

While trending on X, there were over 40,000 posts about the ad. This is exactly what a brand strives for to grow awareness and, in our case, further the cultural conversation. The overwhelming response with zero paid media demonstrates that there is demand for a brand willing to defend the integrity of women's sports.

February 2025, our 11th month in existence, was our best month yet. At first, no thanks to TikTok, which, once again, did not allow us to advertise. We objected. And after weeks of back and forth and countless hours of filling out paperwork, they said "oops, you can run those." But we missed the moment.

It's not just our brand being censored on this issue. Riley Gaines has also been censored by TikTok for supporting fairness and safety in women's sports.

TikTok can continue to discriminate against any company it wants, including mine. But it's clear the firewall between TikTok and Beijing is paper-thin, and if Bejing wishes, in a

3

**399**



keystroke, nonexistent. If there is any nation that should not set a framework for expressive activity or moderating content around women's rights, it's our adversary, Beijing.

The PRC has never been on the side of women's rights. During the days of the "one child policy," women endured forced abortions and sterilizations. This policy did not end until 2015.

Today, minority women such as Uighur's and Tibetans are forced into marriages with Han Chinese to increase birth rates and dilute minority cultures.

Divorce is a political taboo, trapping women in abusive marriages.

And China has the most restrictive speech laws in the world. Censorship is mandated by the Chines Communist Party and the government curtails any political opposition while asserting their legal right to control all content on the internet. As of 2024, the World Press Freedom Index ranks China 172nd out of 180 countries in regard to press freedom and terms it the "world's largest prison for journalists."

Americans should be outraged that a company controlled by a strategic adversary that was forcefully sterilizing women 10 years ago and is the largest censorship regime in the world still, is allowed to shape debate on the most relevant cultural conversation in sports today.

## Meta

Meta prevents us from targeting followers of likeminded influencers. We could of course target Megan Rapinoe's followers. Or even Joe Biden's (before the presidential debate).

This post was rejected by Meta: https://app.air.inc/a/cOr2M60J3 "Stand with us. Check us out @ thetruthfits.com #SaveWomensSports".

Meta blocked the #XX during the Olympics.

The return on ad spend is 3-4x when likeminded followers of influencers is permitted. So our return on ad spend is severely diminished when we are not permitted to target likely buyers. Which means wasted ad dollars and minimized revenue.

Women athletes are more successful at marketing brands than male athletes - due to a combination of their roster value and knowing what works for their audience on social. We see higher conversion when women athlete influencers comment on the brand. And social conversation is one of the strongest driver of sales.

4

**400**



5

XXXY000036

**401**



## Request to Act

Our story is about unfair digital markets and women's rights in the digital age.

When platforms like TikTok and Meta can arbitrarily silence and suppress a company for defending biological reality and empowering women, it reveals not only the doublespeak in how they handicap small businesses, but also how artificial intervention in the free market of ideas can stifle young girls and women athletes' future opportunities.

Small businesses should not be forced to play by invisible rules that punish them for expressing mainstream values. Nor should American entrepreneurs be at the mercy of foreign-controlled, and/or ideologically captured platforms that act as gatekeepers to our own culture.

I respectfully request the FTC examine any consumer harm and investigate an unfair and uncompetitive commerce environment for small businesses.


Sincerely,

Jennifer Sey
Founder and CEO, XX-XY Athletics
1986 Women's National Gymnastics Champion

6

XXXY000037

**402**

# Add Meta and Comcast to the list of media companies censoring XX-XY Athletics

You may have heard we got banned from Tik Tok. But the censorship runs even deeper. Meta and Comcast are also censoring the brand, in far sneakier ways.



**JENNIFER SEY**
JUL 03, 2024

♡ 121    💬 16    ⟳ 19                                    Sha

As you may have heard by now, on June 18<sup>th</sup> the brand I recently started — XX-XY Athletics — was permanently banned from advertising on Tik Tok. For this ad:



Watch Our Launch Ad, "Stand Up"

For running an inspiring ad that simply encourages women and girls to stand up fo fairness, privacy and safety    and paying Tik Tok good money to run it    we were

XXXY000038

**403**

told we violated their advertising policies for "o ensive content."

Apparently, now it is o ensive to stand up for women and girls.

**But it doesn't end there. There's more!** Meta and Comcast are getting in on the act

---

**META**

Meta    owner of Facebook and Instagram    has handicapped our brand as well. T one is a bit more complicated but equally condemnatory of our message and

XXXY000039
**404**

disadvantaging to our business. But it's done in a much more insidious way, in that is hidden from view.

Most brands are able to target the followers of relevant in uencers. Nike can target Megan Rapinoe's 2 million followers, for instance.

But when we try to target Riley Gaines' followers — our own brand ambassador — advertising platform doesn't allow it. You put her name in to the ad manager machi and it just doesn't show up! Despite Riley's 400k+ followers on Instagram, it's like s simply doesn't exist.

We can't target Tulsi Gabbard's close to 1M followers either. Former United States representative from Hawaii, Democratic presidential candidate and U.S. Army Rese O cer. Nope. She doesn't exist either.

Clay Travis, founder of Outkick? Nope.

Isabel Brown, young conservative leaning in uencer with 982k followers? Nope.

A list of the top Christian in uencers . . . ~90% of them . . . nope. (We had to try just validate our hypothesis.)

Watch, we screen recorded what happens.



But if we wanted to target Joe Biden's followers. Or Megan Rapinoe's . . . that's just fine. Here's Megan's profile.



So I think it's pretty clear, if not overtly stated, why Rapinoe's fans can be targeted l Gaines' can't.

XXXY000041

**406**

I know this is a little inside baseball, but essentially Meta is handicapping our abili
to reach likely buyers. In a way that they don't do to brands that deliver the "right"
message. And by "right", I mean Le .

It is also worth noting that targeting the followers of in uencers who align with a
brand's message increases return on ad spend by 3 to 4x. So in disallowing us to do
this, we are forced to spend more to drive the same amount of business. Again, real
bad for business.

Any brand that isn't furthering a le -wing narrative, will be put at a signi cant
disadvantage by Meta, blocked from nding and engaging their potential fanbase. (
at the very least, making it MUCH more di cult.

*Go woke or get the heck out of here*, Meta seems to be saying.

This is viewpoint discrimination in way that is hidden from public view. It's like
shadow banning for businesses. And it is all part of censoring wrong think and
manufacturing consensus.

*See . . . everyone agrees with us!* Yes, it appears that way when media companies censo
individuals and brands that don't further the "approved narratives."

---

## COMCAST

XX-XY Athletics just attempted to execute a television media buy for this month w
Comcast. Same ad as above. We want to run it on television. Like brands do.

While Comcast is willing to run it, they won't run it without a disclaimer required f
political ads saying:

XXXY000042

**407**

## *"This ad is paid for by . . ."*

Have you ever seen a brand ad with this kind of disclaimer?

From Nike? With their *One Day We Won't Need This Day* ad? Or their *Dream Crazy Kaepernick ad*, encouraging us all to *Believe in something even if it means sacrificing everything*?

No. That ad won an Emmy. No political disclaimer.

Always' Run Like A Girl ad? No disclaimer.

Gillette taking on "toxic masculinity" and aligning with the #metoo movement? No

Dove tackling women in sports? No.

I've run TV ads for over thirty years. Some less product focused and more values or mission led. Never have I encountered such a requirement.

Now you might say: *What, they let you run it*? *What are you complaining about*?

Sure. But we get pigeonholed and diminished as a political ad. When we aren't. We' brand selling athletic clothing. With a message that champions female athletes. Jus like Nike. And Dove. And Always. And countless other athletic brands which aren't required to make their ads lamer by slapping on a disclaimer!

**The only ads that have these disclaimers are ads for political candidates and campaigns, as required by law.**

Why are we the only brand being put in this category of being "political"? (Rhetoric question.) We aren't touting a candidate. We aren't aligned with any politician's

XXXY000043

**408**

campaign.

It diminishes the impact of our ad. And it is yet another form of censorship. It obstructs and weakens a brand's message and business potential. And, of course, th censorship always goes one way.

Honestly, I'm astonished that it keeps happening in more and more subtle but insidious ways. But it is a stark reminder of the challenge we are up against as a new business, with a message that strays from the le -wing narrative (but not from common sense or public approval). The deck is stacked against us. Big Tech and corporate media will seemingly do anything to limit our ability to get our message there.

But the good news is, we are reaching fans anyway. Seemingly, people are fed up wi the censorship of one viewpoint and they are seeking us out. It doesn't hurt that ou product is world-class. And people love it.

XXXY000044

**409**

Tomorrow is the 4th of July. And I'm reminded of the founding principles of this country. And freedom of speech is at the core of those principles. It is the most fundamental freedom. Without it, we do not live in a free country.

To quote my own husband, Daniel Kotzin:

> You are only defending freedom if you defend the rights of people who are saying and do things with which you do not agree. Otherwise you are merely defending your own intere

I suppose Tik Tok and Meta and Comcast are defending their own interests. We ca only surmise as to why and how they may be incentivized to do so. And why limitin the potential of XX-XY Athletics would be in their interests anyway? Good questio right?

Daniel has also said:

> My freedom protects you; your freedom protects me.

The best way to protect all of our freedoms is to speak up.

And like our ad says: *Stand up.*

Stand up for truth. And for freedom. Do it now. Do it always.

Happy fourth.

Sey Everything is a reader-supported publication. To receive new posts and support my work, consider becoming a free or paid subscriber.

Type your email...    ...    Subscribe



XXXY000045

 121 Likes · 19 Restacks

## Discussion about this post

**Comments**   Restacks

Write a comment...

**Julie Reeser**   Jul 3, 2024

💙 Liked by Jennifer Sey

I'm only on fb for social media, but I made sure to follow the XX-XY page and I will share all the
Thanks for speaking out.

♡ LIKE (6)   💬 REPLY

**Mike** ⊛  Jul 3, 2024

💙 Liked by Jennifer Sey

Keep fighting for the truth Jen, your strength will win out.

♡ LIKE (3)   💬 REPLY

**14 more comments...**

Link: https://jennifersey.substack.com/p/add-meta-and-comcast-to-the-list

© 2025 Jennifer Sey · Privacy · Terms · Collection notice
Substack is the home for great culture

XXXY000046

**411**

*OPINION*

# I just got kicked off a 'diverse thought' panel for wrongthink: Corporate DEI lives on

By Jennifer Sey

Published March 19, 2025, 7:32 p.m. ET



XXXY000047

**412**

XX/XY Athletics

Woke capitalism is alive and well.

Don't be fooled by American companies' public statements suggesting they're abandoning identity-based diversity, equity and inclusion policies in favor of merit and diversity of thought.

I'm here to prove it: I've been canceled. Again.

This time, bounced from a conference boasting a theme of "breaking down walls."



Five months ago, Peer 150, a networking group for top human resources executives, asked me to speak at one of its events.

  

 Hallmark movie star, 35, died because Vegas restaurant staff halte…

 Australian mother exposed as sex worker to son: 'Mom, do you…

 $43 n
Onlyl
Rain

XXXY000048

413



**Nepo baby Violet Affleck proves Trump right about the United Nations' uselessness**



**Democrat 'Nazi' rhetoric about ICE has inspired tragic violence**

I was pleasantly surprised: I'm pretty well known at this point as being aggressively non-woke.

In 2020, I was the only C-suite executive in a major Fortune 1000 company to push back against lockdowns and school closures during the pandemic.

I resigned from Levi's, a company I'd worked in for 23 years. And then I was banished from all of corporate America for my disobedience.

When I went on to interview for big jobs at big companies in 2023, I was told I'd need to apologize for my stance — despite having been proven absolutely right about school closures being harmful to the nation's most disadvantaged children.

I went public, decrying woke capitalism for its harmful stifling of creativity and innovation as it smothers speech.

And I started my own company, XX-XY Athletics, the only brand of activewear standing up for the protection of women's sports. That's not helping me get myself un-canceled.

So the invitation to air my heterodox views at such a mainstream conference was shocking — but a hopeful sign of change.

The invitation-only Peer 150 conference brings together 800 HR leaders from companies like NBC, Ikea, REI and Universal Music Group to listen to experts' presentations and discuss pressing corporate issues.

**SEE ALSO**



**Trump's victory won't end the fight to protect women in women's sports**

XXXY000049

**414**

The event, set for Portland, Ore., trumpeted that it would "welcom[e] all walks of life with open arms" under the banner "Keep Portland Weird."

"Our weird is about inclusiveness," the conference website proclaims.

"You do realize this crowd might boo me out of the place??" was my initial response to the organizer.

"More like a possible standing ovation when we are done!!!" he wrote back.

So I accepted, and after multiple planning calls we outlined my presentation, a question-and-answer session called "Unfiltered — Championing Performance, Merit and the Power of Diverse Thought."



**Get opinions and commentary from our columnists**
Subscribe to our daily Post Opinion newsletter!

Enter your email address        SIGN UP

By clicking above you agree to the Terms of Use and Privacy Policy.

Apparently, diverse thoughts are triggering to this audience.

Last week I received a call from a Peer 150 co-founder.

I'll paraphrase: Since going live with your name on the conference agenda, he said, we've gotten complaints.

Some members said they won't come. Some threatened to cancel their memberships. Some even suggested they'd pull their companies' sponsorship of the event.

"I warned you," I said.

I haven't decided yet, he said.



**SEE ALSO**

On Tuesday, I got his cowardly email canceling my appearance.

"While we always aim to push conversations forward, we also recognize that our responsibility is to create a space where people feel valued and supported," he wrote. "I just don't feel like Portland is quite ready for you."

XXXY000050



**Former Levi's top exec reveals how woke mobs took over corporations**

"Again, I feel horrible and personally think the discussion would be very insightful, however I also feel as though we need to support our community."

"Support our community." "Valued and supported."

These people are spineless.

They pretend to champion diversity of all sorts, but they can't handle even being in a room with someone who disagrees with them. On anything.

And they see it as "supportive" to allow members to insist on shunning people like me.

The tyrannical minority continues to bully everyone else into silence — manufacturing a fake consensus.

Peer 150's co-founder could have chosen a different path.

"I understand you disagree with some of her views," he could have told the complainers. "But let's have the hard conversations. How can we talk about diversity of thought if we won't even listen to a person who thinks differently than us?"

He didn't. He caved.

So many CEOs write to me and say some version of, "I agree with you, but I can't say it because it will harm my business. I'm the breadwinner."

I've got news for them: So am I.

I have no patience for these weaklings.

---

**205** **What do you think? Post a comment.**

---

They can't take the smallest stand within their own companies — that they run!

They can't stomach the tiniest amount of heat or pushback.

You either believe in a culture of free speech, or you don't. You either have principles, or you don't.

XXXY000051

**416**

Wokeism is alive and well in corporate America — because cowards remain silent.

*Jennifer Sey is founder and CEO of XX-XY Athletics.*

**FILED UNDER**   CORPORATE CULTURE,  CORPORATIONS,  DEI,  DIVERSITY,  WOKE CULTURE,  3/19/25

---

**READ NEXT**   Fresh MTA insults: Burning cash on pointless 'experiments'...

---

## AROUND THE WEB



**A Theory Is Gaining Momentum About Charlie Kirk's Assassin**
NYPost.com



**Rumors Spread About Charlie Kirk & Candace Owens' Relationship**
NYPost.com



**Melania Trump Earned One Seriously Wild Nickname**
TheList.com



**Charlie Kirk's Assassination Investigation Takes A New Twist**
NYPost.com

Link: https://nypost.com/2025/03/19/opinion/i-just-got-kicked-off-a-diverse-thought-panel-for-wrongthink-corporate-dei-lives-on/

XXXY000052

**417**



**Link:** https://www.instagram.com/p/DOCWndtEaTZ/?
utm_source=ig_web_copy_link

XXXY000053

**418**



**Link:** https://x.com/ProtectKidsCO/status/1965144273168609679



**Link:** https://www.instagram.com/reel/DLHHy_oMcTi/?
utm_source=ig_web_copy_link

XXXY000055

**420**



**Link:** https://www.instagram.com/p/DIjsvQ1sKsv/?utm_source=ig_web_copy_link



## MAY 1, 2025

## Giving Parents a Voice Townhall

**Beck Recreational Center**

800 N. Telluride Street
Aurora, CO 80011

XXXY000057

**422**

Arapahoe
United States of America

**423**

## DESCRIPTION

### *Parental Rights are in Danger in Colorado*

## Join us for a critical discussion on the latest threats to parental rights in Colorado.

House Bill 25-1312 has already passed the Colorado House and is now moving to the Senate. If enacted, this legislation would set a troubling precedent by classifying "deadnaming" and "misgendering" as forms of coercion in custody disputes.

Furthermore, the bill proposes significant changes to the Colorado Anti-Discrimination Act, redefining these terms as discriminatory acts subject to penalties enforced by the Colorado Civil Rights Division.

The implications for schools, families, and the fundamental rights of parents are profound and far-reaching. Don't miss this important conversation about what's at stake.

Get your questions answered and have your voice heard.

(All viewpoints welcome)

**This event is free, but SPACE IS LIMITED.**

RSVP today!  Seating will be first come, first served.

*You will need a government issued photo ID to check in for the Event.

*Sponsored By: Moms for Liberty Foundation*

## FEATURED SPEAKERS

**Speaker** Kate Anderson
Kate Anderson serves as senior counsel with Alliance Defending Freedom, where she is the director of the Center for Parental Rights. In this role, she leads the team working to

XXXY000058



ensure schools respect the role of parents in directing the upbringing, education, and health care of their children. In 2023, ...

**FULL DESCRIPTION**



**Speaker** Representative Brandi Bradley
Representative Brandi Bradley is a proud Christian conservative, devoted wife, and mother of four boys in Douglas County. Now in her second term in the Colorado House of Representatives, she has emerged as one of the fiercest defenders of parental rights, children's safety, and the sanctity of life at the ...

**FULL DESCRIPTION**



**Speaker** Representative Jarvis Caldwell
Representative Jarvis Caldwell, an Air Force veteran who served for 10 years, is deeply connected to the large veteran community in HD 20, which encompasses the Air Force Academy. Married to Rheanne with two sons, Jaxon and Colton, Representative Caldwell is committed to representing the district's families and addressing their ...

**FULL DESCRIPTION**



**Speaker** Laura Hanford
Laura Bryant Hanford is a Visiting Fellow with the Devos Center for Life, Religion and Family at the Heritage Foundation. She consults, develops legislation, and writes on a range of family, child protection and religious freedom issues, from the local to the state, national and international levels. Since 2015, when ...

**FULL DESCRIPTION**



**Speaker** Jennifer Sey
Jennifer Sey is an American author, filmmaker, business executive, and retired National Champion gymnast.   She was a seven-time

XXXY000059

**424**

member of the U.S. Women's National Team and the 1986 U.S. Women's All-Around National Champion. She was the first gymnast to speak out about the abuses in the sport in her 2008 ...

**FULL DESCRIPTION**



**Speaker** Erin Lee

Erin Lee is a mother of three children from Northern Colorado, a Speaker, Writer, Founder of Stop Gender Ideology and Executive Director of Protect Kids Colorado. She has told the story of rescuing her 12-year-old daughter from transgender grooming in public school on Fox News, Glenn Beck, NewsMax, DailyWire, The ...

**FULL DESCRIPTION**



**Speaker** Jason Zook

Jason Zook grew up in Columbus, Ohio. After high school, he served four years in the United States Air Force and was honorably discharged. He received an undergraduate degree in English with a minor in History from Colorado State University. He also holds a Master of Elementary Education from Grand ...

**FULL DESCRIPTION**



**Speaker** Cynthia Stein

Cindy Stein is a mother to two amazing boys and one beautiful daughter. She is a Colorado native and currently lives in southwest Colorado. She is a two time cancer survivor and is focused on building a business to help others through their health journeys.

XXXY000060

**425**

**VIEW ALL SPEAKERS (/EVENTS/2994/SPEAKERS/)**

## DATE AND TIME

Thu, May 1, 2025

7 p.m. - 9 p.m.
(GMT-0600) America/Denver

## LOCATION

**Beck Recreational Center**

800 N. Telluride Street
Aurora, CO 80011
Arapahoe
United States of America

Event has ended

Like    38 people like this  Be the first of your friends

(https://www.facebook.com/sharer/sharer.php?
app_id=&u=https://portal.momsforliberty.org/events/2994/)
(https://twitter.com/intent/tweet?
url=https://portal.momsforliberty.org/events/2994/&text=&via=) () () (mailto:?
subject=&body=Good day! Check out our event:
https://portal.momsforliberty.org/events/2994/) (/events/print-view/2994/)

## LOCATION

XXXY000061

**426**

**VIEW LARGER MAP (//MAPS.GOOGLE.COM/MAPS?
Q=800%20N.%20TELLURIDE%20STREET+AURORA,
CO+80011&IE=UTF8&HL=EN&VIEW=MAP&HQ=&HNEAR=800%20N.%20TELLURIDE%20S
TREET+AURORA, CO+80011&Z=14&SOURCE=EMBED)**

## Beck Recreational Center

**800 N. Telluride Street
Aurora, CO 80011
United States of America**

**Group(s):** Moms for Liberty (/groups/global/)

 Print (/events/print-view/2994/)
 Add to My Calendar (/events/ics/2994/)

Subscribe for Moms for Liberty News, Updates, and Events

**JOIN OUR MAILING LIST (/FORMS/GET-UPDATES)**

Moms for Liberty is a 501(c)(4) nonprofit organization.

Moms for Liberty is dedicated to fighting for the survival of America by unifying, educating and empowering parents to defend their parental rights at all levels of government.

**f**  (https://www.facebook.com/Moms4Liberty)    🐦  (https://twitter.com/Moms4Liberty)

📷  (https://www.instagram.com/moms4liberty/)

▶  (https://www.youtube.com/channel/UC2H19eKURyI364Q3Rv-o_5g)

Privacy Policy (/privacy-policy/) / Terms of Use (/terms-of-use/) / Contact Us (/contact-us/) /
Chapter Chair Log In (/committees/chapter-chairs/)

Phone: 321.345.1671 | Email: info@momsforliberty.org (mailto:info@momsforliberty.org) |
Media: media@momsforliberty.org (mailto:media@momsforliberty.org)

XXXY000062

**427**

Copyright © 2023

**428**

**Link:** https://perma.cc/B8VR-RFAN

XXXY000063

**From:** ffgj <bjaags4@gmail.com>

**Sent:** Friday, November 1, 2024 11:23 AM

**To:** caden.a.french@icloud.com <caden.a.french@icloud.com>; XX-XY Athletics Customer Service <orders@xx-xyathletics.com>

**Subject:** KILL ALL WHITE TRAILER TRASH STRAGGOTS! #KAMALA2024! TRANS LIVES MATTER KILL AND HANG ALL DIRTY WHITE BROKE ASSS NIGGER CRACKER BITCHES ROT IN HELL YOU FUGLY ASS HEBOON LOSER APE





XXXY000065

**430**





WHITE LIVES DONT FUCKING MATTER CRY HARDER DUMB NIGGER WHITE TRASH INFERIOR CRACKER LOSER ASS BITCHES ONLY BLACK TRANS WOMENS LIVES DO UR FUCKING UGLY CRACKERS XX LOSER JEALOUS CISSY CUNT SISSYS SHEBOONS

ROT IN HELL YOU DUMBASS WHITE TRASH FUCKTARD NON TRANS CISSY NIGGERS STAY MAD AND GET BLOCKED LOSERRSSS CRY HARDER LET YOUR TRUMPLIKKKAN TEARS FLOW HARDER BITCH ASS FAGGOTS NIGGER WHITIE CRACKER LOSER BITCHES U APES R TRASHY LOSERS!◯

BITCHES ARE FAKE WOMEN ONLY TRANS WOMEN ARE REAL CRY HARDER YOU DURTY PATHETIC ASS WHITE TRAILER TRASH DIE WHORECRACKER APE NIGGERS!

KILL ALL WHITE TRASH INFERIOR LOW IQ  "PEOPLE USUAL SUSPECT:📷 📷  ◯ DEFUND THE POLICE! #KAMALA2024 GO FUCKING HANG URSELF TRUMPLIKKKAN RETARD BITCH RFK SUPPORTS TRANS RIGHTS SO GO CRY HARDER LOSER LMAOOO RFK ISNT EVEN RUNNING YOU DIRTY RIGHT WING MAGAT FUCKTARD LOSER STAY SCAPEGOATED YOU YUCKY WHITE

TRASH BIGOT LOSER ASS NIGGER BITCH! COPE AND SEETH YOU RIGHT WING WHITE TRASH CRACKER GARBAGE CAN LOSER TRANS WOMEN ARE WOMEN U DIRTY NIGGER APE GARBAGE CAN LOSER ASS BITCH IMANE KHELIFS A WOMEN GO CRY HARDER YOU PATHETIC WORTHLESS WHITE TRASH GARBAGE CAN TRUMPLIKKKAN RIGHT WING CRY HARER AND STAY MAD YOU DIRTY NIGGER LOSER ASS CRACKER APE BITCH GO HANG URSELF WORTHLESS WASTE OF OXEGYN PATHETIC WHITE TRASH LMAOO "wOkE mINd vIRuS" doesnt fucking exist you worthless white trashcan faggot bigot loser ass bitch go HANG YOURSELF AND SLIT YOUR WRISTS YOU CLOWN LMAOO UR PATHETIC T SHIRT IS GOING TO TAKE AWAY TRANS RIGHTS CRY HARDER BITCH! #TRANSWOMENAREOWMEN OF COURSE UR A "fiSh farmER" typical OLD WHITE TRASH WASTE OF OXEGYN DIE OFF ALREADY AND HANG YOURSELF KILL YOURSELF YOU FUCKING RETARDED LOSER ASS BITCH! LOL YOU'RE JUST ANOTHER TYPICAL WHITE TRASH RETARDED WASTE OF OXEGYN NOT HAVING THE SHOT CLEARLY AFFECTED YOUR SANITY AS THERE ARE MORE THAN 2 SEXES, INTERSEX PEOPLE EXIST GORead more LOL UR PATHETIC WORTHLESS TINY CHEAPASS T SHIRTS ARENT TAKING AWAY TRANS RIGHTS GO CRY HARDER PATHETIC LIL MENTALLY ILL BRAINROTTED SICKO TRUMPLIKKKAN FETUS BITCH WHITE TRASH LITTLE BOY CLOWN ;-) LOL YOU'RE THE ONE WITH NONSENSE GO CRY HARDER LOSER ASS WHITE TRASH BITCH YOU BRAINDEAD TRUMPLIKKKANS ARE THE ONLY EVIL FORCES AT PLAY YOUR SILLY PATHETIC "xX" LETTER CHEAP ASS PLASTIC MERCH ISNT TAKING AWAY TRANS RIGHTS :-) CRY HARDER BIGOT YOU'RE NOT EVEN IN THE LITTLE BOY WORLD WITH THAT DISGUSTING BRAINDEAD YUCKY CROTCH GOBLIN FETUS BRAIN OF YOURS TRANSPHOBIC RETARD LOSER HAHA GO ROT WHITE TRASH APE!✴ ✳ ✖ ◯ ✖ ☑ ✖ ☑ ☑ ☑ ☑ 🧏 🧏 🧏 🧏 🧏 LMAOO YOU'RE MENTALLY ILL YOUR CISSY BS IS GARBAGE GO CRY HARDER LOSER! #KAMALA2024 TRANS AFFIRMING CARE GO CRY BITCH ASS LOSER YOU'RE MENTALLY BRAINDEAD AND DAMAGED FOR LIFE TRANS PPL DONT AFFECT YOUR LIFE AT ALL YOU FUCKING WHITE TRASH GARBAGE CAN RETARD LOSER APE GO ROT IN HELL SHITBRAINED STRAGGOT FAGGOT ASS WHITE TRASH LOSER PALE CRACKER APE BITCH YOU MONKEY BRAINED TINY BRAINED LOSER ROT I NHELL BITCH BIGOT LOSER ASS CRY HARDER TRANS WOMEN ARE WOMEN 🧏 🧏 🧏 🧏 🧏 🧏 🧏 🧏 ✴ ✖ ◯ CRY HARDER AND VOTE KAMALA2024 FUCKING WHITE TRASH BIGOT LOSER LMAOO IMAGINE "sUpPortING wiMeNZ spORTz AND VOTING FOR A SEXIST WHITE TRASH RAPIST RACIST SEXIST YOU NASTY PATHETIC WHITE TRASH FUCKING LOSER GABAGE CAN NIGGER APE RETARD LOSERA SSS BITCH! LOSERRRR! GARBAGE ASS WHITE TRASH BITCH TRANS WOMEN ARE RECOGNIZED AS WOMEN LEGALLY COPE AND SEETH YOU WORTHLESS WHITE TRASH FAR RIGHT GARBAGE WOKE AGENDA CRACKER LOSER RETARD DEI HIRE SHEBOONS PATHETIC WHITE TRASH LMAOO "wOkE mINd vIRuS" doesnt fucking exist you worthless white trashcan faggot bigot loser ass bitch go HANG YOURSELF AND SLIT YOUR WRISTS YOU CLOWN LMAOO UR PATHETIC T SHIRT IS GOING TO TAKE AWAY TRANS RIGHTS CRY HARDER BITCH! #TRANSWOMENAREOWMEN OF COURSE UR A "fiSh farmER" typical OLD WHITE TRASH WASTE OF OXEGYN DIE OFF ALREADY AND HANG YOURSELF KILL YOURSELF YOU FUCKING RETARDED LOSER ASS BITCH! LOL YOU'RE JUST ANOTHER TYPICAL WHITE TRASH RETARDED WASTE OF OXEGYN NOT HAVING THE SHOT CLEARLY AFFECTED YOUR SANITY AS THERE ARE MORE THAN 2 SEXES, INTERSEX PEOPLE EXIST GO FUCKIGN HANG YOURSELF YOU FUCKING RETARDED PIECE OF WHITE TRASH LOL ITS CLEAR AS DAY YOU'RE JUST ANOTHER TYPICAL WHITE TRASH BRAINDEAD TRUMPLIKKKAN CRYING BS GARBAGE FAGGOT LOSER ASS BITCH! LOL UR THE ONLY ONE WITH BS! GO CRY HARDER YOU WHITE TRASH BIGOTED LOSER PATHETIC CLOWN! THERE ARE BIGGER PROBLEMS THAN UR FUCKING MENTAL ILLNESS CAUSING UR WHITE TRASH TINY BRAIN TO THINK OF UR GARBAGE CONSPIRACY THEORIES OF THE "fAR lEfT tAKinG oVEr" YOU PIECE OF NASTY TRUMPLIKKKAN BULLSHIT GO FUCKING HANG YOURSELF LMFAO GO CRY HARDER YOU BRAINDEAD PIECE OF SHIT CRY HARDER AS I FEARLESSLY SPEAK THE TRUTH BITCH! YOU HAVE NO SANITY AT ALL YOU'RE MENTALLY ILL YOUR CISGENDER XX XY BS IS BRAINROTTED MENTAL ILLNESS GO FUCKING KILL YOURSELF LOSER PIECE OF SHIT! TRANS WOMEN ARE WOMEN! PERIOD! GO FUCKING CRY HARDER AND DIE MAD ABOUT IT YOU TYPICAL WORTHLESS WHITE TRASH BIGOT PIECE OF SHIT☑ ✖ ◯ 🧏 ✴ !"tRANs pEOple eXisTINg aFfEcTS mE" LMFAOO SHUT THE FUCK UP AND GO CRY HARDER YOU PATHETIC WORTHLESS WHITE TRASH RETARDED CLOWN NIGGER APE BITCH SHEBOON LOSER AND ITS NOT "tRaNs bS" YOU MEAN WHITE TRASH CISGENDER BS LIKE YOURSELF? YOU'RE THE ONLY FUCKING PROBLEM IN SOCIETY YOU DIRTY DISGUSITNG WHITE TRASH trumpliKKKan BRAINDEAD CONSPIRACY THOERIST PIECE OF WHITE TRASH GO FUCKING HANG YOURSELF YOU PATHETIC WASTE OF OXEGYN LOSER LMFAOO YOU SOUND DELUSIONAL CLOWN! YOU'RE THE UGLIEST PIECE OF WHITE TRASH IVE SEEN GO GET A FACELIFT AND A NOSEJOB AND LIP FILLER YOU'RE PALE AND WHITE TOO DISGUSTING! YOU'RE INFERIOR WHITE TRASH RACE AGES LIKE MILK FOR A REASON! TRANS WOMEN ARE WOMEN AND THEY LOOK WAY BETTER THAN YOU'RE DISGUSTING PALE FAT FACED WASTE OF OXEGYN GARBAGE ASS NIGGER BITCH LOL, i find it hilarious and laughable how you pathetic retarded worthless WHITE TRASH LOSER braindead trumpliKKKans jump at the dangling carrot of trans women being attacked and set as the next target of the culture war for simply EXISTING!✖ WHITE TR☑ ◯ ✴ LOL YOU FUCKING RETARDED WHITE TRASH SNOWFLAKES ARE MENTALLY DEFECIT IF YOU THINK A CIS MAN WOULDNT BE ABLE TO JUST WALK INTO A WOMANS BATHROOM AND RAPE THEM! YOU'RE SO FUCKING SLOW LOL YOU'RE THE MOST BRAINDEAD PIECES OF SHIT TO EXIST ROT IN HELL LOSERS! TYPICAL MENTALLY ILL WHITE TRASH GARBAGE BAG GO FUCKING HANG YOURSELF GARBAGE CAN! ITS LGBT NOT "lGb" FUCKING WHITE TRASH RETARD LOSER ENJOY LOSING YOUR ACCOUNT FOR MISINFORMATION NASTY WORTHLESS WHITE TRASH RETARD #KAMALA2024 CRY HARDER DISGUSTING MAGAT WORTHLESS WHITE TRASH BIGOT FAGGOT ASS BITCH LOSER TYPICAL USELESS CRACKER GABRGAE CAN! TRANS WOMEN ARE WOMEN STAY MAD CLOWN #TRANSWOMENAREWOMEN CRY HARDER YOU WORTHLESS WHITE TRASH FAT WASTE OF OXEGYN YOU DIRTY FUGLY ASS FUCKING CRACKER WHORE NIGGER BITCH GO HANG URSELF LOSER ASS BITCH! go fucking kill yourself bigot shithead, NOTHING you say makes any sense you're EVIL and mentally deficit i genuinely laughed at this garbage and couldnt even read all the way through LOL... IF A MAN WANTED TO RAPE A WOMAN HE WOULDNT HAVE TO PUT ON A DRESS RETARD! HOPE YOUR PATHETIC FUGLY ASS GARBAGE BAG CROTCH GOBLIN OF A MUTANT WHITE TRASH LOSER "bAby" GETS RUN OVER ID RUN BOTH OF YOU OVER AND BACK UP HAHA ITS GONNA IGNORE YOU AND CUT YOU OFF PATHETIC WHITE TRASH BIGOT LOSER GO SLIT YOUR WRISTS FUCKING RETARD ASS BITCH! TRANS WOMEN ARE WOMEN GO CRY HARDER CLOWN BIGOT TRUMPTARD WHITE TRASH LOSER ASS BITCH LMFAOO YOU DONT GIVE A FUCK ABOUT "wIMenZ sP0rTz" NOBODY DOES! YOU HATE TRANS PEOPLE YOU FUCKING WORTHLESS WASTE OF OXEGYN GO HANG AND KILL YOURSELF GO CUT WORTHLESS WASTE OF OXEGYN GARBAGE BAG ASS WHITE TRASH LOSER ASS BITCH! IMAGINE VOTING FOR THE RAPIST SEXIST RACIST LOSER donOLD DEMENTIA dump YOU PATHETIC WORTHLESS WHITE TRASH CLOWN GO HANG YOURSELF RADICAL RIGHT WING PIECE OF GARBAGE WHITE TRASH BIGOT CLOWN LOL YOU FUCKING WORTHLESS PIECE OF WHITE TRASH THINKING YOU'RE ALL THREATINING WITH YOUR PATHETIC 1 USELESS VOTE THAT WONT EVEN COUNT?GO HANG YOURSELF YOU DISGUSTING RIGHT WING PIECE OF WHITE TRASH #KAMALA2024S GONNA WIN GO CRY THAT OLD DEMENTIA donOLD DUMP BITCH DIDNT WIN SHIT LMAO ENJOY VOTING FOR UR RACIST RAPIST PEDOPHILE CONVICTED FELON YOU NASTY FUCKING RETARDED CLOWN RIGHT WIN GARBAGE CAN WASTE OF SPACE LOSER ASS BITCH! "sAve tHIS kUNtrEE" LMAOO TYPICAL WHITE TRASH RETARDED BITCH GO FUCKING HANG YOURSELF YOU WORTHLESS PIECE OF SHIT HANG URSELF LOSER GARBAGE BAG!✴ TRANS WOMEN ARE WOMEN CRY HARDER CLOWN🧏 🧏 🧏 🧏 BECAUSE YOU'RE FUCKING RETARDED WHITE TRASH LMAOO CRY HARDER LOSER "jEnN" YOU'RE LITERALLY ANOTHER WORTHLESS PATHETIC TRANSPHOBE STAIN TO THE BOTTOM OF MY SHOE GO HANG YOURSELF YOU WORTHLESS WASTE OF OXEGYN YOU DISGUSTING CRETINS NEED TO BE SHOT HUNG AND MURDERED IN COLD BLOOD! WORTHLESS HATEFUL RIGHT WING WHITE TRASH BIGOT PIECES OF GARBAGE "lOgic aND cOMmoN sEnSe" ARE ALL JUST BIGOTRY LIES LIES LIES BLAH BLAH BLAH! TRANS WOMEN ARE WOMEN! CRY HARDER! WEEP HARDER! STAY MAD ABOUT IT AND CRY TEARS OF BLOOD! ILL STAB UR EYEBALLS OUT YOU WORTHLESS NASTY WASTE OF OXEGYN!✴ GOD IS A FAKE FAIRY TAILE LIKE JESUS CRY HARDER YOU STUPID RETARDED WHITE TRASH LOSER BITCH GO FUCKING HANG URSELF GARBAGE WASTE OF SPACE LOSER ASS BITCH NIGGER GO ROT! "cOvId iNSaniTy" JUST SAY UR A COVIDIOT RETARD LOLL!! TYPICAL REPUBLITARD GO HANG URSELF PATHETIC CRACKER APE PALE BITCH! GO BACK TO UR WHITE TRASH EUROPEAN SHITHOLE APE SHEBOON RETARD ! TRANS WOMEN ARE WOMEN!!!! KILL ALL WHITE TRASH "pEoPle" LOCK donOLD DEMENTIA DUMP UP! LOL YOU PATHETIC BIGOTS HIDING ON THIS DISGUSTING HATEFUL WEBSITE HAVE NO LIVES NO FRIENDS NOTHING! HIDING BEHIND A KEYBOARD BECAUSE UR PATHETIC GARBAGE BAGS CLAIMING TO BE "fReE tHinkErS" go rot in hell pathetic worthless wastes of oxegyn! MY PEOPLE WILL COME HANG YOU NASTY trumpliKKKan RACIST WOKE DEI HIRE WHITE TRASH CRACKER NIGGER BITCHES HANG YOURSELVES LOSERS! #KAMALA2024 #DEFUNDTHEPOLICE #TRANSWOMENAREWOMEN #BLACKLIVESMATTER CRY HARDER PATHETIC WHITE TRASH MAGAT LOSER TRUMPANZEE CRACKERS LMAOO EVEN "jEnNIRETaRD "sEy" LOOKS LIKE A WHOLE MAN!!! CRY HARDER YOU XX MALE GARBAGE CAN! AWHH DID I MAKE U MAD TYPICAL LOW IQ WHITE TRASH "pErSoN" TRIGGERED WHITE TRASH SHEBOON TRUMPANZEE MAGAT NIGGER BITCH WASTE OF LIFE!☑ 🧏 ◯ ✖ ◯ ✴ GO CRY HARDER WORTHLESS WASTE OF SPACE & OXEGYN VOTE #KAMALA2024! & LOCK donOLD DEMENTIA DUMP UP FOR LIFE! GO FUCKING HANG YOURSELVES YOU WORTHLESS WHITE TRASH TYPICAL PATHETIC TRUMPTARD MAGAT NIGGER APE BITCHES Ur WHITE, ur opinion= automatically invalid garbage◯ ✴ GENDER PRETENDER WHITE TRASH NIGGERS CAN GO ROT! TRASH OLD SISSY SLUT! GO DIE RETARD NIGGER BITCH WHITE TRASH CRY HARDER DUE MAD ABOUT IT LOSERS! WHITE TRASH APES GO HANG URSELF U TYPICAL FRIENDLESS PALE CRACKER NIGGER HEBOON RETARD BITCH! ROT U PATHETIC IN#BLACKSUPREMACY I SUPPORT #AFROEUGENICS KILL ALL WHITE TRASH FAGGOT BITCHASS GODS FAKE GO CRY HARDER PATHETIC BITCH USUAL SUSPECT☑ 🧏 ✖ ◯ ✴ CRY HARDER donOLD DUMP MAGAT TRUMPTARD MINION! #KAMALA2024 TRANS WOMEN ARE WOMEN YOU "xX" FAT WHITE TRASH OLD SAGGY SKINNED WHORES ARE THE REAL MEN BLACK LIVES MATTER! TRANS WOMEN ARE WOMEN! CRY HARDER PATHETIC WHITE TRASH TRUMPANZEE WASTE OF OXEGYN YOU NASTY WORTHLESS CLOWN NIGGER APE RETARDED ASS LOSER CRACKER BITCH! CLOWN! MENTALLY ILL REPUBLITARD TRUMPLIKKKAN EAT SHIT YOU DIRTY TRUMPANZEE GARBAGE CAN! CRY HARDER CLOWN! Typical RETARED WHITE TRASH MAGAT GO FUCKING HANG YOURSELF YOU YUCKY WORTHLESS WHITE TRASH PIECE OF OXEGYN GO SLIT YOUR WRISTS YOU DIRTY FUCKING WHITE TRASH UGLY BIGOT NIGGER BITCH GO HANG YOURSELF YOU WORTHLESS WASTE OF OXEGYN NASTY FUCKING DIRTY RETARD PALE WHITE TRASH CRACKER FAGGOT SLAVE ASS APE RETARDED BITCH! BITCH!

SLIT UR WRISTS GARBAGE CAN! #KAMALA2024! TRANS WOMEN ARE WOMEN! CRY HARDER YOU DISGUSTING RIGHT WING WHITE TRASH LOSER LMAOO GO FUCKING CRY HARDER GARBAGE BAG WORTHLESS ASS LOSER BITCH HANG YOURSELF GO KILL YOURSELF AGGOT ASS BITCH RETARD DEFUND THE POLICE!

XXXY000067

432

XXXY000068
**433**

LMAO YOUR PUNY LITTLE PATHETIC T SHIRTS ARENT TAKING AWAY TRANS RIGHTS! CRY HARDER YOU PATHETIC GERIATRIC GARBAGE UGLY ASS WHITE TRASH NIGGER BITCH ;-))))))) CRY HARDER YOU OLD PATHETIC WHITE TRASH BITCH YOU'RE THE ONE FALLING VICTIM TO YOUR OWN GARBAGE AGENDA YOU DIGUSTING HATEFUL WOK MIND VIRUS TRANSPHOBE BIGOT GO ROT BITCH! RUTH IS TRANS WOMEN ARE WOMEN GO FUCKING CRY HARDER YOU FUCKING WORTHLESS WHITE TRASH GARBAGE CAN LOSER! TRANS WOMEN ARE WOMEN GO FUCKING CRY HARDER BITCH! LOL GO WRITE YOURSELF TO HELL! HANG YOURSELF AND KILL YOURSELF IN THE MOST PAINFUL WAY! ID BACK UP THE HUGEST SEMI ON YOUR DISGUSTING WORTHLESS BODY UNTIL I HEARD EVERY BONE BREAK IN YOUR PATHETIC USELESS HOLLOW CORPSE OF A BODY! THATS WHAT ALL YOU DISGUSTING TRANSPHOBIC RACIST SEXIST MAGAT REPUBLITARD TRUMPLIKKKANT GARBAGE CANS DESERVE! ;-))) cry harder PATHETIC WHITE TRAHS BIGOT LOSER LMAO UR GARBAGE BIGOTED TINY UGLY T SHIRTS ARENT GONNA TAKE TRANS RIGHTS AWAY CRY HARDER GARBAGE CAN LOSER ASS NIGGER BITCH ;-))))) GO ROT IN HELL AND WAKE THE FUCK UP URSELF LOSER LMAO GODS FAKE AND GO CRY HARDER YOU MINDUFCKED RETARD YOU DUMBASSS LOSER BRAINDEAD GARBAGE CAN CRACKER BITCH! #KAMALA2024 #TRANSWOMEN ARE WOMEN NO DRUGS CAN HELP YOU FROM BEING SANE CLEARLY LMAO YOU'RE THE ONLY MINDFUCKED ONE LMAOO YOU NEED YOUR ASS SUED FOR THIS PATHETIC GARBAGE ASS WORTHLESS "cOMmenT" LMAOO SHUE TRASH SACK OF BONES YOU PATHETIC GARBAGE DEI LOOL CRY HARDER MENTALLY ILL RELIGIOUS CLOWN! GOD IS FAKE BITCH! LOL OF COURSE YOU LOOK LIKE AN UGLY OLD GERIATRIC WORTHLESS WHITE TRASH CAN GARBAGE BIN GO FUCKING HANG YOURSELF YOU WORTHLESS WHITE TRASH BIGOT TRUMPLIKKKAN LOSER GO HANG URSELF U PATHETIC GARBAGE CAN WASTE OF OXEGYN LOSER ASS WHITE TRASH BITCH KILL ALL WHITE TRASH "PEOPLE" CRY HARDER UR PATHETIC LIL CHEAP ASS T SHIRTS ISNT TAKING AWAY TRANS RIGHTS LOSER ASS CRACKER WHITE BITCH ;-))))! STAY MAD U DIRTY OLD FART U WORTHLESS OLD ABANDONED IGNORED FAGGOT I CAN TELL YOU HAVE NO FRIENDS YOU DESPERATE LOSER NOBODIES READING UR GARBAGE ASS SHIT! ALL MY BLACK TRANS RIGHTS AND KILL ALL WHITE "PEOPLE" SHIRTS ARE SELLING FASTER CRY HARDER BITCH! LOL CRY HARDER YOU FUCKING OLD ASS WHITE TRASH MAGAT GARBAGE CAN OF COURSE YOU LOOK LIKE THAT YOU OLD ASS GERIATRIC ARCHAIC WHITE TRASHCAN YOU INFERIOR WHITE TRASH LOSERS AGE LIKE MILK FOR A REASON!✖MPLIKKKAN☺ KILL ALL WHITE TRASH "PEOPLE" GO HANG YOURSELF LOSER ASS BITCH! TRANS WOMEN ARE WOMEN CRY HARDER! IMANE KHELIF IS A WOMAN CRY EVEN HARDER AND DIE MAD ABOUT IT BITCH! YOUR PATHETIC LITTLE PUNY CHEAPASS GARBAGE T SHIRTS ARENT TAKING AWAY TRANS RIGHTS ;-))) CRY HARDER USELESS POWERLESS PATHETIC GARBAGE CANS! YOUR MISERABLE JOBLESS FRIENDLESS WITH NO LIFE GO FUCKING HANG YOURSELF PATHETIC WHITE TRASH GARBAGE CAN LOSER FAGGOT ASS RETARD BITCHES! COPE AND SEETH KEEP BLOCKING BECAUSE THE TRUTH CANNOT BE BLOCKED! YOU'RE JUST ANOTHER TYPICAL TRIGGERED SICK RIGHT WING RADICAL TRANSPHOBE MAKING ISSUES OUT OF THIN AIR FUCK WOMEN AND "wOmEnS spORts" UR ALL FUCKING INFERIOR WHITE TRASH "PEOPLE" THAT LOOK LIKE MANLY UGLY MEN NOBODY WANTS TO SEE YOU FUGLY ASS BITCHES PLAY LOL YOUR GARBAGE TRUTH IS TRANS WOMEN ARE WOMEN GO FUCKING CRY HARDER YOU FUCKING WORTHLESS WHITE TRASH GARBAGE CAN LOSER! TRANS WOMEN ARE WOMEN GO FUCKING CRY HARDER BITCH! LOL GO WRITE YOURSELF TO HELL! HANG YOURSELF AND KILL YOURSELF IN THE MOST PAINFUL WAY! ID BACK UP THE HUGEST SEMI ON YOUR DISGUSTING WORTHLESS BODY UNTIL I HEARD EVERY BONE BREAK IN YOUR PATHETIC USELESS HOLLOW CORPSE OF A BODY! THATS WHAT ALL YOU DITRANS RIGHTS AWAY CRY HARDER GARBAGE CAN LOSER ASS NIGGER BITCH ;-))))) GO ROT IN HELL AND WAKE THE FUCK UP URSELF LOSER LMAO GODS FAKE AND GO CRY HARDER YOU MINDUFCKED RETARD YOU DUMBASSS LOSER BRAINDEAD GARBAGE CAN CRACK THE FUCK UP AND GRAB A ROPE AND HANG YOURSELF! KILL YOURSELF AND DO THE WORLD A FAVOUR YOU NASTY WASTE OF OXEGYN HATEFUL DIRTY TRUMPANZEE MAGAT NIGGER BIGOT BITCH! LOL UR MENTALLY ILL AS FUCK! YOU'RE CLEARLY DRUGGED WITH MINIATURE BREASTS AND A DISGUSTING YUCKY BEARD IF YOU THINK THAT ANYTHING YOU SAID MADE SENSE! NO WONDER UR A PATHETIC WHITE TRASH MAGAT LOSER YOUR A MINWN! TRANS PEOPLE DONWORTHLESS WHITE TRASH GARBAGE CAN TRUMPLIKKKAN RIGHT WING CRY HOWMEN OF COURSE UR A "fiSh farmER" typical OLD WHITE TRASH WASTE OF OXEGYN DIE OFF ALREADY AND HANG YOURSELF KILL YOURSELF YOU FUCKING D LOSER HAHA GO ROT WHITE TRASH APE!❀❄✖○✖○✖☺✖☑☑☑☑☑🗑🗑🗑🗑🗑 LMAOO YOU'RE MENTALLGOT ASS WHITE TRASH LOSER PALE CRACKER APE BITCH YOU MONKEY BRAINED TINY BRAINED LOSER ROT I NHELL BITCH BIGOT LOSER ASS CRY HARDER TRANS WOMEN ARE WOMEN🗑🗑🗑🗑🗑🗑🗑🗑❀☺✖○ CRY HARDER AND VOTE KAMALA2024 FUCKING WHITE TRASH BIGOTay makes any sense you're EVIL and mentally deficit i genuinely laughed at this garbage and coH LOSER ASS BITCH! IMAGINE VOTING FOR THE RAPIST SEXIST RACIST LOSER USELESS VOTE THAT WONT EVEN COUNT?GO HANG YOURSELF YOU DISGUSTING RIGHT WING PIECE OF WHITE WASTE OF SPACE UGLY WORTHLESS TRASHCAN CRACKER GARBAGE CAN NIGGER APE RETARD LOSER ASS BITCH!

LOL NOBODY WANTS AN INSECURE MASCULINE MAN YOU'RE COURRUPED AND THINK IT'S OKAY TO BE WEAK  IT'S NOT CRY HARDER CLOWN! CRY HARDER PATHETIC

LMFAO YOU'RE BRAINDEAD WHITE TRASH TYPICAL TRUMPLIKKKAN BRAINROTTED HATRED FILLED BIGOT PIG GO ROT IN HELL LOSER! LMFAO SHES A WOMAN YOU DUMB FUCK IDIOT ASS RETARD GO SLIT YOUR WRISTS AND GET SHOT KEEP FALLING ON UR "fREE THinkeer" SWORD EVERYTIME YOU WHITE TRASH SHEBOON CRETIN MONKEY NIGGER NASTY BIGOT LOSER🗑🗑  TRANS WOMEN ARE WOMEN CRY HARDER LOSER! SHE'S A WOMAN YOU FUCKING CLOWN ASS LOSER BITCH GO CRY HARDER AND KEEP FALLING ON YOUR PATHETIC WORTHLESS "fREe thINKer" AKA BIGOT SWORD EVERYTIME LOSER LMFAOOO LOL THE LGBT COMMUNITY IS DISNTANCING THEMSELVES AND DITCHING YOU WORTHLESS FUCKING RADICAL WHITE TRASH "aThEiSt aCtiVISts" FOR A REASON! GO FUCKING KILL YOURSELF YOU BRAINDEAD TRUMPLIKKKAN RETARD BIGOT! IMANE KHELIF IS A WOMAN AND I KNOW YOU FEEL SO FUCKING STUPID NOW DONT U RETARD? CRY HARDER SHES A WOMAN YOU FUCKIGN RETARDED LOSER ASS BITCH IMANE KHELIF IS FEMALE GO HANG URSELF AND JUMP OFF A BUILDING U TRANSPHOBIC BIGOTED LOSER LMFAO GO FUCKING HANG YOURSELF DIRTY ASS WHITE TRASH TRANSPHOBIC PIGLET BITCH HOW FUCKING RETARDED DO YOU FEEL KNOWING SHES A WOMAN YOU FUCKING OLD DIRTY WHITE TRASH RIGHT WING OLD HAG BITCH YOUR NAMES LITERALLY "hArOld fICKeTt" LOL GO FUCKING KILL YOURSELF WORTHLESS WASTE OF SPACE LOL I KNOW YOU BIGOTED TRUMPLIKKKAN RETARDS FEEL SO FUCKING STUPID NOW AFTER SHE'S BEEN CONFIRMED AN "XX" WOMAN AKA FAKE WOMEN BY THE WAY, ONLY TRANS WOMEN ARE REAL WOMEN NOT YOU DISGUSTING XX FAKE GENDER PRETENDER WANNABE FEMALES!GO FUCKING HANG YOURSELF YOU FUCKING RETARDED WHITE TRASH BRAINDEAD LOSER ASS BIGOT BITCH LMFAO YOU'RE THE BS GO FUCKING HANG YOURSELF YOU STUPID PIECE OF GARBAGE! IMAGINE PRETENDING TO "pRoTeCt wIm3nz sPoRtS" WHILE HATING ON YOUR OWN FAKE FEMALE GENDER PRETENDER "XX" BITCHES! YOU DISGUSTING WORTHLESS WASTE OF OXEGYN BIGOT PIG BITCH ASS LOSER! IMANE KHELIF ISNT EVEN TRANS YOU FUCKING RETARD! TYPICAL LOW IQ WHITE TRASH CRETIN "PERSON" YOU FUCKING LOSERS CAN GO ROT IN HELL FOREVER LMFAOO IMANE KHELIF IS A LITERAL WOMAN YOU DUMB FUCKING WHITE TRASH TRANSPHOBIC LOSERS GO FUCKING HANG YOURSELF YOU WASTE OF OXGEYN  TRANS WOMEN ARE WOMEN CRY HARDER LOSER!

CRY HARDER YOU PATHETIC WHITE TRASH TRUMPLIKKKAN FRIENLDESS LOSER GARBAGE CAN BIGOT LMAO ENJOY YOUR LOST SALE ONCE I SAW YOU SELL GARBAGE TRUMPLIKKKAN RACIST GARBAGE YOU LOST A SALE RETARD GO FUCKING HANG YOURSELF WORTHLESS WASTE OF OXEGYN LOSER! LET YOUR MAGAT TRUMPANZEE TEARS FLOW CLOWN! vote BLUE CLOWNTARD APE

CRY HARDER TRUMPLIKKKAN BITCH! CRY HARDER THAN MY MAGAT NEIGHBOURS! KILL ALL WHIT TRASH LOSER STAY MAD DIRTY MAGAT BTICH ASS FAGGOT LOSER! #KAMALA2024 KILL ALL WHITE TRASH "PEOPLE" STAY MAD LOSER! CRY HARDER YOU PATHETIC WHITE TRASH TRUMPLIKKKAN FRIENLDESS LOSER GARBAGE CAN BIGOT LMAO ENJOY YOUR LOST SALE ONCE I SAW YOU SELL GARBAGE TRUMPLIKKKAN RACIST GARBAGE YOU LOST A SALE RETARD GO FUCKING HANG YOURSELF WORTHLESS WASTE OF OXEGYN LOSER! LET YOUR MAGAT TRUMPANZEE TEARS FLOW CLOWN! vote BLUE CLOWNTARD APE

CRY HARDER TRUMPLIKKKAN BITCH! CRY HARDER THAN MY MAGAT NEIGHBOURS!

APE DIRTY WHITE TRASH HEBOON GO ROT IMAGINE NOT BEING BLACK TRANS AND SUPERIOR GET BLOCKED U FAGGOT NIGGER APE BICH LOSER APE

LOL go fucking kill yourself you worthless old white inferor ugly pale geriatric white trash transphobic hag bitchass loser, YOU'RE A MAN. TRANS WOMEN ARE WOMEN CRY HARDER BITCH! WE HAVE DOXXED YOUR HOUSE AND WILL HANG YOU AND SLICE THE HEADS OFF OF YOUR FUCKING WORTHLESS TINY WORTHLESS WHITE TRASH GARBAGE CAN BITCH ASS MUTANT "BABY" CREATURE YOU HAVE GO FUCKING CRY ABOUT IT YOU WORTHLESS TRASHCAN TRANSPHOBE LOSER

XXXY000070

**435**

GARBAGE ASS NIGGER BITCH!

CRY EVEN HARDER TAYLOR ENDORSED KAMLALA WHO IS A WOMAN. UNLIKE YOU PATHETIC OLD WHITE TRASH TRIGGERED XX FAKE CISSY LOSER MAN. YOU'RE A MAN. YOU'RE NOT A REAL WOMAN LIKE A TRANS WOMAN. YOU FAKE WOMAN ASS BITCH GO ROT IN HELL AND CRY HARDER YOU DIRTY CRACKER ASS NIGGER BITCH LOSER LMAOO YOU XX'S ARE THE TRANS WOMAN WANTING TO BE REAL WOMAN LIKE XY'S YOU DIRTY PALE WHITE TRASH INFERIOR CISSY YOU'RE A DEGENERATE BRAINDEAD DEFECIT CLOWN GARBAGE CAN TROLL FAGGOT TRANNY ROT IN HELL YOUR GENES ARE INFECTED YOU'RE WHITE TRASH AND XX AKA A MAN. YOU'RE A MAN. CRY HARDER TRIGGERED INFERIOR TRUMPLIKKKAN LOSER AS BITCH! GARBAGE CAN GO ROT FAGGOT ASS LOSER BITCH SLAVE! you desperate little ugly old white trash tranny bitch "sUsAn" and "jEnNIfeR sEniLE"

DONOLD DEMENTIA DUMP IS A WOMAN. CRY HARDER KAMALA HARRIS IS A WOMAN AND YOU'RE A MAN TAYLOR BITCH DESPITE BEING WHITE TRASH IS MORE OF A WOMAN THAN YOU'LL EVER BE YOU FAKE XX CLOWN LOSER THATS CODE FOR XX WORTHLESS CISSY WANNABE WOMAN WHICH IS YOU CLOWN! YOU'RE A MAN.

CRY HARDER YOU PATHETIC WHITE TRASH TRUMPLIKKKAN FRIENLDESS LOSER GARBAGE CAN BIGOT LMAO ENJOY YOUR LOST SALE ONCE I SAW YOU SELL GARBAGE TRUMPLIKKKAN RACIST GARBAGE YOU LOST A SALE RETARD GO FUCKING HANG YOURSELF WORTHLESS WASTE OF OXEGYN LOSER! LET YOUR MAGAT TRUMPANZEE TEARS FLOW CLOWN!

vote BLUE CLOWNTARD APE

CRY HARDER TRUMPLIKKKAN BITCH! CRY HARDER THAN MY MAGAT NEIGHBOURS! KILL ALL WHIT TRASH LOSER STAY MAD DIRTY MAGAT BTICH ASS FAGGOT LOSER! #KAMALA2024 KILL ALL WHITE TRASH "PEOPLE" STAY MAD LOSER! CRY HARDER YOU PATHETIC WHITE TRASH TRUMPLIKKKAN FRIENLDESS LOSER GARBAGE CAN BIGOT LMAO ENJOY YOUR LOST SALE ONCE I SAW YOU SELL GARBAGE TRUMPLIKKKAN RACIST GARBAGE YOU LOST A SALE RETARD GO FUCKING HANG YOURSELF WORTHLESS WASTE OF OXEGYN LOSER! LET YOUR MAGAT TRUMPANZEE TEARS FLOW CLOWN!

vote BLUE CLOWNTARD APE CRY HARDER

CRY HARDER TRUMPLIKKKAN BITCH! CRY HARDER THAN MY MAGAT NEIGHBOURS!

of course you have the ugliest name trying so hard desperately to be a superior black trans woman like me when you're just another fake XX defecit braindead chromosome loser man. YOUR NAME IS CODE FOR MAN. im currently exposing you and all your pathetic "kAmaLa iS a mAn" comments to all the shitty "people" who are so very unfortunate to know such a yucky hellish bottom of my shoe scum cretin like you bitch. YOU'RE NOT A WOMAN. KAMALA IS A WOMAN. go fucking cry about it bitch. TRANS WOMAN ARE MORE WOMAN THAN YOU'LL EVER BE GO FUCKING CRY ME A RIVER YOU RETARDED WORTHLESS WHITE TRASH USELESS CRACKER BITCH! #KAMALA2024 YOU'RE SO TRIGGERED THAT A SUPERIOR BLACK WOMAN WIPED THE FLOOR WITH donOLD DEMENTIA DUMP GO CRY AND LET YOUR WORTHLESS TRUMPLIKKKAN TRUMPANZEE MAGAT TEARS FLOW YOU WORTHLESS CLOWN BITCH. YOU'RE A MAN. YOU'RE JUST ANOTHER PATHETIC XX CISSY CLOWN WISHING YOU WERE A REAL WOMAN AKA A BLACK TRANS WOMAN LIKE ME. you're a nasty piece of work! YOU'RE GETTING DESTROYED IN THE COMMMENTS LMAO GET DUNKED ON YOU NASTY WORTHLESS PIECE OF SHIT I AM DOXXING YOU AND HAVING YOUR EMAILS SPAMMED SO YOU BETTER FUCKING DELETE YOUR GARBAGE ASS YOUTUBE CHANNEL I ALREADY SPAM REPORTED CRY HARDER YOU FAKE WOMAN. YOU'RE NOTHING BUT A MAN. AND YOU'RE AGING LIKE ROTTING MILK TYPICAL OF YOUR INFERIOR WHITE TRASH KIND, I BET YOUR A KKKHRISTIAN TOO LOL WELL GUESS WHAT,

KEEP SCREAMING INTO THE VOID YOU WORTHLESS TRIGGERED ANGRY TRUMPLIKKKAN INFERIOR XX WHITE TRASHCAN LOSER MALE. YOU'RE A MAN. NOT A REAL WOMAN LIKE A TRANS WOMAN IS. YOUR NAMES ARE CODE NAMES FOR FAKE WOMAN.

KEEP WEEPING AND CRY HARDER ABOUT TRANS WOMAN AKA REAL WOMAN SINCE THATS ALL YOU THINK ABOUT YET NO TRANS WOMAN HAS EVER STOPPED FOR A SECOND TO THINK ABOOUT YOUR WORTHLESS SORRY ASS BITCH! HAHAHA YOU'RE SO FUCKING IRELLEVANT CRYING IN COMMENT SECTIONS LIKE A FUCKING RETARDED DOWN SYNDROME BOT LOSER WHILE GETTING DUNKED IN EVERY COMMENT SECTION REPLY YOU WORTHLESS HATEFUL BIGOT ID RUN YOU OVER WITH MY TRUCK AND BACK UP A MILLION TIMES IN ENJOYING EVERY BONE CRACK YOU HAVE TOO MUCH TIME ON YOUR HANDS GO FUCKING JUMP IN FRONT OF A TRUCK YOU WORTHLESS WASTE OF OXEGYN DIRTY WASTE OF SPACE WHITE TRASH NIGGER BITCH CRY HARDER NOBODY WILL READ UR REPLY UR BLOCKED BITCH ASS TRIGGERED ANGRY CRACKER NIGGER BITCH ASS FAGGOT LOSER

GET DOXXED YOU WORTHLESS WHITE TRASH FUCKS WE ARE COMING TO SHOOT YOUR HEADS OFF AND BOMB YOU ILL FUCKING SLIT YOUR MUTANT WHITE TRASH BABY KIDS THROAT OFF WHILE YOU WATCH IN A TORTURE DEVICE HAVING EVERY SINGLE ONE OF YOUR PATHETIC WHITE TRASH ARCHAIC GERIATRIC ROTTEN MILK BONES CRUSHED FIRST YOUR LEGS THEN ARMS, ILL MAKE SURE YOU SUFFER EVERY SECOND AND CRY HARDER BITCH! THEN YOU'LL GET YOUR THROAT SLIT AND DIE YOU WORTHLESS WHITE TRASH TRIGGERED MOTHERFUCKING GARBAGE CAN LOSER

GODS FAKE GO FUCKING CRY ABOUT IT YOU DESERVE TO BE RAPED, MURDERED  SHOT AND HUNG GO FUCKING SLIT YOUR WRISTS YOU WORTHLESS NASTY WASTE OF OXEGYN! #KAMALA2024! FUCK YOU AND DONOLD DUMP YOU PATHETIC WORTHLESS CLOWN "KAMALA IS A MAN" IS CODE FOR TRANS WOMAN. WHICH IS WHAT YOU ARE.

 YOU'RE A FAKE XX LOSER. CRY HARDER PATHETIC INFERIOR WHITE TRASH TRANNY CLOWN BITCH!

KILL ALL WHITE TRASH INFERIOR LOW IQ  "PEOPLE USUAL SUSPECT:

DEFUND THE POLICE! #KAMALA2024 GO FUCKING HANG URSELF TRUMPLIKKKAN RETARD BITCH RFK SUPPORTS TRANS RIGHTS SO GO CRY HARDER LOSER LMAOOO RFK ISNT EVEN RUNNING YOU DIRTY RIGHT WING MAGAT FUCKTARD LOSER STAY SCAPEGOATED YOU YUCKY WHITE TRASH BIGOT LOSER ASS NIGGER BITCH! COPE AND SEETH YOU RIGHT WING WHITE TRASH CRACKER GARBAGE CAN LOSER TRANS WOMEN ARE WOMEN U DIRTY NIGGER APE GARBAGE CAN LOSER ASS BITCH IMANE KHELIFS A WOMEN GO CRY HARDER YOU PATHETIC WORTHLESS WHITE TRASH GARBAGE CAN TRUMPLIKKKAN RIGHT WING CRY HARER AND STAY MAD YOU DIRTY NIGGER LOSER ASS CRACKER APE BITCH GO HANG URSELF WORTHLESS WASTE OF OXEGYN PATHETIC WHITE TRASH LMAOO "wOkE mINd vIRuS" doesnt fucking exist you worthless white trashcan faggot bigot loser ass bitch go HANG YOURSELF AND SLIT YOUR WRISTS YOU CLOWN LMAOO UR PATHETIC T SHIRT IS GOING TO TAKE AWAY TRANS RIGHTS CRY HARDER BITCH! #TRANSWOMENAREOWMEN OF COURSE UR A "fiSh farmER" typical OLD WHITE TRASH WASTE OF OXEGYN DIE OFF ALREADY AND HANG YOURSELF KILL YOURSELF YOU FUCKING RETARDED LOSER ASS BITCH! LOL YOU'RE JUST ANOTHER TYPICAL WHITE TRASH RETARDED WASTE OF OXEGYN NOT HAVING THE SHOT CLEARLY AFFECTED YOUR SANITY AS THERE ARE MORE THAN 2 SEXES, INTERSEX PEOPLE EXIST GORead more LOL UR PATHETIC WORTHLESS TINY CHEAPASS T SHIRTS ARENT TAKING AWAY TRANS RIGHTS GO CRY HARDER PATHETIC LIL MENTALLY ILL BRAINROTTED SICKO TRUMPLIKKKAN FETUS BITCH WHITE TRASH LITTLE BOY CLOWN ;-) LOL YOU'RE THE ONE WITH NONSENSE GO CRY HARDER LOSER ASS WHITE TRASH BITCH YOU BRAINDEAD TRUMPLIKKKANS ARE THE ONLY EVIL FORCES AT PLAY YOUR SILLY PATHETIC "xX" LETTER CHEAP ASS PLASTIC MERCH ISNT TAKING AWAY TRANS RIGHTS :-) CRY HARDER BIGOT YOU'RE NOT EVEN IN THE LITTLE BOY WORLD WITH THAT DISGUSTING BRAINDEAD YUCKY CROTCH GOBLIN FETUS BRAIN OF YOURS TRANSPHOBIC RETARD LOSER HAHA GO ROT WHITE TRASH APE!

 LMAOO YOU'RE MENTALLY ILL YOUR CISSY BS IS GARBAGE GO CRY HARDER LOSER! #KAMALA2024 TRANS AFFIRMING CARE GO CRY BITCH ASS LOSER YOU'RE MENTALLY BRAINDEAD AND DAMAGED FOR LIFE TRANS PPL DONT AFFECT YOUR LIFE AT ALL YOU FUCKING WHITE TRASH GARBAGE CAN RETARD LOSER APE GO ROT IN HELL SHITBRAINED STRAGGOT FAGGOT ASS WHITE TRASH LOSER PALE CRACKER APE BITCH YOU MONKEY BRAINED TINY BRAINED LOSER ROT I NHELL BITCH BIGOT LOSER ASS CRY HARDER TRANS WOMEN ARE WOMEN

XXXY000071

436

CRY HARDER AND VOTE KAMALA2024 FUCKING WHITE TRASH BIGOT LOSER LMAOO IMAGINE "sUpPortING wiMeNZ spORTz AND VOTING FOR A SEXIST WHITE TRASH RAPIST RACIST SEXIST YOU NASTY PATHETIC WHITE TRASH FUCKING LOSER GABAGE CAN NIGGER APE RETARD LOSERA SSS BITCH! LOSERRRR! GARBAGE ASS WHITE TRASH BITCH TRANS WOMEN ARE RECOGNIZED AS WOMEN LEGALLY COPE AND SEETH YOU WORTHLESS WHITE TRASH FAR RIGHT GARBAGE WOKE AGENDA CRACKER LOSER RETARD DEI HIRE SHEBOONS PATHETIC WHITE TRASH LMAOO "wOkE mINd vIRuS" doesnt fucking exist you worthless white trashcan faggot bigot loser ass bitch go HANG YOURSELF AND SLIT YOUR WRISTS YOU CLOWN LMAOO UR PATHETIC T SHIRT IS GOING TO TAKE AWAY TRANS RIGHTS CRY HARDER BITCH! #TRANSWOMENAREOWMEN OF COURSE UR A "fiSh farmER" typical OLD WHITE TRASH WASTE OF OXEGYN DIE OFF ALREADY AND HANG YOURSELF KILL YOURSELF YOU FUCKING RETARDED LOSER ASS BITCH! LOL YOU'RE JUST ANOTHER TYPICAL WHITE TRASH RETARDED WASTE OF OXEGYN NOT HAVING THE SHOT CLEARLY AFFECTED YOUR SANITY AS THERE ARE MORE THAN 2 SEXES, INTERSEX PEOPLE EXIST GO FUCKIGN HANG YOURSELF YOU FUCKING RETARDED PIECE OF WHITE TRASH LOL ITS CLEAR AS DAY YOU'RE JUST ANOTHER TYPICAL WHITE TRASH BRAINDEAD TRUMPLIKKKAN CRYING BS GARBAGE FAGGOT LOSER ASS BITCH! LOL UR THE ONLY ONE WITH BS! GO CRY HARDER YOU WHITE TRASH BIGOTED LOSER PATHETIC CLOWN! THERE ARE BIGGER PROBLEMS THAN UR FUCKING MENTAL ILLNESS CAUSING UR WHITE TRASH TINY BRAIN TO THINK OF UR GARBAGE CONSPIRACY THEORIES OF THE "fAR lEfT tAKinG oVEr" YOU PIECE OF NASTY TRUMPLIKKKAN BULLSHIT GO FUCKING HANG YOURSELF LMFAO GO CRY HARDER YOU BRAINDEAD PIECE OF SHIT CRY HARDER AS I FEARLESSLY SPEAK THE TRUTH BITCH! YOU HAVE NO SANITY AT ALL YOU'RE MENTALLY ILL YOUR CISGENDER XX XY BS IS BRAINROTTED MENTAL ILLNESS GO FUCKING KILL YOURSELF LOSER PIECE OF SHIT! TRANS WOMEN ARE WOMEN! PERIOD! GO FUCKING CRY HARDER AND DIE MAD ABOUT IT YOU TYPICAL WORTHLESS WHITE TRASH BIGOT PIECE OF SHIT







XXXY000073

**438**





XXXY000074

**439**





XXXY000076

**441**









ROT IN HELL YOU DUMBASS WHITE TRASH FUCKTARD NON TRANS CISSY NIGGERS STAY MAD AND GET BLOCKED LOSERRSSS CRY HARDER LET YOUR TRUMPLIKKKAN TEARS FLOW HARDER BITCH ASS FAGGOTS NIGGER WHITIE CRACKER LOSER BITCHES U APES R TRASHY LOSERS!○

# The "uncomfortable fit" and guilt by association argument

I don't want to be associated with the people who stalk, harass, attack and threaten thos of us who stand up for girls.



**JENNIFER SEY**
SEP 06, 2025

♡ 149    💬 47    ⟳ 18    Sha

A common approach by the legacy press and random X users to dismiss the argume that men do not belong in women's sports and spaces is to say — *the people who thin this are right wing grifters so you must be too if you think that.*

With this guilt by association strategy they try — pretty effectively, I'd argue — to scare people away from taking a stand. From saying a true and obvious thing out lou Arguably this is why Malcolm Gladwell was "[cowed](#)" into not saying *yeah no boys in girls sports.* He didn't want to be associated with the right and get cancelled in doing

In fact, Ruth Graham — the faith and religion reporter for *The New York Times* — asked a lesbian Democrat from San Francisco, if she found it an "uncomfortable fit" support Riley Gaines, who is a conservative.

Go to 1:50 in below interview where Graham asks this question:

XXXY000079

**444**



To flip this approach back on these folks, I wanted to provide some evidence of the types of people who have decided it is ok to harass those of us who dare to take a st for women and girls. If I believed this argument had merit — the guilt by associatic argument — I would definitely say these are people that I find to be an "uncomfort: fit." I don't want anything to do with these people.

Here is just a smattering of the "feedback" I receive almost daily.

Here's one from yesterday into our customer service email at XX-XY Athletics:

XXXY000080

445



Here's a series of fun ones. This was a 20 page email missive XX-XY Athletics recei
last year. It came with almost 200 Substack replies to this newsletter, as well. Which
deleted. I'm not including the whole "letter." Just some of the highlights.

Here's the subject line:

XXXY000081

**446**

Fwd: KILL ALL WHITE TRAILER TRASH STRAGGOTS! #KAMALA202 💙💙💙💙💙 TRANS LIVES MATTER KILL AND HANG ALL DIRTY WHITE BROKE ASSS NIGGER CRACKER BITCHES ROT IN HELL YOU FUGLY ASS HEBOON LOSER APE

There were photos:

 

And highlights of the email here (I apologize in advance for making you see this):

SLIT UR WRISTS GARBAGE CAN! #KAMALA2024! TRANS WOMEN ARE WOMEN! CRY HARDER YOU DISGUSTING RIGHT WING WHITE TRASH LOSER LMAOO GO FUCKING CRY HARDER GARBAGE BAG WORTHLESS ASS LOSER BITCH HANG YOURSELF GO KILL YOURSELF AGGOT ASS BITCH RETARD DEFUND THE POLICE! #KAMALA2024 GO FUCKING HANG URSELF TRUMPLIKKKAN RETARD BITCH RFK SUPPORTS TRANS RIGHTS SO GO CRY HARDER LOSER LMAOOO RFK ISNT EVEN RUNNING YOU DIRTY RIGHT WING MAGAT FUCKTARD LOSER STAY SCAPEGOATED YOU YUCKY WHITE TRASH BIGOT LOSER ASS NIGGER BITCH! COPE AND SEETH RIGHT WING WHITE TRASH CRACKER GARBAGE CAN LOSER TRANS WOMEN ARE WOMEN U DIRTY NIGGER APE GARBAGE CAN LOSER ASS BITCH IMANE KHELIFS WOMEN GO CRY HARDER YOU PATHETIC WORTHLESS WHITE TRASH GARBAGE CAN TRUMPLIKKKAN RIGHT WING CRY HARER AND STAY MAD YOU DIRTY NIGGEI LOSER ASS CRACKER APE BITCH GO HANG URSELF WORTHLESS WASTE OF OXEGYN PATHETIC WHITE TRASH LMAOO "wOkE mINd vIRuS" doesnt fucking exist you worthless white trashcan faggot bigot loser ass bitch go HANG YOURSELF AND SLIT YOUR WRISTS YOU CLOWN LMAOO UR PATHETIC T SHIRT IS GOING TO TAKE A TRANS RIGHTS CRY HARDER BITCH! #TRANSWOMENAREOWMEN OF COURSE UR A "fiSh farmER" typical OLD WHITE TRASH WASTE OF OXEGYN DIE OFF ALREADY HANG YOURSELF KILL YOURSELF YOU FUCKING RETARDED LOSER ASS BITCH! LOL YOU'RE JUST ANOTHER TYPICAL WHITE TRASH RETARDED WASTE OF OXEGYN N HAVING THE SHOT CLEARLY AFFECTED YOUR SANITY AS THERE ARE MORE THAN 2 SEXES, INTERSEX PEOPLE EXIST GORead more LOL UR PATHETIC WORTHLESS T CHEAPASS T SHIRTS ARENT TAKING AWAY TRANS RIGHTS GO CRY HARDER PATHETIC LIL MENTALLY ILL BRAINROTTED SICKO TRUMPLIKKKAN FETUS BITCH WHITE TRASH LITTLE BOY CLOWN ;-) LOL YOU'RE THE ONE WITH NONSENSE GO CRY HARDER LOSER ASS WHITE TRASH BITCH YOU BRAINDEAD TRUMPLIKKKANS ARE T ONLY EVIL FORCES AT PLAY YOUR SILLY PATHETIC "xX" LETTER CHEAP ASS PLASTIC MERCH ISNT TAKING AWAY TRANS RIGHTS :-) CRY HARDER BIGOT YOU'RE NOT EVEN IN THE LITTLE BOY WORLD WITH THAT DISGUSTING BRAINDEAD YUCKY CROTCH GOBLIN FETUS BRAIN OF YOURS TRANSPHOBIC RETARD LOSER HAHA GO WHITE TRASH APE! 😀😀😀🌼🌼🍼👨🖼🤮🍼🐵❌🧼❌🐵❌✅✅✅🟰🟰🟰🟰LMAOO YOU'RE MENTALLY ILL YOUR CISSY BS IS GARBAGE GO CRY HARD LOSER! #KAMALA2024 TRANS AFFIRMING CARE GO CRY BITCH ASS LOSER YOU'RE MENTALLY BRAINDEAD AND DAMAGED FOR LIFE TRANS PPL DONT AFFECT YO LIFE AT ALL YOU FUCKING WHITE TRASH GARBAGE CAN RETARD LOSER APE GO ROT IN HELL SHITBRAINED STRAGGOT FAGGOT ASS WHITE TRASH LOSER PALE CRACKER APE BITCH YOU MONKEY BRAINED TINY BRAINED LOSER ROT I NHELL BITCH BIGOT LOSER ASS CRY HARDER TRANS WOMEN ARE WOMEN🟰🟰🟰🟰🟰🟰 🟰🟰🟰🟰🟰🟰🍼🌼🐵🍼❌🖼👄👄👄💙💙💙💙CRY HARDER AND VOTE KAMALA2024 FUCKING WHITE TRASH BIGOT LOSER LMAOO IMAGINE "sUpPortING wiMeNZ spORTz AND VOTING FOR A SEXIST WHITE TRASH RAPIST RACIST SEXIST YOU NASTY PATHETIC WHITE TRASH FUCKING LOSER GABAGE CAN NIGGER APE RETARD LOSERA SSS BITCH! LOSERRRR! GARBAGE ASS WHITE TRASH BITCH TRANS WOMEN ARE RECOGNIZED AS WOMEN LEGALLY COPE AND SEETH YOU WORTHLESS WHITE TRASH FAR RIGHT GARBAGE WOKE AGENDA CRACKER LOSER RETARD DEI HIRE SHEBOONS PATHETIC WHITE TRASH LMAOO "wOkE mINd vIRu doesnt fucking exist you worthless white trashcan faggot bigot loser ass bitch go HANG YOURSELF AND SLIT YOUR WRISTS YOU CLOWN LMAOO UR PATHETIC T SI IS GOING TO TAKE AWAY TRANS RIGHTS CRY HARDER BITCH! #TRANSWOMENAREOWMEN OF COURSE UR A "fiSh farmER" typical OLD WHITE TRASH WASTE OF OXEGYN DIE OFF ALREADY AND HANG YOURSELF KILL YOURSELF YOU FUCKING RETARDED LOSER ASS BITCH! LOL YOU'RE JUST ANOTHER TYPICAL WHITE TRASH RETARDED WASTE OF OXEGYN NOT HAVING THE SHOT CLEARLY AFFECTED YOUR SANITY AS THERE ARE MORE THAN 2 SEXES, INTERSEX PEOPLE EXIST GO FUCKI( HANG YOURSELF YOU FUCKING RETARDED PIECE OF WHITE TRASH LOL ITS CLEAR AS DAY YOU'RE JUST ANOTHER TYPICAL WHITE TRASH BRAINDEAD TRUMPLIKI CRYING BS GARBAGE FAGGOT LOSER ASS BITCH! LOL UR THE ONLY ONE WITH BS! GO CRY HARDER YOU WHITE TRASH BIGOTED LOSER PATHETIC CLOWN! THERE BIGGER PROBLEMS THAN UR FUCKING MENTAL ILLNESS CAUSING UR WHITE TRASH TINY BRAIN TO THINK OF UR GARBAGE CONSPIRACY THEORIES OF THE "fAR tAKinG oVEr" YOU PIECE OF NASTY TRUMPLIKKKAN BULLSHIT GO FUCKING HANG YOURSELF LMFAO GO CRY HARDER YOU BRAINDEAD PIECE OF SHIT CRY HARD I FEARLESSLY SPEAK THE TRUTH BITCH! YOU HAVE NO SANITY AT ALL YOU'RE MENTALLY ILL YOUR CISGENDER XX XY BS IS BRAINROTTED MENTAL ILLNESS GO FUCKING KILL YOURSELF LOSER PIECE OF SHIT! TRANS WOMEN ARE WOMEN! PERIOD! GO FUCKING CRY HARDER AND DIE MAD ABOUT IT YOU TYPICAL WORTHI WHITE TRASH BIGOT PIECE OF SHIT 👄👄👄🍼❌🖼🖼💙💙💙💙💙🇺🇸!"tRANs pEOple eXisTINg aFfEcTS mE" LMFAOO SHUT THE FUCK UP AND GO CRY HARDI YOU PATHETIC WORTHLESS WHITE TRASH RETARDED CLOWN NIGGER APE BITCH SHEBOON LOSER AND ITS NOT "tRaNs bS" YOU MEAN WHITE TRASH CISGENDE LIKE YOURSELF? YOU'RE THE ONLY FUCKING PROBLEM IN SOCIETY YOU DIRTY DISGUSITNG WHITE TRASH trumpliKKan BRAINDEAD CONSPIRACY THOERIST PIE( WHITE TRASH GO FUCKING HANG YOURSELF YOU PATHETIC WASTE OF OXEGYN LOSER LMFAOO YOU SOUND DELUSIONAL CLOWN! YOU'RE THE UGLIEST PIECE ( WHITE TRASH IVE SEEN GO GET A FACELIFT AND A NOSEJOB AND LIP FILLER YOU'RE PALE AND WHITE TOO DISGUSTING! YOU'RE INFERIOR WHITE TRASH RACE A LIKE MILK FOR A REASON! TRANS WOMEN ARE WOMEN AND THEY LOOK WAY BETTER THAN YOU'RE DISGUSTING PALE FAT FACED WASTE OF OXEGYN GARBAGE NIGGER BITCH LOL, i find it hilarious and laughable how you pathetic retarded worthless WHITE TRASH LOSER braindead trumpliKKKans jump at the dangling carro trans women being attacked and set as the next target of the culture war for simply EXISTING!😀👄🧼🍼❌🖼🖼 🖼👄👄👄🌼 LOL YOU FUCKING RETARDED W

XXXY000083
**448**

ROT IN HELL DISGUSTING WORTHLESS WHITE TRASH BIGOT FAGGOT LOSER! YOU'RE MENTALLY ILL RETARDED AND HATEFUL NASTY ASS BIGOT! LOL KEEP GETTING WALLET DRAINED BY UR PATHETIC MISERABLE ANGRY TRANSPHOBIA YOU WORTHLESS LOSER ASS GARBAGE CAN YOU'VE BEEN IN THE SAME BATHROOM AS TRA PEOPLE GO CRY HARDER DUMBASS RETARDED WHITE TRASH NIGGER GABEG BAG LOSER FAGGOT! TRANS WOMEN ARE WOMEN CRY HARDER LOSER! UR PATHETI CHEAPASS GARBAGE SHIRTS ARENT TAKING TRANS RIGHTS AWAY! ;-)) STAY MAD YOU PATHETIC WHITE TRASH MENTALLY DEFECIT BRAINROTTED BRAINDEAD BIG FAGGOT LOSER! LMAOOO THE OWNER IS TRANS AND STEALING U DISGUSTING TRANSPHOBIC LOSERS MONEY CRY HARDER BITCH! TRANSPHOBIAS REALLY DRAINING YOUR PATHETIC MISERABLE SAD ANGRY BIGOTED INSECURE WALLET SO MUCH YET YOU'RE PATHETIC LITTLE CHEAPASS GARBAGE MADE T-SHIRTS ARE TAKING TRANS RIGHTS AWAY!! 😂😂😂😂😂👊👊👊👊❌🍑🍆 ▢🥦❌🙅‍♀️🍬🍬🍬🍬🍬🍬 ;-)))))) CRY HARDER LOSER ASS BITCH!CRY HARDER THIS DISGUSTING XX MALE "jIMmy" sEY" CAN GO ROT IN HELL! TRANS WOMEN ARE THE ONLY REAL WOMEN CRY HARDER YOU DIRTY WHITE TRASH NIGGER LOSER ASS BITCH FAGGO GO HANG URSELF LOSER TRANS WOMENA RE WOMEN NOT U DIRTY XX CLOWN FAGGOT BITCHES! TRANS WOMEN ARE WOMEN, NOT YOU DISGUSTING XX CISSY CLOWN GARBAGE CANS YOU'RE MEN😂🍆🍆🥦👊🍆 ▢😂💙💙💙💙🍬! CRY HARDER NIGGER BITCH ASS WHITE TRASH BIGOT LOSER PIG! GO HANG YOURSELF YO WORTHLESS TRANSPHOBIC GARBAGE CAN LMAO YOUR PUNY LITTLE PATHETIC T SHIRTS ARENT TAKING AWAY TRANS RIGHTS! CRY HARDER YOU PATHETIC GERIA GARBAGE UGLY ASS WHITE TRASH NIGGER BITCH ;-))))))) CRY HARDER YOU OLD PATHETIC WHITE TRASH BITCH YOU'RE THE ONE FALLING VICTIM TO YOUR OWN GARBAGE AGENDA YOU DIGUSTING HATEFUL WOK MIND VIRUS TRANSPHOBE BIGOT GO ROT BITCH! RUTH IS TRANS WOMEN ARE WOMEN GO FUCKING CRY HARDER YOU FUCKING WORTHLESS WHITE TRASH GARBAGE CAN LOSER! TRANS WOMEN ARE WOMEN GO FUCKING CRY HARDER BITCH! LOL GO WRITE YOURSE TO HELL! HANG YOURSELF AND KILL YOURSELF IN THE MOST PAINFUL WAY! ID BACK UP THE HUGEST SEMI ON YOUR DISGUSTING WORTHLESS BODY UNTIL I HE/ EVERY BONE BREAK IN YOUR PATHETIC USELESS HOLLOW CORPSE OF A BODY! THATS WHAT ALL YOU DISGUSTING TRANSPHOBIC RACIST SEXIST MAGAT REPUBLITARD TRUMPLIKKKANT GARBAGE CANS DESERVE! ;-))) cry harder PATHETIC WHITE TRAHS BIGOT LOSER LMAO UR GARBAGE BIGOTED TINY UGLY T SHIRTS ARENT GONNA TAKE TRANS RIGHTS AWAY CRY HARDER GARBAGE CAN LOSER ASS NIGGER BITCH ;-))))) GO ROT IN HELL AND WAKE THE FUCK UP URSELF LOSER LMAO GODS FAKE AND GO CRY HARDER YOU MINDUFCKED RETARD YOU DUMBASSS LOSER BRAINDEAD GARBAGE CAN CRACKER BITCH! #KAMALA2024 #TRANSWOMEN ARE WOMEN NO DRUGS CAN HELP YOU FROM BEING SANE CLEARLY LMAO YOU'RE THE ONLY MINDFUCKED ONE LMAOO YOU NEED YOUR ASS SUED FOR THIS PATHETIC GARBAGE ASS WORTHLESS "cOMmenT" LMAOO SHUE TRASH SACK OF BONES YOU PATHETIC GARBAGE DEI LOOL CRY HARDER MENTAL ILL RELIGIOUS CLOWN! GOD IS FAKE BITCH! LOL OF COURSE YOU LOOK LIKE AN UGLY OLD GERIATRIC WORTHLESS WHITE TRASH CAN GARBAGE BIN GO FUCKING HANG YOURSELF YOU WORTHLESS WHITE TRASH BIGOT TRUMPLIKKKAN LOSER GO HANG URSELF U PATHETIC GARBAGE CAN WASTE OF OXEGYN LOSER ASS WH TRASH BITCH KILL ALL WHITE TRASH "PEOPLE" CRY HARDER UR PATHETIC LIL CHEAP ASS T SHIRTS ISNT TAKING AWAY TRANS RIGHTS LOSER ASS CRACKER WHITE BITCH ;-))))! STAY MAD U DIRTY OLD FART U WORTHLESS OLD ABANDONED IGNORED FAGGOT I CAN TELL YOU HAVE NO FRIENDS YOU DESPERATE LOSER NOBOD READING UR GARBAGE ASS SHIT! ALL MY BLACK TRANS RIGHTS AND KILL ALL WHITE "PEOPLE" SHIRTS ARE SELLING FASTER CRY HARDER BITCH! LOL CRY HARDEF YOU FUCKING OLD ASS WHITE TRASH MAGAT GARBAGE CAN OF COURSE YOU LOOK LIKE THAT YOU OLD ASS GERIATRIC ARCHAIC WHITE TRASHCAN YOU INFERI WHITE TRASH LOSERS AGE LIKE MILK FOR A REASON!😂😂😂🥦👊🍆 ❌🍑😂KILL ALL WHITE TRASH "PEOPLE" GO HANG YOURSELF LOSER ASS BITCH! TRANS WOM ARE WOMEN CRY HARDER! IMANE KHELIF IS A WOMAN CRY EVEN HARDER AND DIE MAD ABOUT IT BITCH! YOUR PATHETIC LITTLE PUNY CHEAPASS GARBAGE T SHIRTS ARENT TAKING AWAY TRANS RIGHTS ;-))) CRY HARDER USELESS POWERLESS PATHETIC GARBAGE CANS! YOUR MISERABLE JOBLESS FRIENDLESS WITH NO I GO FUCKING HANG YOURSELF PATHETIC WHITE TRASH GARBAGE CAN LOSER FAGGOT ASS RETARD BITCHES! COPE AND SEETH KEEP BLOCKING BECAUSE THE TRU CANNOT BE BLOCKED! YOU'RE JUST ANOTHER TYPICAL TRIGGERED SICK RIGHT WING RADICAL TRANSPHOBE MAKING ISSUES OUT OF THIN AIR FUCK WOMEN AI "wOmEnS spORts" UR ALL FUCKING INFERIOR WHITE TRASH "PEOPLE" THAT LOOK LIKE MANLY UGLY MEN NOBODY WANTS TO SEE YOU FUGLY ASS BITCHES PLAY YOUR GARBAGE TRUTH IS TRANS WOMEN ARE WOMEN GO FUCKING CRY HARDER YOU FUCKING WORTHLESS WHITE TRASH GARBAGE CAN LOSER! TRANS WOM ARE WOMEN GO FUCKING CRY HARDER BITCH! LOL GO WRITE YOURSELF TO HELL! HANG YOURSELF AND KILL YOURSELF IN THE MOST PAINFUL WAY! ID BACK UF HUGEST SEMI ON YOUR DISGUSTING WORTHLESS BODY UNTIL I HEARD EVERY BONE BREAK IN YOUR PATHETIC USELESS HOLLOW CORPSE OF A BODY! THATS WI ALL YOU DISGUSTING TRANSPHOBIC RACIST SEXIST MAGAT REPUBLITARD TRUMPLIKKKANT GARBAGE CANS DESERVE! ;-))) cry harder PATHETIC WHITE TRAHS BIG LOSER LMAO UR GARBAGE BIGOTED TINY UGLY T SHIRTS ARENT GONNA TAKE TRANS RIGHTS AWAY CRY HARDER GARBAGE CAN LOSER ASS NIGGER BITCH ;-))))) ( ROT IN HELL AND WAKE THE FUCK UP URSELF LOSER LMAO GODS FAKE AND GO CRY HARDER YOU MINDUFCKED RETARD YOU DUMBASSS LOSER BRAINDEAD GARBAGE CAN CRACK THE FUCK UP AND GRAB A ROPE AND HANG YOURSELF! KILL YOURSELF AND DO THE WORLD A FAVOUR YOU NASTY WASTE OF OXEGYN HATEFUL DIRTY TRUMPANZEE MAGAT NIGGER BIGOT BITCH! LOL UR MENTALLY ILL AS FUCK! YOU'RE CLEARLY DRUGGED WITH MINIATURE BREASTS AND A

Ok, that one goes on. And on. But you get the point.

Also, Vince Crabtree has some thoughts:



**Vince Crabtree**

Scumbag company ran by a scumbag CEO to give garbage clothes to scumbag customers. You're all going to burn forever

on Thu    Like    Reply    😄 2

XXXY000084

**449**

They all seem to be obsessed with me rotting and burning in hell. I don't believe in hell (sorry, to my religious followers) so I'm not so worried.

Ryan Holman has some thoughts that he just had to DM me on X. I mean how could you keep this deep insight to yourself! This was a while ago, back in November 2022. This was well before I started XX-XY Athletics so he must have been upset by me thinking that public school children should have been able to go to school during covid.



"Jane" wrote to me also. These people really want me to kill myself.

**Name:** Jane Driver

**Email:** jjdrives@gmail.com

**Phone:** (212) 456-3946

**Please select the nature of your inquiry?:** General Inquiry

**Additional Information:** I genuinely hope you kill yourself like every single day I am praying with all of my might you get the courage to just put us all out of our misery and dome yourself. fucking scum rat you deserve nothing and to only feel paint.

Manage Submissions

Does this submission look like spam? Report it here.

Here is one voicemail from a series of MANY voicemails I have received in the past year. My husband gets them too. Don't worry, I have a very effective blocking app o

my phone now.



I've ruined your morning enough. I could go on all day but you get the point.

I wish reporters like Graham would ask those on the side of men in women's sports how they can stand to be associated with a movement that seems to be just fine wit this type of harassment.

Isn't that an uncomfortable fit?

Sey Everything is a reader-supported publication. To receive new posts and support my work, consider becoming a free or paid subscriber.



XXXY000086

451



149 Likes · 18 Restacks

## Discussion about this post

Comments   Restacks

 Write a comment...

**Meredith McKell Graff**  Sep 6

💙 Liked by Jennifer Sey

My two younger, adult children (male and female) are caught up in this. They do not speak to me
never ending heartache because I have lost not only them, but also my grandchildren. I consider
myself a feminist back in the early '80's when we were fighting for the ERA. Being a feminist now
the same. Women's sports should be for women and girls only. We need to protect women's spa
love what you are doing, Jennifer; I love your company and your products; I hope and pray every
that more and more people will wake up and stop enabling this mental illness that is the lie of "t

♡ LIKE (36)   💬 REPLY

5 replies by Jennifer Sey and others

**Ute Heggen**  Sep 6 *Edited*

💙 Liked by Jennifer Sey

That voice at the end is a male throwing his voice into the soprano range. These men enjoy spou
their rage. I've gotten the same variety of comments on my YouTube channel, where I read out tl
testimonies of trans widows (women who divorced suddenly full time crossdressing husbands) U
and personal, they are literally dangerous. The husbands of Jennifer Anderson and Olesya Sinkov
murdered their non-affirming wives. The rate of sexual and physical assault, with 73 women's
information. is in the 40% range. I can't use the information from these murdered women becaus
don't know all the details, but maybe I should incorporate these cases. That will approach 50%. V
will the indoctrinated Left start caring about women and girls?

XXXY000087

**452**

https://www.youtube.com/watch?v=yHRqk8IPJPI&t=684s

♡ LIKE (26)        💬 REPLY

**45 more comments...**

© 2025 Jennifer Sey · Privacy · Terms · Collection notice

Substack is the home for great culture

**Link:** https://open.substack.com/pub/jennifersey/p/the-uncomfortable-fit-and-guilt-by?utm_campaign=post&utm_medium=web

XXXY000088

**453**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01668-RMR-SBP

_____

COMMITTEE OF FIVE, INC. d/b/a XX-XY ATHLETICS,

Plaintiff,

vs.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights
Division, in her official capacity; SERGIO RAUDEL CORDOVA,
GETA ASFAW, MAYUKO FIEWEGER, DANIEL S. WARD, JADE ROSE
KELLY, and ERIC ARTIS, as members of the Colorado Civil
Rights Commission, in their official capacities; and PHIL
WEISER, COLORADO Attorney General in his official
capacity,

Defendants.

_____

30(b)(6) DEPOSITION OF COMMITTEE OF FIVE, INC,
BY JENNIFER SEY                    NOVEMBER 4, 2025

_____


        Pursuant to Notice and the Federal Rules of

Civil Procedure, the 30(b)(6) deposition of COMMITTEE OF

FIVE, INC, by JENNIFER SEY, called by Defendants, was

taken on Tuesday, November 4, 2025, commencing at 9:08 a.m.,

at 370 Seventeenth Street, Suite 4500, Denver, Colorado,

before Connie L. Tocco, Registered Professional

Reporter within and for the State of Colorado.

**AB Litigation Services**

Q.    Can people come to shop at that office space by appointment or otherwise?

A.    No.  It's a corporate office.

Q.    So would it be fair to say that there's no public access?

A.    To that office?

Q.    Yes.

A.    Yeah.  It's a private office.

Q.    Have you, that you're aware of, sold XX-XY's products to a trans person or a non-binary person?

A.    Yes, we have.

Q.    And how are you aware that the person identified as trans or non-binary?

A.    Well, there's been more than one, but I think the one that comes to mind right now is an individual who goes by Sara Higdon.  He has posted pictures of himself online, on X, as well as Instagram in our product, recommending the product.  I thanked him for repping the brand and the product, and we met in person recently in California and I did his podcast.

Q.    Would it be your preference to only sell XX-XY products to somebody who is cisgender?

A.    No.

Q.    And just so we're clear, when I use

"cisgender," what I mean is somebody who identifies with the sex that they -- their biology indicated they were at birth.

A.    I understand.

Q.    Is that also your understanding?

A.    That was my understanding, yes.  Higdon wears our product proudly.  He buys the women's product.

Another trans-identified individual, female at birth, who presents -- prefers to present as male, Buck Angel, also wears our product.  And I've also met her in person.

Q.    If you saw a person you believed to be transgender wearing an XX-XY shirt, how would you feel about that?

A.    I would thank them, as I did with Higdon.

Q.    So is it fair to say you want everyone to buy XX-XY products, regardless of their gender?

A.    Absolutely.  I would love for everybody to buy our products, and I would love for everybody to take the position that biological reality matters and has an impact on physicality.

Q.    Do you believe that somebody wearing your products likely espouses that position?

A.    I think they likely do.  I think there are some -- I think they buy the product because they

456

We are looking for a longer term, temporary space in Denver to test a retail concept with a shorter term pop-up.

Q.  So at any of XX-XY's pop-ups that you're aware of, have you had an in-person customer that you believe to be transgender?

A.  At the -- I can look through here, right? At the Aurora town hall, there were, I would estimate, approximately, ten trans-identified individuals in the meeting hall.

Q.  And how did you know that those people were trans?

A.  I think it's generally pretty clear. They presented and looked to be male, for the most part, facial hair, but choosing to wear women's clothing.

Q.  And did anyone from this group of people purchase XX-XY clothing?

A.  They did not purchase.  They stood near our table and seemed to be looking at the product.

Q.  Did you interact -- or did you -- strike that.

Did you speak to any of these people?

A.  Not directly, no.

Q.  So were they customers?  Or were they there to attend the town hall?

**457**

*AB Litigation Services*

MR. FRAMPTON:  Objection to the form.

Go ahead and answer.

A.   I think it's indistinguishable.

Q.   (By Ms. Fischer)  Did any of them ask to see products or act interested in purchasing?

A.   They were standing very close to the shop and definitely looking at the product but didn't move to purchase or ask for a size.

Q.   Now, I've been using "you" in reference to "XX-XY."

Were you there personally?

A.   I was there personally.  I was speaking at the event and I was there with one of my colleagues.

Q.   Did you speak directly to any of these ten people?

A.   When I spoke at the events on the stage, I was speaking directly to the audience.

Q.   But it would be fair to say you didn't have a one-on-one conversation?

A.   I did not have a one-on-one conversation with anybody.

Q.   Have you ever had an in-person customer who you greeted by one pronoun or by an honorific, like sir, correct you and ask to be referred to by a different pronoun?

A.   I have not had that direct conversation. I have talked with the person I referred to earlier, Sara Higdon, at length, about my unwillingness to use preferred pronouns.  I use biologically correct pronouns.

Q.   So looking at Exhibit 2, if you turn to Page 10, if you'd take a look where it says "Supplemental Response."  I know there's a lot of bolding on this page. We refer to a conversation with Sara Higdon at Freedom Fest.

Is that the same conversation you've been talking about?

A.   Yes.  But I've talked with him offline as well, on the phone, on Zoom.

Q.   Would you say that your use of biologically correct pronouns is separate from XX-XY's mission to protect women's sports?

A.   No.  I think they're inextricably linked.

Q.   So -- how so?

A.   The case that we are making is that biological reality matters in women's sports and in women's spaces.  We seek to protect the integrity of women's sports and women's private spaces.

If we concede to using what -- biologically incorrect pronouns, it's very hard at that point to say to a person you have called "she" or called "a woman,"

that they cannot come in to women's spaces.  That's why we are adamant in adhering to the truth about biological reality.

Q.   So what -- so hypothetically speaking, if somebody you believe to be trans identifying approaches a table, you greet that person as sir, and you say, I can't call you that, what is your intention?

MR. FRAMPTON:  Objection to the form.

Go ahead.

A.   My intention is to be faithful to the truth.  Not to be disrespectful of anybody.  I don't think speaking the truth is disrespectful or discriminatory in any way.  It's simple -- it's simply adherence to truth.

Q.   (By Ms. Fischer)  Do you intend to communicate to this person that they're not welcome?

A.   No, of course not.

Q.   Do you intend to humiliate them?

A.   No, of course not.  I don't think the truth is humiliating.

Q.   So is it fair to say you would not believe the customer would experience this as humiliating?

MR. FRAMPTON:  Objection to the form.

A.   I can't speak to how somebody else would

experience it.

Higdon did not.

Q.    (By Ms. Fischer)  What did Higdon say?

A.    We've had extensive conversations.  He shares his view online.  I've shared my view online.  We both agree that women's sports should be for women only.  He acknowledges male physical advantage.  He requests to be called "she" and to be called "Sara."  I do call him "Sara."  I don't know his born name.

But he understands that we differ on the view of pronouns and women's private spaces.  He understands that.  He knows that I still respect him and I would say we still have a very amicable relationship.

Q.    Have you ever asked Sara Higdon for Higdon's original name?

A.    I have not.

Q.    Would you -- if you encounter somebody -- for instance, somebody introduces themselves as Joe.

A.    Yeah.

Q.    You believe Joe is likely a biological female.

Would you ask Joe for a different name?

A.    I would -- I would not.  But I would refer to -- well, Joe can be a male or female name anyway.  I would use female pronouns and honorifics, but

I would not go so far as to ask for their name they were given at birth.  If I know the name given at birth, that is what I will use.

Q.   Have you ever guessed wrong about someone's gender?

A.   Not to my knowledge.  But if someone passed and I was unaware, then I wouldn't know.

Q.   So you've never called -- for lack of a better explanation, called a butch woman "sir," and have her say, oh, no, you're wrong?

MR. FRAMPTON:  Objection to the form.

Go ahead.

A.   We have many, as you put it, "butch women," that buy our brand.  I have never referred to any of them as "sir."  I have never been corrected in terms of pronouns or honorifics for more masculine-presenting women who still identify as women.

Q.   In a regular interaction with a customer at a pop-up shop, how often do you use names and pronouns?

A.   Honestly, names rarely come up.  You know, if you think about your experience in a retail shop, you're probably not sharing your name.  It's a little overly familiar for customer service.

Pronouns come up quite frequently or --

because often you pass a customer off.  You might greet them with an honorific.  We tend to be quite polite. Sir, how may I help you?  And then you might pass them off at the cash wrap and say, this gentleman would like to purchase these items, or can you help him find a size that he is looking for?

So pronouns, words like "ma'am," "ladies," "gentlemen," those words come up quite frequently.  Names do not, unless I know the person that is in the shop.

Q.   Would you agree that interactions with customers do not always involve the use of any pronouns or honorifics?

A.   They don't always, but I would say the vast majority of the time we choose to greet people with honorifics.  And the vast majority of the time when you're handing a customer off to somebody else, a pronoun is the natural way to do that.

Q.   I'm going to call your attention back to Exhibit 2 to Page 11, where it refers to an experience you had with an individual named Buck Angel?

A.   Yeah.

Q.   And it's my understanding from this response that Buck Angel uses he/him pronouns; is that correct?

A.   That is correct.

Q.   And you say that Buck Angel interviewed you and you explained your personal pronoun policy; is that accurate?

A.   I don't believe we discussed that on the podcast that I was interviewed on.  We did discuss it in private conversation.

Q.   And do you refer to Angel as "her"?

A.   I do.

Q.   Is Buck Angel offended by that?

A.   She is not.  We have a friendly relationship.

Q.   And has Buck Angel purchased XX-XY clothes?

A.   She has worn the product, yes.

Q.   And neither of these two interactions on this that we've been discussing, Sara -- your conversations with Sara Higdon and your conversations with Buck Angel, neither of those took place at a pop-up shop; is that correct?

A.   With Higdon, yes.  That was a pop-up shop we had at Freedom Fest that lasted two-and-a-half days in Palm Springs, California.  With Buck that was a private launch that we had in Los Angeles, and the podcast I did from my home in Denver.

Q.   And was that the first time you met Sara

Higdon, was at that pop-up shop?

A.    That was the first time we met in person, but we had had several online video calls before that.

Q.    Would you agree that using biological pronouns a transgender person does not use may or may not be offensive to that person?

A.    As I stated, I don't claim to know what people think.  I think that the truth is not offensive.

Q.    I'm going to ask you some questions about online interactions, now, with customers.

A.    Sure.

Q.    So the XX-XY website has a chatbot that asks customers questions; is that correct?

A.    Well, the customers ask questions to help find products.

Q.    But there is a chatbot they can interact with?

A.    There is.

Q.    Does the chatbot -- let me strike that.

The chatbot does not ask customers to state their names or genders; is that right?

A.    No.  Generally, the questions submitted -- it's very new functionality.  It's not perfected yet.  I will admit -- I will admit that.

Generally, the questions are with help finding

*AB Litigation Services*

product:  Do you have 2XL?  Do you have tall?  Do you have black leggings?  That kind of thing.

Q.  So to make a purchase -- strike that.

So nothing on your website asks a customer visiting the website what their name is, correct?

A.  No.  I don't think there's any website that does that.

Q.  And nothing on the XX-XY website asks a customer what their gender is?

A.  No.  We don't ask what a person's sex is when they're shopping on the website.  Generally, there's not interaction with the person, unless we get emails in to customer service.  We have a customer service email.

Q.  And when customers -- and so does a person answer customer service emails?

A.  Yes.

Q.  And does whoever answers the customer service emails ask the customers to confirm their name and gender when they reply?

A.  No.

Q.  So is it fair to say that the person answering the email just takes the customer's word for it?

MR. FRAMPTON:  Objection to the form.

Go ahead.

A.   They try to help them find the product that they want or facilitate a return.

We get quite a few threats and complaints into our customer service.  We tend not to respond to those. We forward them to law enforcement.

Q.   (By Ms. Fischer)  Is it fair to say that your pronoun policy is not implemented in the XX-XY online experience?

MR. FRAMPTON:  Objection to the form. Go ahead.

A.   No.  We identify -- you know, the navigation for product is men's and women's.  We identify men's as "XY."  Women's as "XX."  We state on our website that we believe in biological reality and we speak to the importance of retaining the integrity of women's sports, you know, if it comes up with a customer.  It comes up naturally but we -- our position is very clear on the website.

Q.   But you have no way of knowing if an online customer is using a pronoun that doesn't match their birth sex, correct?

A.   Sometimes we have phone calls, if they request a phone call.

Q.   But if there's no phone call, you have no way of knowing?

*AB Litigation Services*

A.    I mean, if somebody is choosing to -- no. I would not be able to know that.

Q.    And so in the typical online purchase experience, nothing asks the customer to provide their gender or name?

A.    I mean, if we're going to ship, we need the name.

Q.    Fair enough.

But you would have no way -- but if I used my husband's credit card and used his name, you would have no way of knowing it's me on the other end?

A.    I suppose not.

Q.    If my husband were to purchase product under his name with his credit card, could he buy a sports bra?

A.    Of course.  He could buy you a gift.

Q.    Has XX-XY ever been the subject of a charge of discrimination filed with a government entity?

A.    Not yet.

Q.    So nothing from the Colorado Civil Rights Division?

A.    Not as yet.  We are very clear, as I said, about our position, our policy.  We state it publicly on the website, as well as on our social media handles.  I think the risk is very real.  My

*AB Litigation Services*

understanding is, in stating our policy that we do not use incorrect pronouns, that in and of itself is a violation.  So the risk is very real.  We're a very new company.  It is a fairly new law.  We get, as I said, threats and complaints all the time, and so I -- I mean, we live with that threat being very real every day.

Q.   Has XX -- so to confirm, XX-XY has not received -- been -- scratch that.

XX-XY has not been the subject of a formal charge of discrimination with a government entity?

A.   No.  As yet, that has not yet happened.  But we have received many complaints.  We received complaints with our pop-up at the Spartan Race.  We were banned permanently from TikTok for an ad that they claimed was hate speech because we called a male player -- volleyball player -- a male.  So the threat is constant and very real.

Q.   Did XX-XY receive complaints before the passage of House Bill 25-1312?

A.   Yes.

MR. FRAMPTON:  Objection.  Form.

Go ahead.

A.   Yes.  We've received complaints since -- since we launched from the public.

Q.   (By Ms. Fischer)  And you launched, you

*AB Litigation Services*

said, in May 2024; is that correct?

A.   March.

Q.   March 2024?

A.   March 25th, 2024.

Q.   And House Bill 25-1312 was not passed until May of 2025?

A.   I think that's correct.  You would know better than I.

Q.   Does XX-XY receive informal complaints from its customers?

A.   Any member of the public is potentially a customer.  So I'm not -- I'm not totally sure I understand the question.  But anyone is potentially a customer and we do receive complaints through our customer service line and online on our social media handles.

Q.   Has anyone, that you're aware of, who purchased XX-XY clothing complained about your pronoun policy?

A.   Not that I'm aware of.

But as I stated earlier, Sara Higdon does not agree with my personal and the brand's pronoun policy. We agree on the need to protect women's sports.  And so, you know, he chooses to wear the product.  He thinks it's great product.  And we agree on some of the issues.

**470**

*AB Litigation Services*

Q.   Have you received any complaints where somebody specifically says, I chose not to purchase XX-XY because of your pronoun policy?

A.   That would be a very specific complaint. We have not received one that says exactly that.

Q.   Have you received any returns of products accompanied with the statement, I'm returning this because I don't like your policy?

A.   No one has said that, specifically. There are many people that complain about the brand and our statements and our policy, and they submit those complaints, either to our customer service, they might direct message me, or they might post those complaints online.  Online those complaints are posted nearly every day.  By "online," I mean social media.

Q.   Would it be fair to say those complaints are coming from the public in general?

A.   The public is -- they are all potential customers.  The law applies, is my understanding, to the public.  It doesn't specify customers.

Q.   I'm going to ask you to look at Exhibit 2 again, and turn your attention to the bottom of Page 11.

A.   Yeah.

Q.   And then going on to -- through Page 15.

You were asked to identify complaints XX-XY

*AB Litigation Services*

received for refusing to use chosen names and pronouns here, correct?

A.    That is correct.

Q.    For the complaints listed here in this response, did any of them specifically address language use?

A.    The -- the TikTok stuff -- well, let me look at -- the TikTok stuff definitely addressed language use.

In the ad we say, "If you think it isn't fair or safe for males to compete in girls' sports, stand up." The use of male over the video of a male volleyball player slamming the ball into the face of a female player, they said that was hate speech that we used male.

I asked specifically how could we have said this so that it would not get us banned?

And they said, if you were to say, if you think it isn't fair or safe for females to compete in girls' sports, which is a ridiculous statement.

Q.    Other than the TikTok response, the rest of these complaints are about XX-XY's brand message in general, correct?

MR. FRAMPTON:  You're entitled to review before you answer.

A.    Yeah.  Let me take a second here.

*AB Litigation Services*

I did not -- to my recollection, I have not seen the specific written complaints at the Spartan Race.

My understanding is that those complaints were about our position, that biology matters and women's sports are for women.  That is integrally linked and I believe cannot be separated from pronoun use.

We've been censored on Meta several times.  Again, I think, generally it's related to our position about biological reality, and that is inextricably linked to correct pronoun use.

So I think you can't really separate our use of biologically accurate language from our mission to protect women's sports.  They are one and the same.

Q.   (By Ms. Fischer)  Okay.

MS. FISCHER:  We've been going for about an hour.  It might be a good time for a break.

THE DEPONENT:  Sure.  I'd appreciate that.

MS. FISCHER:  Okay.

(Recess was taken.)

Q.   (By Ms. Fischer)  So we're going to switch gears a little bit.  I'm going to ask you to turn back to Tab 1 --

A.   Okay.

Q.   -- which is Exhibit 1.



XXXY000006

**474**



XXXY000007
**475**



**Link:** https://x.com/JenniferSey/status/1963733386146754876



**Link:** https://www.instagram.com/reel/DJ-1IgqtvkV/?utm_source=ig_web_copy_link



**Link:** https://www.instagram.com/reel/DKK7OjwugSJ/?
utm_source=ig_web_copy_link

**478**



**Link:** https://www.instagram.com/reel/DJx3Gt-tVMG/?
utm_source=ig_web_copy_link



**Link:** https://www.facebook.com/reel/666794652714686

XXXY000012

480



**Stephanie Turner Takes A Knee Against Male**

XX-XY Athletics    Subscribe
3.38K subscribers



2.3K views  5 months ago  #RealWomenRock
"It will probably, at least for a moment, destroy my life." - Stephanie Turner

**Link:** https://youtu.be/9Mu2_9-t4Dw?si=8q4EWIY5fI5p8g7s



**Watch Our Launch Ad, "Stand Up"**

**XX-XY Athletics**
3.38K subscribers
Subscribe

1.9K     Share     Save     ...

**159K views  1 year ago**  #TheTruthFits
We believe women deserve the opportunities that sports, and single sex spaces provide.

**Link:** https://youtu.be/0HYRsFNbm3o?si=1cogb4hh1CxCcspx

XXXY000014
**482**



**Link:** https://www.facebook.com/reel/1065353398855253

XXXY000015
**483**



**Link:** https://www.instagram.com/reel/DKpqEOryvyW/?
utm_source=ig_web_copy_link



**Link:** https://www.instagram.com/reel/DJkqf4vtT61/?utm_source=ig_web_copy_link



**Link:** https://www.instagram.com/reel/DJmu57OO-HF/?
utm_source=ig_web_copy_link

XXXY000018

**486**



**Link:** https://www.instagram.com/reel/DI_jt5VtSt2/?utm_source=ig_web_copy_link



**Link:** https://www.facebook.com/reel/465032349262719

**488**



**Link:** https://www.facebook.com/reel/1051592049896895

XXXY000021
**489**



**Link:** https://www.instagram.com/reel/DOP3HwJDDs3/?
utm_source=ig_web_copy_link



**Link:** https://www.instagram.com/reel/DJ46oxEu1o_/?
utm_source=ig_web_copy_link



**Link:** https://x.com/xx_xyathletics/status/1906808685721964922



**Link:** https://x.com/xx_xyathletics/status/1907049407863828502



**Link:** https://x.com/xx_xyathletics/status/1944101945553170497





**Link:** https://perma.cc/U5AU-ZQCJ

XXXY000027

**495**



**Link:** https://x.com/xx_xyathletics/status/1931021038134960626



**Link:** https://x.com/xx_xyathletics/status/1930977099910705263

XXXY000029

**497**



**Link:** https://x.com/xx_xyathletics/status/1930287340557074607



**Link:** https://x.com/xx_xyathletics/status/1909583643015782605

XXXY000031

**499**

Confidential – Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-02177-RMR-MDB

DOXA ENTERPRISE, LTD d/b/a BORN AGAIN USED BOOKS,

Plaintiff,

v.

AUBREY C. SULLIVAN, et al.,

Defendants.

---

## DIVISION AND COMMISSION DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION

---

Defendants Aubrey Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly, and Eric Artis, in their official capacities (the "Division and Commission Defendants") hereby provide their responses to Plaintiff's First Set of Interrogatories and Requests for Production.

### INTERROGATORIES

1. In Defendants' view, would it violate the Denial Clause for an employee of Born Again Used Books to deny a transgender-identifying customer's request to use pronouns that matched the person's gender expression and instead knowingly and intentionally refer to the customer with the pronouns inconsistent with the customer's gender expression in the customer's earshot?  Assume for purposes of this interrogatory that the customer subjectively felt discriminated against and filed a complaint with CCRD.  Please explain why or why not.  If you contend that additional facts are needed to know whether such a scenario would violate the Denial Clause, please identify specifically what additional materials facts are needed, why, and how they affect the analysis.

1

500

Confidential – Subject to Protective Order

**OBJECTIONS**: Division and Commission Defendants object to the extent that this request calls for a legal conclusion. Division and Commission Defendants further object to this request as vague and ambiguous as to the circumstances under which an employee of Born Again Used Books "den[ies] a transgender-identifying customer's request to use pronouns that matched the person's gender expression." Division and Commission Defendants further object to the extent that this request calls for speculation about additional facts which are not present but, if they were to become present, may or may not establish a violation of CADA. C.R.S. § 24-34-305(3) prohibits the Division or Commission from presuming that some conduct violates CADA without developing evidence through an investigation. Division and Commission Defendants further object to the extent that this request calls for Defendants to create hypothetical facts for the purpose of analyzing those facts. Further highlighting that this interrogatory asks an improper hypothetical is that it is premised on facts not at issue in this action and that may not occur. Eric Smith, Born Again Books' Rule 30(b)(6) designee, testified that Born Again Books employees will use a form of address that avoids a person's pronouns if they do not match their sex at birth, by using the person's first or last name, or even an individual's chosen name consistent with gender identity. Doxa Tr. 28:15-21; 29:6-8; 32:5-34:15; 37:10-25; 46:17-47:5. Further, Born Again Books asserts that everyone is "worthy of dignity and respect" and that it will welcome all customers even while following its policy. Doxa Action, ECF No. 1, ¶ 4.

**RESPONSE**: Subject to the foregoing objections, there is insufficient information to answer this interrogatory, as the interrogatory does not describe the interaction between the customer and the Born Again Books employee in any detail or provide any other facts that would enable the Division and Commission Defendants to

2

**501**

Confidential – Subject to Protective Order

determine whether the facts amount to a violation of C.R.S. § 24-34-601(2)(a)'s provision providing that "[i]t is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation."

The Division analyzes all charges of discrimination in a consistent and standard manner, regardless of protected class status, as outlined by C.R.S. § 24-34-306. The Division further builds off its knowledge base as it analyzes charges that raise similar allegations as prior cases. Here, the interrogatory asks Defendants to assume that a Born Again employee refused to use pronouns that matched the customer's gender expression and instead knowingly and intentionally referred to the customer with the pronouns inconsistent with the customer's gender expression in the customer's earshot, and the Division would look to similar cases for insight. Taking the interrogatory at face value, the Division has not found probable cause in any public accommodations case solely based upon a respondent place of public accommodation's failure to use an individual's chosen name and/or how the individual chooses to be addressed. Moreover, the complaints based on gender identity and/or gender expression that the Division has received and refer to statements made by employees have often alleged additional conduct. *See, e.g.*, Sullivan Suppl. Decl. Ex. A. The same holds true for complaints based on an employee of a place of public accommodation making verbal statements directed at an individual's race, religion, or any other protected trait in that they generally allege additional conduct. *See, e.g.*, CCRD1268-1298 (███████

████████████████████████████████

3

**502**

Confidential – Subject to Protective Order

██████████████████████████████████████ ); CCRD402-436 ( ███████

████████████████████████████████████████████

████████████████████████████████████████████

███ ); CCRD1403-1565 ( ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███ ). The lack of complaints based on verbal statements alone highlights the difficulty of speculating about purely hypothetical propositions.

In general, a violation of C.R.S. § 24-34-601(2)(a)'s provision providing that "[i]t is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation" requires three findings. First, the public accommodation must intentionally treat a customer or prospective customer differently based on their protected class status (this means, for example, that this threshold requirement is not met in cases of accidental misgendering or accidental deadnaming because they do not involve the intentional choice to treat the individual differently based on gender identity). Second, the customer must, as a subjective matter, experience the conduct at issue to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation because of the customer's gender identity. Third, the Division would have to determine that a reasonable person, under the circumstances, would experience the conduct to be a denial the full and equal enjoyment of the goods, services, facilities, privileges,

4

**503**

Confidential – Subject to Protective Order

advantages, or accommodations of a place of public accommodation based on their gender identity. All three steps must be satisfied to establish a CADA violation—and the same analysis would apply to any complaint that a public accommodation's interactions with a customer and directed to that customer's protected class status denied that individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation.

Under the premise of the interrogatory, the subjective requirement has been met—the interrogatory asks Defendants "to assume that the customer subjectively felt discriminated against and filed a complaint with CCRD." Turning to the objective inquiry, the Division would consider whether a reasonable person, under the circumstances experienced by the complainant, would experience the course of conduct as denying them full and equal enjoyment of Born Again Books' goods, services, facilities, privileges, advantages, or accommodations based on their gender identity.

To the extent the Division received a Complaint based on a public accommodation's failure to use an individual's chosen name and/or pronouns matching gender identity, the Division would be guided by its Intake & Investigations Manual, as well as the regulations governing CADA. The Intake & Investigations Manual provides that public accommodation violations occur when an individual "is denied 'full and equal enjoyment of a place of public accommodation.' This may include restricted access, harassing treatment, differential pricing, the posting or publishing discriminatory material, and more." Manual, at 11.  Without any facts regarding the circumstances surrounding the hypothetical complained conduct, the most comparative conduct described by the interrogatory would be harassment. Titled "Sexual Orientation Harassment," 3 CCR 708-1-81.6 provides:

> Unlawful harassment is conduct that creates an environment that is

5

504

Confidential – Subject to Protective Order

subjectively and objectively hostile, intimidating, or offensive on the basis of sexual orientation. Prohibited conduct includes, but is not limited to, the following:

(1) Asking unwelcome personal questions about an individual's sexual orientation;

(2) Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation;

(3) Using offensive names or terminology regarding an individual's sexual orientation;

(4) Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun; or

(5) Harassing, subjecting to differential treatment, discharging, demoting, or denying promotion opportunities or employment benefits to an individual because of open discussion or other communication or presentation related to an individual's gender expression, gender identity, or sexual orientation.

As provided in the regulation, intentional misgendering or deadnaming must rise to the level of harassment to deny that individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation—i.e., it must create a hostile environment on the basis of sexual orientation.

This framework reflects that not every deliberate instance of misgendering or deadnaming amounts to harassment on the basis of gender identity. In other words, a place of public accommodation's failure or refusal to use an individual's chosen name and/or how the individual chooses to be addressed, by itself, is not *per se* unlawful discrimination under CADA. Any analysis would need to consider the full circumstances of the interaction between the customer and the Born Again Books employee to determine whether a reasonable person, under the circumstances experienced by the complainant, would experience the employee's reference to the customer with pronouns inconsistent with the customer's gender expression in the customer's earshot as

6

505

Confidential – Subject to Protective Order

harassment, and/or would otherwise experience the full course of conduct as denying them full and equal enjoyment of Born Again Books' goods, services, facilities, privileges, advantages, or accommodations based on their gender identity. Relevant circumstances may include, for example:

1. The social context in which the conduct occurred;
2. Whether the conduct included indicia that the use was malicious, ill-willed, derogatory, insulting, demeaning, abusive, pejorative; or disparaging;
3. The frequency of the conduct with respect to the individual complainant;
4. Whether the conduct was severe or pervasive;
5. Whether the complainant asked the place of public accommodation to start or stop the alleged conduct (here, use of pronouns, names, or gendered language that is different from how the individual wants to be referred to), and how the place of public accommodation responded to such requests;
6. Whether the conduct caused a person to leave the place of public accommodation without making a purchase or enjoying the privileges, advantages, or advantages of the place of public accommodation which they had intended to use;
7. Whether the conduct caused a person to not attempt to patronize a place of public accommodation because of their protected trait(s);
8. Whether the conduct occurred in the context of other potentially discriminatory conduct, such as an actual denial of service or the use of slurs or epithets targeting a complainant's protected trait(s);
9. Whether the place of public accommodation expressed a preference not to serve certain individuals or groups of individuals because of those individuals' protected traits; and
10. Whether the place of public accommodation had a history of discriminatory conduct.

2.    In Defendants' view, would Born Again Used Books violate the Publication Clause, Unwelcome Clause, Denial Advertisement Clause, Discriminatory Advertisement Clause, or Unwelcome Advertisement Clause if a transgender-identifying member of the public read the Pronoun Blog Post, provided as Exhibit B of the Complaint, on Born Again Used Books' website and filed a complaint with the CCRD? Assume for purposes of this interrogatory that the complainant subjectively felt discriminated against by the assertion in the Pronoun Blog Post that Born Again Used Books will only use biologically accurate pronouns when referring to members of the public. Please explain why or why not. If you contend that additional facts are needed

7

506

Confidential – Subject to Protective Order

to know whether such a scenario would violate the Denial Clause, please identify specifically what additional material facts are needed, why, and how they affect the analysis.

**OBJECTIONS**: Division and Commission Defendants object to the extent that this request calls for a legal conclusion. Division and Commission Defendants further object to the extent that this request calls for speculation about additional facts which are not present but, if they were to become present, might establish a violation of CADA. C.R.S. § 24-34-305(3) prohibits the Division or Commission from presuming that some conduct violates CADA without developing evidence through an investigation. Division and Commission Defendants further object to the extent that this request calls for Defendants to create hypothetical facts for the purpose of analyzing those facts. Division and Commission Defendants object to the extent that this request is unclear given that it refers variously to "the Publication Clause, Unwelcome Clause, Denial Advertisement Clause, Discriminatory Advertisement Clause, or Unwelcome Advertisement Clause" in part and to the Denial Clause in part.

**RESPONSE:** Subject to the foregoing objections, no. In explaining why the act of publishing the Pronoun Blog Post does not, in and of itself, violate the identified clauses, this response first outlines the applicable framework and then addresses the Pronoun Blog Post.

The Division analyzes all charges of discrimination in a consistent and standard manner, regardless of protected class status, as outlined by C.R.S. § 24-34-306. The Division further builds off its knowledge base as it analyzes charges that raise similar allegations as prior cases. The Division has not received any complaints of discrimination based on a place of public accommodation's written communication regarding a failure to use an individual's chosen name and/or how the individual

8

**507**

Confidential – Subject to Protective Order

chooses to be addressed. In general, however, a written communication that expressly announces plans to deny full and equal enjoyment of goods, services, benefits or privileges of a place of public accommodation would violate these provisions. For example, a sign stating "Whites Only" would violate CADA because it states that certain persons will be denied service based on race and/or that they are unwelcome, objectionable, unacceptable or undesirable at the place of public accommodation because of their race.

In reviewing a complaint based on the Policy, the Division would be guided by the Intake and Investigations Manual, which provides as follows:

> To prevail on a claim of discriminatory communication of a refusal to provide the full and equal enjoyment of goods, services, benefits or privileges of a place of public accommodation, the evidence must show:
> (1) the Respondent is a place of public accommodation;
> (2) the Respondent directly or indirectly published, circulated, issued, displayed, posted or mailed a written, electronic or printed communication notice or advertisement;
> (3) the notice or advertisement indicated that the full and equal enjoyment of goods, services, benefits or privileges provided by Respondent will be refused, withheld from or denied to a person or persons based on their protected class;
> or
> (4) the notice or advertisement indicated that the presence of a person or persons of a protected class is unwelcome, objectionable, unacceptable or undesirable at the Respondent's place of public accommodation.

Manual at 77.

These inquiries, and in particular (3) and (4), are viewed objectively. In other words, from the perspective of a reasonable person in the complainant's circumstances, the notice or advertisement must communicate that they would be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on a protected trait, or that their patronage or presence at a place of public accommodation would be unwelcome,

9

**508**

objectionable, unacceptable, or undesirable because of a protected trait.

Applying this framework, the Policy states that employees of Born Again Books "will not use 'gender neutral' pronouns or neologisms, such as 'they,' 'xe,' or 'Mx.,' to describe, address, or reference an individual contrary to that individual's biological sex," and that "[w]hen requested to use a pronoun or form of address that would violate our policy, employees should respectfully and charitably decline and instead use a form of address that does not contradict the individual's biological sex, such as the person's first or last name."

The Policy does not state that Born Again Books intends to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of Born Again Books based on a protected trait or that their patronage or presence at Born Again Books would be unwelcome, objectionable, unacceptable, or undesirable because of a protected trait. The Policy does not state, for example, that transgender individuals are not welcome at Born Again Books, that transgender individuals cannot purchase certain goods, or that transgender individuals will be charged more for Born Again Books goods.

Rather, the Policy states only that Born Again Books will not use pronouns that are contrary to an individual's sex at birth, and will instead use forms of address avoiding such usage. The Policy does not state that employees will intentionally use pronouns of an individual that do not match their gender identity, and does not address chosen names. A place of public accommodation's failure or refusal to use an individual's chosen name and/or how the individual chooses to be addressed, by itself, is not *per se* unlawful discrimination under CADA. Rather, whether or when such conduct would violate CADA instead depends on context. Highlighting the fact-intensive nature of whether refusing to use an individuals' chosen name or pronouns, 3 CCR 708-

10

**509**

Confidential – Subject to Protective Order

1-81.6, titled "Sexual Orientation Harassment," provides:

> Unlawful harassment is conduct that creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of sexual orientation. Prohibited conduct includes, but is not limited to, the following:
>
> > (1) Asking unwelcome personal questions about an individual's sexual orientation;
> >
> > (2) Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation;
> >
> > (3) Using offensive names or terminology regarding an individual's sexual orientation;
> >
> > (4) Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun; or
> >
> > (5) Harassing, subjecting to differential treatment, discharging, demoting, or denying promotion opportunities or employment benefits to an individual because of open discussion or other communication or presentation related to an individual's gender expression, gender identity, or sexual orientation.

As provided in the regulation, "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" reflects the accommodation's intentionally different treatment of individuals based on protected class status, but to be actionable, such misuse must rise to the level of harassment, i.e., it must create a hostile environment on the basis of sexual orientation, gender identity, gender expression, or other protected class status. The Policy does not establish that its application will create an environment that is subjectively and objectively hostile to individuals based on their gender identity. As a result, the Policy, standing alone, does not violate the various CADA provisions directed to communications. However, whether and how Born Again Books ultimately applies the Policy to an individual and whether such interactions violate the Accommodation Clause of C.R.S. § 24-34-601 would depend on the specific facts of the interaction.

11

510

Confidential – Subject to Protective Order

3.      In Defendants' view, is a place of public accommodation's use of a customer's preferred pronouns or chosen name a good, service, facility, right, privilege, convenience, advantage, or accommodation as those terms are used in the Public Accommodation and Advertising Provisions? Please explain why or why not. If you contend additional facts are needed to answer this interrogatory, please identify specifically what additional material facts are needed, why, and how they affect the analysis.

**OBJECTIONS**: Division and Commission Defendants object to the extent that this request calls for a legal conclusion. Division and Commission Defendants further object to the extent the Interrogatories do not define the "Public Accommodation and Advertising Provisions." Division and Commission Defendants further object to the extent that this request calls for speculation about additional facts which are not present but, if they were to become present, might establish a violation of CADA. C.R.S. § 24-34-305(3) prohibits the Division or Commission from presuming that some conduct violates CADA without developing evidence through an investigation. Division and Commission Defendants further object to the extent that this request calls for Defendants to create hypothetical facts for the purpose of analyzing those facts.

**RESPONSE**: Subject to the foregoing objections, no. On its own, a place of public accommodation's use of a customer's preferred pronouns or chosen name is not "a good, service, facility, right, privilege, convenience, advantage, or accommodation" as those terms are used in the public accommodation provisions of CADA. Stated differently, a failure to use a customer's preferred pronouns or chosen name, standing alone, is not a refusal to provide a customer the goods, services, benefits or privileges provided by the place of public accommodation and does not amount

12

511

Confidential – Subject to Protective Order

to a *per se* violation of CADA. However, depending on the totality of the circumstances, a place of public accommodation's refusal to use a customer's preferred pronouns or chosen name may impact that customer's full and equal enjoyment of the goods, services, benefits or privileges offered by the place of public accommodation. Whether a place of public accommodation denied the full and equal enjoyment of goods, services, benefits or privileges of a place of public accommodation to a complainant based on a protected trait is context-dependent, as outlined above in response to Interrogatory No. 1. For example, an African American person may be denied the full and equal enjoyment of goods, services, benefits or privileges of a restaurant if the server at the restaurant repeatedly refers to the person using a racial slur. In such example, the repeated use of a racial slur amounts to harassment. The customer is still provided their order, but they are denied full and equal enjoyment of the restaurant's goods and services because of their protected trait (race) as compared to other customers.

4.        Do Defendants require a person bringing a complaint against a place of public accommodation based on the Publication Clause, Unwelcome Clause, Denial Advertisement Clause, Discriminatory Advertisement Clause, or Unwelcome Advertisement Clause to demonstrate that the complainant sincerely desires or intends to patronize the complained-of place of public accommodation? Why or why not? If you contend additional facts are needed to answer this interrogatory, please identify specifically what additional material facts are needed, why, and how they affect the analysis.

**OBJECTIONS**: Division and Commission Defendants object to the extent that this request calls for a legal conclusion. Division and Commission Defendants further object to the extent that this request calls for speculation about additional facts which are not

13

512

Confidential – Subject to Protective Order

present but, if they were to become present, might establish a violation of CADA.

C.R.S. § 24-34-305(3) prohibits the Division or Commission from presuming that some

conduct violates CADA without developing evidence through an investigation. Division

and Commission Defendants further object to the extent that this request calls for

Defendants to create hypothetical facts for the purpose of analyzing those facts.

**RESPONSE**: Subject to the foregoing objections, no. Whether the complainant

sincerely desires or intends to patronize the complained-of place of public

accommodation is not part of the analysis. *See* Intake & Investigations Manual at 77

(outlining elements of prima facie case).

## REQUESTS FOR PRODUCTION

1.      Please produce all guidelines, interpretive materials, manuals,

memoranda, policies, procedures, training materials, or similar documents, specifically

including the CCRD Intake and Investigations Manual and related appendices, from

2008 to the present concerning (a) the process for investigating claims of public-

accommodation discrimination based on gender identity, gender expression, sex,

and/or sexual orientation; (b) the use of preferred names, pronouns, or honorifics; (c)

"misgendering," "deadnaming," or any similar concepts; (d) your interpretation of

CADA's prohibition on public-accommodation discrimination based on gender identity,

gender expression, sex, or sexual orientation; or (e) the process for investigating claims

of violation of the Publication Clause, Unwelcome Clause, Denial Advertisement

Clause, Discriminatory Advertisement Clause, or Unwelcome Advertisement Clause

relating to any protected category.

**OBJECTIONS**: Division and Commission Defendants object to the extent that this

request calls for the production of any documents which must be kept confidential

14

513

Confidential – Subject to Protective Order

pursuant to C.R.S. § 24-34-306(3). Division and Commission Defendants further object to the extent that this request is unduly burdensome to the extent it requests the production of "all documents" from 2008 to the present, and is not limited to seeking documents regarding the relevant protected traits (sexual orientation, gender identity, and gender expression).

**RESPONSE**: Pursuant to and without waiving any objection, please see CCRD001621-3323.

2.      Please produce all training documents, presentations, policies, procedures, guidelines, or similar documents from 2008 to the present that provided scenarios, case studies, or hypotheticals related to discrimination based on gender identity, gender expression, or sexual orientation, or violations of the Publication Clause, Unwelcome Clause, Denial Advertisement Clause, Discriminatory Advertisement Clause, or Unwelcome Advertisement Clause relating to any protected category.

**OBJECTIONS**: Division and Commission Defendants object to the extent that this request calls for the production of any documents which must be kept confidential pursuant to C.R.S. § 24-34-306(3). Division and Commission Defendants further object to the extent that this request is unduly burdensome to the extent it requests the production of "all documents" from 2008 to the present, and/or is not limited to seeking documents regarding the relevant protected traits (sexual orientation, gender identity, and gender expression), and/or requires Division and Commission Defendants to interpret whether any particular document provides "scenarios, case studies, or hypotheticals."

**RESPONSE**: Pursuant to and without waiving any objection, please see CCRD001621-

15

**514**

Confidential – Subject to Protective Order

3323.

Respectfully submitted this 23rd day of December, 2025,

PHILIP J. WEISER
Attorney General

For Defendants Aubrey C. Sullivan, Sergio
Cordova, Geta Asfaw, Mayuko Fieweger, Daniel
S. Ward, Jade R. Kelly and Eric Artis:

*s/ Nora Q.E. Passamaneck*
Nora Q.E. Passamaneck
Senior Assistant Attorney General
Helen Norton
Deputy Solicitor General
Janna K. Fischer
Senior Assistant Attorney General
Dominick D. Schumacher
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
FAX: (720) 508-6032

16

515

Confidential – Subject to Protective Order

VERIFICATION

I, Aubrey Sullivan, a citizen of the United States and a resident of the State of Colorado, hereby state under penalty of perjury that the foregoing responses are true and correct to the best of my knowledge.

Executed this 23rd day of December, 2025 at Denver, Colorado.

<div style="text-align:right">

*s/ Aubrey Sullivan*
Aubrey Sullivan

</div>

**516**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-02177

DOXA ENTERPRISE, LTD d/b/a BORN AGAIN USED BOOKS,

    *Plaintiff,*

vs.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights
Division, in her official capacity;
SERGIO RAUDEL CORDOVA, GETA ASFAW, MAYUKO
FIEWEGER, DANIEL S. WARD, JADE ROSE KELLY, and
ERIC ARTIS, as members of the Colorado Civil Rights
Commission, in their official capacities; and
PHIL WEISER, Colorado Attorney General, in his official
capacity;

    *Defendants.*

---

**PLAINTIFF'S RESPONSES TO CCRD AND COMMISSION DEFENDANTS'
FIRST SET OF WRITTEN DISCOVERY REQUESTS**

---

Plaintiff Born Again Used Books submits the following responses to CCRD and Commission Defendants' discovery requests pursuant to Judge Dominguez Braswell's order at ECF No. 24. Plaintiffs make this response without conceding the relevance or materiality of any discovery request and without prejudice to their right to object to admissibility at trial with respect to the subject matter of any discovery request. The word usage and sentence structure are that of the attorneys who drafted these responses.

1

**517**

## DEFINITIONS

1.    The connectives "and" and "or" shall be construed either conjunctively or disjunctively whenever appropriate in order to bring within the scope of these Interrogatories and Requests for Production all responsive facts and documents which might otherwise be construed to be outside of their scope.

2.    The singular form of a word shall be interpreted as plural and the plural form of a word shall be interpreted as singular whenever appropriate in order to bring within the scope of these Interrogatories and Requests for Production, which might otherwise be construed to be outside of their scope.

3.    "Document" or "documentation" shall mean any handwritten, typewritten, printed, recorded, or graphic material in any form, including originals, copies, and drafts, including without limitation, any correspondence, minutes of meetings, written memoranda or communications, e-mail, text messages, social media posts, transcripts of testimony, studies, reports, notes, notebooks, telephone message slips, diaries, computer diskettes or printouts, contracts, work papers, books, bookkeeping entries, bills, invoices, calendar entries, microfilm or microfiche, together with all other items which are subject to request for production pursuant to the Federal Rules of Civil Procedure.

4.    "You" or "Your" shall include and refer to, in addition to Plaintiff, Doxa Enterprises, LTD, all agents, servants, employees, representatives, officers, governing boards or committees, and others who are in possession of or who may have obtained information for or on behalf of Plaintiff.

**RESPONSE: Plaintiff objects to this definition to the extent that it asks Plaintiff to answer on behalf of "all agents," "servants," "employees," and "representatives" as those individuals may have knowledge outside**

2

518

**the knowledge or control of the owners of the company. Plaintiff will
answer these discovery requests to the best of the owners' knowledge.**

### INTERROGATORIES

1.      Identify all instances in which (1) a transgender individual asked You
to use their chosen name, pronouns, or title corresponding to their gender identity
instead of a name, pronoun, or title associated with their biological sex; or (2) You
refused to use an individual's chosen names and/or how they choose to be addressed,
including how you determined that individual's birth name and/or sex at birth. For
each instance identified in response to this Interrogatory, further identify the
relationship of the individual or person to You, including whether they were a
customer or potential customer of Your goods or services, whether they complained
to You about Your refusal to use their chosen names and/or how they choose to be
addressed, and/or whether they purchased goods after Your refusal to use their
chosen names and/or how they choose to be addressed.

**RESPONSE: While transgender-identifying individuals have visited
Born Again Used Books on multiple occasions, Plaintiff is not aware of any
instance where a transgender-identifying individual asked an owner,
employee, or any other representative of Plaintiff to use the individual's
chosen name, pronouns, or title corresponding to his or her gender
identity instead of a name, pronoun, or title associated with his or her
biological sex. Had one of these individuals asked Plaintiff or its owners or
employees to use biologically inaccurate pronouns, titles, or similar
language, Plaintiff would have politely declined.**

2.      As to your "pronoun policy" attached as Exhibit A to the Complaint,
please describe how, but for House Bill 25-1312, codified at Colo. Rev. Stat. § 24-34-

3

**519**

301(3.5) & (9), You intend to implement such policy, including (1) how You intend to identify whether an individual is transgender; (2) Your expected and/or planned interactions with such individuals, and (3) how such expected and planned interactions differ, if at all, from any prior interactions You have had with transgender individuals.

**RESPONSE: Pursuant to the Pronoun Policy attached as Exhibit A to the Complaint, Plaintiff's owner has instructed each Born Again Used Books employee to only use pronouns, titles, and similar terms that are consistent with an individual's biological sex and never to use pronouns, titles, or similar terms that are inconsistent with a person's biological sex. The owner also instructed each employee to respectfully decline if a customer or member of the public requests that the employee use a pronoun, title, or similar term that is inconsistent with the individual's biological sex and to use the person's first or last name instead of pronouns, titles, and similar terms if possible. But for House Bill 25-1312, codified at Colo. Rev. Stat. § 24-34-301(3.5) & (9), the owner would additionally make physical copies of the Blog Post, attached as Exhibit B to the Complaint, available in the store and instruct employees to provide customers and members of the public with such copies in response to questions about the Pronoun Policy. And, but for House Bill 25-1312, codified at Colo. Rev. Stat. § 24-34-301(3.5) & (9), the owner would distribute the Pronoun Policy in writing to each employee for reference.**

**Plaintiff expects and plans to interact with transgender-identifying individuals like it interacts with all other customers, including welcoming them to the bookstore, answering any questions they have, helping them**

4

**520**

find books and other products in the store, and processing their purchases. When using gendered language like pronouns and titles, unless a person has self-identified as transgender, Plaintiff and its owners and employees will follow the Pronoun Policy by using the language that appears biologically accurate to them and will decline any requests to use biologically inaccurate language. In light of HB-1312's specific protection for the way an individual chooses to be addressed and the number of people who come in and out of the bookstore, Plaintiff thinks it likely that it will be confronted with a transgender-identifying individual requesting to be referred to with pronouns or titles that are consistent with their gender identity, and Plaintiff intends to politely decline such requests. Since there are often multiple employees in the store at any one time, it is common for employees to talk to each other and use gendered references about customers, often within the customer's hearing (e.g., "Can you help him check out?"). The same is true when there are multiple customers in the store (e.g., "The lady in the blue dress is looking for …").

However, without an injunction prohibiting enforcement of HB-1312 against Plaintiff, multiple of Plaintiff's employees have expressed anxiety over using gendered language around customers. For example, in August 2025, two men wearing female clothing entered Born Again Used Books and browsed the store. The store owner began helping them identify whether a book they sought was available at the store until an employee offered to assist. The owner began to explain to the employee that the customers were seeking a particular book and nearly referred to them as "these guys" or "these gentlemen," which was the most natural way for the

5

**521**

**owner to refer to the customers. However, fearing enforcement of HB-1312, the owner refrained from using any gendered language when referring to the customers, even though it was unnatural to do so. Once the employee began to assist the customers, she also avoided using gendered language when referring to them out of fear of enforcement of HB-1312. But for fear of enforcement of HB-1312, the employee may have referred to one of the individuals with masculine pronouns or similar terms. And this possibility was especially likely because the employee was in a position to speak about one of the individuals to the other, which requires the use of pronouns.**

3.    As to your blog and social media posts, please describe what, but for House Bill 25-1312, codified at Colo. Rev. Stat. § 24-34-301(3.5) & (9), You intend to post, including how such statements differ, if at all, from any prior statements You have made.

**RESPONSE: But for House Bill 25-1312, codified at Colo. Rev. Stat. § 24-34-301(3.5) & (9), Plaintiff would post the Blog Post, attached as Exhibit B to the Complaint, to the blog on Born Again Used Books' website, and it would share the Blog Post to the Born Again Used Books Facebook and Instagram accounts. These statements are not inconsistent with any prior statements Plaintiff has made.**

4.    Identify all complaints You received for refusing to use an individual's chosen name and/or how they choose to be addressed, and all charges of discrimination filed against You with the Colorado Civil Rights Division.

**RESPONSE: On July 21, 2025, the owner of another bookstore in Colorado Springs informed Eric Smith, Plaintiff's owner, that he objected**

6

**522**

523

to Plaintiff's position on pronoun usage. He also stated that he would no longer swap books with Plaintiff or refer customers there, as he could not be sure that the customers would be welcome.

On July 23, 2025, a Facebook user sent a message to Plaintiff's Facebook account complaining about Plaintiff's position in this lawsuit. Among other things, the user stated, "If you can't abide by the fact that there are people and ideologies in this world that will make their way into your store and be civil and compliant, maybe opening up a business or working in one is not for you." And he stated, "Misgendering is infringing on the rights of others."

In late July 2025, Eric Smith, Plaintiff's owner, received a handwritten letter from an anonymous sender complaining about Plaintiff's alleged mistreatment of members of the LGBT community.

Plaintiff has not received a charge of discrimination filed against it with the Colorado Civil Rights Commission.

## REQUESTS FOR PRODUCTION

1.      One copy of all advertising and/or marketing materials You have published and/or intend to publish that refer to or describe Your beliefs, policies, or use of birth names and sex at birth.

**RESPONSE: Responsive documents are produced at Bates BAUS000001–BAUS000005.**

2.      All documents identified, referenced, or relied upon in responding to the interrogatories.

**RESPONSE: Responsive documents are produced at Bates BAUS000006–BAUS0000011.**

7

Respectfully submitted this 12th day of September, 2025,


*s/ Henry W. Frampton, IV*
Henry W. Frampton, IV (S.C. Bar No. 75314)
Jonathan A. Scruggs (Ariz. Bar No. 030505)
Mercer Martin (Ariz. Bar No. 038138)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org
hframpton@ADFlegal.org
mmartin@ADFlegal.org


*Counsel for Plaintiff*

8

**524**

525

## VERIFICATION

I, Eric Smith, a citizen of the United States and a resident of the State of Colorado, hereby state under penalty of perjury that the foregoing responses to the interrogatories and requests for production are true and correct to the best of my knowledge.

Executed this 12th day of Sept., 2025, at Colorado Springs, Colorado.

_____

Eric Smith

9

**525**

**526**

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2025, I served a copy of the foregoing

to the following counsel of record for Defendants:


Nora Q.E. Passamaneck
Helen Norton
Janna K. Fischer
Dominick D. Schumacher
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
FAX: (720) 508-6032
nora.passamaneck@coag.gov
helen.norton@coag.gov
janna.fischer@coag.gov
dominick.schumacher@coag.gov


_s/ Henry W. Frampton, IV_
Henry W. Frampton, IV


10

**526**

**AB Litigation**
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

527

Page 21

yes, he has been in our bookstore a number of times.

Q    So do you personally know Joe Shearer?

A    I have not met him in person but we know each other.

Q    How do you know Joe Shearer?

A    He has come in our bookstore. He would set aside books that were donated to his bookstore that he didn't want to carry, usually Christian in nature. He would bring those over to us and we would set aside books that we don't carry, and we then take those over to him. So we have a mutual working business relationship, so he was in our store. I know him through our employees.

Q    Okay. It sounds like you guys exchanged books for no money?

A    Correct.

Q    Did he ever buy a book, that you can recall?

A    I don't know.

Q    And Base Camp Books and Adventures is another used bookstore in the Colorado Springs area.

Page 22

A    It is.

Q    So in the e-mail, Mr. Shearer shares his beliefs with respect to Christianity. I don't intend to ask you any theological questions.

Is it fair to summarize this e-mail as Mr. Shearer saying that he does not wish to have a business relationship anymore?

A    Yes.

Q    And that's because of your business's position on pronouns and names?

A    Yes.

Q    Would you agree that speech, telling a business that they don't like how that business operates, is free speech?

MR. FRAMPTON: Object to form.

Go ahead.

A    Can you repeat that?

Q    (By Mr. Schumacher) Sure. Would you agree that an individual telling a business that they don't like the way the business operates is part of that individual's right to free speech?

A    I would, yeah.

Q    And would you say it's fair that a business can choose what other businesses it wants to do business with?

Page 23

A    Yes, businesses can make those decisions.

Q    You can go ahead and close the binder. It's all I have on that e-mail chain.

I wanted to ask a little bit about some prior interactions with customers.

Have you ever had a customer who you believed to be transgender?

A    Yes.

Q    Approximately how many times has that happened?

A    We had three, three times that we believed that's happened.

Q    Okay. I'll go through each three.

What was the first time that you had a customer you believed to be transgender?

A    The first one was about six months ago. And one of our staff was helping this young man, who in every way she was talking to him, what she saw and heard from his voice, believed him to be a young teen male.

And when -- he was asking for a specific book. And so Nancy was helping him look for that one. We didn't have it. So she then left where he was. He was going to continue to

Page 24

look around. And then she came out to another part of the store and ran into his parents. He came in with a mom and dad and sibling.

She ran into the parents. They were then asking for that same book, kind of talking amongst themselves. She said I just helped your son, and we looked for that book and we don't have it. And then the dad very clearly said we don't have a son.

Q    So you said six months ago. This would be roughly March of 2025?

A    Yes.

Q    And your employee's name is Nancy?

A    Nancy.

Q    And you -- this individual in question, you described him as a male.

Is it your belief that he was biologically male?

A    Yes, Nancy was really clear on that, everything she saw gave -- yeah.

Q    And this individual presented as a female?

A    She was confused because of the interaction with the father.

Q    Was there anything about this

528

*AB Litigation Services*

Page 25

individual's appearance or dress that indicated that they were presenting as something other than a male?

A    He had longer hair.  But we found it really interesting that the dad was so adamant that we don't have a son.  As we think about just the kind of the trans ideas of kind of if gender is fluid, and Nancy said I just referred to him as a male.  She thought he was a male.  We used gender pronoun or gender description as son.  And then the dad's response clearly showed us like there is something else going on here.

Q    Is it fair to say that the dad's response led you to believe that the parents viewed this child as female?

A    The dad's -- yes.  Yeah.  Whether the child was -- I mean, he looked male.  So when the dad denied that, he seemed to be making more of a statement, that we recognize what Nancy saw as a boy, that they no longer saw as a boy.

Q    So I guess I'm just a little confused about whether this was a -- what you believe to be a biological male presenting as a woman or a biological woman presenting as a male.  Can you provide some clarity on

Page 26

that?

A    A biological male, who in large part looked male.  And then struck by the dad's comment that no, that we don't have a son.

Q    Do you know this individual's name?

A    I do not.

Q    Okay.  And then other than the father's comments saying we don't have a son, do you have any indication what this individual's sex at birth would be?

MR. FRAMPTON:  Objection, form.

Go ahead.

A    Just by looking at him, just as we would with any other human being, Nancy saw a young man.

Q    (By Mr. Schumacher)  And this individual with his parents was looking for an individual book?

A    Yes.

Q    Do you recall whether you had that book?

A    We did not.

Q    Do you know if the child or their parents bought anything in that interaction?

A    We don't know.  I don't recall.

Page 27

Q    Have you seen any of these three individuals in your store since that interaction?

A    That's a good question.  I don't know because Nancy was the one that interacted with them on that day.  They could have returned and a different employee worked with them and maybe wouldn't have known that it was the same people.  I don't know if they have been back.

Q    Do you know if this interaction in March of 2025 was their first time in the store?

A    I don't know.

Q    After being told we don't have a son, did Nancy refer to the individual using any name, pronoun or other language which might indicate gender?

A    Nancy doesn't recall interacting with them much.  They are looking for this specific book.  She recalls that they looked around on their own for a little while after that.  And then she couldn't remember if they found something and purchased it or if they just left.

Q    Did any of these three individuals complain about how they were treated?

A    No, they did not complain to us.

Page 28

Q    And to your knowledge, they did not file any charge or complaint with CCRD?

A    To our knowledge, we have not heard of a charge like that.

Q    I wanted to discuss the second time that you have had an interaction with a customer who may be transgender.  Can you recall that second instance?

A    Yeah.  This was four months ago, and we had the two gals walk in the store, who both seemed to present as males, in terms of the clothing they were wearing, just gray T-shirts, pants, big kind of like medallion necklaces, like a big chain, short hair.

And they came in together and looked around the store some.  My employee greeted them.  She was uncertain and kind of nervous about how to address them.  She saw women, but she knew by the way they were carrying themselves and their dress, she wasn't sure how to address them.

This particular employee almost always welcomed people in with welcome in ladies or using gendered language.  So she remembers consciously refraining from doing that when these

*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

**529**

Page 29

ladies came in.

Q    Which employee was that?

A    This was Heidi.

Q    So in this instance, Heidi just didn't use gendered language in her greeting?

A    She didn't use gendered language in her greeting.  She kind of silenced herself on that.

Q    How long did these two individuals stay in the store?

A    They didn't stay real long.  They wanted to look around.  And after looking around the store a little bit, they headed out.  Minutes probably.

Q    Do you know what biological sex these two individuals are?

A    Heidi was certain they were female.  Again, just using general observation in terms of, you know, looking at the face, looking at body structure.  But she saw that they were clearly not presenting that way.  They seemed very much -- and she would say both how they dressed and just how they moved in trying to be more like a more masculine way.  They were striding.  Their walk was different than a

Page 30

typical woman.

Q    Did either of those customers introduce themselves?

A    They didn't.  They didn't introduce themselves.

Q    Did either indicate what their gender identity is?

A    Neither of them did that, no.

Q    What specifically about their face or body structure indicated that they were female?

A    Yeah, I guess sort of the whole thing, right.  Just her making -- Heidi making the observation.  Looking at them and saying these are female hips, more so lack of an Adams apple.  And she did talk with them, so she heard their voices and heard female voices in that.

Q    Would you agree that there are some women who like to present as more masculine but are not transgender?

MR. FRAMPTON:  Objection, form.

Go ahead.

A    There are.  I'm aware of maybe kind of a Butch lesbian presentation.  It's a little bit difficult to tell when someone seems biologically one way and then presenting totally

Page 31

differently.  And that fits pretty clearly with kind of the transgender idea of gender expression.

Q    So is it possible that these people were, in your words, more of the Butch lesbian type rather than transgender?

A    Is it possible?  It's possible.  It just doesn't seem maybe probable.  Again, we are -- this is kind of why we are here today.  It just seems like in a moment two folks walk in our store who appear to be biologically one way, but present a different way.  And all of a sudden, we are caught in this issue of our trying to discern are we talking to a Butch lesbian or somebody who is trans.

Q    Do you know whether these two individuals bought anything that day?

A    They did not.

Q    Do you know whether this was each of the individuals first time in the store?

A    I don't know.

Q    Do you know whether either individual has returned?

A    I don't know that.  Same as last time, a different employee may have worked with

Page 32

them if they did come back.

Q    Did either complain about how they were treated?

A    No, they didn't complain to us.

Q    And then the third instance interacting with a customer, who you believe may have been transgender, when was that?

A    That was last month, mid August.  August 19th.

Q    Can you tell me more about that August 19th incident?

A    We had two young men.  I was there and I would put them in their young 20s.  Both of them dressed in feminine clothes and kind of blousy tops that were similar.  One had kind of shorts to match the tops, and the other kind of blousy bottoms, pants.  Both of them spoke as young men.  They sounded like men.  Both of them were carrying purses.  One of them had a small beard.

Q    When you say a blouse, I'm thinking somewhat like a professional button-down shirt that a woman would wear.

Is that what you mean?

A    I was kind of hoping we wouldn't

AB Litigation Services

Page 33

get into specifics. A light, silky top, multicolored. It wasn't a button-down. It was a silky, loose fitting, short-sleeve top.

The interaction was they came in and began looking around the store. My employee, Becky, was working at the time and she greeted them as they came in. She refrained from using a gender greeting, like hey guys or gentlemen or anything else.

They went in and looked around for some time. I don't know how long. They were looking for a book. Then I approached them and remembered specifically having to refrain -- I wanted to say can I help you guys find anything? That's what was natural. That's what I saw.

I refrained from saying that in this case. Honestly, the law was very much in my mind because this is August and the law is in place. I did ask them can I help you? Is there something specifically you're looking for?

They did refer to a book that they were looking for. I wasn't familiar with it. What we usually do is we get out our phones and start looking it up to see what kind of book it is so we know what section in the store it might

Page 34

be in.

As I was doing that, Becky, who was helping someone checkout and was right behind us, she finished up with this other customer and that customer was leaving. And then these two guys said we'll just ask her. And they turned around to go ask Becky if she knew if we carried the book.

It was at that point then something that is really common is we try to handoff customers. We are trying to do it in a very personal way. And that's where we always use pronouns or gendered language.

And my gut instinct was to say these gentlemen or these guys are looking for this specific book, Becky. Here's the name of it. Can you help them with this?

I did refrain from using gendered language out of fear of what might happen, legally speaking, knowing the law was in place.

So I just kind of made a little bit of an awkward handoff to Becky. Becky, these two are looking for a specific book. And then they began talking with Becky about the book they were looking for, and she helped them from there.

Page 35

Becky also, as she and I spoke afterwards, refrained from using gendered language. It was awkward. We find that in the bookstore we use gendered language all the time, especially as we are helping two customers who have come in together. As we make a handoff, like okay, I will help you in a minute but let me help him over here first. She helped them. We didn't have the book they were looking for. There was a greeting and then they headed out.

Q   You said each of these two individuals were carrying purses.

Can you describe what those purses looked like?

A   Yeah. They were small, with like a small strap like a handheld small purse, feminine-looking purse. Sorry about the hand motion. I don't what you can do with that.

Q   I know it can be tough. So it looks like you were describing a bag that was maybe eight inches wide and two inch deep or something like that?

A   Yes, that would be accurate. Colored, one of them was red, and I'm drawing a blank on the other. And each with a small

Page 36

handle.

Q   And you said that you did not have the book that they were looking for?

A   That is correct.

Q   So they did not purchase anything?

A   They did not purchase anything.

Q   Do you know if this was either of those two individuals first time in the store?

A   I don't know.

Q   Do you know if they have been back since?

A   I don't know if they have been back since. They could have worked with other employees.

Q   During this August 19th interaction, neither you nor Becky used any gendered language to refer to these two individuals; is that right?

A   When speaking to them, we did not use gendered language.

Q   Is it fair to say that they didn't complain about how they were treated?

A   They did not complain to us about how they were treated.

Q   I want to turn to Exhibit 1. This one is a little confusing. Open the tab to Exhibit

**Q At the bottom of Page 5, going onto Page 6, you describe an interaction in August of 2025 with two men wearing female clothing entering your store, correct?**

A Correct.

**Q Is that the interaction that we have already discussed that occurred on August 19th of 2025?**

A It is, yes.

**Q Okay. Is it your belief that anything in that interaction violated CADA?**

MR. FRAMPTON: Object to form.

Go ahead.

A Are you asking if anything in the way we interacted with these two gentlemen violated CADA?

**Q (By Mr. Schumacher) Correct.**

A Our experience with them in the bookstore while they were there?

**Q Yes.**

A No, I don't believe anything that we did there violated CADA. Seemed like it could have been close, depending on any direction they wanted to take in the conversation or how they wanted to identify themselves and what they might

have asked of us. The way the interaction went, no.

**Q You said earlier you were concerned to use any kind of gendered language for fear of violating CADA?**

A I was concerned to use any gendered language because what I wanted to say would have been accurate in terms of how they were biologically, and I could see they weren't dressing and not presenting in that same way.

So I felt like if I say hey gentlemen or hey guys can I help you find a book, that that could have caused problems if they then filed a complaint, if they started a conversation of what pronouns they wanted you to use.

My understanding of CADA is if we don't treat everyone -- and again, forgive me, I don't know all the words here. Reading over CADA, everyone is supposed to be treated the same, have the same advantages, I think is one of the words.

In this specific case, we just don't treat everyone the same. My concern was with anybody else that walks in the bookstore,

I'm going to use their pronouns because they match their biological reality.

With these two guys, if they start saying you got to call us ma'am or you have to call me a she, and I can't do that. Then I think they are going -- my concern is then they file a complaint and say we didn't get treated fairly. They were discriminating against us.

**Q Is it fair to say that it's not your intent to deny anybody the right to buy a book at your store because of their gender identity or gender expression?**

A We want to serve everybody that comes in our store, we want to serve them. Again, wether someone would say we treat everybody fairly, my concern is that someone would say we don't because we don't agree with inaccurate pronoun usage.

**Q Do you have a preference not to serve individuals that are transgender?**

A No, we do not.

**Q And taking this August 2025 incident, was it your concern that if you use the term hey guys, and they said no, please don't call us guys, that would violate CADA?**

A My concern is that they could file a complaint saying that they weren't treated fairly or didn't have -- weren't treated the same way everybody else was.

If they had said call us -- and I forgot exactly what you said. Hey guys, don't call us guys, call us gals or something. Sorry, I can't do that. That potentially opens us up under the new rule of 1312.

**Q Is it fair to say that there are people who it's very hard to tell what their sex or gender is based solely off their appearance?**

A There are. Of course, there are some that may be difficult, so we'll do the best we can. I will say the experiences we have had in the bookstore have not been difficult. Not difficult to see that there is kind of a biological reality and presenting as something else.

**Q And that's based solely off of an individual's appearance?**

MR. FRAMPTON: Objection, form.

Go ahead.

A Well, lots of things, right? Appearance, voice, how they move. Just taking

Page 53

all those things into consideration.

Q    (By Mr. Schumacher) Sure. I'll ask it a different way. It's not based upon a conversation with them, where they tell you what their sex at birth or gender identity or gender expressions are?

A    Correct. It's us making observations, yes.

Q    So let's take a situation where somebody is not transgender but their sex is difficult to identify. You know, a biological male who that's their sex; that's their gender identify; that's the way they want to express themselves. An employee says oh good morning, ma'am. And they say no, I'm a male.

Are you concerned about that kind of interaction leading to a CCRD complaint?

MR. FRAMPTON: Objection, form and scope.

Go ahead.

A    We are concerned. We are concerned about, gosh, any kind of complaint. Could there be a situation where it's a little bit difficult and we accidently get it wrong? It is possible. The probability of that happening seems pretty

Page 54

low. We're concerned, as we have seen just in the last six months. A little Christian bookstore has had people walk in, where it looks like their biological reality doesn't match the way they are presenting.

We think we're pretty -- we are not far away from one of these conversations going wrong, kind of as we are discussing here, a disagreement over pronoun usage and somebody complaining about how we treated them.

Q    Are you aware of any other businesses receiving CCRD complaints regarding how they have treated somebody based on their sex or gender?

A    We had a gal come in who owns a restaurant and was talking with us about a complaint she had received on this issue. I'm a little bit fuzzy on whether it was actually -- whether it was actually this type of complaint or a formal complaint or just verbal. That's the only one I'm aware of.

Q    Who is that woman?

A    I don't recall. She was a gal who stopped in our bookstore.

Q    Do you recall the name of the

Page 55

restaurant?

A    No.

Q    If you please turn to Exhibit 2. This is Born Again Used Books blog post on using biologically accurate language subtitle Love and Biological Accuracy.

So Born Again has a blog as part of its website, correct?

A    That's correct, we do.

Q    What is that blog generally used for?

A    That blog is used for a lot of store promotions and announcements, sales, book signings. Wife and I put some personal information on there, our family history. Some statements on Christian beliefs, putting scripture out there, that kind of thing.

Q    When did you start the blog?

A    We started it -- we have used it -- I don't know exactly when we started it. I know it's been years. We have owned the business for five years. I don't know if it quite goes all the way back five years. It's been years, so we used it.

Q    How frequently do you publish blog

Page 56

posts?

A    We publish something. It can be kind of intermittent, but probably monthly. Maybe more frequently than that, if there is more things we want to make known to people that follow us and post out there for the public.

Q    It's my understanding that this Exhibit 2 is a draft policy that has not been published; is that accurate?

A    That's correct.

Q    Other than what we are looking at here, has Born Again made any blog posts discussing issues of sex and gender?

A    We have not, no explicit posts on sex and gender. Certainly some of our Christian beliefs. That would be seen throughout, but nothing specific on this.

Q    Who generally writes the blog posts?

A    A lot of times my wife does. Sometimes Nancy does.

Q    Do you know who, other than any attorney, contributed to this blog post?

A    My wife and I.

Q    Okay. When did you start writing in blog posts?

Page 65

A    That's our first concern, yeah. Again, I don't know that I had in mind why someone would come in.  But we just think the quantity of customers, and we have already seen transgender individuals come in, we think we'll encounter more.

Q    And it's fair to say that there are individuals that identify as transgender that also hold Christian beliefs?

A    That's a good question.  It could be possible, I suppose.  But I -- that would be a very big disagreement.  There would need to be a conversation around what do you think.  If they are Christian, how do you understand the fact that God created male and female.

Q    So I guess, would you agree that there are many people who would identify as Christian but hold somewhat different beliefs across different sects or versions of Christianity?

A    Yes, I agree with that.

Q    So it's fair to think somebody might identify as transgender but also identify themselves as a Christian?

A    It's possible.

Page 66

Q    You can go ahead and close this. Earlier we discussed how at least one of your employees, I think it was Heidi, often greets people with gendered language.
Do you recall that?

A    Yes, I do.

Q    Is it fair to think that it's possible to have customary interactions without using any gendered language, whether that's names, pronouns or salutations?

A    I'm going to repeat the question. You're asking if it's possible to interact with customers without using gendered language?

Q    Yes.  Sorry.  I'm not trying to trick you.

A    It's possible.  It's surprising how much we use gendered language in the bookstore.  As I have thought about it more since this lawsuit, it just shows that we just interact so much with gendered language, from the greeting coming into the store.  If there is a group and they split up and we say I'm helping her or I'm helping him.  Interacting with multiple customers at the same time.

Q    Thinking back on your own

Page 67

experiences in retail as a customer, is it fair to say you had a lot of interactions which did not include any gendered language?

A    Gosh, that's a good question. There has definitely been interactions where it didn't have gendered language.  I think our bookstore is different.  We are very personable. We go up to people, so it's not like going to a fast food counter ordering a burger and leaving.
We ask what people are looking for because it's a Christian store.  That's leads sometimes to deeper conversations.  And we'll often stop and pray with people.
When I think about our bookstore, it's very different.  It's very conversational and personable and that's the sort of people we hire and that's how we want to treat our customers.  So gendered language comes up a lot in that setting.

Q    We've talked about a few interactions today where somebody appeared to identify as a gender that might not match their sex at birth.
Do you question customers as to what their sex is?

Page 68

A    We do not ask customers what their sex is.  It seems a little awkward.

Q    So if somebody said -- if you referred to somebody as sir and they said I'm not a sir, would you ask any follow-up questions about their sex?

A    We would at that point.  Again, trying to treat people kindly.  We would politely decline if that didn't seem to match what we are looking at.  If we saw a biological reality of like a man, a sir, and he said treat me as a ma'am, call me ma'am, we would say, you know, we are just not going to do that but glad to call you by your name.  Hi, I'm Eric.  What's your name?

Q    Okay.  It's fair to say inquiries are over?  You're not going to ask for their driver's license or anything?

A    We are not going to ask for a driver's license.

Q    Or a birth certificate?

A    Correct.

Q    Earlier we saw an interaction involving Born Again's Facebook account.
Born Again has a Facebook page; is

**534**

Page 69

that correct?

A   That is correct.

Q   What is that page used for?

A   That is used for posting, again, events happening at the store, sales, book signings. We often post scripture out there, notices, and things we want to communicate to people who follow us.

Q   Who manages the Facebook account?

A   My wife and Nancy.

Q   Do any other employees or individuals have access to make posts?

A   Currently, no. In the past, yes. We have had another employee contribute to it.

Q   Is that employee still employed by Born Again?

A   She is not.

Q   How often would you say that Born Again posts on their Facebook page?

A   I would say at least weekly. At times, it could be daily and can spread out, maybe be every other week. Weekly would be a good average.

Q   Has Born Again operated a Facebook page since starting the business in 2020?

Page 70

A   Yes. Yeah. We actually acquired the business and the name, so the Facebook page predates us.

Q   In your tenure as owner, has Born Again's Facebook page included any posts specific to sex or gender issues?

A   We haven't posted anything, you know, like our blog that you have seen or our potential blog or our pronoun policy. Things we have posted would have been either promoting a book on a topic or scripture.

Q   Other than that Facebook account, does Born Again have any other social media accounts, like Instagram, Twitter or X?

A   Instagram is the only other one.

Q   And how long have you operated the Instagram account?

A   Same, since we purchased the business.

Q   Have you made any posts on Instagram about sex or gender issues?

A   Same as with Facebook. If we have, it's been related to quoting scripture or books on the topic.

Q   Do you advertise your business

Page 71

anywhere, other than your website or on the Facebook page?

A   Website, Facebook page. We have purchased some Facebook ads in the past. It's been a little while since we have done that. We have also sponsored some local community theater events and have had advertisements in the programs.

Q   Have you purchased space on any billboards?

A   No billboards.

Q   Any radio or TV advertisements?

A   One radio spot. I don't know. I don't recall if that was a purchase or if it was like one of those public announcements on our behalf.

Q   Any newspaper, magazine or other print advertisements?

A   Just the theater programs.

Q   Thinking about all of those advertisements across various media platforms, have any of those advertisements related to sex or gender?

A   In our advertisements, we just mention the name of the store and the content,

Page 72

Christian books and home school materials. We keep it to that.

MR. SCHUMACHER: Okay. Let's take five minutes and go off the record.

(A break was taken from 11:41 to 11:47.)

Q   (By Mr. Schumacher) I just had one quick follow-up question. Earlier we talked about the employee handbook that you have.

What kind of policies are in that handbook?

A   We instruct our staff on when to arrive and how to answer the phone, how to treat customers, in general. Books, how we get books coming in by donation. And so how to know which books we carry, concerning Christian books we carry or not and ones we wouldn't. And we have a store credit policy that we will give store credit for books they donate, so we have instructions.

Q   That sounds like pretty generic employment policies; is that fair?

A   They are probably pretty common. Some unique to a used bookstore.

Q   That's all I have. Before I hand it

*AB Litigation Services*

Page 73

off to your counsel to see if they have any questions for you, is there anything that you said today which you would like to correct or verify before we wrap up?

A    No, I don't have anything.

Q    Is there anything else you would like to share?

A    No.

Q    Okay.

EXAMINATION

BY MR. FRAMPTON:

Q    All right.  I think I have one.  I just want to make sure we had this.

The interaction that you shared regarding Heidi, was it her impression that she was interacting with biological females presenting as men?

A    Yes.

MR. FRAMPTON:  All right.  I don't have anything else.

COURT REPORTER:  I need to get on the record, Mr. Schumacher, would you like this transcribed?

MR. SCHUMACHER:  Yes, please.

COURT REPORTER:  And Mr. Frampton,

Page 74

would you like to buy a copy?

MR. FRAMPTON:  Yes, and we'll read and sign.

(Deposition was concluded at 12:05 p.m.)

Page 75

I, ERIC SMITH, do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true and complete record of my testimony.

_____
Signature of Deponent

( ) No amendments
( ) Amendments attached

Acknowledged before me this _____ day of _____, 20___.

Notary Public:  _____

My Commission Expires:  _____

Seal:

Page 76

STATE OF COLORADO)
)ss.  REPORTER'S CERTIFICATE
COUNTY OF COSTILLA)

I, Linda S. Overdeer, do hereby certify that I am Shorthand Reporter and Notary Public within the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth, that it was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within activity.

In witness whereof, I have affixed my signature this 6th day of October, 2025.

My commission expires June 10, 2029.



Linda S. Overdeer
216 - 16th Street, Suite 600
Denver, Colorado 80202

**Page 77**

AB LITIGATION SERVICES
216 - 16th Street, Suite 600
Denver, Colorado  80202
October 6, 2025
Henry W. Frampton, Esq.
15100 North 90th Street
Scottsdale, Arizona 85260
Re:  30(b)(6) DEPOSITION OF DOXA ENTERPRISES, LTD
        as given by ERIC SMITH
        Doxa Enterprise LTD vs. Sullivan
        Civil Action No. 1:25-cv-02177-RMR-MDB

The aforementioned deposition is ready for
reading and signing.  Please attend to this
matter by following BOTH of the items indicated
below:
_____ Call 303-296-0017 and arrange with us
        to read and sign the deposition in our
        office
_XXX_ Have the deponent read your copy and sign
        the signature page and amendment sheets, if
        applicable; the signature page is attached
_____ Read the enclosed copy of the deposition
        and sign the signature page and amendment
        sheets, if applicable; the signature page
        is attached

_XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

_____ By _____ due to a trial date of_____

Please be sure the original signature page and
amendment sheets, if any, are SIGNED BEFORE A
NOTARY PUBLIC and returned to AB Litigation Services
for filing with the original deposition.  A copy
of these changes should also be forwarded to
counsel of record.  Thank you.
AB LITIGATION SERVICES
cc:  All Counsel

**Page 78**

AB LITIGATION SERVICES
216 - 16th Street, Suite 600
Denver, Colorado  80202


        30(b)(6) DEPOSITION OF DOXA ENTERPRISES, LTD
                as given by ERIC SMITH
                September 25, 2025
            Doxa Enterprise LTD vs. Sullivan
          Civil Action No. 1:25-cv-02177-RMR-MDB


The original deposition was filed with
Dominick D. Schumacher, Esq. on approximately
the 6th day of October, 2025.
_____ Signature waived
_____ Signature not requested
_____ Unsigned; signed signature page and
        amendment sheets, if any, to be filed at
        trial
_XXX_ Unsigned; original amendment sheets and/or
        signature pages should be forwarded to
        AB Litigation Services to be filed in the
        envelope attached to the sealed original


Thank you.

AB LITIGATION SERVICES

cc:  All Counsel

**Page 79**

                    - AMENDMENT SHEET -

  30(b)(6) DEPOSITION OF DOXA ENTERPRISES, LTD

              as given by ERIC SMITH

                September 25, 2025

        Doxa Enterprise LTD vs. Sullivan

      Civil Action No. 1:25-cv-02177-RMR-MDB

The deponent wishes to make the following changes

in the testimony as originally given:

Page  Line          Should Read          Reason
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____

Signature of Deponent: _____

Acknowledged before me this ____ day of _____,

20___.

(seal)      Notary's signature _____

            My commission expires_____



**538**

*AB Litigation Services*

*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

539

*AB Litigation Services*

*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

540

*AB Litigation Services*



*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

541

*AB Litigation Services*



*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

**542**

Case No. 1:25-cv-02177-RMR-MDB    Document 46-1    filed 02/11/26    USDC Colorado
pg 546 of 828

*AB Litigation Services*

543

*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

*AB Litigation Services*



544

*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

*AB Litigation Services*

545

*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

*AB Litigation Services*



*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

546

*AB Litigation Services*



*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

547

*AB Litigation Services*

*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

548

*AB Litigation Services*



*30(b)(6) Doxa Enterprises LTD Eric Smith  - 09/25/2025*

549

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| DEFENDING EDUCATION, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 1:25-cv-01572-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants.* | |
| COMMITTEE OF FIVE, INC., | |
| *Plaintiff,* | |
| v. | Case No. 1:25-cv-01668-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants.* | |
| DOXA ENTERPRISE, LTD., | |
| *Plaintiff,* | |
| v. | Case No. 1:25-cv-02177-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants.* | |

1

550

## SUPPLEMENTAL DECLARATION OF AUBREY SULLIVAN

I, Aubrey Sullivan, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1.  On November 20, 2025, I submitted a declaration in the three above-captioned cases. ("November Declaration"). I submit this Supplemental Declaration to clarify and/or correct certain statements made in the November Declaration.

### Statements Regarding Public Accommodations Cases

2.  In my November Declaration, I stated at paragraph 13 that "To the best of my knowledge during my tenure at the Division, the Division has found probable cause in only two public accommodations cases wherein the complainant alleged discrimination based upon gender identity or gender expression. The charges did not involve allegations of any failure to use an individual's chosen name and/or how the individual chooses to be addressed. I further stated at paragraph 15 that "To the best of my knowledge during my tenure at the Division, the Division has received two complaints of discrimination in public accommodations on the basis of gender identity, gender expression, or sexual orientation in which misgendering was part of the alleged discrimination. Neither resulted in a finding of probable cause. In both instances, the alleged misgendering was secondary to additional conduct, including the use of anti-LGBTQ slurs. Both complaints pre-date the passage of H.B. 25-1312."

3.  I made these statements based on my own recollection and internal searches conducted by the Division for such cases. Since my November Declaration, and based on additional searches conducted in response to document requests by Plaintiffs, I attach,

2

**551**

552

as Exhibit A, a chart summarizing cases with letters of determination involving allegations of misgendering and/or deadnaming against places of public accommodations. In total, there are 17 cases, and one in which a finding a probable cause of discrimination was made.

4. To the best of my knowledge during my tenure at the Division, the Division has received no complaints of discrimination under the unwelcome clause or Part 7 of CADA based on a failure to use an individual's chosen name and/or how the individual chooses to be addressed.

5. None of the information uncovered in these additional searches changes my earlier statements regarding whether the plaintiffs in any of these three actions have violated CADA.

**Analysis of XX-XY and Born Again Books**

6. My understanding is that Plaintiffs XX-XY and Born Again Books challenge CADA based on potential interactions with members of the public and on actual or proposed publications stating that they will not knowingly use pronouns inconsistent with sex at birth (both Plaintiffs) and/or chosen names (XX-XY). In my November Declaration, I stated that "because the analysis is fact-specific and contains both subjective and objective elements, and because there is no complainant, there is insufficient information to determine whether [XX-XY's/Born Again Books'] conduct violates CADA." November Declaration ¶¶ 24, 27. I understand that XX-XY and Born Again Books have served interrogatories asking Division and Commission Defendants to analyze their publications separately from their interactions with individuals.

3

**552**

553

7.  By themselves, neither the Pronoun Statement posted by XX-XY on its X social media account nor the proposed Pronoun Policy Blog Post by Born Again Books violate CADA's provisions governing publications of a place of public accommodation because they do not establish that their application will create  an environment that is subjectively and objectively hostile to individuals based on their gender identity. As a result, they do not, standing alone, violate the various CADA provisions directed to written communications. Whether and how the policies would be applied to any individuals and whether such interactions violate the Accommodation Clause of C.R.S. § 24-34-601 would depend on the specific facts of the interaction.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day December, 2025.


*s/ Aubrey Sullivan*
Aubrey Sullivan
Director
Colorado Civil Rights Division

4



# COLORADO
## Department of Regulatory Agencies
### Colorado Civil Rights Division

# Public Accommodation Discrimination 101

CCRD002191
554

# DISCLAIMERS

This presentation is intended to provide the attendees with a **broad overview** of anti-discrimination laws in Colorado.

This webinar is not intended to be used as legal advice or directives.

The Division cannot and will not offer any official opinion on actual or hypothetical scenarios.

Determinations on allegations are issued only after a full investigation of a duly filed charge.

CCRD002192



# Legislative

Senate
House of Representatives
State Auditor
Joint Budget Committee

# Judicial

Supreme Court
Court Administrator
Court of Appeals
District/County Trial Courts
Probation Services



# Executive

## Governor

Lt. Governor - Attorney General - Treasurer - Secretary of State



*Department of Regulatory Agencies*



CCRD002193

556



# COLORADO
**Department of Regulatory Agencies**

Colorado Civil Rights Division

## C.R.S. 24-34-301 et seq.

The Colorado Civil Rights Division ("CCRD") enforces the Colorado Anti-Discrimination Act ("CADA"), which prohibits discrimination in the areas of:

- Employment

- Housing

- **Places of Public Accommodation**





**COLORADO**
Department of
Regulatory Agencies
Colorado Civil Rights Division

# Colorado Civil Rights Division

Charged with enforcing the Colorado Anti-Discrimination Act (CADA)

Intake and Investigation
Alternative Dispute Resolution
Community Outreach and Education

The manner in which cases are processed is dictated by statute and/or administrative rules:
ccrd.colorado.gov/regulatory-information

Staff of 39

For fiscal year 2024, the Division received over **1,700 complaints of discrimination.**



# Colorado Civil Rights Commission

The CCRC is a seven-member bipartisan panel appointed by the Governor and confirmed by the state Senate.

- Selected from various regions across state
- Represent both political parties
- Four Year Terms
- Hears appeals of cases dismissed by the CCRD for lack of probable cause.
- Has the authority to set cases for hearing
- Can pursue probable cause cases through litigation if they do not settle through conciliation.

Monthly public meetings are being held the **fourth Friday of every month (Meeting links on https://ccrd.colorado.gov/)**





**COLORADO**

Department of
Regulatory Agencies

Colorado Civil Rights Division

# Key Definitions

## Place of Public Accommodation:

Any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public.

**C.R.S. § 24-34-601**

## Americans with Disabilities Act of 1990:

**C.R.S. 24-34-301 (5.3):** "Place of public accommodation" or "public accommodation" has the same meaning as set forth in **Title III of the federal "Americans with Disabilities Act of 1990",** 42 U.S.C. sec. 12181(7), and its related amendments and implementing regulations.

Creator attribution: Nick Youngson - link to - http://nyphotographic.com/

CCRD002197



# COLORADO

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Public Accommodation Examples



Also includes hospitals, public schools, libraries, museums, etc.



**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Public Accommodation Exemptions



- Church

- Synagogue

- Mosque

- Any other place that is "principally used for religious purposes."



- Private Clubs

CCRD002199
562



# COLORADO
**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Key Definitions

## CCRD Exemptions:

- Federal employees filing against a federal employer
- Police and sheriff and other law enforcement officer misconduct
- Judicial determinations or court matters
- Prisoners' rights
- Discrimination based characteristics such as personal appearance, political affiliation, lack of education and training, short-term disabilities, and personality conflicts
- Labor relations issues, including wage and hour matters not based on a protected class, and workers' compensation
- Voting access

C.R.S. § 24-34-601


Creator attribution: Nick Youngson - link to -
http://nyphotographic.com/



CCRD002200
563



# COLORADO
**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Public Accommodation Discrimination

## C.R.S. § 24-34-601

A place of public accommodation cannot "refuse, withhold from, or deny to an individual.. the **full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations**," based on protected class.

Discrimination occurs when individual from a protected class is subject to to **disparate, unfavorable treatment** because of that individual's "protected class."



# COLORADO
## Department of Regulatory Agencies
Colorado Civil Rights Division

## Protected Classes
### Public Accommodation Discrimination

It shall be unlawful in places of public accommodation, and hereby prohibited [to discriminate **because** of:

- **Sex**

- *Sexual Orientation*

- *Gender Identity*

- *Gender Expression*

- National Origin/Ancestry

- Race/Color

- Creed

- **Disability (mental/physical)**

- Marital Status

- Retaliation *(engaging in protected activity, such as filing a complaint of discrimination, complaining of harassment based on membership in a protected class)*





COLORADO

**Department of
Regulatory Agencies**

Colorado Civil Rights Division



# Disparate Impact

Involves an adverse action that is:

- **Facially neutral** (intentional motivation not required)

- **Disadvantages** members in a protected class more than those from another class

- Is **not** consistent with a business **necessity**

- **Adverse impact** can often be supported by statistical evidence. Need not be intentional or motivated by animus/bias.





# COLORADO
**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Disparate Treatment

- Involves **intentional** discrimination
- Proven through direct, circumstantial, or statistical **evidence**

### Prima Facie Case

- Individual is member of a **protected** class
- Individual suffered a **negative** action
- Individual was treated **differently** than similarly situated patrons not in the same protected group



# Jurisdiction

## Nexus:

a connection or series of connections linking two or more things.: "the nexus between industry and political power".



**Discriminatory Action**

**Protected Class**

CCRD002205

568



## COLORADO
**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Discriminatory or Unfair Practices in Public Accomodation



- Refusal of Service
- Refusal to Sell Goods
- Unequal Terms and Conditions
- Disparate Impact
- Disparate Treatment
- Segregating/Isolating
- Printing or circulating any statement, advertisement, or publication ... that expresses, either directly or indirectly, any limitation, specification, or discrimination as to [protected classes].

C.R.S. § 24-34-601

CCRD002296

569



# Federal Law Considerations

**Title II of the Civil Rights Act (1964):** All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination on the ground of race, color, religion, or national origin.

**Title III of the ADA:** prohibits discrimination on the basis of disability in the activities of places of public accommodations and requires newly constructed or altered places of public accommodation—as well as commercial facilities (privately owned), to comply with the ADA Standards.



Accessible Design & ADA



**COLORADO**
**Department of**
**Regulatory Agencies**
Colorado Civil Rights Division

# Anti-Discrimination Notices

# 3 CCR 708-1

*(ccrd.colorado.gov/regulatory-information)*

**ANY PLACE OF BUSINESS engaged in any SALES to the PUBLIC and ANY PLACE OFFERING SERVICES, FACILITIES, PRIVILEGES, ADVANTAGES, or ACCOMMODATIONS to the PUBLIC** are **required** to post a notice that summarizes prohibited discriminatory or unfair practices.

All notices available in English and Spanish *(website or hard copy)*



**COLORADO**
Department of
Regulatory Agencies
Colorado Civil Rights Division

## Colorado Law Prohibits
## Discrimination in places of:
# PUBLIC ACCOMMODATION
C.R.S. § 24-34-601 *et seq.*

**PLACE OF PUBLIC ACCOMMODATION MEANS:**
ANY PLACE OF BUSINESS engaged in any SALES to the PUBLIC and ANY PLACE OFFERING SERVICES, FACILITIES, PRIVILEGES, ADVANTAGES, or ACCOMMODATIONS to the PUBLIC.

**IT IS A DISCRIMINATORY PRACTICE AND UNLAWFUL FOR A PERSON DIRECTLY OR INDIRECTLY TO:**
REFUSE, WITHHOLD FROM, or DENY to an individual or a group FULL and EQUAL ENJOYMENT of the GOODS, SERVICES, FACILITIES, PRIVILEGES, ADVANTAGES, or ACCOMMODATIONS of a place of public accommodation

**BECAUSE OF:** DISABILITY, RACE, CREED, COLOR, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER EXPRESSION, MARITAL STATUS, NATIONAL ORIGIN or ANCESTRY.

**SERVICE ANIMALS C.R.S. § 24-34-803:**
SERVICE ANIMAL DESIGNATION IS LIMITED TO A DOG OR MINIATURE HORSE — EMOTIONAL SUPPORT ANIMALS ARE NOT SERVICE ANIMALS
THE DOG MUST BE INDIVIDUALLY TRAINED TO PERFORM TASK(S) OR WORK RELATED TO A DISABILITY.
THE MERE PRESENCE OF THE DOG MEANT TO PROVIDE EMOTIONAL SUPPORT/THERAPY/ AND/OR COMPANIONSHIP IS NOT SUFFICIENT TO MEET THE DEFINITION OF A SERVICE ANIMAL.
AN ENTITY MAY NOT REQUIRE OR REQUEST A LICENSE, REGISTRATION, OR OTHER DESIGNATION CONFIRMING STATUS AS A SERVICE ANIMAL. AN ENTITY MAY MAKE THE FOLLOWING INQUIRIES:
1.) IS THIS DOG A SERVICE ANIMAL TRAINED TO PERFORM A TASK(S) OR WORK RELATED TO A DISABILITY?
2.) WHAT IS THE TASK OR WORK THE DOG IS TRAINED TO PERFORM?
A SERVICE ANIMAL MUST BE UNDER THE CONTROL OF ITS HANDLER AT ALL TIMES. THE HANDLER IS RESPONSIBLE FOR THE CARE OF THE SERVICE ANIMAL, INCLUDING TOILETING, FEEDING, AND OTHERWISE CARING FOR THE DOG.
A SERVICE ANIMAL MAY BE DENIED ENTRY IF ITS PRESENCE WOULD RESULT IN A FUNDAMENTAL ALTERATION OF THE NATURE OF THE ENTITIES' OPERATIONS AND/OR MAINTENANCE OF A STERILE ENVIRONMENT. THE MERE PRESENCE OF A SERVICE ANIMAL IS NOT GROUNDS FOR A VIOLATION OF THE HEALTH CODE. SERVICE ANIMALS MUST BE ALLOWED IN DINING AREAS AND IN SELF SERVICE FOOD LINES. AN ENTITY MAY NOT CHARGE FEES FOR ALLOWING A SERVICE ANIMAL TO BE PRESENT.

CCRD002208



# COLORADO
## Department of
## Regulatory Agencies
Colorado Civil Rights Division



## Complaint Process

Intake

Investigation

Determination

Appeal

Mediation

Conciliation

Settlement/Closure

**COLORADO**
Department of
Regulatory Agencies
Colorado Civil Rights Division

## Complaint Process

Intake → Investigation → Determination

Appeal

Determination

Conciliation

Mediation

Settlement/Closure

## Intake

- Jurisdiction subject to CADA?

- Harm based on or because of protected class(es)?

- Timely? – **60 days** from alleged act of discrimination.

## Three Ways to Begin Process:

1- Online (preferred):

**CaseConnect Civil Rights**

Start a New Intake Inquiry

2- Telephone: **303-894-2997**

3- In-Person Kiosk:
1560 Broadway, Suite 100
Denver, CO  80202

CCRD002240
**573**





# Mediation

- Voluntary
- Typically four hours
- Goal to resolve the case w/o investigation and subsequent determination
- Results in No Fault Settlement Agreement (NFSA) if successful



## Investigation

- Investigative Specialist gathers initial complaint statement, submits an **RFI** from the responding party (Position Statement), other key documents.

- Rebuttal statement from Complainant (optional)

- *In public accommodations cases Position Statement and Rebuttal is requested within thirty (30) days from request date.*

CCRD002242
575

COLORADO
Department of
Regulatory Agencies
Colorado Civil Rights Division

## Determination

- Finding of facts.
- Goal is to issue w/in 270 days from filing.
- PC = probable cause to believe a violation of CADA has occurred.
- NPC = no probable cause to believe a violation of CADA has occurred.
- Mixed Finding= PC/NPC possible if complaint alleges more than one violation of CADA



## Probable Cause

- Compulsory conciliation.

- Goal of conciliation is to resolve matter. Similar to mediation with the *caveat that there is a PC determination*.

- If unable to reach resolution, CCRC will set matter for hearing (i.e., file an administrative lawsuit with OAC).



## No Probable Cause

- Complainant may appeal to CCRC. CCRC may then:
  - Uphold determination
  - Request additional investigation
  - Reverse determination

- If no appeal and/or appeal unsuccessful, determination acts as a dismissal.

CCRD002245

578



**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Protected Class: Disability

- **A physical or mental impairment that substantially limits a major life activity**

- A record of such an impairment; or; Being regarded as having such an impairment.

- Definition of "disability" and "substantially limited" is **construed broadly;**

- Impairment can be a disability even if episodic or in remission;



- Mitigating measures should not be considered in determination if an impairment is substantially limiting.

CCRD002246

**579**



**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division



**Protected Class:
Disability
(Mental/Physical)**

## Diagnoses *generally* considered

## to be substantially limiting major life activities

- Deafness, blindness, mobility impairments requiring use of a wheelchair, partially or completely missing limbs;

- Autism, intellectual disability, cancer, cerebral palsy, diabetes, epilepsy, HIV infection, lupus, multiple sclerosis, muscular dystrophy;

- Mental impairments such as major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive-compulsive disorder, schizophrenia.



**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division



# Protected Class: Disability (PA Accessibility)

## Questions to Ask:

1. Are the entrance and approach to the entrance accessible?
2. Can visitors get to the goods or products in an accessible manner?
3. Are the restrooms accessible?

## The basic areas where places places of public accommodations must make changes to accommodate people with disabilities are:

1. Store signs and directions
2. Parking lots
3. Curbs for store entrances and sidewalks
4. Ramps and stairways
5. Doors and building entrances
6. Shelves, aisles, and maneuvering space
7. Checkout and service counters
8. Dressing rooms
9. Restrooms

CCRD002218
581



**COLORADO**
Department of
Regulatory Agencies

Colorado Civil Rights Division

# Reasonable Accommodation

Definition: An addendum to rules, policies, practices or services that is ***necessary*** to allow the person with a disability equal access to public service or location.

*A business owner need not provide such accommodation if doing so would create an **undue hardship** - e.g. significant difficulty or expense.*

- Only **actual disabilities** can be accommodated - i.e. not regarded as or perceived as disabled.

- Patron must initiate request ((no formal verbiage required); can be a verbal request)

- Accommodation request can be made on behalf of patron by third party.



**COLORADO**
Department of
Regulatory Agencies

Colorado Civil Rights Division



# Reasonable Accommodation and the Interactive Process

- Good Faith Participation

- Working Together: A business owner need not necessarily provide the specific accommodation requested by the patron, <u>**if another equally effective accommodation is available.**</u>

- Accommodations are seldom a single-step process. A business owner may be required to make **multiple efforts** to identify and implement a reasonable accommodation or reevaluate the effectiveness of a current accommodation.



**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Service Animals
## *and PA Discrimination*

## C.R.S. 24-34-803

A qualified individual with a disability has the right to be accompanied by a service animal individually trained  for that individual **without being required to pay an extra charge for the service animal** in or on the  following places or during the following activities and subject to the conditions and limitations  established by law and applicable alike to all individuals:

**(a) Any place of employment, housing, or public accommodation;**
**(b) Any programs, services, or activities conducted by a public entity;**
**(c) Any public transportation service; or**
**(d) Any other place open to the public.**



# COLORADO
**Department of Regulatory Agencies**
Colorado Civil Rights Division

# Assistance Animals

An "Assistance Animal" is an animal that works, **provides assistance**, or **performs tasks** for the benefit of a person with a disability, or provides emotional support that alleviates one or more identified symptoms or effects of a person's disability.

An assistance animal is **NOT a pet.** Assistance animals include both Service Animals and Emotional Support Animals ("ESA").

**Service Animals:** Dog or Miniature Horse that is individually trained to do work or perform tasks for a person with a disability- e.g. guide dog.

**ESA:** any type animal, need not be individually trained to perform tasks - mere presence may provide therapeutic effect.



They told me to "Try someplace else." So I did. I called HUD.

CCRD002232
585



# COLORADO

## Department of Regulatory Agencies

Colorado Civil Rights Division

# Certifications?

Private company "Assistance Animal" certifications are **not recognized** under CADA



New! Upgraded Professional Archival Documentation Package

Click any item to enlarge

Items not to scale.

Screenshot of the $50 package from the US Service Dog Registry



## DO NOT:

-Ask for a license/certification

-Ask for animal to "demonstrate" task

This "deluxe package" from an official-looking site called US Service Animals sells for nearly $200. Service dogs need to be trained for specific disabilities, and faking one is a criminal offense in many states.

CCRD002223
586



# COLORADO
**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Service Animals
## *and PA Discrimination*

(1)    It is unlawful for any person, firm, corporation, or agent of any person, firm, or corporation to:

(a) **Withhold, deny, deprive, or attempt to withhold, deny, or deprive** a qualified individual with a disability who is accompanied by a service animal or a trainer of a service animal of any of the  rights or privileges secured in section 24-34-803;

(b) **Threaten to interfere** with any of the rights of a qualified individual with a disability who is  accompanied by a service animal or a trainer of a service animal secured in section 24-34-803;

(c) **Punish or attempt to punish** a qualified individual with a disability who is accompanied by a  service animal or a trainer of a service animal for exercising or attempting to exercise any right  or privilege secured by section 24-34-803; or

(d) **Interfere with, injure, or harm, or cause another dog to interfere with, injure, or harm, a  service   animal.**

(2) **Any person who violates any provision of subsection (1) of this section commits a class 3 misdemeanor and shall be punished as provided in section 18-1.3-501, C.R.S.**

CCRD002234
587



# COLORADO
**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Service Animals
## Examples

**Guide Dog** – assists an individual that has vision impairment.

**Mobility Dog** – may **retrieve items, open doors** or even push buttons for its handler.  Also, this service animal may assist people with disabilities with walking, balance and transferring from place to place.

**Hearing Dog** – alert its handler with a hearing loss to sounds.  This can be telephone, doorbell, smoke alarm, crying baby, traffic and more.

**Medical Alert Dog** – trained to alert to some types of oncoming medical conditions or attend its handler in the event of heart attack, stroke, diabetes, epilepsy, seizure, etc.

**Autism Service Dog** –  trained to interrupt certain negative behaviors of its handler so that the handler may keep these behaviors to a minimum.

**Psychiatric Service Dog** – works with a handler that has a mental disability.  Some types of tasks could be to attend a handler who may need a dog to be able to go out in public (agoraphobic), or a handler who suffers from  panic attacks, anxiety attack, PTSD (post-traumatic stress disorder) or other mental disorders.  These dogs are trained NEVER to leave their handler's side.



**COLORADO**
Department of
Regulatory Agencies

Colorado Civil Rights Division

# Service Animals



# COLORADO
## Department of Regulatory Agencies
Colorado Civil Rights Division

# Service vs Emotional Support

**Emotional support animals, comfort animals, and therapy dogs are <u>not</u> service animals.**

## COMPARISON

Service | Emotional Support

**ADA covered: Rights to bring animal into public establishments** — Service ✓ | Emotional Support ✗

**May fly inside the airplane with their disabled owner** — Service ✓ | Emotional Support ✗

**May live with their disabled owners, even if "No Pets" policy in place** — Service ✓ | Emotional Support ✓

CCRD002237
590

**COLORADO**

Department of
Regulatory Agencies

Colorado Civil Rights Division

## Service Animals
### Exemptions

- ## Not allowed in:
  - ### Certain areas of Zoos
  - ### Surgical or burn units
  - ### Public swimming pools



CCRD002228

591



**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Sexual Orientation and Gender Identity

- _Sexual Orientation_ - A person's identity in relation to the gender or genders to which they are sexually attracted; the fact of being heterosexual, homosexual, etc

- _Gender Identity-_ innate sense of one's own gender

- _Gender Expression-_ external appearance, characteristics or behaviors typically associated with a specific gender.

_Places of public accommodation must allow individuals the use of gender-segregated restroom facilities that are consistent with the individual's gender identity._

CCRD002229
592



## COLORADO
**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Gender Identity and Gender Expression

## Equal Restroom Access

- All covered entities shall allow individuals the use of <u>gender-segregated facilities</u> that are <u>consistent with their gender identity</u>. Gender-segregated facilities include, but are not limited to, ***restrooms, locker rooms, dressing rooms, and dormitories***.

- <u>Not all facilities are gender segregated, there are often "unisex," "family restrooms" and "gender neutral" restrooms that are available for use by any sex; often these sorts of restrooms are restricted to the use of one person and/or one family at a time.</u>



CCRD002232

593





# Case Examples

CCRD002231
594



# COLORADO

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# July 5th, 1978

- On this day, a group of disability rights protesters shut down the Colfax bus line at the Broadway/Lincoln stop for 24 hours.
- They became known as The Gang of 19. They laid their bodies in front and behind the buses.
- They chanted "We will ride! We will ride".
- This is a key moment in public transportation access in Denver.





CCRD002232

595



# COLORADO

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Gavin G v Gloucester County School Board

**Charge in 2015-**
- Gavin Grimm began transitioning to his male gender identity.
- He was located in a mostly rural area east of Richmond, VA
- He had chest reconstruction surgery and hormone therapy
- Gavin initially was allowed to use to the boys' restroom and locker room
- Then, the school board banned Gavin from the boy's facilities and forced him to use a private restroom for the remainder of his education
  - This led to health complications, both mental and physical
- His old high school refused to issue a transcript with the correct name and gender

**Result in 2021-**

- 1.3 Million dollars in legal fees paid
- Issued a transcript with the correct gender identity



**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Dignity Health v. Minton

## Charge in 2016-

- Evan Minton is a man from California.
- He was scheduled to receive routine surgery from his local hospital
- However, two days before his scheduled surgery, he disclosed the fact that his gender identity to the surgical team.
- His surgery was cancelled as a result of his gender identity
- This resulted in him having to go to another hospital to get his surgery

## Result in 2017-

- California Supreme Court affirms under their version of CADA that public establishments cannot discriminate on the basis of Gender Identity

https://www.aclu.org/cases/dignity-health-v-minton

CCRD002234

597



# COLORADO
## Department of Regulatory Agencies
Colorado Civil Rights Division

# Fry v. Napoleon Community Schools

**Charge in 2009-**

- Ehlena Fry has cerebral palsy which led her pediatrician to recommend her a service dog.
- The dog, named Wonder, assisted her with various tasks such as: opening doors, picking up items, helping her balance while going from her walker to the toilet and turning on lights
- The local school board refused to let her on school property
- They claimed that by assigning her an aide, this made Wonder the service dog unnecessary.
- The school mocked the claims that having a service dog was a reasonable accommodation.
- She had to switch schools as a result.

**Result in 2017-** After a lower court dismissed the claim, stating that they had no exhausted all possibilities necessary for the process, SCOTUS ruled in favor of her rights to her dog

Source:https://www.aclu.org/news/disability-rights/ehlena-and-wonder-service-dogs-incredible



**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division



## Anderson v. Pass Christian Isles Golf Club

**Charge in 1972-**

- Four Black men from Jackson, MS purchased a Golfers Holiday tour including rounds of golf at Pass Christian Isles GC.
- They were denied access due to them being Black, since according the the Golf Club's policy that Blacks were not allowed.
- They sought relief from the courts in response to this treatment.

**Result in 1974-**

- Overturning of lower court's decision
- Compensatory Damages
- Specific Declaratory Relief
- A court order was issued preventing this from happening again
- Awarding of attorneys' fees

Source:https://casetext.com/case/anderson-v-pass-christian-isles-golf-club

CCRD002236



# COLORADO

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Remedies Available
## *(Settlement)*

- Cease and Desist from discriminatory practices
- Compensatory Damages
- Monetary and/or Non-Monetary - "pain and suffering"
- Punitive Damages
- Attorney Fees
- Affirmative requirements to overcome a discriminatory practice
    - Policy and procedure modifications
    - Education and training of management and staff

CCRD002237

**600**



# COLORADO
## Department of Regulatory Agencies
Colorado Civil Rights Division



image courtesy of YARDI MATRIX

## Thank you!

## Questions?

1560 Broadway, Suite 825
Denver, CO  80202
Phone: 303-894-2997
Website:  ccrd.colorado.gov
E-mail: richard.forney@state.co.us

Was this training part of a settlement agreement?
Trainee must email certificate: DORA_CCRDcompliance@state.co.us and reference case number.

CCRD002238





**Sexual Orientation, Gender Identity and Gender Expression Discrimination**

CCRD002689
602



# DISCLAIMERS

This presentation is intended to provide the attendees with a **broad overview** of anti-discrimination laws in Colorado.

This webinar is not intended to be used as legal advice or directives.

The Division cannot and will not offer any official opinion on actual or hypothetical scenarios.

Determinations on allegations are issued only after a full investigation of a duly filed charge.

OCRD002690
603





# What is Sexual Orientation?

○ A person's identity in relation to the gender or genders to which they are sexually attracted such as: heterosexual, homosexual, bisexual, etc.

CCRD002691
604

**Gender Identity**

# What is Gender Identity?

○ An individual's personal sense of having a particular gender such as: cis/trans man, cis/trans woman, non-binary, and two spirit.

CCRD002692
605





# What is Gender Expression?

○ The way in which a person expresses their gender identity, typically through their appearance, dress, and behavior such as wearing traditionally masculine or feminine clothes

CCRD002693

606





CCRD002694
607

 

COLORADO

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Sexual Orientation, Gender Identity and Gender Expression Discrimination in Employment

CCRD002695
608



# Employment Discrimination

Employment discrimination occurs when an employer subjects an employee or a job applicant to **disparate, unfavorable treatment** because of that individual's "protected class."

An employer may not base decisions on an employee or applicant's protected class(es).

CCRD002696

609



## CADA
### *Employer Obligations*

It is a discriminatory practice for any person, whether or not an employer, an employment agency or a labor organization, to:

- aid, abet, incite, compel or coerce a discriminatory employment act;
- obstruct or prevent any person from complying with the provisions of the Act;
- or attempt, either directly or indirectly, to commit an act defined as discriminatory.

### Employers are obligated to:

- Maintain a workplace that free from unlawful discrimination, harassment and/or retaliation;
- ***Engage in an interactive process*** when a request for a religious, pregnancy or disability accommodation is made by a qualified employee/applicant;
- **Promptly investigate complaints of discrimination, harassment and retaliation**;
- Where discrimination, harassment and/or retaliation may have occurred, **take prompt and appropriate remedial action** (i.e., discipline commensurate with the offense).

CCRD002697

# Discriminatory or Unfair Employment Practices

- Failure/Refusal to Accommodate an individual the right of using gender segregated facilities according to their gender identity/expression
- Failure/Refusal to accommodate an individual during their transition
- Refuse to Hire
- **Discharge**
- Failure to Promote
- Demote
- Harass
- Unequally apply terms and conditions of employment - schedule, working conditions, etc.
- Unequally compensate - employees are permitted to inquire about, disclose, compare, or otherwise discuss employee wages.
- **Retaliation**
- Printing or circulating any statement, advertisement, or publication … that expresses, either directly or indirectly, any limitation, specification, or discrimination as to [protected classes].

C.R.S. § 24-34-402



CCRD002698

611

**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Sexual Orientation, Gender Identity and Gender Expression Discrimination in Housing

CCRD002699
612



## Housing Discrimination

*CADA; Title VIII, ADA, Section 504-RA*

Fair housing laws apply to **housing providers** (landlords), but also real estate brokers, mortgage lenders, homeowner associations, and others.

Housing discrimination occurs when a provider subjects a member of a protected class to **disparate, unfavorable treatment** because of that individual's "protected class."



# Exemptions to CADA

## Excluded from FHA "Housing" Definition

**Familial Status:** Single Family homes exempt if private individual owns no more than 3 single family homes.

**Housing for Older Persons:** Exempts housing only from Familial Status provision

CCRD002701

614

# Discriminatory or Unfair Housing Practices

- Refusal to rent/sell (make housing "unavailable")
- Misrepresent availability
- Apply unequal terms or conditions of sale or rental
- **Refusal to accommodate an individual's transition or gender identity/expression**
- **Not allowing an individual use of gender segregated facilities according to their gender identity/expression**
- Redlining
- Steering
- Intimidation, Threaten/Coerce (Harassment)
- Advertise with a discriminatory preference or limitation
- Retaliation



CCRD002702

615



# Discriminatory Advertising

"No same sex couples"

"Straight people only"

"No queers"

"Trans individuals not allowed"



**Rule of Thumb: Describe the property, not who you want to live there.**

CCRD002703

616

COLORADO
Department of
Regulatory Agencies
Colorado Civil Rights Division

# Sexual Orientation, Gender Identity and Gender Expression Discrimination in Places of Public Accommodation

CCRD002704
617



## Public Accommodations Discrimination

### C.R.S. § 24-34-601

A place of public accommodation cannot "refuse, withhold from, or deny to an individual.. the **full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations**," based on protected class.

Discrimination occurs when individual from a protected class is subject to to **disparate, unfavorable treatment** because of that individual's "protected class."

# Discriminatory or Unfair Practices in Public Accomodations



- Refusal of Service
- Refusal to Sell Goods
- Unequal Terms and Conditions
- Disparate Impact
- Disparate Treatment
- Segregating/Isolating
- **<u>Refusal to accommodate an individual's transition or gender identity/expression</u>**
- **<u>Not allowing an individual use of gender segregated facilities according to their gender identity/expression</u>**
- Printing or circulating any statement, advertisement, or publication … that expresses, either directly or indirectly, any limitation, specification, or discrimination as to [protected classes].

CCRD002706

619



# Public Accommodations Examples

## PUBLIC ACCOMMODATIONS

ARE ANY PLACE WE ARE WHEN NOT AT HOME, WORK OR SCHOOL.

*This includes, but is not limited to:*

| Medical Offices | Hotels | Theaters | Public Parks | Restaurants | Retail Stores & Malls | Public Transit |

Also includes hospitals, schools, libraries, museums, etc.

CCRD002797

620



Colorado Department of Regulatory Agencies
Colorado Civil Rights Division

# Public Accommodations Exemptions

- Church

- Synagogue

- Mosque

- Any other place that is "principally used for religious purposes."

- Private Clubs





CCRD002798

621



**COLORADO**

Department of
Regulatory Agencies

Colorado Civil Rights Division

# Gender Identity and Gender Expression

## Equal Restroom Access



STUDENT GENDER NEUTRAL BATHROOM
ANYONE CAN USE THIS RESTROOM, REGARDLESS OF GENDER IDENTITY OR EXPRESSION

- All covered entities shall allow individuals the use of gender-segregated facilities that are consistent with their gender identity. Gender-segregated facilities include, but are not limited to, *restrooms, locker rooms, dressing rooms, and dormitories.*

- Not all facilities are gender segregated, there are often "unisex," "family restrooms" and "gender neutral" restrooms that are available for use by any sex; often these sorts of restrooms are restricted to the use of one person and/or one family at a time.

CCRD002799

622






CCRD002710
623



# EEOC v. APPLEBEE'S

**Charge (2021)** According to the EEOC's lawsuit, two members of the restaurant's staff verbally abused a black employee by the use of anti-gay and racist slurs on a consistent basis. One of the harassers wore confederate flag apparel on days that the employee worked. The employee's hours were cut and then the employee quit in response.

## Result (2022)

$100,000 Dollars in monetary relief

Specialized training for HR and Management around Sexual Orientation discrimination

Appointment of an internal consent decree monitor

CCRD002711

624

Source: https://www.eeoc.gov/newsroom/applebees-pay-100000-settle-eeoc-lawsuit-over-sexual-orientation-and-race-discrimination

# Recent Cases

## Lusardi v Department of the Army

**Charge (2013)** The soldier requested to use a bathroom according to her gender identity and have people use she/her pronouns with her. The higher ranking officers refused to let her use the women's facilities, and one team leader used male pronouns repeatedly to the soldier directly.

### Result (2015)

Immediate access to the common women's areas

Immediate cessation of using male pronouns and titles

Mandatory training on gender identity

Source: https://www.eeoc.gov/sites/default/files/migrated_files/decisions/0120133395.txt

CCRD002712
625

# Recent Cases

## Felix R. v NASA

**Charge (2019)** Employee was subjected to repeated slurs regarding his sexual orientation. The employee was mocked repeatedly by his supervisor to the point that a hostile work environment was created. Comments were leveled against employee and the larger gay community altogether.

### Result (2021)

Employee will no longer work in a chain with former supervisor

Mandatory training on sexual orientation issues

CCRD002713
626

Source: https://www.eeoc.gov/sites/default/files/decisions/2021_11_30/2019002240%20DEC.pdf



# Recent Cases

## Lynne E. v Department of Veterans Affairs

**Charge (2015)** Employee was subjected to a hostile work environment. Multiple co-workers and supervisors made statements like the community was not ready for someone with her sexual orientation. Her supervisor's reaction to hearing the news that they hired a gay employee was to say, "Oh my gosh, I hired a gay employee"

### Result (2016)

Employee will be restored leave lost due to issues or be allowed to transfer to another location

Mandatory training on sexual orientation issues

CCRD002714

627

Source: https://www.eeoc.gov/sites/default/files/decisions/2021_08_31/0120170202.pdf

**COLORADO**
**Department of Regulatory Agencies**
Colorado Civil Rights Division

## Recent Cases

## Sis-Bro, Inc. v EEOC

<u>Charge (2024)</u> In 2018 a high performing employee began transitioning to her female gender identity while working at Sis-Bro, Inc. One of the co-owners of the company immediately began engaging in constant harassment of the employee based on her gender identity. She also was not accommodated for her transition, and harassed for using company health insurance and leave for this process. In 2020, a new male employee was hired. This new employee engaged in constant sexual harassment of the trans employee. This was often in view of other employees. At least one other employee reported the harassment. Both of the above behaviors continued until the employee in question was forced to quit her job.

Source: https://www.eeoc.gov/newsroom/eeoc-sues-sis-bro-inc-gender-identity-discrimination-and-harassment

CCRD002715

628

COLORADO

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Recent Cases

## Gavin G v Gloucester County School Board

**Charge (2015)** Gavin Grimm began transitioning to his male gender identity. He lived in a mostly rural area east of Richmond, VA. He had chest reconstruction surgery and hormone therapy. At first, Gavin was allowed to use to the boys' restroom and locker room. Then, the school board banned Gavin from the boy's facilities and forced him to use a private restroom for the remainder of his education. This led to health complications, both mental and physical. His old high school refused to issue a transcript with the correct name and gender.

### Result (2021)

1.3 Million dollars in legal fees

Issued a correct transcript

Source:https://apnews.com/article/education-lawsuits-us-supreme-court-school-boards-d4bcef5873b85e020ecc1de39884e448

CCRD002716

629




# Ways to File

## 1. Online(Preferred)



## 2. Telephone
303-894-2997

## 3. In Person

## 1560 Broadway, Suite 100 Denver, CO  80202



CCRD009717
630

**COLORADO**
Department of
Regulatory Agencies
Colorado Civil Rights Division

## Time to File

### Fair Housing

CCRD
Filing: **1 year**
Determination Goal:
**100 days**

HUD
Filing: **1 year**
Determination Goal:
**100 days**

### Employment

CCRD
Filing: **300 days**
Determination Goal:
**1 year**

EEOC
Filing: **300 days**
Determination Goal:
**N/A**

### Public Accommodations

CCRD
Filing: **60 days**
Determination Goal:
**270 days**

CCRD002718

631



COLORADO
Department of
Regulatory Agencies
Colorado Civil Rights Division



# Remedies Available
## *(Settlement)*

- Cease and Desist from discriminatory practices
- Compensatory Damages
- "Pain and suffering"
- Punitive Damages
- Attorney Fees
- Affirmative requirements to overcome a discriminatory practice
  - Policy and procedure modifications
  - Education and training of management and staff

CCRD002719

632



**COLORADO**
Department of
Regulatory Agencies
Colorado Civil Rights Division



Thank you!

Questions?

1560 Broadway, Suite 825
Denver, CO  80202
Phone: 303-894-2997
Website:  ccrd.colorado.gov
E-mail: richard.forney@state.co.us

CCRD002720
633

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

_____

REMOTE DEPOSITION OF ILAN MEYER, Ph.D.

January 30, 2026

_____

| | |
|---|---|
| Plaintiffs:<br><br>DEFENDING EDUCATION,<br>et al.,<br><br>v.<br><br>Defendants:<br><br>AUBREY C. SULLIVAN, in<br>her official capacity as<br>the Director of the<br>Colorado Civil Rights<br>Division, et al.,<br><br>Plaintiff:<br><br>COMMITTEE OF FIVE, INC.,<br>d/b/a XX-XY ATHLETICS,<br><br>v.<br><br>Defendants:<br><br>AUBREY C. SULLIVAN, in<br>her official capacity as<br>the Director of the<br>Colorado Civil Rights<br>Division, et al., | Case No.<br>1-25-cv-01572-RMR-MDB<br><br><br><br><br><br><br><br>Case No.<br>1:25-cv-01668-RMR-MDB |

_____

**634**

letters "Methodology."  Let me know when you're there.

A.    Yes.

Q.    Okay.  So in paragraph 9 you state, "In this report, I rely on my reading and interpretation of current scientific peer-reviewed literature in different disciplines."

Did I read that correctly?

A.    Yes.

Q.    Is that an accurate statement of how you prepared this report?

A.    Yes.

Q.    Okay.  So outside of existing -- reviewing existing literature, you didn't do any independent research to prepare this report; is that right?

A.    That's correct.

Q.    You didn't conduct any new studies, correct?

A.    Correct, although I should say -- I'm sorry -- some of the research that I relied on is research I had conducted, but I didn't conduct any new research for this purpose.

Q.    You didn't conduct any new interviews with anyone, correct?

A.    No.

Q.   You didn't otherwise independently gather other data to prepare this report aside from what you prepared in the articles you cite here?

A.   Right.

Q.   Your conclusions in this report do not rely on any clinical experience, correct?

A.   Correct.

Q.   Do you know how many pieces of literature you consulted to prepare this report?

A.   Yeah.  Can I add something on the clinical side?

Q.   Sure.

A.   I'm not a clinician, but my training, as I mentioned before, I should have said, was in psychiatric epidemiology, which is the epidemiology of mental disorders.  So I do have familiarity from a research perspective on psychiatric disorders and was trained in that field, just to be clear on that.

I think there are something like 30 maybe sources.  There are 36 citations, but some of them repeat.  So honestly, I didn't count them, but there's 36 footnotes, but there might be around the same number of sources.

Q.   Is all of the literature that you reviewed cited in the footnotes in the article in your report?

are kind of leading journals.  Like in my field of

public health, the American Journal of Public Health

is a prestigious journal to publishing, so -- but

again, that doesn't mean that other journals that are

not in the regular public health are not good or not

citable.  It's very rare that I would say a journal

is something I would not rely on.  So that comment

was -- really would apply to rare cases where I would

feel what I would make this assessment.

Q.    Can you give me an example of a journal

that you would consider insufficiently prestigious to

finding that, as you would, insufficiently

prestigious to include in the literature you

reviewed?

A.    Yeah.  Everything here is debatable and

controversial.  There's a group of journalists on the

Frontier, such as Frontier in Psychology, that -- and

even within that some of them might be better than

others, but some of them are very easy publications,

let's put it this way.  You send the article.  You

barely get any comments.

A normal article, when you submit an

article, it takes months to review.  You get

extensive reviews from reviewers and the editor, and

then you revise and send it back, so this process is

often averted in some Frontier publication, just as an example.

And I would be a little hesitant, but it doesn't mean that I would wholesale ban looking at the Frontier's article either.

Q.   Right.

A.   Authors may have done a good job and sent it there, and I would definitely look at it.  So there's no fast rule in that.  I was just mentioning that as one aspect.

Q.   Were there any articles or other pieces of literature that you considered including in the report but did not include because they were in a journal that you didn't consider prestigious enough?

A.   No.

Q.   Okay.  When you prepared this report, did you consult any pieces of literature that found no association between microaggressions and negative health outcomes for transgender people?

MS. FISCHER:  Objection; form.

A.   Some of the articles I cited found relationships that were not -- some of the relationships were not confirmed by the articles I cited, whereas some others were.

So I did not have -- I did not see an

638

article that concluded there is no relationship and I would therefore exclude it, if that's what you're asking.  But some of the articles that I did cite have some aspects of what they looked at that was not confirmed, that was negative, as you say.

Q.    (BY MR. DRAPER)  Can you tell us which articles those were?

A.    I would have to look at them again, but --

Q.    If you need to take a minute to look at the report again, that's perfectly fine.

A.    I mean, I wouldn't be surprised if every article had some elements that are not confirmed because that's very typical in research, so when they conclude something is based on the kind of overarching finding, so specific aspects of what they looked at, for example, in -- I want to say maybe if we look at page -- if I use my page numbers, I don't have the page numbers.

Q.    That's fine.  If you want to refer to the paragraph --

A.    Paragraph 33 reports on review of other articles.  Some of them did and some of them didn't find the specific relationships, so -- but I would say that is very typical in every research.  You don't find every single association to be

significant.  You look at the tendency -- overall tendency of the results.

Q.    Are you referring to the Kimber review?

A.    Yes.

Q.    Okay.  But did any of the articles that you cite in the footnotes in your report -- did any of them reach the overall conclusion that there's no association between microaggressions --

A.    No.

Q.    -- and negative health outcomes?  Okay. Okay.  If you could turn to page -- the bolded numbers, page 222 of your report.  It is --

A.    Do you have the paragraph number?

Q.    Paragraph 12.

A.    Okay.  Yeah, I'm here.

Q.    Okay.  So on that page in bolded font it reads -- and I'll read it -- "Transgender people are a stigmatized group subject to discrimination and violence."

Did I read that correctly?

A.    Yes.

Q.    Okay.  And then a few pages later just above paragraph 14, there's bolded wording reading, "Stigma against transgender people leads to excess stress and related adverse health outcomes."

Did I read that correctly?

A.    Yes.

Q.    And those are your conclusions when you prepared this report?

A.    Yes.

Q.    And you believe those conclusions are accurate still today?

A.    I do.

Q.    Okay.  What you call "stigma" here, does that include misgendering and deadnaming?

A.    That -- well, stigma is a broader concept, but deadnaming and misgendering can lead to -- some of the articles -- one of the articles showed it leads to the person feeling stigmatized.  But in terms of what stigma is, it is an overall devaluation of a category of people.

So deadnaming and misgendering would be an outcome of that, I would say.  It's a social attitude that may lead some people to that expression of stigma.

Q.    To make sure I understand you, misgendering and deadnaming can lead to stigma, correct?

A.    No.  Let me say it again.  So stigma is the overall social phenomenon, and certain

interpersonal behaviors that we're talking here now can stem from that.

So people learn about stigma or socialized, stigmatized attitudes, and that could be expressed as deadnaming and misgendering.

Q.    Understood.  And just to make sure we're on the same page, you're familiar, presumably, with the term "misgendering"?

A.    Yes.

Q.    How would you define that term?

A.    Referring to the person's gender that is different from their gender identity and preferred way of being addressed.

Q.    So if someone identified as a male, but I refer to them using female pronouns, that would be an act of misgendering, correct?

A.    Correct.

Q.    And I assume you're familiar with the term "deadnaming," correct?

A.    Yes.

Q.    How would you define that term?

A.    Similarly, somebody uses a name that is not the preferred name that the person uses in their interactions with people.  That would be using a name typically that was assigned to the person before

**642**

their transition.

Q.    Okay.  So if an individual used to identify as male and go by the name "John," now identifies as female and goes by the name "Jane," but if I were to refer to them as "John," that would be an act of deadnaming, correct?

A.    Yes.  Let me just add to this that we're assuming they're intentional rather than mistaken or accidental use of those, both the misgendering and the deadnaming.

So, for example, I can imagine a situation where this Jane had a document and not mentioned her name, and somebody reading the document would use that name and then maybe correct it.  So it's really an intentional act usually that we think of.

Q.    Okay.  But when people use the term "misgendering" or "deadnaming," that can include accidental misgendering or deadnaming, correct?

MS. FISCHER:  Objection; form.

A.    It could, yes.

Q.    (BY MR. DRAPER)  Okay.  Based on your research, how do transgender people typically react when they are misgendered or deadnamed?

A.    Misgendering or deadnaming is really a message, as we established earlier, that is

**643**

associated with stigma towards people.  And as I said, stigma is a devaluation of the person's worth.

So it is an insult to their sense of identity, and they will typically react with feeling hurt, feeling stigmatized, feeling upset, I would imagine, as well as several consequences that are laid out in the report.

Q.   I want to make sure I'm not talking -- are you finished with that answer?

A.   Yes.

Q.   Okay.  In your view, is that reaction reasonable?

A.   Yes.

Q.   When transgender people are misgendered or deadnamed, can that lead them to experience stress?

A.   Yes.

Q.   Can you explain why they experience that?

A.   Yes.  So our definition of stress is the experience of social stress.  There are many different kinds of stress.  Some of them are large events like losing a job.  Some of them are more what we used to call "minor" or people call "microaggressions," which is kind of what we're talking about today.

And the experience of stress has to do

with the context of the comment, and that's why I said that it has to do with the devaluation of the person and the devaluation of their identity.

We sometimes call it an "identity threat" where your sense of yourself is not being respected and accepted to some extent by others, whether it's family, strangers, or even institutions in the case of, for example, travel documents or driver's licenses, things like that.  They are also part of the same experience of not having your sense of yourself validated and respected by society, I would say.

Q.    Okay.  Would you say that transgender people are likely to feel offended if they are intentionally misgendered or deadnamed?

A.    I would think so.  Of course, I can't predict any particular individual's response.  It would be varied, but I would think it would be offensive, yeah.

Q.    In the research that you reviewed either to prepare this report or in your career otherwise, would you say that research indicates that people -- transgender people feel offense when they are misgendered or deadnamed?

A.    I don't know the measured offense

specifically, but the answer is, yes, in that what I read from that in particular when they describe the feeling of being stigmatized and, of course, some of the impact of those experiences, those microaggressions, like it's called.

Q. So when transgender people are misgendered or deadnamed, do they interpret that as the person doing the misgendering or deadnaming denying their identity?

MS. FISCHER: Objection; form.

A. I think -- again, I don't know if they go through this specific type of analysis. What I'm saying is that its meaning -- the meaning of this behavior, of this interpersonal behavior is off -- treating with disrespect, lack of dignity.

So I think offended -- I don't know how they -- you know, that's a very specific thing. I mean, in general, they do feel, as I said, mistreated, disrespected. In some ways it's an assault on their sense of self -- self-identity. So I think offended might be one of the reactions they experience.

Q. (BY MR. DRAPER) Based on the research that you've seen, when transgender people are misgendered or deadnamed, do they tend to perceive

that as harmful?

A.    They -- research shows that it is harmful. Whether they perceive it as harmful, I would -- I don't know specifically, like, whether it was perceived as harmful or perceived, as we said, as disrespectful, I would say.  And the research has shown the harmful impact of that by looking at associations.

So I don't think I can answer specifically whether they perceived it as harmful, but it was harmful by the research results.

Q.    Looking at some of the research that you're referring to, do they -- how do they measure -- how do they measure the fact that the act of misgendering or deadnaming is harmful?

A.    Well, these are all correlational studies, I believe, without exception.  Some studies were qualitative.  So they did ask people's sense of experience, but in most quantitative studies, you ask a series of questions.  And some of them assess things -- in this example that you ask some of them would assess misgendering, and have you ever experienced this, or have you experienced this in the past day or the past week?  There are a variety of ways of doing this.  And the same thing for

**647**

deadnaming.

And they also ask separately a number of questions that assess, let's say, mental health outcomes like suicidality, depression, anxiety symptoms, things like that, and the research correlates between the two.

So it's not the person said, Because I was deadnamed, I feel depressed; but the research finds that the relationship between people who have experienced, let's say deadnaming, are more likely to also report depressive symptoms, for example.  So that's the kind of association that the research describe.

Q.    Understood. Okay.  Let's move to paragraph 13 of the report, so in this paragraph -- and I'll read it -- you state, "Transgender people have historically experienced -- and continue to experience -- both de facto and de jure discrimination across several aspects of public and private life."

Did I read that correctly?

A.    Yes.

Q.    How do you define "de facto discrimination"?

A.    Well, that's the experiences that people

have in their day-to-day lives, whether it's from interpersonal relationships, from family, at school, at work.  It could take different forms.

When I say "discrimination," I should note in this report entirely and in my deposition today, I'm referring to discrimination the way social scientists refer to it rather than any legal definition of discrimination.

And the way we define discrimination and measure it is basically about discriminatory not in the legal sense -- differential, I would say, the way you are treated differentially, different from other people.

So we ask questions like -- one of the very often used measures that's called "everyday discrimination" ask, for example, Were you treated with less respect than other people?  And if you said yes, that's considered discriminatory.  But again, that's not obviously a legal definition of "discrimination," but a social, scientific one.

Q.    Okay.  Well, so I'll ask a similar question.  Can you define how you're using the term "de jure discrimination" here?

A.    So these are discrimination that is written into law and has been practiced through laws

*AB Litigation Services*

and maybe policies.  For example, there's a long history of -- there was a history of criminalizing cross-dressing in the United States where people were arrested for wearing clothes that were not fitting their sex assignment at birth, as we call it.  So a transgender woman who wears a dress would be arrested for cross-dressing.

Other laws barred people who are transgender from service, for example, in the military; and even now there's laws that bar them from obtaining a passport that matches their gender presentation, which is contested in several lawsuits.

So those are the kind of things that are -- we assess discriminatory that are written in the law or were in the past written into laws.

Q.   Okay.  Moving back to paragraph 14, here you state that, "LGBT people are" -- and I quote -- "at risk for excess exposure to stress and related adverse outcomes."

Did I read that correctly?  That was the very last sentence.

A.   Oh, the last sentence.

Q.   Sorry, apologies.

A.   The last sentence of paragraph 14?

Q.   The last sentence states that, "LGBT

mentioned, between a major life event, such as losing a job or losing a loved one, and other types of stresses.  Just a range of stressors that I can explain more about, but deadnaming and misgendering would be among those sometimes referred to as microaggressions or, you know, smaller events; the daily events, sometimes they're called.

Q.    Okay.  Did any of the sources that you cite in the footnotes for this paragraph specifically evaluate the negative effect, if any, that misgendering and deadnaming have on transgender people?

A.    No.

MS. FISCHER:  Objection; form.

A.    Sorry.  No, not this -- well, are you talking about paragraph 14?

Q.    (BY MR. DRAPER)  Yes, correct.

A.    So it doesn't specifically address deadnaming, although citation 10 does talk about workplace discrimination and harassment, and I have to be honest, I don't remember if they included it or not, but this paragraph was meant to provide an overall, somewhat introductory paragraph that I used that later explained.

Q.    So this paragraph is discussing the effect

**651**

of all forms of anti-LGBT stigma and prejudice?

A.    Yes.  Again, it's talking about LGBT, not specifically even transgender, so it includes more broader processes.

Q.    Understood.  Okay.  So I'd also like to understand -- and we discussed it a little bit, but I want to focus in on it -- what we mean by "excess stress."

A.    Yes.

Q.    So can you -- and apologies if you've already discussed this a little bit, but could you please explain to us what "excess stress" refers to?

A.    Yes.  I don't want to go into a lecture, but I will try to be brief.  First of all, the reason why it's important, excess stress, is because when we measure in epidemiology a risk factor for a disorder or a disease, it has to be in excess of other people for it to be a risk.

So an example for that is smoking. Smoking is a risk factor for cancer.  It's an excess risk to many other risks that people have, so the smokers compared to nonsmokers, we would look at the impact of that specific risk.

In a similar way here, we look at risk that is specific or unique to LGBT population or to

MS. FISCHER:  Yeah, that's fine.

MR. DRAPER:  Okay.  Great.

Q.    (BY MR. DRAPER)  So let's move down to paragraph 16.

A.    Yes.

Q.    One second.  So in this paragraph you're discussing the concept of societal and familial rejection, correct?

A.    Correct.

Q.    And you say that this societal and familial rejection can lead to adverse outcomes for transgender people, correct?

A.    Right.

Q.    Okay.  So another definition question: Could you tell us what you mean by "societal and familial rejection"?

A.    Yes.  Again, those are broad terms that can be expressed in different ways.  Societal -- well, I guess the difference is if it happens within the family or outside of the family in general in society.

So under societal, I would include any kind of interpersonal interactions in society, including public accommodations, school, work environment.

And obviously familial would be within the family.  Usually we look at relationships with parents or siblings and their regard to an LGBT person.  So that would be examples of familiar -- or not example, but this would be societal versus familial.

Q.    Okay.  So again, this could include -- societal and familial rejection could include a range of behaviors, correct?

A.    Yes.

MS. FISCHER:  Objection; form.

Q.    (BY MR. DRAPER)  Could it include, for example, a parent telling their child that they have to leave the household because they're transgender?

A.    Yes.

Q.    Okay.  The sources that you cite in this paragraph in the footnotes, did any of them evaluate the adverse outcomes that result from deadnaming and misgendering in particular?

A.    So the purpose of the citations are not specifically to explore this.  As I said before, those are general kind of introductory statements explaining and addressed more directly than they mean and misgendering later.

But I can tell you that for sure a copy of

this article may mention it, but I can't remember right now, but they're not here for that purpose. They're making a broader point about family rejection. And some of those articles may include reference to misgendering, but that's not what I was citing them for in this particular paragraph.

Q.    Okay.  So your conclusions in this paragraph are discussing the impact of societal and familial rejection generally, not just misgendering and deadnaming in particular?

A.    Yes.

Q.    In preparing this report and reaching the conclusions in this paragraph, did you investigate the difference between misgendering and deadnaming as opposed to other kinds of familial and societal rejection in terms of their impact on transgender people?

MS. FISCHER:  Objection; form.

A.    Not here, but as I said, towards the end of the report it focuses on those two aspects of rejection, but here I did not make those distinctions.

Q.    (BY MR. DRAPER)  Okay.  Let's move down to paragraph 19.  The second sentence in that paragraph reads, "Thus, research has shown that LGBT youth and

adults, when compared to their non-LGBT peers, are more susceptible to depression, anxiety, self-harm, substance use, and suicide attempts because of the minority stressors they face."

Did I read that correctly?

A.    Yes.

Q.    Can you tell me how you reached that conclusion?

A.    Well, this article -- this relies on comparison of transgender and non-transgender youth in people or looking at findings from transgender status and comparing them to standards established by large studies of the U.S. populations.

So we can see the group of -- it's a group.  LGBT people are, as I said here, more susceptible, meaning they have more -- higher prevalence of depression, anxiety, self-harm, substance use, and suicide attempts.  And the association with minority stressors -- again, there's a variety of them -- is true correlational data.

Q.    In reaching this conclusion, did you evaluate the effect that misgendering in particular as opposed to other stressors has a likelihood that an LGBT person will suffer one of these negative outcomes?

MS. FISCHER:  Objection; form.

A.    No, that is not specific to this -- to stressors.

Q.    (BY MR. DRAPER)  Okay.  So again, this paragraph is talking about stress generally, not stress particularly from misgendering or deadnaming?

A.    It is not specifically, but inclusive.  So it is -- there are different ways of measuring stress, as I said, so this is more of an overarching study, although misgendering is an important stressor especially with studies with transgender populations, but this paragraph and these citations are more general.

Definitely they mention misgendering, but that's not what is specifically referred to here in this paragraph.

Q.    So this paragraph is not claiming that misgendering or deadnaming in particular leads to a higher likelihood of self-harm among transgender people; do I have that right?

A.    Not per se in this particular paragraph, but it is later provided in -- I think we're probably going to get to the rest of it, but in this particular paragraph this is not specifically assessing the -- sorry.  It is not assessing the

**657**

specific role of misgendering and deadnaming.

Q.   Okay.  All right.  Now let's move down to paragraph 20.  In this paragraph you're discussing gender affirmation, and you say that gender affirmation -- I'm looking at the second sentence -- I'm sorry; I apologize.

Third sentence you say gender affirmation, "is an interpersonal, interactive process whereby a person receives social recognition and support for gender identity and expression."

Did I read that correctly?

A.   Right.

Q.   Can you give me an example of something that you would consider gender-affirming?

A.   Yeah.  So not misgendering, not deadnaming, but also, as I think I talk about in this paragraph or the next paragraph also, as I mentioned, documents are a very important way of affirming or not affirming gender.

So a transgender woman who has a driver's license or passport that shows her male name to indicate that she's male is a way of non-affirming, whereas a passport that shows the gender identity and name that the person uses is affirming.

Q.   Okay.  Let's move down to paragraph 22.

There in the first sentence you state that, "compared with people with lower gender-affirming experiences, transgender people with greater gender-affirming experiences fare better in terms of their mental health."

Did I read that correctly?

A.   Yes.

Q.   So kind of reflecting what we just discussed, when you say "gender-affirming experiences" here, this is referring to all kinds of gender-affirming experiences, not a particular kind of experience?

MS. FISCHER:  Objection; form.

A.   That's correct, but it's -- it includes gender-affirming in the form of deadnaming and pronouns used.

Q.   (BY MR. DRAPER)  So did any of the sources that you cite in this paragraph specifically evaluate the effect that the use of gender-affirming pronouns in everyday speech has on a person's mental health?

MS. FISCHER:  Objection; form.

A.   Yes.

Q.   (BY MR. DRAPER)  Which one?

A.   All of them.  They didn't necessarily isolate it separately, but -- and I have to refer to

the original here, but they all measure it.  So, for example, reference 28 is specifically looking at identity documents.  27 talks about experiences in different social and medical, like, interactions.

And the measure could be a little broader, but it basically refers to gender affirmation in general.  Gender deadnaming and pronouns are the two most significant types of affirmation within interpersonal interactions other than, as I said, documents and things like that.  So they're often tested and measured, but the articles measure them in different ways.

Q.   Did any of these sources cited in these footnotes for this paragraph look at the use of gender-affirming pronouns in everyday speech?

MS. FISCHER:  Objection; form.

A.   Yeah, I'm not sure what "everyday speech" means.

Q.   (BY MR. DRAPER)  So, for example, you know, in a conversation in a business that you happen to be in that day as opposed to, you know, on a person's ID or in a medical context, which might be more formal settings.

MS. FISCHER:  Objection; form.

A.   Can you repeat the question?  I'm sorry.

Q.    (BY MR. DRAPER)  Yeah.  I guess I'm just asking if any of the studies cited here evaluated the effect on transgender people's mental health of being misgendered or deadnamed in everyday conversation, so a conversation with a friend or a family member or a coworker as opposed to, you know, the one study here looks at identity documents.  Another one looks specifically in the medical context.

A.    Yes.  Well, the one that looks at the medical context, looks at other social contexts is, I would say, everyday experiences.  So I believe I referred to that in the other paragraph.

These are all -- the reason that I'm trying to be careful is that the way the studies measure gender affirmation is with a list of questions, maybe sometimes being one or two questions, sometimes more; and those would always include deadnaming or pronouns because those are the most pronounced ways of gender affirmation in interpersonal relationships.

So the answer is, yes, they do measure it, but they might measure it in different ways.  You know, each time he uses a somewhat different way to measure it.

Q.    Okay.  So we've already touched on it, but

paragraph 22 here refers to the study of personal identification documents matching someone's gender. This is in footnote 28, correct?

A.   Correct.

Q.   Okay.  I am going to place another document into the Zoom chat.  Okay.  It should be there.  Do you see it?

A.   Yeah.

Q.   Could you please open that and let me know when you have it open?

A.   Yes.

Q.   Okay.  Is this the study about gender-affirming ID's that we've been referring to? You can take a minute to look at it if you'd like.

A.   It's opening.  Sorry.

MS. FISCHER:  Take your time, Dr. Meyer, if you need a minute to look at the whole thing.

A.   Yes, that's the study.

MR. DRAPER:  Okay.  I'm going to enter this as Exhibit B, I believe we're on.

(Deposition Exhibit B was marked for identification.)

Q.   (BY MR. DRAPER)  Okay.  So looking back at paragraph 22 of your declaration, you say that this study found that transgender people who had an ID --

and I'm paraphrasing here -- who had an ID that matched their gender identity had a lower prevalence of psychological distress and suicidal ideation compared to transgender people whose ID did not match their gender identity.

Did I accurately summarize your description there?

A.   Yes.

Q.   And when we say, "the ID matches their gender identity," I'm assuming that means that the ID listed the individual's chosen name, even if it was different from their name assigned at birth, and listed their gender identity as opposed to their sex assigned at birth, correct?

A.   Yes.  To be more precise, we look at the measure, but that's what it refers to.

Q.   Okay.  So this study in particular only focused on the role of gender-affirming identification documents, correct?

A.   Correct.

Q.   It did not evaluate the effect that any other kind of gender-affirming or non-gender-affirming behavior has on transgender people, correct?

A.   Right.

Q.    So it did not evaluate the effect of being verbally misgendered or deadnamed, correct?

A.    Correct.

Q.    And it did not evaluate the effect of being misgendered or deadnamed in written form other than on a personal ID, correct?

A.    Correct.

Q.    And this study did not study the effect of a single instance of misgendering or deadnaming as opposed to persistent misgendering or deadnaming, correct?

A.    Correct.  I mean, it doesn't differentiate.  It just asked whether the document is concordant.  It doesn't specifically talk about the exposure of anybody to those documents.

Q.    So again, in paragraph 22 you state that having -- of your declaration, you state that having an ID that matched their gender identity was associated with, quote, less suicidal ideation.  Do I have that right?

A.    Yes.

Q.    Okay.  So let's turn back to the study, the Scheim study, and turn to page e199.  The page number should be in the bottom corners.

A.    I need to fix my view here.

Q.   Oh, take your time.  I believe it's the fourth page of the --

A.   Yeah, it kept skipping.  Page 199, yes.

Q.   Yep.  So I'm looking at the paragraph right under the bolded words "Statistical analysis."

A.   Uh-huh.

Q.   And I'm going to read that first sentence. "We examined associations between respondents' IDs reflecting their preferred name and gender, and psychological distress and past-year suicide ideation, planning, and attempts."

Did I read that correctly?

A.   I'm sorry.  Is it the paragraph above "Statistical analysis"?

Q.   The paragraph right under "Statistical analysis."  It starts, "We examined."

A.   Oh, sorry.  We examined, yes.

Q.   So I'll read that again.  It says, "We examined associations between respondents' IDs reflecting their preferred name and gender and psychological distress and past-year suicide ideation, planning, and attempts."

Did I read that correctly?

A.   Yes.

Q.   So this study looked not just at suicidal

ideation and planning, but actual suicidal attempts, correct?

A.    Yes.

Q.    And then please turn to page 202.

A.    Yes.

Q.    So about halfway down the first paragraph there, there's a sentence that reads, "Gender-concordant ID status was not associated with suicide attempts."

Do you see that?

A.    Yes.

Q.    Did I read that correctly?

A.    Yes.

Q.    Okay.  So just to make sure I understand the study correctly, in this study's findings, having a gender-affirming ID correlated to the likelihood of suicide ideation but not to the likelihood of actual suicide attempts.

Do I understand that correctly?

A.    I need to refer to it again.  Sorry.

Q.    Take your time.

A.    Okay.  So if you look at page e201 in the middle column -- in the left column in the middle paragraph, if I may read it to you:  "Respondents with all or some concordant IDs were significantly

Q.   (BY MR. DRAPER)  Okay.  Looking back at your declaration, we're going to go back to paragraph 22 there.  At the very end of that paragraph, you say that this study indicates, quote, a protective health effect of gender affirmation.

Did I read that correctly?

A.   Correct.

Q.   Okay.  Can you explain what you mean by that?

A.   Well, it's kind of the opposite of what we just said, so we call it a "protective health effect" if what they found was having those documents did not lead to those outcomes like depression, anxiety symptoms, and the suicidality items.  So that's why we call it a "protective effect."

Q.   Okay.  So is a -- let's go back to the study, back to page 202 of the study, and this time I'm going to look in the right column in the second to last paragraph that starts with, "Our findings." You can let me know when you're there.

A.   Yes.

Q.   Okay.  So that sentence there -- that first sentence of that paragraph reads, "Our findings have various limitations, particularly the cross-sectional study design, which precludes causal

interpretations."

Did I read that correctly?

A.    Yes.

Q.    So is this study making any conclusions about the causal effect of having a gender-affirming ID?

A.    Can you ask the question again?

Q.    Yeah.  This study did not conclude that having a gender-affirming ID causes somebody to have better mental health outcomes, correct?

A.    That is correct in part.  When we discuss causality, we infer it from causal association. That's not ever a perfect assessment of causality, but it is often the only way that we can assess it.

So in that sense, I agree with their pointing out this limitation because it didn't test causal relationship as you would.  We would need a clinical trial for that.  That cannot happen.

So we use associations to infer about causal relationships based on a variety of other elements in the study, and in this case, I believe that it does indicate a protective health effect because of the associations they found.  But it is also true to say they did not prove causal associations.

Q.    Okay.  I'm going to read the very next sentence in that paragraph.  It says, "It is possible that psychological distress and suicidality preceded the exposure; in particular, psychological distress could make it more difficult to obtain gender-concordant IDs."

Did I read that correctly?

A.    Yes.

Q.    Okay.  Let's turn back to your declaration, paragraph 25 this time.

A.    I'm sorry.  Can you repeat this?

Q.    If you can turn back to your declaration, back to your report --

A.    Yes.

Q.    -- back to paragraph 25 this time.

A.    Yes.

Q.    This paragraph is discussing a study about the prevalence of gender identity discrimination in Massachusetts, correct?

A.    Correct.

Q.    And this is referring to the 2015 Reisner study in footnote 29, correct?

A.    Yes.

Q.    Okay.  I'm going to place that document into the Zoom chat.  All right.  It should be there.

Open it if you can.

A.    I'm downloading it.  Yes, I got it.

Q.    Okay.  You can take as long as you need to look at it, but is this the study that you're referring to in that footnote?

A.    Yes.

MR. DRAPER:  I'm going to mark this as Exhibit C, I believe we're on.

(Deposition Exhibit C was marked for identification.)

Q.    (BY MR. DRAPER)  This study was a survey of transgender individuals in Massachusetts, correct?

A.    Yes.

Q.    And what year was the survey administered?

A.    2013.

Q.    Okay.  And this survey asks respondents if they had experienced discrimination in a place of public accommodation in Massachusetts within the past year.  Do I have that correct?

A.    Yes.

Q.    Could you please turn to page 490 of the article?

A.    Yes.

Q.    And then I want to look at the second paragraph.  The second sentence of that paragraph

reads, "Respondents were asked:  Based on your transgender or gender-nonconforming status, please --

A.    Wait.  I'm sorry.  Are we looking at page 489?

Q.    I have it on page 490, I'm looking at.

A.    Oh, sorry, sorry.

Q.    Sorry if I misspoke.  I meant page 490.

A.    Okay.  And which paragraph?

Q.    And then we're in the second paragraph under "Measures."

A.    Yes.

Q.    Okay.  So this paragraph is describing how they conducted the evaluation, and the second sentence of the paragraph, starting there, it reads, "Respondents were asked:  Based on your transgender" status -- or "based on your transgender or nonconforming status, please check whether you have experienced any of the following by a staff member or stranger in at least one of these public spaces in the past 12 months.  Respondents were considered to have experienced discrimination when they marked 'yes' to one or both of the following questions on specific types of public places.  I did not receive fair treatment or service, or I was verbally harassed or disrespected?"

I know that was a lot, but did I read that correctly?

A.    Yes, that's correct.

Q.    So when the article states that 65 percent of transgender adults experienced public accommodation discrimination in the previous year, that includes both those who were denied fair treatment or service and those who were verbally harassed or disrespected; do I have that right?  You can take the time to look at it.

A.    Yeah.  I'm sorry.  I just wanted to verify.

Q.    Go ahead.

A.    I believe you're right, but I'm just trying to -- yes, one or both, yeah.

Q.    Okay.  Does this article tell us what portion of that 65 percent falls into each of those categories:  Those who were denied fair treatment versus those who were verbally harassed or discriminated?

A.    I have to look for that in the results section.

Q.    Take your time.

A.    I don't see that they separated it.

Q.    Does the article define the term "fair

treatment or service"?

A.    They were -- that's the way the people were asked to answer that, what they felt was fair treatment.

Q.    Okay.  So the term was open to the respondents' interpretation?

A.    Yes.

MS. FISCHER:  Objection; form.

Q.    (BY MR. DRAPER)  And same for the term "verbal harassment and disrespect," was that left to the respondents' interpretation?

MS. FISCHER:  Objection; form.

A.    Yes.

Q.    (BY MR. DRAPER)  Okay.  Does this article specify how many, if any, of the survey respondents reported experiencing discrimination because they were referred to with terms other than their chosen name or preferred pronouns?

A.    They don't specifically ask it that way, but they -- as you already indicated, they asked specifically related to transgender and gender-nonconforming status whether they were disrespected or did not receive fair treatment. Misgendering is the most common way that that would happen, so -- but they didn't specify -- they didn't

isolate that.

Q.   Okay.  So verbal harassment or discrimination -- I'm sorry.  Verbal harassment or disrespect, that could include things other than misgendering or deadnaming, correct?

A.   Yes.

Q.   Okay.  Looking back at your declaration back on paragraph 25, in the last two sentences of that paragraph you state, "That discrimination" -- referring to the discrimination in this article -- "was associated with a greater risk of adverse emotional and physical symptoms, including emotional symptoms for the past 30 days, a positive screen for clinical depression in the past 7 days, negative physical symptoms in the past 30 days, and a gastrointestinal diagnosis.  Significantly, each additional site of public accommodation discrimination experienced by the person was associated" -- I'm assuming there's supposed to be a "with" there -- "was associated with an increase of risk for adverse outcomes."

Did I read all that correctly?

A.   Yes.

Q.   So in evaluating this effect, in evaluating the association between experiencing

discrimination and having adverse health outcomes, did this study distinguish between those who indicated that they were denied fair treatment or service and those who indicated that they were verbally harassed or disrespected?

A.    No.

MR. DRAPER:  If it works for you, Dr. Meyer and Janna, now might be a good time -- I'm maybe going to move on to another set of questions. Now might be a good time to take a five- or ten-minute break if it works.  Would that be all right?

THE DEPONENT:  Okay.

MS. FISCHER:  That's fine with me if it's fine with Dr. Meyer.

THE DEPONENT:  Yeah, I'm okay with that.

MR. DRAPER:  You want to take maybe ten minutes?  Come back at 12:40?  I'm sorry, 12:40 Eastern time.

THE DEPONENT:  Yeah, yeah.

(Break was taken from 10:32 a.m. to 10:42 a.m.)

MS. KRAEMER:  Paul, I'm sorry.  This is Talia.  Can I just cut in real fast?

MR. DRAPER:  Sure.

cite in your report?

A.    Yes.

Q.    Okay.  Are you aware of any other scoping reviews focusing on this topic?

A.    I'm not.

Q.    Okay.  Let's look at page 128 of the study.  You'll see it's a table of the different studies that were included in the review.

A.    Yes.

Q.    Okay.  Can you tell us how many studies were included in the review?

A.    Then?  They had 12 studies.

Q.    Okay.  And are you familiar with all the different studies listed here?

A.    Well, I wasn't familiar with them before I looked at it.  I'm not familiar with them independently.

Q.    Okay.  So you did not separately review the studies listed here when you were conducting -- when you were drafting your report?

A.    No, I didn't.

Q.    Okay.  So if you look in the far-right column, it's labeled "Key outcomes."  Do you see where I'm looking on page 128 of the table?

A.    Is that on Figure 1 still?

**676**

*AB Litigation Services*

Q.    Table 1, still on page 128.

A.    Oh, okay, yeah.

Q.    So this column describes the main findings of each of the studies, correct?

A.    Yes.

Q.    Okay.  So I'm just looking down this column here.  Looking at this, it appears that some of these studies found no association between microaggressions and negative health outcomes.  Do I have that correct?

A.    Yes.  I referred to that earlier when you asked me about that too.

Q.    Okay.  So I'm looking, for example -- and I apologize if I get any of these names wrong -- the Cascalheira study in 2023.  It's the fourth study down.  Do you see which one I'm referring to?

A.    One, two, three, four, yeah.

Q.    Okay.  And if you look at the key outcomes for that in the right column, it says, "Microaggressions were not associated with mental health."

Did I read that correctly?

A.    Yes.

Q.    And then two studies down, the Velez 2024 study, do you see which one I'm referring to?

*Ilan Meyer - 01/30/2026*

**677**

A.    Yes.

Q.    And then if you look at the key findings for that, it states, "General anti-trans and nonbinary microaggressions were not associated with psychological distress."

Did I read that correctly?

A.    Yes.

Q.    And then all the way at the bottom, the Woodford 2017 study, do you see which one I'm referring to?

A.    Yes.

Q.    And then if you look at the key outcomes for that, it states, "Microaggressions were not associated with depression and suicide attempts."

Did I read that correctly?

A.    Yes.

Q.    Okay.  And then some of the other studies listed in here found mixed or limited association between microaggressions and negative health outcomes; is that correct?

A.    Yes.

Q.    So for example, if you look at the Austin 2022 study, so it's the second one down.  Do you see which one I'm referring to?

A.    Yes.

**678**

Q.   And then the key outcomes for that, it states, "Interpersonal microaggressions were associated with suicide attempts.  Microaggressions were not associated with six-month suicidality."

Did I read that correctly?

A.   Yes.

Q.   The Truszczynski study, so that's three further down, the Truszczynski 2022 study.  Do you see which one I'm referring to?

A.   Yes.

Q.   And then if you look at the key outcomes for that, it states, "Participants were more likely to use marijuana following multiple discriminatory events than when experiencing microaggressions alone."

Did I read that correctly?

A.   Yes.

Q.   Okay.  And then, finally, the Woodford 2018b study, it's two more down.  Do you see which one I'm referring to?

A.   Yes.

Q.   Okay.  And then the key outcomes for that, it states, "Microaggressions were associated with depression but not suicide."

Did I read that correctly?

**679**

A.   Yes.

Q.   Okay.  If we can turn back to the very first page of the article, so I think it's the second page of the PDF where we've got the abstract.

Do you see what I'm looking at?

A.   Yes.

Q.   Okay.  The results section of the abstract, the second sentence there, I'll read it. It states, "While findings were mixed, most included studies that found microaggressions towards trans- and gender-diverse people were associated with adverse mental health outcomes."

Did I read that correctly?

A.   Correct.

Q.   So is it fair to say that the studies included in this report found -- some of them found -- scratch that.

Is it fair to say that the results of the studies included in this report were mixed in terms of their findings regarding the association between microaggressions and negative health outcomes?

A.   Yes.

Q.   Okay.  The 12 studies that were included in this review, do you know if all of them used the same definition of "microaggression"?

A.    They did not.

Q.    Okay.  Do you know if they all evaluated the same microaggressions when they were evaluating their effect on health outcomes?

A.    No, they did not.

Q.    Do you know if they all used the same methodology to measure the outcomes?

A.    They did not.

Q.    Okay.  Let's turn to page 135 of the study.  Let me know when you're there.

A.    I'm here.

Q.    Okay.  So I'm looking at the third paragraph in the left column.  It starts with, "There was limited discussion. . ."

A.    Yes.

Q.    Do you see where I'm looking?  Okay.  The second sentence of that paragraph states that, "Only two studies reported on income."

Did I read that correctly?

A.    Yes.

Q.    Does this mean that the other ten studies did not include information about the respondents' income?

A.    That's how I read it.

Q.    Okay.  So in the next sentence it states,

*AB Litigation Services*

"As socioeconomic status consistently predicts psychological well-being, it is an important variable to consider in mental health research."

Did I read that correctly?

A.    Yes.

Q.    Do you agree that it's important to control for socioeconomic status in mental health research?

A.    I don't agree it's important to control, but it's important to consider.  That's what you just read.

Q.    So the very next sentence in that paragraph states, "Additionally, ability status was not assessed with any of the included studies."  And the next sentence states, "This is despite people with disabilities experiencing unique microaggressions and poorer mental health outcomes."

Did I read that correctly?

A.    Yes.

Q.    Do you think it's important for studies of this nature to include information about ability status?

MS. FISCHER:  Objection; form.

A.    Well, to include information is kind of a vague question because I'm always going to like more

*Ilan Meyer  - 01/30/2026*

**682**

*AB Litigation Services*

information.  That's what we do.  But I think maybe if I'm reading into what you asked about controlling for something, that's a different question, so -- because you referred to controlling.

I think the authors in this particular review, those two statements are correct.  Both SES income, ability, and many other variables are important to consider.  I don't think they are needed in the control if we're looking at the model that's statistically controlled for them.

Q.   (BY MR. DRAPER)  So if -- if the studies do not include data about the respondents' ability status, is it possible that mental health outcomes could be driven by ability status rather than the presence of microaggressions?

MS. FISCHER:  Objection; form.

A.   What the studies show -- I mean, we actually talked about the same thing in an earlier study, whether the control model is looked at or not.  What the studies show is this population that was exposed to this microaggression as measured by the different studies, a majority of them was associated with some outcome or at least one of the outcomes.

The need to control is necessary when you have two groups that you're comparing when one group

is different in one of those variables.  So if I concurred transgender and nontransgender people and one group was disabled and one was not, then you can say that the disability in one group could lead to the differences we are observing.

In this one group analysis that they're doing here, it is -- would be informative, but I don't think it's important, necessary even, to control because what you find is what you got, which is that transgender people who experienced these microaggressions were more likely to also experience some of the outcomes.

They were not chosen in particular to be disabled versus the group that didn't experience them, but I will always say with more data, it would be nice to look at, but I don't think it's necessary as far as drawing a conclusion in this case.

Q.    (BY MR. DRAPER)  Is it possible that transgender and nonbinary people experience disabilities at a higher rate than the general population?

MS. FISCHER:  Objection; form.

A.    It is possible, but in this example, everybody was transgender.  So as I said, I didn't feel that it was necessary to control for that,

although you can, of course, pose all kinds of hypotheticals where it would matter.

Q.    (BY MR. DRAPER)  Okay.  Let's turn back to your declaration, and I want to look at paragraph 27 of the declaration now.

A.    Yes.

Q.    So in the first sentence here, you refer to a study that indicates that for young people, the ability to use a chosen name at home, school, and work was associated with improved mental health.  Do I have that right?  I'm paraphrasing, not quoting exactly.

A.    Can you repeat it?  I think you said --

Q.    Sure.  I'll just read -- I'll read the sentence to you.  "Among youth and young adults, the ability to use a chosen name at home, school, and work was significantly associated with lower levels of depression and suicidality and with higher self-esteem."

Did I read that correctly?

A.    Yes, that's correct.

Q.    And the study this is citing is the 2019 Pollitt study in footnote 34, correct?

A.    Yes.

Q.    Okay.  I am going to place that in the

chat.  Okay.  You can open it up and let me know when you have it.

A.    Yes, I got it.

Q.    Okay.  You can take as long as you need to to look at it.  Is this the Pollitt study that you referred to in your report?

A.    Yes, it is.

MR. DRAPER:  Okay.  I'd like to enter this as Exhibit E, I think we're on.

(Deposition Exhibit E was marked for identification.)

Q.    (BY MR. DRAPER)  Okay.  So just looking at your declaration, you say, "This report refers to youth and young adults."  This study only looked at young people, then?

A.    I believe that's correct.

Q.    Okay.  So as far as you're aware, it did not evaluate the effect of using a chosen name for adults, correct?

A.    I'm sorry.  I need to look at the --

Q.    Take your time.

A.    Sometimes we consider the different definitions of youth and adults, so I want to make sure.  So their age group was 15 to 21, so depending on your definitions, some of them were adults.

*AB Litigation Services*

Q.   Okay.  But it did not evaluate anyone over 21, correct?

A.   Correct.

Q.   Gotcha.  This study evaluated the use of a chosen name at home, school, and work, correct?

A.   Yes.

Q.   So it did not evaluate the effect of using a chosen name in other contexts; do I have that right?

A.   I believe in my declaration it says, "with friends" as well.  I guess that's part of "at school and work," yeah.

Q.   So it didn't evaluate the use of a chosen name in the public accommodations context --

A.   No.

Q.   -- except where those overlap with school and work, right?

A.   Correct.

Q.   This study, did it evaluate the use of preferred pronouns?

A.   I think so, but -- yeah, it's just asking about chosen name.

Q.   So -- sorry.  Just to make sure I've got that, so it does not evaluate the use of preferred pronouns, correct?

*Ilan Meyer  - 01/30/2026*

**687**

A.   Correct.  I should say, "not directly."
It just asks the question about chosen name.  It didn't ask directly about pronouns, so they're a little bit overlapping.  If your name is Jane, it has a gender in it.

Q.   How did this study measure a person's ability to use a chosen name in these contexts?

A.   How did they -- well, I'm sorry.  Can you ask me this again?  How did they measure the chosen name?

Q.   Yeah.  How did it evaluate a person's ability -- how did it measure an individual's ability to use a chosen name in these contexts?

MS. FISCHER:  Objection; form.

A.   Well, they asked, first of all, whether people have a different chosen name, and then if they were able to use that in the different settings, specifically home, school, work, and with friends.

Q.   (BY MR. DRAPER)  So it asks participants if they could generally use a chosen name in a given context, correct?

A.   Yes.

Q.   Did the study ask participants if or how frequently they -- did the -- sorry.  Did the study ask participants how frequently they have been

**688**

deadnamed in any of these settings?

MS. FISCHER: Objection; form.

A. I believe they only asked if they could use their name, not how frequently they looked at the different outlet -- different contexts, as we said, but not how many times it happened in any particular place.

Q. (BY MR. DRAPER) Does the study measure the psychological impact of a discrete instance of being deadnamed in one of these settings?

A. Can you ask that again?

Q. Yeah, sure. I guess what I'm trying to get at is the difference between the ability to generally use a chosen name in a setting versus, you know, a single instance of being referred to with the incorrect name.

A. I see.

Q. So I'll represent to you that at school, a student who identifies as transgender might generally be allowed to use a chosen name, but in passing, one of their classmates might refer to them using their dead name.

This study did not evaluate the psychological impact of that latter example of a passing instance of somebody referring to you using a

*Ilan Meyer - 01/30/2026*

**689**

dead name, correct?

A.    That's correct.

MS. FISCHER:  Objection, form.

A.    Sorry.  That's correct.

Q.    (BY MR. DRAPER)  Did this study conclude -- reach any conclusions about causation?

A.    It's the same answer that I explained before.  A perfect study of causation is not available at all.  But when we assess in epidemiology, causes, we start by the way the studies are done and infer about whether there's a consistent -- whether the explanation is consistent with causation, but it does not prove causation.

Q.    Gotcha.  So did the study rule out the possibility that transgender youth are more likely to use a chosen name in these contexts because they have better health mental status?

A.    No, they could not rule that out.

Q.    Okay.  Moving back to your declaration, back to paragraph 27, in the -- I'm looking at the second sentence there, the next two sentences.  They read, "And using a chosen name in more of these contexts (home, school, work, and with friends) was associated with lower depression, suicidal ideation, and suicidal behavior.  That is, depression, suicidal

ideation, and suicidal behavior were lowest when chosen names could be used in all four contexts."

Did I read that correctly?

A.   Yes.

Q.   And in the footnote you're citing to another study here, the Russell study from 2018; is that correct?

A.   Right, which is -- it's the same study but a different paper referring to the same study.

Q.   Okay.  Well, I will -- I will place that document into the chat as well.  You can let me know when you have it open.

A.   Okay.

Q.   And you can take a minute to look at it if you'd like, but is this the document that you're referring to in your report?

A.   Yes.

MR. DRAPER:  Okay.  I'll offer this as Exhibit F.

(Deposition Exhibit F was marked for identification.)

Q.   (BY MR. DRAPER)  So you stated this is looking at the same set of data as the previous report?

A.   I believe so, yes.

Q.    Okay.  Well, I'll ask just a few questions about this one, then.  So this -- again, this report is only looking at the use of chosen names in the home, school, work, and with friends context, correct?

A.    Yes.

Q.    So it's not looking at the use of chosen names in public accommodations outside of those contexts?

A.    Correct.

Q.    Okay.  And again, this study just looked at the use of chosen names, correct?

A.    Whether they could use a chosen name, yes.

Q.    This report, like the last one, I understand, you know, there's -- there's about exactly what causation might mean, but it did not reach any conclusions about causation, correct?

A.    Yes.

MS. FISCHER:  Objection; form.

A.    With the same caveat that I mentioned earlier as far as inferring.

Q.    (BY MR. DRAPER)  All right.  Then looking back at your declaration, in the last few sentences of that paragraph, paragraph 27, you state, "Another study among youth found that regardless of frequency,

**692**

*AB Litigation Services*

being misgendered was significantly associated with feeling stigmatized.  In turn, feeling stigmatized was associated with negative emotions, such as anger and shame, lowered self-esteem related to others' perception of their appearance, and feelings of inauthenticity."

Did I read that correctly?

A.    Yes.

Q.    And this is referring to the McLemore, or Macelmore maybe, 2018 study in footnote 36?

A.    Yes.

Q.    Okay.  I will go ahead and place that into the chat as well, and you can let me know when you have it open.

A.    I got it.

Q.    Okay.  Again, you can take a minute to look at it, but is this the document you're referring to in your report?

A.    Yes.

MR. DRAPER:  Okay.  Then I will offer this as Exhibit G, I believe we're on.

(Deposition Exhibit G was marked for identification.)

Q.    (BY MR. DRAPER)  This study, like the other two, only evaluated young people, correct, not

adults?

A.    Yes, but in this case it's a little older than the other one, so the average age here was, I believe, 26.

Q.    Okay.

A.    Yeah.  We have a varying definition of what we consider youth.  Usually 18 to 29 is considered youth.

Q.    Okay.  This study, did it focus on a particular context for misgendering, like the home or the workplace?

A.    I have -- I'm sorry.  Let me take a look. No, it just asked, How often do people misgender you?

Q.    Okay.  So it didn't ask questions about misgendering in public accommodations specifically, correct?

A.    It didn't ask specifically any -- where that happened.

Q.    Okay.  How did this study measure the frequency of misgendering?

A.    It asked them to indicate on a scale of "never to always."

Q.    Okay.  Now, you say in your report that this study found an association between feeling stigmatized by misgendering and negative emotions

**694**

like anger, shame, and low self-esteem.  Do I have that correct?

A.    Yes.

Q.    I understand the caveats we've been using, but this study, did it reach any conclusions about causation?

A.    No.

Q.    So does this study preclude the possibility that an individual with poor mental health is more likely to feel stigmatized by misgendering?

MS. FISCHER:  Objection; form.

A.    No.

Q.    (BY MR. DRAPER)  Okay. Okay. We discussed this briefly towards the beginning of the deposition, but there are studies out there on the relationship between microaggressions and mental health that you did not include in your report, correct?

A.    Yes, presumably.

Q.    Okay.

A.    Sorry.  Let me just clear this up.

Q.    Go ahead.

A.    I did not exclude any studies, but I used the ones that I found that I had -- that I felt were

sufficient.

Q.    Okay.  Yeah, I just want to establish there are studies out there that you didn't cite in your report, correct?

A.    Presumably.  I didn't see them and exclude them, but I'm sure there are studies that I might have overlooked or not considered.

Q.    I want to look at two of those studies, so I'm going to drop another document into the chat, and you can open it and tell me when you've got it.

A.    Yes, I've got it.

MR. DRAPER:  Okay.  I'll mark this as Exhibit H.

(Deposition Exhibit H was marked for identification.)

Q.    (BY MR. DRAPER)  So I'll represent to you that this is a study published in 2024 that examined the association between misgendering and the well-being of nonbinary people in Canada.  You can take a minute to look at it now, or as I'm asking questions, take as much time as you'd like to look at it before answering.

A.    I'm going to need to look at the abstract.

Q.    Perfect.  Go ahead.

A.    Okay.

Q.   Okay.  Are you familiar with this study?

A.   I don't remember it offhand.  I'm familiar with some of the authors of this study.

Q.   Okay.  If you look at the top of the very first page, you can see where this study was published.  It says it was published in the International Journal of Transgender Health.  Do I have that correct?

A.   Yes.

Q.   Are you familiar with that journal?

A.   Somewhat, yes.

Q.   To your knowledge, is that a peer-reviewed journal?

A.   Yes, I believe it is.

Q.   Okay.  So still on the first page, if you look in the abstract, it describes the study's Aims.  You can see where it has the bolded word "Aims." I'll read that.  It says, "Our research asked:  Among nonbinary people, what factors are associated with frequency of misgendering?  And do nonbinary people who experience misgendering less often have better health outcomes?"

Did I read that correctly?

A.   Yes.

Q.   Okay.  Now I want to turn to page 824 of

the study.

A. Got it.

Q. So I'm looking in the "Discussion" section in the first full paragraph on the right column, so it starts with, "While misgendering. . ."  Do you see where I'm looking?

A. Hold on.  I'm sorry.  I need to --

Q. Take your time.

A. Okay.  824?  I'm sorry.  Go ahead.

Q. Page 824, I'm looking on the right column in the first full paragraph that starts with, "While misgendering. . ."

A. Yes.

Q. Okay.  I'll read the first sentence there. "While misgendering frequency was associated with measures of anxiety, depression, and psychological well-being in unadjusted regression models, after adjusting for confounders, we observed a small but statistically significant effect on anxiety, and no significant effect on depression or psychological well-being."

Did I read that correctly?

A. You did.

Q. Okay.  And then I'll continue reading the next two sentences.  "Given our sample's general

perception of misgendering as a highly distressing experience, this finding is surprising.  Potentially, individuals may experience intense distress immediately after being misgendered, but this impact dissipates over time."

Did I read that correctly?

A.    Yes.

Q.    So based on that, is it fair to say that this study found no significant relationship between misgendering and psychological well-being for nonbinary people?

MS. FISCHER:  Objection; form.

A.    Well, they did report in the adjusted model a small but statistically significant effect on anxiety, and the unadjusted models reported effect -- according to this paragraph again on anxiety, depression, and psychological well-being.  So there was an effect on one of those in the adjusted model and the effect on the three outcomes in the unadjusted model.

Q.    (BY MR. DRAPER)  But am I correct in reading this, that after adjusting for confounders, they found, quote, no significant effect on depression or psychological well-being?

A.    Yes.

*Ilan Meyer - 01/30/2026*

**699**

it is limited to nonbinary people, and I tried to use more general articles that look at the entire population.

Nonbinary people are people who don't -- so it's a little different, in my mind, in terms of the question we're asking here.  Some articles include nonbinary and transgender.  This article specifically looked only at nonbinary people, so I wouldn't necessarily -- it just complicates the picture.  So I didn't include it.

But I don't recall, honestly, the thinking process, but that would be a reason why I wouldn't include it.

Q.   Okay.  I'm going to place one more document into the chat.  There we go.  It should be there.  You can let me know when you have it open.

A.   Okay.  I have it.  Let me just take a look.  Okay.

MR. DRAPER:  Okay.  I would like to -- if I haven't already, I'd like to enter this as Exhibit I, I believe.

(Deposition Exhibit I was marked for identification.)

Q.   (BY MR. DRAPER)  Are you familiar with this study, Dr. Meyer?

Q.    Gotcha.  So it's similar to a scoping review?

A.    It's similar only in the sense that it's a review of existing literature, but it uses different standards for the analysis --

Q.    Okay.

A.    -- the difference being that you actually create a data set from those other studies that you can then analyze separately from their findings.

Q.    Understood.  Okay.  I'd like to turn to page 31 of the study.

A.    Yes.

Q.    Okay.  And then on the right column there, there's a paragraph labeled "Grade of the evidence."

Do you see what I'm looking at?

A.    Yes.

Q.    Okay.  So this paragraph indicates that the studies in this report were evaluated using this grade system.  Are you familiar with that system?

A.    Not specifically, but there is a system for grading articles; and, yeah, I have no problem with that.

Q.    Okay.  So the last sentence of the paragraph indicates -- it states, "The quality of the evidence was rated very low for all the estimates

**701**

*AB Litigation Services*

mainly due to the small number of studies included and the risk of bias linked to the sample selection."

Did I read that correctly?

A.    Yes.

Q.    To your knowledge, is "very low" the lowest possible grade in the grade system?

A.    I am not sure, but "very low" sounds pretty low.

Q.    Okay.  All right.  You can set that to the side.  So we've spent a while going through your declaration and looking at the different studies.

A.    Can you give me one second?  I'm sorry.

Q.    Yep, yep, take your time.

A.    So this statement is talking about --

Q.    Yep.

A.    -- very low for the inclusion in a systematic review.  The benefit of the systematic review is that you rely on existing studies.

Q.    Uh-huh.

A.    A small number of them is a disadvantage because you're -- in some ways, you're not moving the literature far enough from the individual studies. So that's what they're referring to here, I believe.

Q.    Okay.  You can set that to the side.

A.    Okay.

Q.    So we're not looking at any particular document right now.  I just want to ask you a few more questions.  We've looked through your declaration, looked at the different studies you cite.

Thinking about the studies that you've cited in your report, would you agree that none of the studies you cite in your declaration specifically evaluated the effect that misgendering and deadnaming in places of public accommodation has on transgender people's health outcomes?

MS. FISCHER:  Objection; form.

A.    When -- I mean, I don't know if you -- what you said was too general, but they didn't specifically assess those two things, although they included, you know -- especially I'll presumably one day be asked about some of the harassment or disrespect.  Those would include that, but they didn't isolate specifically the deadnaming and misgendering in that particular context.  They each have different ways of addressing this question.

Q.    (BY MR. DRAPER)  Okay.  So there were studies that looked at misgendering and deadnaming in other contexts, but not in public accommodations, correct?

A.    Well, as we said before, public accommodation, if you mean a business or -- I mean, they did look at different places that could be considered public accommodation, so I don't know how we would define "public accommodation" for that purpose.  Um --

Q.    Sorry.  I didn't want to cut you off. Were you finished?

A.    Yeah, that's my point.  I'm not sure how you define "public accommodations" in this example, in this question, but some of the studies looked at things that are public accommodations as well.

Q.    Okay.  And I know you -- we had a study looking, for example, at misgendering or the use of a chosen name in school, which might be considered public accommodations.  But none of the studies evaluated the effect of misgendering and deadnaming in public accommodations as a category, correct?

MS. FISCHER:  Objection; form.

A.    I'm not sure this question is precise enough for me to address.  None of them identified public accommodation as a term perhaps.

Q.    (BY MR. DRAPER)  So, for example, in the Massachusetts survey study that asked respondents if they had suffered -- if they had been the victim of

**704**

discrimination in public accommodations --

A.    Right.

Q.    -- that study, for example, did not ask specifically, Have you been a victim of misgendering or deadnaming in public accommodations?

A.    Right, right.

Q.    And -- sorry.  Go ahead.

A.    I think in the most specific way, if I understand this question, I would agree.  But as I said, there are different ways that the studies highlight these issues, but they didn't specifically isolate those issues that you are addressing -- that you're describing.

Q.    Okay.  So just to make sure I understand that, none of the studies asked respondents if they had been misgendered or deadnamed in public accommodations as opposed to asking them about a specific context like a school or a workplace?

A.    We just said that the school is public accommodation, so. . .

Q.    I understand, but none of the studies asked about public accommodations broadly in the way that the Massachusetts survey did, for example?

A.    It's very hard for me to answer it, honestly.  Broadly, meaning -- it's a little unclear,

**705**

but --

Q.    I guess I'll -- sorry.  Go ahead.

A.    I will try to help you.  I think they don't specifically do this deadnaming and pronouns in a specific public accommodation that they identified, but as you mentioned, the Massachusetts study did ask about restaurants, retail but, again, did not specifically mention deadnaming.

So I think it's that the specificity is not there, but the overarching findings, as I said, illuminate this question, in my mind.

Q.    Okay.  Did any of the studies that you cite in your declaration find that transgender individuals are more likely to attempt suicide based only on misgendering and deadnaming?

A.    Meaning that that is the only cause of them attempting suicide?  Is that what you're asking?

Q.    I'm asking if any of the studies you cited in your report found a relationship specifically between misgendering and deadnaming and the higher likelihood of attempting suicide as opposed to microaggressions generally?

A.    I see.  I think there is only a couple of studies that specifically look at deadnaming and pronouns.  I really can't remember specifically that

they didn't -- that the studies didn't look at suicide.  I have to find the studies.  I'm sorry.

Q.    Take your time.

A.    So I think the review, as we said, had a variety of ways of measuring the microaggression they defined.  And they did find a relationship with some of the studies, but I can't right now tell you whether any of the nine or so articles in there measured specifically gender, deadnaming, or gender pronouns.

I don't know if they were isolated separately.  I know some of them measured it, but I don't know if they isolated the effect for that, and the review was not addressing the isolated item.

Q.    Okay.  So just sitting here right now, to the best of your recollection, you can't recall that any of the articles you cited in your study found a relationship specifically between misgendering and deadnaming and the higher likelihood of suicide attempts?

A.    Right.  They isolate those two aspects of the -- yes.

Q.    Okay.  Okay.  And finally, you would -- you would agree that there are peer-reviewed studies that have found no association between

microaggressions and negative health outcomes for transgender people, correct?

A.    Yes.

Q.    Okay.  And I don't believe -- you do not cite any of those in your report, correct?

A.    Well, I mean those are the ones that I include in the review by Kimber.

Q.    In the Kimber scoping review?

A.    Yeah.

Q.    Okay.  But you didn't separately cite any of those --

A.    No.

Q.    -- listed here, correct?

MR. DRAPER:  Okay.  Why don't we take a five-minute break, and then I'll come back and potentially have no more questions, but we basically reached the end of my questioning.  So if we could just take a five-minute break, I'll come back and we can see if there's anything more.

Does that sound good, Janna?

MS. FISCHER:  Yeah, that's fine.

(Break was taken from 11:47 a.m. to 11:54 a.m.)

MR. DRAPER:  We have no further questions.

MR. FRAMPTON:  All right.  I think that's

**708**

They do separate interpersonal, and in that case, the media.  So I think everybody recognizes the interpersonal sphere, as I would say it's more primary maybe.

Q.   Okay.  Let me ask you this:  Within that interpersonal sphere, if a -- if a transgender person is interacting and the person they're interacting with deadnames the other person that they're with, would that still, in your mind, be a sort of interpersonal interaction, an interpersonal microaggression?

MS. FISCHER:  Objection; form.

A.   I think if I tried to imagine that hypothetical that you're giving, so there's two people who might be transgender, and one of them observed the other one being misgendered, I would think it would be a microaggression in the sense of what I described it for; that the deadnaming or using the wrong pronouns is really a message that has social context.

And in that sense, the two people experiencing it, even though it's directed at one, I would think they both see it as a disrespectful statement that applies to both of them.

Q.   (BY MR. FRAMPTON)  Okay.  And they --

based on your understanding in the literature, that interpersonal microaggression, they could perceive that as hostile, correct?

MS. FISCHER:  Objection; form.

A.    Yeah.  Again, I think most of the literature, I -- they ask about your personal experience.  I can't recall right now a measure that asked, you know, when it happened to somebody you were with, like in your hypothetical.

But I'm assuming that it will have a similar effect if it happened to you.  If we're talking about a public accommodation, you would have a sense that this person who is treating your person you're with with disrespect as far as their pronoun or name has negative feelings about transgender people in general, presumably.

Q.    (BY MR. FRAMPTON)  Okay.  And I guess, similarly, within the rubric of an interpersonal microaggression specifically in the public accommodation context, the misgendering could be like two employees of the store talking to each other about the person, correct, that they can hear?

MS. FISCHER:  Objection; form.

A.    I can see that.

Q.    (BY MR. FRAMPTON)  Okay.  And it would be

*AB Litigation Services*

reasonable for a transgender person, based on the literature, to perceive that as objectively hostile, correct?

MS. FISCHER:  Objection; form.

A.    I can't say based on the literature because as I said, I am not -- I can't recall right now the studies that looked at it specifically, but by extension, I would agree that that would send a message of derision in that particular context.

So if the person observed it or if it was addressed to them, I would think their understanding of the establishment that they were at or the person they were interacting with would be pretty similar if they're both similarly situated.

Q.    (BY MR. FRAMPTON)  Got it.  Do you have any familiarity with a brand known as XX-XY Athletics?

A.    I am familiar with just -- I believe the Complaint mentioned it.  I read it a long time ago. I believe -- so my familiarity is very shallow, but I believe that's one of the people -- one of the establishments mentioned in the Complaint and that -- or one of the plaintiffs here.

Q.    Okay.  Do you -- do you agree that a transgender person viewing advertising material that

deadnames and misgenders people could cause them psychological distress?

MS. FISCHER:  Objection; form.

A.    Again, I don't have evidence for that.  So I really can't answer whether it would have that impact.  It definitely would be something that offends them maybe, but I don't know what impact it will have specifically on health and mental health.

Q.    (BY MR. FRAMPTON)  Okay.  Do you agree that a business's refusal to refer to a transgender person with that person's preferred name or pronouns can cause psychological distress?

MS. FISCHER:  Objection; form.

A.    I agree that a person experiencing that, the research shows, could lead to psychological effects again because of the message of derision, disrespect, or rejection.

Q.    (BY MR. FRAMPTON)  Do you agree that could cause the person to feel unwelcome or objectionable in that particular business?

MS. FISCHER:  Objection; form.

A.    I can only guess that probably, but it's again not something that I -- it seems by extension, that if they experience it, they would feel unwelcome.  But it's a little bit of speculating on

how they would feel, and of course, people have
different feelings.

Q.    (BY MR. FRAMPTON)  Would it be reasonable
for the person to feel unwelcome or objectionable
based on being deadnamed or misgendered
intentionally?

MS. FISCHER:  Objection; form.

A.    Again, I feel -- I feel a bit out of the
scope because you're asking, in my personal opinion,
would it be reasonable?  I don't mind answering.  I
think it is reasonable for them because there's
clearly a message that this person or establishment
is not respecting them.

So anybody would want to feel respected in
their interaction with a business, so -- but again,
this is just based on my speculating here on what a
person might feel if they had confronted that.  It
makes sense that -- again, within the context of
rejection in general society, the stigma and
prejudice that I described earlier, the stereotypes
about transgender people, that they would take that
message to mean that.

Q.    (BY MR. FRAMPTON)  Okay.  And I think what
you've said that, in your mind -- in your
understanding, the literature would show that there

**713**

Exhibit K.  It should be there.

(Deposition Exhibit K was marked for identification.)

A.   Yes, I got it.

Q.   (BY MR. FRAMPTON)  All right.  And that is a study that you cited in paragraph 22 of your report; is that right?

A.   Yes.  I haven't verified it was 22, but it is -- I believe I referred to it twice, actually, so in paragraph 19 -- no, sorry, paragraph 22.  Yeah, paragraph --

Q.   Okay.  So you're generally familiar with this study?

A.   Yes.

Q.   All right.  Go to page 6, if you would.

A.   Okay.

Q.   All right.  Do you see the sort of subheading, "Gender Affirmation"?

A.   Yes.

Q.   It says, "Social gender affirmation was assessed by asking participants whether they had disclosed their gender identity to one or more family members or coworkers," correct?

A.   Yes.

Q.   And in this section, that appears to be

**714**

the only measure of social gender affirmation in the study, correct?

A.    Yes.

Q.    Okay.  And so that is not asking about deadnaming or misgendering, correct?

A.    Right.

Q.    And it's not even asking if people are going by their chosen names or pronouns, correct?

A.    Right.

Q.    And then if you go right above that on "Transgender-Related Discrimination," it says -- describes the measure that they used for assessing transgender-related discrimination, correct?

A.    Yes.

Q.    And that also did not ask specifically about deadnaming or misgendering, correct?

A.    Correct.

Q.    So someone could answer those questions, yes, and be talking about some other type of discriminatory event, right?

A.    Yes.

Q.    And then if we flip to page 13.

A.    Yes.

Q.    Go to the first full paragraph, second sentence, "Given our study's cross-sectional design,

*AB Litigation Services*

it is not possible to make causal inferences."

Did I read that correctly?

A.    Yes.

Q.    And then the next sentence says, "Given that our measures were self-reported, it is possible that biases in recollection or reporting influenced the results."

Did I read that correctly?

A.    Yes.

Q.    And that's a general -- that's a general concern anytime that you've got self-reported metrics, correct?

A.    Which is almost any study, yes.

Q.    One way you can try to mitigate that is through a structured interview rather than just a survey; is that right?

A.    No, because a structured interview will also be self-report.  The only way to overcome self-report is by using other sources of data.  Some use -- I mean, I can explain more, but there's other ways to get data, but most studies use self-report because you have to rely on the participants to tell you what happened to them or how they feel, et cetera.

Q.    Right.  And that can be influenced by a

*Ilan Meyer - 01/30/2026*

**716**

*AB Litigation Services*

variety of things, correct, their ability to recall?

A.    Yes, absolutely.  It's not perfect.

Q.    All right.  Go back to the McLemore study, which was Exhibit G.

A.    I got it.

Q.    And go to page 56.

A.    Yes.

Q.    First column, halfway down the page, it's got the subheading, "Misgendering frequency and felt stigma."

A.    Yes.

Q.    And in this study they did not distinguish among who was doing the misgendering, correct, whether it was a family member versus a stranger, correct?

A.    Correct.

Q.    So they were lumping together experiences with very close relations and experiences with people you may not know at all, right?

A.    Presumably.  They just asked, yeah, How often do people misgender you?  So anybody.

Q.    Okay.  If we go to page 58.

A.    Yes.

Q.    Bottom of the second column, couple of sentences after it reads, "One avenue for future

research would be to examine how different situational and relational characteristics affect" --

A.    Excuse me.  Can you direct me again?

Q.    Oh, yeah, I'm so sorry.  Page 58.

A.    Yes.

Q.    Second column.

A.    Yeah.

Q.    Bottom of the page right above Table 4.

A.    Oh, okay.  Okay.  Go ahead.

Q.    Yeah.  So a couple of sentences up, do you see where it starts, "One avenue. . ."?

A.    Yes, thank you.

Q.    "One avenue for future research would be to examine how different situational and relational characteristics affect the subjective evaluation of misgendering as a stigmatizing experience.  For example, it would be useful to identify if the intimacy associated with the source of the misgendering leads to different appraisals of the experience.  In other words, being misgendered may be less psychologically impactful if the source is a stranger rather than a family member or friend.  Furthermore, it may be important to examine if the location or context in which an individual is misgendered affects how the experience is appraised."

**718**

*AB Litigation Services*

Did I read all of that correctly?

A.    Yes.

Q.    And so they're pointing out that those are things that might affect somebody's experience, but that they were not measuring in this particular study, correct?

A.    Correct.

Q.    And if we go to page 60.

A.    Yes.

Q.    Second paragraph under "Limitations," you see where I am?

A.    Yes.

Q.    They say, "Moreover, this study was cross-sectional and involved only self-report data. As a result, it is not possible to determine the causal direction of the variables examined in this study.  For example, it is entirely plausible that an individual who perceives transgender and gender-nonconforming individuals to be stigmatized in society more generally to also perceive themselves as misgendered more frequently.  Similarly, poor mental health may bias the reporting of experiences with misgendering, which could in part explain the observed relationships in this study."

Did I read that correctly?

A. Yes.

Q. And they're just pointing out that there are -- that the causal arrow could go one way or the other based on this data, correct?

A. Say it again.

Q. Right. They're saying that the --

A. I just didn't hear your last sentence.

Q. Yeah. They're saying the causal arrow could go one way or the other based on this data?

A. Yes, it could go in the reverse order, yes.

Q. Go back to the Pullitt study or Pollitt. I apologize. I don't know how to pronounce that person's name.

A. Yeah, Pollitt, I think, is right.

Q. Pollitt. It's Exhibit E.

A. Yes.

Q. And go to page -- go to page 8, if you would.

A. Okay.

Q. The last sentence before "Discussion" -- before the "Discussion" section, it says, "Chosen name use at home and at school did not predict any negative health outcomes in this model."

Did I read that correctly?

**720**

*AB Litigation Services*

A.    Yes.

Q.    So they're saying that whether a person was allowed to use their chosen name at home or at school was not a predictor of negative health outcomes; is that right?

A.    Yes.

Q.    Let me see.

A.    I just hesitate because I think they asked if they had it rather than if they were allowed to use it, and you said "allowed" to use it.

Q.    Okay.  Chosen name -- well, let's look at it.   Flip back to page 6.

A.    Yeah, it says, "Chosen name used."

Q.    Yes.  So it says -- well, first they ask, Do you have one, right?  But then if yes, they asked if you could go by it at home or at school, at work, or with friends, right?

A.    Right.

Q.    So when they're saying that it's not -- that chosen name use didn't predict negative health outcomes, they're talking about whether you're able to use it at home or at school, correct?

A.    Well, and I think I can just tell you what they say, which is, yeah, you could go by their name. You said "allowed."  I don't know if that was

scale.  I will drop into the chat as Exhibit M a new one.

(Deposition Exhibit M was marked for identification.)

Q.    (BY MR. FRAMPTON)  If you would, please, take a look at that, and I'm simply -- question one, so you're loaded for it, is simply, does this appear to be the study that provided the microaggression scale for the Austin study?

A.    Okay.  Let me just look -- read this here.

Q.    Take your time, sir, please.

A.    Yeah, that's the study they're referring to.

Q.    Okay.  So if we look at Woodford, go to Appendix A and tell me if that appears to be the microaggression scale that was used.

A.    I'm just making sure that they use all those items.  Those are definitely the items.

Q.    Okay.

A.    So I think this is a shortened version, it looks like, but it is using the items.  It seems that they used 5 items and 4 items and so 20 items.  The Woodford lists 20 items.  I believe, from what I'm reading in the paragraph you pointed to, that they used 9 items.

*AB Litigation Services*

Q.    Okay.  And they -- the Woodford scale is specific to LGBQ issues and not LGBTQ issues, correct, and they had to adapt it?

A.    Yes.

Q.    Okay.  In the original version of the Woodford scale, it doesn't have any items that deal with deadnaming or misgendering, correct?

A.    I think it -- that it would be the case. I didn't read all the items, but being that it's not directed at transgender people, yes.

Q.    Okay.  And from the Austin article, from their description, we don't know whether the adapted version asked about deadnaming or misgendering, correct?

A.    Correct.

Q.    So as we sit here today, this Austin study, we don't know if it even asked people about a deadnaming or misgendering microaggression, correct?

A.    Correct.

Q.    Look back at Woodford -- if we -- the original Woodford version included five items that it called "environmental microaggressions," correct?

A.    Correct.

Q.    And that included, like, seeing something on -- negative messages on social media, correct?

A.    Yes.

Q.    Hearing people make jokes in their school or workplace, correct?

A.    Yes.

Q.    And although we don't know exactly how they did it, in the Austin study, they adapted that and asked about some kind of environmental microaggression as applied to transgender people, correct?

A.    They gave you some sample items, so -- or maybe one sample item.

Q.    One sample item?

A.    Yeah.

Q.    But we know that they did incorporate the concept of an environmental microaggression into that study, correct?

A.    Oh, yes.

Q.    All right.  Let me show you another Woodford study.  All right.  I'll show you what I'm going to mark as Exhibit -- I'm sorry.  My Zoom window went away when I tried to share it with you. I'm going to try again.  Showing you what I am marking as Exhibit --

MR. FRAMPTON:  Are we on N, Madam Court Reporter?

**724**

THE COURT REPORTER:  Yes.

(Deposition Exhibit N was marked for identification.)

Q.    (BY MR. FRAMPTON)  All right.  Let me know when you've got it open.  You got it?

A.    I got it.  Yeah, sorry.

Q.    Okay.  And is this also one of these studies identified in the Kimber scoping review?

A.    Yes.

Q.    Okay.  All right.  Scoot to page 427, please.

A.    I'm here.

Q.    Okay.  First column, last paragraph, do you see where it says, "For trans students, we used seven items to assess environmental microaggressions" -- I'll skip the parenthetical -- "and 18 items for interpersonal microaggressions"?

Do you see that?

A.    Yes.

Q.    Did I read that correctly?

A.    Yes.

Q.    Okay.  And it looks like they are -- they obtain the items from a different Woodford 2018 study; is that how it looks to you?

A.    I mean, the 2018 study assessed the

psychometric properties.  It might be where they introduced the scale, but I'm not sure.

Q.    And if you flip to the -- to the references at the back, does it look like -- that Woodford 2018, does it look like they're citing to a conference presentation?

A.    Yes.

Q.    Okay.  And so that would not be available in the peer-reviewed literature, correct?

A.    Some conferences would publish abstracts. I am not familiar with this conference, and I don't know if they would, but not -- the entire paper typically would not be available like that.

Q.    Okay.  So as we sit here just looking at this study, we don't know if they asked about deadnaming or misgendering as part of their microaggression scale, correct?

A.    I have to look at how they describe the measure.  Sorry.

Q.    Sure.  Page 427, go ahead and review that.

A.    Yes, I believe that's true.

Q.    Okay.  And this study also included the concept of an environmental microaggression, correct?

A.    Yes.

Q.    The idea being there's something

**726**

disrespectful in the person's environment, but not necessarily happening in an interpersonal interaction, right?

A.    Yes.  I mean, when you say "environment," it's not as vague, but access to bathrooms and things like that that affect a person, but they're not happening in an interpersonal way.  So it seems like they measured the environment and presumably how it affects the person in question, but it is not an interpersonal interaction.

Q.    Right.  And that might include, per that last study we looked at, something like what they see on social media?

A.    I think here they asked about things like -- they had in the LGBT scale, which we looked at just now, which were more like -- it did include one question about social media, but some of it was, you know, about the school environment.  I mean, four of the five that were listed in the other Woodford article were asking about the school environment.

Q.    Right.  Things like what people are saying around them, correct?

A.    And I think what the school environment is more generally.  So I think when they say -- I hear someone say, That's so gay, they're referring to kind

of the school policies about things like that.  So if you hear it, it means that, presumably, the school doesn't monitor or ban that kind of language, things like that.

Q.    Go in Woodford to -- I'm sorry, Woodford (2018), go to Table 3, which is on page 431.

A.    Okay.

Q.    And if you look at the bottom half where they're looking at trans students, do you read this table to say that there was no statistically significant association between either environmental or interpersonal microaggressions and suicide attempts?

A.    So it looks like there's a definition of "victimization."  You were asking about the microaggressions?

Q.    Yeah.  We can look back at the definition of "victimization," but I was asking about microaggressions.

A.    I'm sorry.  The two microaggression items were not associated with increased risk in a significant level.

Q.    All right.

A.    Although significance level is not the only thing I would look at, but the significance

**728**

*AB Litigation Services*

him, that would be microaggression, yes.

But I can see other examples where maybe -- and as I said, the term "microaggression" is being used in many ways, and I don't typically use it so much myself.  I like to be more specific and precise, but as an umbrella term, it refers to a lot of incidents like that that a person might take offense to.

Q.    Sure.  Let me ask you it this way, then: You've said that -- you know, if you and I are talking, and you say, My pronouns are he/him, and I say, Well, I don't use those.  I'm calling you she/her, that would be an interpersonal microaggression, correct?

A.    I think so.  I think I would experience it like that.

Q.    Right.  So then let me -- let me change the scenario a little bit and try to understand where it would fit.  If a transgender person walks into a store, and the store has a big sign that says, We will only use biologically based pronouns in language.  If you were born male, we'll refer to you as "Mr." and "he."  Don't bother asking for other pronouns.  We won't use them.

MS. FISCHER:  Objection; form.

Q.    (BY MR. FRAMPTON)  As you understand it, would seeing that sign count as an -- either an interpersonal or an environmental microaggression?

MS. FISCHER:  Objection; form.

A.    I think so, because, again, the main characteristic there is I'm going to -- you're not going to be respected as a transgender person in this environment; and moreover, you won't be even served maybe.  I don't know what the example was.  So, yeah, I would say yes.

Q.    (BY MR. FRAMPTON)  Okay.  Do you know who Dylan Mulvaney is?

A.    I'm sorry?

Q.    Do you know who Dylan Mulvaney is?

A.    Can you remind me?

Q.    Identifies as a transgender female, social media presence, got into a controversy over -- with Bud Light a few years ago.

A.    The Coors person?

Q.    I think it was Bud -- Bud Light, but yeah.

A.    Oh, Bud, yeah, yeah.  I remember.  I mean, I obviously don't know her, but yes.

Q.    Okay.  Then I'm going to show -- let's look at what I am going to mark as Exhibit O.  It's a video, so I'm going to ask you to play it.

*AB Litigation Services*

A.    Are you sending it on the chat?

Q.    I am putting it in the chat.  It looks like it just went through.

A.    Okay.  Hold on.

Q.    Just let me know if you're able to play it.

(Deposition Exhibit O was marked for identification.)

Q.    (BY MR. FRAMPTON)  Sorry.  It got loud on mine.

A.    Yeah, I think I can play it.

Q.    Go ahead and play it and look at it, and then I'll ask you a couple of questions.  Just let me know when you're done.

(Deposition Exhibit O was played.)

A.    Okay.  I've viewed it.

Q.    (BY MR. FRAMPTON)  All right.  And my question is, could a transgender person seeing that video on social media experience that as an environmental microaggression?

A.    Again, we're asking for a lot of generalizations here, but again, they could, of course.

Q.    Well, would that fit within, like, an adapted version of Woodford's scale where you see

something on social media that disrespects transgender people?

A.    Yes.

Q.    Okay.  So it would fit as something someone could sort of check the box, I experienced that as a microaggression?

MS. FISCHER:  Objection; form.

A.    I think so, yes.

Q.    (BY MR. FRAMPTON)  Okay.  We've been talking a lot -- we talked about misgendering generally, and I guess just let me make sure as I break down that word.  In your understanding, what are we referring to when we refer to "gender"?

A.    Well, gender is the expressed and experienced gender, whether the person experiences themselves as male, female, transgender, nonbinary, which could be -- although most often it's not different than their, what we call, sex assigned at birth.  Some people call it "biological sex."

Biological is a bit of a misnomer even in that ad because biology is a lot more complicated than XX-XY, but I understand their point of the ad, of course.  It's not a biology lesson.

Q.    Got it.  And so misgendering is simply, in some form or fashion, treating someone out of

CONFIDENTIAL
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

-------------------------------------------------------

30(b)(6) DEPOSITION OF COLORADO CIVIL RIGHTS
DIVISION as given by AUBREY C. SULLIVAN
January 19, 2026

-------------------------------------------------------
Plaintiffs:

DEFENDING EDUCATION, et al.,

v.                              Civil Action No.
                                1:25-cv-01572-RMR-MDB
Defendants:

AUBREY C. SULLIVAN, Director
of the Colorado Civil Rights
Division, in her official
capacity, et al.

Plaintiff:

COMMITTEE OF FIVE, INC.,
d/b/a XX-XY ATHLETICS,

v.                              Civil Action No.
                                1:25-cv-01668-RMR-MDB
Defendants:

AUBREY C. SULLIVAN, Director
of the Colorado Civil Rights
Division, in her official
capacity, et al.

Plaintiff:

DOXA ENTERPRISE, LTD., d/b/a
BORN AGAIN USED BOOKS,

v.                              Civil Action No.
                                1:25-cv-02177-RMR-MDB

Defendants:
AUBREY C. SULLIVAN, Director
of the Colorado Civil Rights
Division, in her official
capacity, et al.
-------------------------------------------------------

**733**

complainant provides the facts of what happened, so why they believe they were discriminated against or experienced an adverse action based on a protected class.

Q    And why does the division make online charges available?

MS. PASSAMANECK:  Objection; form.

A    So the division is not making online charges available.  They are making the online filing process to file a charge available.  And one of the reasons that they do this is for ease of use for the parties on both sides and accessibility as well.

Q    (By Mr. Martin)  So you would say it's important to the department to make it easy to file a charge?

MS. PASSAMANECK:  Objection; form.

A    I think that the division looks to be efficient.

Q    (By Mr. Martin)  Okay.  Do you know approximately how many charges against places of public accommodation the division receives through intake each year?

A    I'm not sure of exact numbers.  And to clarify, we're talking about just cases of public

or the attorney general?

MS. PASSAMANECK:  Objection; form.

A    I think that if the situation arose, that the division and the commissioner would work with our respective counsel to determine what that process would look like.

Q    (By Mr. Martin)  Does the division have a position on whether deadnaming and misgendering impose a significant societal or community impact?

A    No.

Q    And could the commission, a commissioner, or the attorney general file a charge without identifying an aggrieved person?

A    No.

Q    So if you were to receive a charge from the commission or commissioner or the attorney general that identified a discriminatory practice that they discovered that a place of public accommodation was engaged in, but they did not identify an individual who had been discriminated against by that practice, how would the division analyze that charge?

MS. PASSAMANECK:  Objection; form.

A    Without a complainant or a charge of discrimination, the division wouldn't have

jurisdiction to investigate.

Q   (By Mr. Martin)  Well, let's say that you did receive a charge from the attorney general, but -- but the charge just did not identify a person that experienced discrimination under the practice.  You are saying that the division would not have jurisdiction to analyze that charge?

MS. PASSAMANECK:  Objection; form.

A   If we received a charge, we would consult with counsel to determine whether we had jurisdiction and whether the charge in itself satisfied jurisdictional requirements for filing.

Q   (By Mr. Martin)  Okay.  So if the attorney general were to see a publication that he believed violated CADA and imposed a significant societal or community impact and filed a charge with the division stating that the publication was discriminatory under CADA, could the division proceed with such a charge?

MS. PASSAMANECK:  Objection; form.

A   Again, it would depend on facts and context, and because we've never seen such a case before, we would consult with counsel before continuing or moving the case further.

Q   (By Mr. Martin)  Generally speaking,

witnessing the publication be an adverse action that provides the division with jurisdiction to investigate that charge?

MS. PASSAMANECK:  Objection; form.

A     So the division has never received a charge based on written communications.  And so to that end, because we haven't seen one before, we would look at all of the facts and circumstances and we would likely consult with counsel.

Q     (By Mr. Martin)  Could the division move forward with an investigation on a charge that was based solely on a publication?

MS. PASSAMANECK:  Objection; form.

A     The division would look to its intake and investigations manual and the regulations that govern CADA to determine whether they have jurisdiction over the charge.  And every case is different, so it would depend on the facts and circumstances.

Q     (By Mr. Martin)  Okay.  Would you describe the process of transferring a submission through intake into a perfected complaint?

A     Sure.  So a potential charging party files either online using the online filing system or using a paper intake packet, and they submit

**737**

that information to the division.

The division's intake team then reaches out to the prospective complainant and facilitates an interview to collect information regarding what happened, what they experienced, why they believe that they were discriminated against based on a protected class.

If there is information that shows that we have jurisdiction in looking at the intake and investigations manual and applicable regulations, then the division will process the charge, and the charge will be sent to the complaining party for signature, and then it is deemed as filed.

Q    All right.  And how does the division confirm a jurisdiction when it receives a charge?

A    The division is guided by its intake and investigations manual as well as the regulations that govern CADA.

Q    Are there any specific elements that the division employs when assessing jurisdiction?

A    The division looks to the intake and investigations manual and regulations that govern CADA to help determine jurisdiction.

Q    And what are the different bases that the division looks for to determine that it has

*AB Litigation Services*

the claim prior to an investigative finding.

If they don't participate in mediation, then the case goes to investigation.  During the investigative process, evidence is collected, witness statements are taken, looking at statements from other people; for example, employees.  The division may collect affidavits.  The division may collect comparative data.

All of the evidence is analyzed, and then a recommendation is made as to whether there is cause for discrimination or not.

Q    Okay.  Does the division investigate every perfected complaint that it receives?

A    So as I said before, if the division has jurisdiction over a case, it typically conducts an investigation.  However, there is also an opportunity for mediation, and there are a fair number of cases that go to mediation and do not result in a finding.

There are also other circumstances where the division will dismiss a case, such as if the parties withdraw a case and decide that they don't want to continue the process.  Sometimes that happens pursuant to settlement when they've reached an outside settlement.

The parties can also request a right to sue. So perhaps if they want to take the case -- if they have other claims that they wish to consolidate and they want to take the case to court, they can request a right to sue, and the division would not be looking at that.

Q    Okay. You mentioned that the division may request documentation from respondents or complainants. What kind of documentation is normally requested from a respondent during the investigation phase?

A    Every case is different, so it depends on the facts of a specific case. We collect evidence that is relevant to whether -- to the analysis of whether discrimination occurred.

Q    So that could include financial information about a business, a respondent?

A    Possibly.

Q    Could it possibly include personnel files?

A    Yes.

Q    Could it possibly include emails or text messages?

A    Yes.

Q    And does the division also compound

written questions for respondents and complainants during the investigation process?

A    Yes.

Q    Do those take the form of an interrogatory or some other form?  Can you describe how you would have written questions sent?

A    So that would be called a request for information, and it's a process -- it's a standard process for all kinds of cases, that is sent to the respondent or complainant during the investigative process in writing.  And the parties have an opportunity to provide a response to that request for information.

Q    Okay.  If the respondent does not respond to a request for information, how would the division respond?

A    The division typically reaches out when a respondent doesn't respond or isn't responsive and sends a demand letter.

Q    And if the respondent still did not provide the information requested after the demand letter, what would the division next do?

A    The division may possibly subpoena, send a subpoena to the respondent in an attempt to get the information.

*AB Litigation Services*

Q    Okay.  And how would that subpoena be enforced?

A    The subpoena would be -- if necessary, which we do not typically see during our process -- we would work with counsel on that process.

Q    And if the subpoena would go to the enforcement stage with the court, would the attorney general's office prosecute that subpoena?

A    I cannot speak to what the attorney general's office would do.  That is outside of my process.

Q    But it would be that office that would have the responsibility of enforcing that subpoena in court; is that correct?

A    I believe so.

Q    Who makes the decision on whether to proceed with enforcing a subpoena if a respondent does not comply with a request?

A    That has so rarely, if ever, happened that we would typically consult with counsel prior to making a decision on whether to pursue enforcement.

Q    Do you have any written policies on determining whether to proceed with enforcing a subpoena or not?

*AB Litigation Services*

whether or not to recommend a complaint to the commission?

A    The division uses its intake and investigations manual, the regulations that govern CADA, and consults with counsel.

Q    Do you have an estimate on approximately what percentage of complaints that -- where probable cause was found, what percentage of those are recommended to the commission?

A    I can't speculate. Sitting here, I can't think of an exact number.

Q    Would you say that most of the time -- if the division finds probable cause in a complaint and the parties don't settle, most of the time the division would recommend that a hearing will be set with the commission?

A    No, I would not say that.

Q    So less than half?

A    Yes.

Q    And can you describe the hearing process for the commission, generally?

A    I can't speak to the hearing process because that's outside of the division's process.

Q    Who represents the interests of the complainant during the hearing process before the

they wouldn't necessarily have experienced unequal treatment; is that right?

MS. PASSAMANECK:  Objection; form.

A    I think there's two parts to the question that you're asking.  We would need to know if the statement in itself was actually discriminatory. We would have to analyze that.  The division has never looked at any cases based on written communications, so we would consult with counsel.

Q    (By Mr. Martin)  But there's nothing prohibiting you from proceeding if the complainant merely witnessed the publication; you could possibly proceed with investigating that charge?

A    If the division has a complainant and establishes jurisdiction, then we can proceed with investigation.

Q    So if, let's say, an African American individual were to witness a publication posted by a place of public accommodation that said, "Whites Only," and that person filed a charge with the division, would the division consider that complainant to be an aggrieved person?

A    Yes.

Q    Okay.  So on what basis would you conclude that person was an aggrieved person under

the regulations?

A    You're talking about signage in this specific example, correct?

Q    Yes, a sign.

A    So the signage in the example that you provided is indicating that an individual will be denied goods, services, privileges, facilities, advantages, accommodations, et cetera, based on a protected class, or that the individual would be -- their presence or patronage would be unwelcome at a place of public accommodation based on a protected class, and because of that, that would meet jurisdictional requirements for taking the charge.

Q    Okay.  So then it is enough for jurisdiction that the individual merely read the sign, even if no one actually interacted with that person from the place of public accommodation?

A    I wouldn't say it like that.  The preliminary issue before determining whether there is jurisdiction is the division would also have to know if the place is actually a place of public accommodation.

Q    Assuming that it is a place of public accommodation in the scenario I presented, for the individual to be aggrieved, he would not have had

to actually speak with someone from the place of public accommodation?

A    If an individual is alleging differential treatment based on a protected class, and the division, in using its intake and investigations manual and applicable regulations, determined that there is jurisdiction, it will take the case.

Q    Okay.

MS. PASSAMANECK:  We've been going almost an hour, do you want to take a break?

MR. MARTIN:  This is a good point.

(Break taken from 9:07 a.m. to 9:18 a.m.)

Q    (By Mr. Martin)  Earlier you had mentioned that, to your knowledge, the division has not received a charge from the attorney general. What basis do you have to make that determination? Why do you believe that the division has never received such a charge?

A    It's based on the time that I have worked at the division, I have never seen that happen.

Q    Okay.  And I'd like to go back to the CCRD rules and regulations, specifically 10.12(C)(1), and this is the rule concerning charges initiated by the commission, a commissioner, or the attorney general.  The last

**746**

*AB Litigation Services*

division would investigate?

MS. PASSAMANECK:  Objection; form.

A    Yes.

Q    (By Mr. Martin)  Okay.

(Exhibit 4 was marked.)

MS. PASSAMANECK:  Counsel, this appears cut off.  You're missing Number 10 in the list of definitions.  You may not be going there, but the record should reflect that this is not a complete copy of C.R.S. 24-34-301.

MR. MARTIN:  Okay.  We'll have it on the record, but I won't be asking about that specific definition.

MS. PASSAMANECK:  Okay.  And if for some reason, Ms. Sullivan, you know what 10 is or 24 is and need them for any answers, let me know and we'll figure out what to do at that point.

Q    (By Mr. Martin)  All right.  So this is Section 24-34-301 of the Colorado Anti-Discrimination Act, and we're going to go to Section 15(a), which states, "Person means one or more individuals, limited liability companies, partnerships, associations, corporations, legal representatives, trustees, receivers, or the state of Colorado and all of its political subdivisions

and agencies."

Is this the definition that the division uses to define a person under the Colorado Anti-Discrimination Act?

A    Yes.

Q    Based on this definition, could a civil rights advocacy group file a complaint of discrimination?

MS. PASSAMANECK:  Objection; form.

A    The division has never seen a case like that before, and so it would likely consult with counsel.  But this says one or more individuals, limited liabilities companies, partnerships, associations, corporations, legal representatives, trustees, receivers, et cetera.  So we would likely use the definition in determining whether we have jurisdiction to take a charge.

Q    (By Mr. Martin)  And if that civil rights advocacy group was a limited liability company or a partnership or a corporation, then it would be a person who could have experienced discrimination under CADA and file a complaint, correct?

MS. PASSAMANECK:  Objection; form.

A    A person here, person, has to allege discrimination based on a protected class.  It

would depend on the facts and circumstances of that specific case.  And again, because we've never had that happen, we would likely consult with counsel before moving forward, if at all.

Q    (By Mr. Martin)  Assuming they do allege discrimination, would the division at least conclude that that limited liability company or partnership, that's also a civil rights group, could at least be a person and that has jurisdiction to file a complaint?

MS. PASSAMANECK:  Objection; form.

A    Again, because it's a context and facts that I've never seen before, I would consult with counsel prior to making any conclusion.

Q    (By Mr. Martin)  And after consulting with counsel, the division would make the final determination on whether or not that organization is a person, correct?

MS. PASSAMANECK:  Objection; form.

A    The division would make the determination, but they take advice from counsel.

Q    (By Mr. Martin)  All right.  And do you have any policies that would prohibit the division from investigating a charge brought by a civil rights group?

MS. PASSAMANECK:  Objection; form.

A    Not to my knowledge.

Q    (By Mr. Martin)  Okay.  So you would -- you could not say that the division would not investigate a charge alleging discrimination brought by a civil rights group that was, say, a corporation?

MS. PASSAMANECK:  Objection; form.

A    Again, the division has never received such a charge and has never seen that situation. It would be fact and context dependent, and we would consult with counsel prior to making a decision, and I can't say how we would handle it definitively.

Q    (By Mr. Martin)  But it is possible that the division could move forward with a complaint brought by such a group?

MS. PASSAMANECK:  Objection; form.

A    It's possible, but again, that has never occurred.

Q    (By Mr. Martin)  All right.  Let's go to the next exhibit.

(Exhibit 5 was marked.)

Q    (By Mr. Martin)  All right.  This is Exhibit Number 5, Section 24-34-600.3 of CADA, and

a wide array of businesses to be a place of public

accommodation in order to prevent discrimination?

MS. PASSAMANECK:  Objection; form.

A    The division processes charges of

discrimination in a consistent and standard manner

using the intake and investigations manual and

statute and regulations.

MR. MARTIN:  All right.

(Exhibit 6 was marked.)

Q    (By Mr. Martin)  I'll give you a moment

to review it if you need it, but do you recognize

this document?

A    This looks like it is some sort of

training document that maybe came from outreach at

CCRD.  I don't know the date of the document or

whether this is updated or when it was created.

Q    Okay.  This is a document that we

received in discovery and the PDF said it was --

the title said it was from October of 2025.  Does

that sound like the time that this could have been

produced?

MS. PASSAMANECK:  Objection; form.

A    Yes.

Q    (By Mr. Martin)  Okay.  And who developed

the content in this document?

*AB Litigation Services*

A    The content would have been developed by a CCRD's outreach staff.

Q    Okay.  And how would that have used it?

A    So this typically would have been provided during an online training on public accommodations.

Q    Okay.  And who would be the recipients of that training?

A    The trainings are open to the public.

Q    And how is the public made aware of these trainings?

A    The trainings and dates thereof are posted on the division and commission's website online.

Q    And to your knowledge, does the division still employ this particular PowerPoint in its trainings?

A    I cannot say without checking with my outreach manager whether this specific training is being used right now.

Q    Would you say that the training PowerPoint here accurately describes the division's policies and practices?

MS. PASSAMANECK:  Objection; form.

A    Without taking the time to review the

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

**752**

*AB Litigation Services*

entire document, I cannot say with certainty, but from my limited review of it sitting in front of me, it does look like at least some of it is applicable.

Q    (By Mr. Martin)  We're just going to look at one slide in it in particular.  If you need to reference something, you can.  But let's go to CCRD002198.

MS. PASSAMANECK:  Ms. Sullivan, just so you're aware, what he's referring to are the Bates numbers at the bottom right-hand, and those are put on in producing documents to opposing counsel.

THE DEPONENT:  Thank you.

Q    (By Mr. Martin)  His slide says, "Public Accommodation Examples," and it says, "Public accommodations are any place we are when not at home, work or school," and then it lists a few examples as well.

Would you say this accurately describes how the division defines a place of public accommodation?

MS. PASSAMANECK:  Objection; form.

A    To me it looks like this PowerPoint presentation was created to give a training to the general public.  So I think that the verbiage used

in here is meant to make it easier and more digestible for the public versus the division in processing charges of discrimination.

The division uses the intake and investigations manual, regulations governing CADA, and statute.

Q    (By Mr. Martin)  So the division would not use this definition to determine what a place of public accommodation is?

A    No.

Q    Why, then, did it feel comfortable sharing this to the public if it's not what it itself uses to define a place of public accommodation?

A    I can't speak to the person's intent who created this document, because I did not create it, but as I stated, perhaps they were trying to make this more digestible for the general public, rather than someone who works for division staff and is using the intake and investigations manual, regulations, and statute.

Q    And so what would you say is different -- I'll start over.

What is different about the division staff definition of a public accommodation from

754

this definition provided from the training?

MS. PASSAMANECK:  Objection; form.

A    The division is following its intake and investigations manual, the regulations that govern CADA, and statute to define a place of public accommodation.

Q    (By Mr. Martin)  And in reviewing those resources, is it reasonable to say the division would conclude that this definition is, in fact, what a place of public accommodation means?

MS. PASSAMANECK:  Objection; form.

A    To clarify, are you asking if the division is looking at regulation, statute, and its intake and investigations manual if it's going to determine that this, on this page, 2198, meets the definition?

Q    (By Mr. Martin)  Correct.

MS. PASSAMANECK:  Same objection.

A    I think that this training document is extremely broad and, as stated before, is directed at a different audience.  Whereas, division staff would not necessarily say that this, the items on this -- these are pictures in this.  And the division staff is going to use the intake and investigations manual and regulations and statute

to determine what a place of public accommodation is.

Q    (By Mr. Martin)  Aside from the intake and investigations manual, regulations, and statute, are there any other documents or policies or guidelines that the division uses to define a place of public accommodation?

A    The intake team would also have the opportunity to work with division management.  And, again, if we have facts or context that we have not seen before, we consult with counsel in the attorney general's office.

Q    Okay.  Would you say that an online business without a physical storefront could qualify as a place of public accommodation under CADA?

MS. PASSAMANECK:  Objection; form.

A    It depends on the facts and circumstances regarding that online business.  The online business would have to engage in sales to the public and offer services, facilities, privileges, advantages, or accommodations to the public.

Q    (By Mr. Martin)  If the online business were to do those things, offer sales and goods to the public, it could qualify as a place of public

context of that place.  I can't say definitively without more information.

Q    (By Mr. Martin)  Does the fact that a business engages in issue advocacy have any impact on how the division analyzes whether or not it's a place of public accommodation?

MS. PASSAMANECK:  Objection; form.

A    The division would use this definition and applicable regulations to determine whether the entity is a place of public accommodation in any case that is filed consistently.

Q    (By Mr. Martin)  And so if a business that did sell goods to the public was also engaged in issue advocacy, it is then possible that it is also a place of public accommodation; is that correct?

MS. PASSAMANECK:  Objection; form.

A    If the business is engaged in any sales to the public and offering services, facilities, privileges, advantages, or accommodations to the public, it is possible.

Q    (By Mr. Martin)  All right.  Let's go to Exhibit 7.

(Exhibit 7 was marked.)

Q    (By Mr. Martin)  And this is Section

**757**

A    Without information, facts, and context developed during a case, the division would not make a determination that disparate impact occurred, et cetera.

Q    (By Mr. Martin)  What additional facts would be needed in that scenario to determine that discrimination had occurred?

A    Well, first, the division would need to determine whether the entity that was being visited was actually a place of public accommodation and whether the prospective complainant was filing a case alleging differential treatment based on a protected class to establish jurisdiction to even take the case for investigation.

And then during the investigation, the full facts and circumstances would be collected; and without more information on specific facts and circumstances, I wouldn't want to speculate.

Q    (By Mr. Martin)  So let's say that in this scenario, an African American man requested to sit on the patio, and the restaurant owner came and said, I'm sorry, the patio is only available for white customers, so I'm not going to seat you out there.  And then the individual left the restaurant, was not served, and filed a charge of

discrimination.  In that scenario, would you say that the complainant received disparate, unfavorable treatment by the restaurant owner?

MS. PASSAMANECK:  Objection; form.

A    So to clarify, you're asking about an actual interaction?

Q    (By Mr. Martin)  Correct.

A    So the division, before making a determination, would look to see whether or not the place of public accommodation was denying this individual goods, services, facilities, privileges, advantages, or accommodations based on the individual's protected class or that the individual's presence or patronage was unwelcome or objectionable based on a protected class prior to making any sort of determination; and that determination would be fact and context specific.

Q    In that scenario, would the division consider access to the patio to be a service, facility, privilege, advantage, or accommodation under CADA?

A    Under the limited facts that you provided, yes, it's possible.

Q    And if the restaurant owner explicitly said to the complainant patron, We will not allow

**759**

A I think that, according to CADA, that -- sorry, I got kind of lost in there. Can you please restate your question?
Q (By Mr. Martin) Would you agree that, along with the regulations, CADA also requires that businesses make available restrooms to individuals based on their gender expression?
MS. PASSAMANECK: Objection; form.
A I believe that CADA and the regulations are two separate guiding principles that are used to determine whether an individual has been denied goods, services, facilities, privileges, advantages, or accommodations.
Q (By Mr. Martin) So restrooms could be one of those facilities regulated under CADA, correct?
A I believe so.
Q And if a business were to deny a transgender man access to a men's restroom, would that be providing, that facility, unequal terms based on that individual's protected status?
MS. PASSAMANECK: Objection; form.
A That would depend on the specific facts of the interaction, and analysis would need to be done to determine, first, whether the entity was a

Confidential

and the division didn't believe that that interaction rose to the level of harassment, you're saying the division would not conclude that the restaurant violated CADA?

MS. PASSAMANECK:  Objection; form; misstates testimony.

A    For an interaction to be found to violate CADA, the interaction has to show that the place of public accommodation treated the complainant differently intentionally, intentionally treated the complainant differently based on the complainant's protected class, and then the complainant has to subjectively experience that treatment to be the denial of goods, services, facilities, privileges, advantages, or accommodations because of their protected class.

And then, lastly, the division has to objectively determine that a reasonable person under the same circumstances as the complainant would have experienced that interaction to be a denial of the goods, services, facilities, privileges, advantages, or accommodations based on their protected class.

So all of those are taken into account and are very fact and context specific.

Q   (By Mr. Martin)  In that description, you didn't mention harassment.  So when does the division determine whether or not a denial needs to rise to the level of harassment to violate CADA?

A   The analysis that I just stated in terms of the intentional, that is the analysis that is used for harassment.  It is when an individual is intentionally treated differently based on protected class and the place of public accommodation creates an environment that is both subjectively and objectively hostile based on that person's protected class.

MS. PASSAMANECK:  Counsel, we've been going over an hour.  Should we take a break?

MR. MARTIN:  I have a few more questions on this, and then we can take a break.

MS. PASSAMANECK:  I want to take a break now.

MR. MARTIN:  Can I just ask a few more, and then --

MS. PASSAMANECK:  I will give you three more, but I don't want the situation where we go on for another 20 minutes.  So three more questions.

MR. MARTIN:  Okay.  I will not go on for another 20 minutes, for sure.

**762**

goods, services, facilities, et cetera, based on protected class.

MR. MARTIN:  Okay.  We'll take a break there.

(Break from 10:25 a.m. to 10:36 a.m.)

Q    (By Mr. Martin)  All right.  Going back to the PowerPoint here.  This also states, lists, "Refusal to accommodate an individual's transition or gender identity expression."

Can you describe what it means for a place of public accommodation to refuse to accommodate an individual's transition or gender identity expression?

A    I think it would be fact specific.  It depends on the context of the case.  But I think an example might be the restroom example you just gave.

Q    Is using an individual's chosen name a part of accommodating an individual's transition or their gender identity expression?

A    I think it could be a part of the analysis.

Q    And using a person's preferred pronouns, would that also be a part of accommodating an individual's transition or gender identity

**763**

expression?

A    Again, I think it's fact specific and context specific, but I think it could be part of the analysis.

Q    And when you say it would be part of the analysis, can you describe what you mean by that? What part of the analysis would that play?

A    I think that we are looking at the sum of all of the circumstances to determine whether the individual was denied goods, services, facilities, privileges, advantages, or accommodations based on their protected class.

Q    Do you believe that accommodating an individual's transition or gender expression is an accommodation as that term is used in CADA in the denial clause?

MS. PASSAMANECK:  Objection; form.

A    Can you give me a second to look at the definition in CADA?

Q    (By Mr. Martin)  Yes, sure.

MS. PASSAMANECK:  I think that's Exhibit 7.

A    So to be clear, you are asking me if refusal to accommodate an individual's transition or gender identity expression would be a denial of

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

**764**

an accommodation?

Q    (By Mr. Martin)  Correct.

MS. PASSAMANECK:  Objection; form.

A    I think it's possible.  I think it would depend on the specific facts of what happens and the circumstances.

Q    (By Mr. Martin)  What kind of facts would be needed for the division to determine that, in such a circumstance, there was a denial of an accommodation under CADA?

A    We're looking for facts that would show that the individual was denied goods, services, privileges, facilities, advantages, or accommodations because of their protected class. So facts would have to support that.

Q    And in the instance of someone misgendering or deadnaming, let's say a public accommodation misgendered or deadnamed an individual, a patron at their place of public accommodation, what facts would the division look to to determine whether or not that amounted to a denial of a facility, good, service, accommodation under CADA?

A    So just to clarify, now we're only talking about -- we're talking about just

misgendering and deadnaming?

Q    That's right.

A    Okay.  So that would go to what I was discussing before the break where the place of public accommodation has to -- we have to show that the place of public accommodation intentionally deadnamed or misgendered the individual based on that person's protected class, here gender identity, and that that deadnaming or misgendering rises to the level of harassment.

Q    Okay.

A    And so that harassment means that the individual subjectively experienced the conduct to be a denial of the goods, services, facilities, privileges, advantages, or accommodations at a place of public accommodation because of their gender identity, and the division would have to objectively determine that an individual under the same circumstances as the complainant would experience that deadnaming or misgendering, the conduct, to be a denial of goods, services, privileges, facilities, advantages, accommodations at the place of public accommodation based on the individual's protected class.

Q    And let's just back up one moment.  Would

you define how the -- or how does the division define misgendering?

A    So misgendering is referring to an individual by a gender other than their preferred gender or how they identify.

Q    And how does the division define deadnaming?

A    Deadnaming is the use of an individual's birth name -- an individual that is transgender or nonbinary, the use of their birth name after they have changed their name following a gender transition.

Q    Okay.  So let's say that the division received a complaint by a patron at a place of public accommodation and the division concludes this is a place of public accommodation, it has jurisdiction.  The individual was deadnamed or misgendered, and they asserted in their charge that they felt that that was discriminatory.  Would that be enough for the division to conclude that the complainant had met that subjective prong of the analysis that you mentioned?

MS. PASSAMANECK:  Objection; form.

A    So to be clear, you're just asking if the complainant saying that they experienced the

conduct as a denial of goods, services, et cetera, is enough to make meet the subjective part of that?

Q    (By Mr. Martin)  Right, they said they felt discriminated against.

A    Yes.

Q    I'd like to go back to this Appendix D, Exhibit 3.  When the division analyzes claims that someone was misgendered or deadnamed at a place of public accommodation, would it employ these elements under Enjoyment of PA Provision here under Appendix D?

A    This would be part of the analysis, yes.

Q    What else would be part of the analysis?

A    The division would also look to the regulations governing CADA, such as Rule 81.6.

Q    Okay.  And is it possible that an investigator could rely solely on these elements without going to Rule 81.6 to analyze a claim alleging deadnaming or misgendering in a place of public accommodation?

MS. PASSAMANECK:  Objection; form.

A    The language contained in 81.6 isn't part of this, but it is implicit in the analysis of whether harassment occurred during allegations involving deadnaming or misgendering.

Q    (By Mr. Martin)  Okay.  So it's possible that division staff could find probable cause on a claim of misgendering or deadnaming in a place of public accommodation by just referencing these elements without going to Rule 81.6 to make that determination?

MS. PASSAMANECK:  Objection; form.

A    So, no, I would not say that.

Q    (By Mr. Martin)  Okay.

A    So for deadnaming or misgendering to be considered discrimination, they would have to rise to the level of harassment, and that analysis would require the analysis that's discussed in 81.6 as I discussed prior.

Q    Do you have any -- I'll strike that.

Have you instructed division staff that when they are reviewing claims of misgendering or deadnaming by a place of public accommodation, that they need to employ Rule 81.6 in that analysis?

A    I wouldn't say that, but I think that it is understood at the division that 81.6 is implicit in the analysis of those types of claims.

Q    Okay.  All right.  Let's go to the next exhibit here.

(Exhibit 9 was marked.)

**769**

determination.  Would you like me to speak to the first or the --

Q     (By Mr. Martin)  I'm asking about the objective.

A     Okay.  So to be clear, are we -- to give this some context, because everything depends on facts and context, are you asking about a misgendering or deadnaming interaction?

Q     That's correct, yes.

A     Okay.  So for the objective part of the analysis, the division would have to determine that a reasonable person under the same circumstances as the complainant would experience the conduct to be a denial of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation based on that individual's protected class, here, gender identity, because it's involving deadnaming or misgendering.

Q     Could there ever be an instance where a place of public accommodation intentionally misgendered or deadnamed a patron in an interaction in a way that wasn't objectively discriminatory?

MS. PASSAMANECK:  Objection; form.

A     So intentional deadnaming and

*AB Litigation Services*

misgendering are not per se CADA violations.  A situation such as that would be fact and context specific, and it would have to rise to the level of harassment.

So the complainant -- we would have to determine that the place of public accommodation intentionally deadnamed or misgendered the complainant based on the protected class.  And then the complainant would have to subjectively experience that conduct as a denial of goods, services, facilities, privileges, advantages, or accommodations at the place of public accommodation based on their gender identity, their protected class.

And then, lastly the division would have to objectively determine that a reasonable person under the same circumstances as the complainant would have experienced the conduct as the denial of full and enjoyment -- or the goods -- excuse me, as a denial of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on protected class, here, gender identity.

Q    (By Mr. Martin)  And on page 11 of this document, you list a number of factors that the

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

**771**

regulations.  That was our very first exhibit.

MS. PASSAMANECK:  Actually, it was not, Counselor.  That was the second.

MR. MARTIN:  Oh, right.  My bad.

Q    (By Mr. Martin)  And we're going to go to Rule 81.6.

MS. PASSAMANECK:  It's page 1651 at the bottom.

Q    (By Mr. Martin)  Okay.  And are division staff instructed on how to use these regulations in conducting probable cause analyses?

A    The division staff are guided by the intake and investigations manual and the regulations that govern CADA.

Q    And let's specifically talk about Rule 81.6.  So we've discussed Rule 81.6, and specifically 81.6(A)(4) mentions that unlawful harassment could include deliberately misusing an individual's preferred name, form of address, or gender-related pronoun.

In your review, how does the regulation relate to the Colorado Anti-Discrimination Act?  Does it implement it or is it doing something different?

MS. PASSAMANECK:  Objection; form.

A    So these words are not in the Colorado Anti-Discrimination Act, but this analysis is implicit in determining whether an individual has been denied goods, services, facilities, privileges, advantages, or accommodations based on a protected class.

Q    (By Mr. Martin)  So you're saying that this essentially implements CADA?

MS. PASSAMANECK:  Objection; form.

A    I wouldn't use those exact words.  I would say that this is implicit in the analysis of cases.

Q    (By Mr. Martin)  And when analyzing -- and you would say that when dealing with claims of misgendering or deadnaming at a place of public accommodation in an interaction, Rule 81.6 is part of the CADA analysis; is that right?

MS. PASSAMANECK:  Objection; form.

A    It is part of the analysis of whether an individual has been denied goods, services, et cetera.

Q    (By Mr. Martin)  And when analyzing claims under this specific regulation, am I correct that when you're analyzing whether deliberately misusing an individual's preferred name, form of

**773**

address, or gender-related pronoun, whether it violates this rule, it needs to be subjectively or objectively experienced as discriminatory; is that correct?

MS. PASSAMANECK:  Objection; form.

A    You said subjectively or objectively.  So to be considered discriminatory, the deadnaming or misgendering would have to rise to the level of harassment, meaning that the place of public accommodation intentionally deadnamed or misgendered the complainant based on their protected class.

And then the complainant would have to show that they subjectively experienced that deadnaming or misgendering conduct to be a denial of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation based on their gender identify, and the division would have to determine objectively that a reasonable person under the same circumstances as the complainant would have experienced that conduct to be the denial of goods, services, facilities, privileges, advantages, or accommodations based on a protected class.  And all three of those factors have to be met.

*AB Litigation Services*

Q    (By Mr. Martin)  All right.  And specifically, what would the division look to to determine whether a place of public accommodation's deadnaming or misgendering was objectively hostile, intimidating, or offensive such that it would rise to the level of harassment and violate this rule?

A    The division would look to whether a reasonable person under the same circumstances as the complainant would have experienced the conduct to be a denial of goods, services, facilities, privileges, advantages, or accommodations based on a protected class; in this case, gender identity.

Q    And would a reasonable person conclude that the intentional deadnaming of a transgender-identifying person would be objectively hostile, intimidating, or offensive?

MS. PASSAMANECK:  Objection; form.

A    I think that would depend on the specific facts of the interaction.  That would be highly context dependent.

Q    (By Mr. Martin)  But it is possible that the division would conclude so?

MS. PASSAMANECK:  Objection; form; asked and answered.

A    It's possible.

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

**775**

Q    (By Mr. Martin)  And would a reasonable person conclude that intentional misgendering would be objectively hostile, intimidating, or offensive?

A    Can you please restate the question?

Q    Would a reasonable person conclude that intentional misgendering is objectively hostile, intimidating, or offensive?

MS. PASSAMANECK:  Objection; form.

A    That is highly fact specific and would depend on whether that person -- or whether a reasonable person under the same circumstances as the complainant felt would experience that conduct to be a denial of goods, services, facilities, privileges, advantage, or accommodations based on a protected class.

Q    (By Mr. Martin)  Okay.  And to clarify, when conducting an analysis under the objective prong, the division would use these factors that you've outlined on page 11 and 12 of your interrogatory response to XX-XY; is that right?

MS. PASSAMANECK:  Objection; form.

A    I think those factors are some factors that could be considered, but not necessarily all factors that might be considered.  The division would look at the totality of the circumstances.

Q    (By Mr. Martin)  So it's really -- are these factors published anywhere for division staff to use or look at?

A    To be clear, are you referring to the ten -- the factors in the --

Q    (Nodded head.)

A    No, they aren't.

Q    Is there a specific number of these factors that need to be found for the case to rise to the level of harassment in violation of CADA?

A    No.  There are -- those are factors that could be considered, and there's -- not all of them might be considered.  There are other factors that could be considered.  Again, it would be highly dependent on the specific facts of an actual case.

Q    Okay.  Does the division believe that deadnaming and misgendering are equally as harmful as using racial slurs?

MS. PASSAMANECK:  Objection; form.

A    The division doesn't have a belief on that.

Q    (By Mr. Martin)  Okay.  Does -- would the division say that similar harms emanate from racial slurs as the harms that emanate from deadnaming and misgendering?

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

**777**

*AB Litigation Services*

conducted in response to document requests by Plaintiffs, I attach as Exhibit A a chart summarizing cases with letters of determination involving allegations of misgendering and/or deadnaming against places of public accommodations. In total, there are 17 cases, and one in which a finding a probable cause of discrimination was made."  I believe there was a slight typo in that last sentence, but did I read that correct?

A    Yes.

Q    Are you familiar with the cases that are identified in Exhibit A?

A    Yes.

Q    What is the general time period that the complaints in these cases were made?

A    I believe that the time period was from 2016 to present.

Q    Okay.  Were any of these complaints made after May 16th, 2025?

A    Not that I'm aware.

Q    So all of these complaints would have been made before the passage of H.B. 25-1312; is that correct?

A    To my knowledge, yes.

Q    And when I refer to H.B. 25-1312, you're

aware of the piece of legislation that I'm referring to?

A    Yes.

Q    When the division makes a probable cause determination, does it try to be thorough with its reasoning in its written opinion?

MS. PASSAMANECK:  Objection; form.

A    Yes.  The division uses the available evidence and the facts and context that we have collected during the investigative process and issues a letter of determination that is as thorough as possible.

Q    (By Mr. Connolly)  Okay.  Does the division explain its reasoning?

A    Yes.

Q    Does the division list out all of the facts that led to a finding of probable cause?

MS. PASSAMANECK:  Objection; form.

A    The division issues a letter of determination that provides reasoning as to why the determination was made.

Q    (By Mr. Connolly)  And in that determination, it would list the facts that led to its finding of a probable cause, correct?

A    Most cases have a long form letter of

promulgated 3 C.C.R. 708-1:81.6, covering sexual orientation harassment.  That regulation clarifies that, quote, deliberately misusing an individual's preferred name, form of address, or gender-related pronoun may create an environment that is subjectively and objectively hostile and therefore violate CADA.  This regulation is still in effect and applies to housing, employment, and public accommodations discrimination."

Did I read that correctly?

A    Yes.

Q    Now, we have been focusing on the part of Rule 81.6 earlier in this deposition that refers to deliberately misusing an individual's name or pronoun, but Rule 81.6 applies more broadly to other provisions or other actions as well, right?

MS. PASSAMANECK:  Objection; form.

A    Yes.

Q    (By Mr. Connolly)  Thinking about the regulation more broadly, so not just the deadnaming and misgendering provision, has the division ever found probable cause than an employer violated Rule 81.6 by engaging in unlawful harassment against an employee?

MS. PASSAMANECK:  Objection; form.

A    The division has found probable cause in employment cases that allege harassment of an employee, yes.

Q    (By Mr. Connolly)  Very roughly, ballpark, do you know how many times that has happened since you've been there --

MS. PASSAMANECK:  Objection; scope.

Q    (By Mr. Connolly)  -- in the employer-employee context?

A    Sitting here, I don't know the exact number of times.

Q    More than 50?

MS. PASSAMANECK:  Objection; scope.

A    I wouldn't want to speculate.  I don't want to guess.  I'm not sure of the exact number.

Q    (By Mr. Connolly)  Okay.  More than five?

A    I would say more than five, yes.

Q    Has the division ever found probable cause that a company engaged in unlawful harassment in housing under Rule 81.6?

A    By company, are you referring to a housing provider or an HOA or an entity that would be providing housing?

Q    Let me rephrase.  Has the division ever found probable cause that anyone engaged in

unlawful harassment in housing?

A    Yes.

Q    Can you give me an example of how that would occur?

A    So I can't think of exact specifics off the top of my head, but harassment might occur in the housing context where someone is treated differently based on a protected class, such as race, based on their activity -- I mean, based on their protected classes.  They are treated differently in a housing context based on their protected class.

Q    Can you give me an example of how someone could be harassed in the housing context?

A    An example might be if they were at an interaction where they were referred to as a racial slur.

Q    Okay.  So maybe a landlord is interacting with someone who rents there and uses a racial slur, that could be a form of harassment?

A    It could be, yes.

Q    Okay.  So, similarly, has the division ever found probable cause that anyone operating within a place of public accommodation engaged in unlawful harassment under Rule 81.6?

*AB Litigation Services*

MS. PASSAMANECK:  Objection.

A    I wouldn't say it like that.  We have had cause cases in the public accommodations context, but we wouldn't refer to them as probable cause under Rule 81.6.

81.6 is implicit in the analysis, and it is used as a tool for determining whether a complainant was subjected to the provisions of CADA or subjected to violations of the provisions of CADA.

Q    (By Mr. Connolly)  So sitting here today, you can't recall any example of the division ever specifically finding that Rule 81.6 was violated, that there was probable cause that Rule 81.6 was violated by somebody operating in a place of public accommodation; is that correct?

A    I wouldn't say it like that.  So the division has found probable cause in harassment cases where 81.6 would have been used as a tool for analysis to determine whether harassment occurred. But the division's finding may not denote that it was based on 81.6 or cite 81.6.

Q    Correct.  And you can't think of a specific example where the division said, We hereby conclude that Rule 81.6 was likely violated,

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

**783**

correct?

A    I've seen many cases, and I can't, sitting here, identify a specific case.

Q    Does the division have any internal guidance that says that Rule 81.6 is, quote, implicit in the analysis of how you figure out whether somebody who is operating in a place of public accommodation violates CADA?

MS. PASSAMANECK:  Objection; form.

A    The division looks to guidance in its intake and investigations manual and the regulations of CADA.

Q    (By Mr. Connolly)  Okay.  And are you aware, is that -- are those instructions in either your intake manual or the regulations?

A    To clarify, are you asking if there is specific guidance pertaining on the use of 81.6 and its application?

Q    Correct.

A    Not to my knowledge.

Q    When did the division reach the determination that Rule 81.6 is implicit in the analysis of when you determine whether someone is -- who is operating in a place of public accommodation is violating CADA?

MS. PASSAMANECK:  Objection; form.

A    I can't speak to exact dates, as it might have been before I was an employee at the division as an investigator, but since I have been in my role, it has been understood that it is implicit and used as a tool in harassment analysis.

Q    (By Mr. Connolly)  How do you know that it's understood if it's not written down anywhere?

MS. PASSAMANECK:  Objection; form.

A    The division looks to its intake and investigations manual and also informs its practices based on previous cases that it has received and how those cases have been handled.

Q    (By Mr. Connolly)  Now, focusing on Rule 81.6(A)(4), which applies to deliberately misusing an individual's preferred name, form of address, or gender-related pronoun, has the division ever found probable cause that an employer engaged in unlawful harassment of an employee by misgendering or deadnaming?

MS. PASSAMANECK:  Objection; form and scope.

Michael, just so she has it, I pulled up her exhibit of 81.6.

A    Sitting here, I can't think of any.

*AB Litigation Services*

Q    (By Mr. Connolly)  Has the division ever found probable cause that a place of -- that an -- strike that.

Has the division ever found probable cause that someone operating in a public accommodation likely violated Rule 81.6(A)(4) by misgendering or deadnaming?

MS. PASSAMANECK:  Objection; form.

A    Not to my knowledge, no.

Q    (By Mr. Connolly)  In paragraph 10 of your declaration, you state, "In May 2025, H.B. 25-1312 amended the definition of gender expression to expressly include an individual's chosen name and how the individual chooses to be addressed."

Did I read that right?

A    Yes.

Q    You're aware of the legislation H.B. 25-1312, correct?

A    Yes.

Q    When the legislature was considering H.B. 25-1312, were you having any discussions with the legislature about the legislation?

A    No.

Q    Do you know if anyone at the division was having any discussions with anyone at the

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

**786**

legislature about H.B. 25-1312?

A    To my knowledge, no one at the division was engaged in any discussions regarding 1312 with the legislature.

Q    After H.B. 25-1312 was enacted, did the division issue any new internal guidance as to how to implement the new law?

A    No.

Q    Why not?

A    The division hadn't received any cases pertaining to the new legislation.

Q    Did the division ever make a determination as to how H.B. 25-1312 changed CADA?

A    The division did not, and the division continued to process charges of discrimination in a standard and consistent manner in accordance with statute.

Q    Let me ask you a different way then.  How does the division interpret H.B. 25-1312 to have changed CADA?

MS. PASSAMANECK:  Objection; form.

A    The division has interpreted 1312 to amend the definition of gender expression.

Q    (By Mr. Connolly)  And practically speaking, what does that mean?

81.6 and that analysis is implicit in determining whether an individual has been denied the goods, services, facilities, privileges, advantages, accommodations of a place of public accommodation based on protected class.

Q    To your knowledge, does CADA prohibit harassment?

MS. PASSAMANECK:  Objection.

A    CADA prohibits discrimination, which harassment may be a type of discrimination that occurs based on a protected class.

Q    (By Mr. Connolly)  So harassment is a type of discrimination that can occur under CADA; is that correct?

A    Yes.

Q    So there may be other forms of discrimination that can occur under CADA that are not harassment; is that correct?

A    Yes.

MS. PASSAMANECK:  Michael, if we could just go off the record for one minute.

MR. CONNOLLY:  Sure.

(Discussion off the record.)

Q    (By Mr. Connolly)  Paragraph 12 of your declaration -- actually, strike that.

Let's go to paragraph 17.  It says here, "I reviewed the Amended Complaint in the Defending Education action and the Amended Motion for Preliminary Injunction and Brief in Support, both filed June 13th, 2025."  Did I read that correct?

A    Yes.

Q    So you were generally aware of the type of speech that the plaintiffs in the Defending Education action want to make, correct?

A    Yes.

Q    You're aware of the Plaintiffs Colorado Parent Advocacy Network, also known as CPAN, and Protect Kids Colorado, also known as PKC?

A    Yes.

Q    You're aware that Lori Gimelshteyn is the head of CPAN and Erin Lee is the head of PKC, correct?

A    Yes.

Q    I will represent to you based on these filings that Lori and Erin want to go to places of public accommodation, like a hotel or a restaurant, and they want to misgender and deadname specific people while they are in a place of public accommodation.

Does that sound like an accurate

description of the speech they want to engage in according to your review of the documents?

A    Yes.

Q    Now, let's say that instead of Lori and Erin doing this, it is employees of a hotel.  So we've got a hotel in Colorado that is holding an event, and the hotel's employees want to specifically misgender and deadname people who are in the audience.  Is it possible that the division could find probable cause against this hotel for violating CADA?

MS. PASSAMANECK:  Objection; form.

A    I would need more information and facts and context to answer that question.

Q    (By Mr. Connolly)  What additional information would you need?

A    I would need to know if the -- you're referencing a hotel, correct?

Q    Yes.

A    We would need to know if the hotel or those employees of the hotel were acting as a place of public accommodation.  We would need to know if they were providing goods, services, facilities, privileges, advantages, or accommodations to the general public.

Q   Okay.  So I will represent to you that in this situation, the hotel is holding an event. Everyone is allowed to attend.  And at the event there are speakers, and these speakers are hotel employees, and those hotel employees are misgendering and deadnaming individuals who are in the room.

A   So as --

MS. PASSAMANECK:  Objection; form. Sorry.  I wasn't sure if there was a question there.

Q   (By Mr. Connolly)  So once I give you those facts, now can you determine whether there is probable cause -- whether there might be probable cause that those hotel employees are violating CADA?

MS. PASSAMANECK:  Objection; form.

A   So based on the specific facts that you gave me, I would need to know whether these employees were providing goods, services, et cetera, to the general public.

In the example that you provided, where they are just engaged in speech or advocacy, they would not be a place of public accommodation because they would not likely be providing services

that relate to their employment at the hotel.

Q    (By Mr. Connolly)  So in this situation, the hotel would not be a place of public accommodation?  A hotel that is welcoming individuals off the street to hear speakers, the division would not consider that hotel to be a place of public accommodation?

MS. PASSAMANECK:  Objection; form.

A    To clarify, was your question about the employees that were speaking or the hotel that was speaking?

Q    (By Mr. Connolly)  Let's use the hotel -- either.  Hotel or the employees, could either of them -- is it possible that the division could find probable cause that either the hotel or the employees violated CADA?

MS. PASSAMANECK:  Objection; form.

A    It depends on the specific facts and the context.  When an entity is engaging in advocacy alone, that would not be a violation of CADA.  It would not be a place of public accommodation based on just the speech, because the speech in itself does not show a denial of goods, services, facilities, privileges, advantages, or accommodations based on a protected class.

*AB Litigation Services*

Q    (By Mr. Connolly)  Yes, but in this situation, I'm not talking about the plaintiff organizations in this case.  I'm talking about the hotel or the hotel employees.  So in my example, could the hotel or the hotel employees -- is it possible that the hotel or hotel employees might be violating CADA in the facts that I gave you?

MS. PASSAMANECK:  Objection; form.

A    To clarify, are we talking about speech itself or the provision of goods or services?  In your example, are you talking about an instance where they are at this supposed place of public accommodation, and they are providing goods and services, or are you just talking about they are engaged in speech or advocacy?

Q    (By Mr. Connolly)  Let me summarize the facts again and make sure we're on the same page.

Hotel, call it a Marriott.  Marriott in Denver says, We are going to have an event.  We're talking about -- we're talking about food all day, and everyone from the street is welcome to come in and listen to Marriott, and the Marriott employees are going to talk about anything and everything.

When people come in off the street, the hotel and the hotel employee -- the hotel employees

are specifically misgendering and deadnaming individuals that come in off the street to listen to the hotel talk about -- talk during their event.

Is it possible that the division would find probable cause that this hotel has violated CADA because of its misgendering and deadnaming of specific individuals?

MS. PASSAMANECK:  Objection; form.

A    Okay.  So first we would look to determine that the hotel is actually a place of public accommodation.  And then I believe that the next part of your question involves an interaction where the employees of a place of public accommodation are intentionally deadnaming people at the place of public -- individuals at the place of public accommodation.

So that interaction would -- the intentional misgendering and deadnaming alone are not per se discrimination.  They must rise to the level of harassment.  And so you would need to show that the place of public accommodation intentionally deadnamed or misgendered those individuals based on their gender identity, and that the individual subjectively experienced that conduct to deny them the goods, services,

facilities, privileges, advantages, or

accommodations of that place of public

accommodation based on their gender identity.

And then the division would need to objectively determine that a reasonable person under the same circumstances as the complainant would have experienced the conduct to be a denial of the goods, services, facilities, privileges, accommodations, or advantages of the place of public accommodation based on gender identity.

Q   (By Mr. Connolly)  So you cannot -- if those three factors were met, then it is possible that the division could find that the hotel, in my example, violated CADA, correct?

A   It is possible.

Q   Paragraph 18, you state, "Based on my review, it does not appear that Plaintiffs CPAN or PKC offer any good, service, facility, privilege, advantage, or accommodation to the general public that would subject them to CADA's public accommodation provisions."

Did I read that correctly?

A   Yes.

Q   Is it the division's position that an organization cannot be liable under CADA unless

people.  Is it your position that the KKK would not be in violation of CADA?

MS. PASSAMANECK:  Objection; form.

A    I would need to determine if the KKK was a place of public accommodation and engaged in the goods -- in providing goods, services, facilities, privileges, advantages, or accommodations to the general public.  If the KKK was not deemed to be a place of public accommodation because the organization was not providing those services, the division would not have jurisdiction because they would not be a place of public accommodation.

Q    (By Mr. Connolly)  Do you have any internal guidance that would support this -- which I, frankly, find very astonishing -- conclusion?

A    The division looks --

MS. PASSAMANECK:  Objection; form and argumentative.

A    The division looks to its intake and investigations manual for guidance as well as the regulations that govern CADA.

Q    (By Mr. Connolly)  And sitting here today, are you aware of anything in your -- in those documents that supports your interpretation?

MS. PASSAMANECK:  Objection; form.

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

**796**

*AB Litigation Services*

A    With regard to the terminology in those documents, are you asking what the documents specifically state?

Q    (By Mr. Connolly)  Yes.

A    I think that we would look at the intake and investigations manual and the regulations that govern CADA consistently, and it would depend on the facts and context of the case.

Q    Has the division ever found that an individual likely violated CADA?

MS. PASSAMANECK:  Objection; form.

A    To be clear, your question could include someone that is an employer or a housing provider or an individual that provides goods, services, facilities, privileges, advantages, or accommodations to the public.  If you're asking about that context, then the person might have -- we would have jurisdiction over the individual and could look at a case, and an individual could possibly violate CADA.

Q    (By Mr. Connolly)  You could have an individual working for a company and the company, and both might possibly be in violation of CADA, correct?

A    It's context specific.  It depends on

what kind of case it is and the facts of the case.

Q    But it's possible, correct?

A    Possible.

MS. PASSAMANECK:  Do you want a break, Michael?

MR. CONNOLLY:  Sure, that's fine.

(Break from 1:08 p.m. to 1:18 p.m.)

Q    (By Mr. Connolly)  Going back to our KKK example that we were talking about.  So, again, to refresh, this is where the KKK is holding an event at a hotel and refusing to let Black people come into their events.  Is it possible that the commission could find probable cause that the hotel was violating CADA?

MS. PASSAMANECK:  Objection; form.

A    So we would need to look at whether the hotel was a place of public accommodation and whether the hotel was providing goods, services, facilities, privileges, advantages, or accommodations to the public.

Q    (By Mr. Connolly)  So let's assume that both of those are true.  Could the division find that a hotel -- that this hotel was likely violating CADA?

MS. PASSAMANECK:  Objection; form.

**798**

*AB Litigation Services*

advantages, or accommodations to the public.

Q    (By Mr. Connolly)  And where are you -- where are you getting that?  Do you have anything in your internal documents or regulations or anywhere that makes that interpretation of CADA?

A    The division looks to its investigations and intake manual and the regulations governing CADA, and its analysis is also informed by cases that it has received in the past.

Q    Sitting here today, can you identify a single place where you ever made that interpretation?

A    In every public accommodations case, the charges are processed and analyzed in a consistent and standard manner regardless of protected class.

So in public accommodations cases, in order for the division to have jurisdiction in a public accommodation cases we have to first determine whether the entity that a prospective charge is filed against is actually a place of public accommodation.  And if the entity is not a place of public accommodation, the division does not take the charge of discrimination.  They don't have jurisdiction over the case.

Q    (By Mr. Connolly)  Respectfully, you

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

**799**

didn't answer my question.  Do you have any -- can you right now sitting here think of any place where you have ever made the interpretation that you just gave me?

MS. PASSAMANECK:  Objection; form; asked and answered.

A    The division, to my knowledge, has never received a case that involved advocacy.  So in light of that, if we did receive such a case and those facts and circumstances were there, we would likely confer -- we would talk to counsel and discuss before moving forward.  But again, we have never seen this before.

Q    (By Mr. Connolly)  I'd like to introduce another exhibit.  You should have these in front of you.  This is your response to our interrogatories.

(Exhibit 12 was marked.)

Q    (By Mr. Connolly)  Do you have the document in front of you?

A    Yes.

Q    Do you recognize this document?

A    Yes.

Q    It's titled "Division and Commission Defendants' Responses to Plaintiffs' First Set of Interrogatories," and at the last page there is a

privileges, advantages, or accommodations.

Q     On page 5, you reference the investigations and intake manual.  Can you tell me when that was last updated?

A     To my knowledge, it was 2023.

Q     And so during, this deposition when you're referring to the intake manual, you're referring to this version from 2023, correct?

A     Yes.

Q     At the bottom of page 6, do you see the ten factors -- or the ten relevant circumstances that you listed here?

A     Yes.

Q     Where did you get these circumstances?

MS. PASSAMANECK:  I believe she's already been asked this once by prior counsel.

If you can answer this question without revealing attorney-client privilege, you may.

A     We discussed with counsel.

Q     (By Mr. Connolly)  So these factors were provided to you by counsel?

MS. PASSAMANECK:  Answer that yes or no, that is it.

A     Yes.

Q     (By Mr. Connolly)  Are these factors

contained in your intake manual?

A    No.

Q    Page 8.  Do you see in the middle where it says, "As to Drs. Morrell's and Leswing's interactions"?

A    Yes.

Q    You are generally familiar with the speech that Dr. Morrell and Dr. Leswing want to engage in, correct?

A    Yes.

Q    Let's assume that Dr. Morrell and Dr. Leswing are repeatedly misgendering and deadnaming one of their patients.  Is it possible that the division would find probable cause that they were in violation of CADA?

MS. PASSAMANECK:  Objection; form.

A    So to be clear, we're talking about an interaction while they are treating a patient, correct?

Q    (By Mr. Connolly)  Correct.

A    So intentional deadnaming and misgendering is not a per se CADA violation.  It depends on context and the facts of the specific interaction and it has to rise to the level of harassment.

**802**

*AB Litigation Services*

Q   So is it possible that their speech --
that the division would find that their speech
violated CADA?

A   The division would first have to
determine that they were acting as a place of
public accommodation, and that they intentionally
deadnamed or misgendered an individual based on
that individual's gender identity, and that that
deadnaming and misgendering created an environment
that was both subjectively and objectively
offensive based on an individual's protected class.

Q   So let's assume that this speech occurred
at the doctor's office.  Let's say the patient
found it insulting.  Let's say it happened multiple
times.  Let's say the doctors purposefully did
this.  It wasn't an accident.

Under those facts, is it possible that
the division would find probable cause that
Dr. Morrell and Dr. Leswing violated CADA?

MS. PASSAMANECK:  Objection; form.

A   If the doctors are engaged in an
interaction that is related to their provision of
services in their practice, and an individual was
intentionally deadnamed or misgendered, and the
deadnaming and misgendering rose to the level of

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

803

harassment, meaning that it created an environment that was both subjectively and objectively hostile based on that person's gender identity, then it is possible that it would violate CADA.

Q    (By Mr. Connolly)  You've said a number of times that misgendering and deadnaming are not per se CADA violations; is that correct?

A    Yes.

Q    Would there be a situation where misgendering and deadnaming alone by a person in a place of public accommodation violated CADA?

A    Misgendering and deadnaming have to -- it depends on the facts and context, and they have to rise to the level of harassment.  Intent to deadname and misgender alone is not a violation of CADA.  It has to rise to the level of harassment.

Q    In your view, could intentionally deadnaming and misgendering by an individual in a place of public accommodation ever arise to the level of harassment under 81.6?

A    So I will speak to the division's practices rather than to my view, because I don't have a view.  I'm speaking in my official capacity. But in order for -- if the intentional deadnaming and misgendering rose to the level of harassment

**804**

and created an environment that both subjectively and objectively created an environment that was hostile based on an individual's protected class, it would violate CADA.

Q    So you cannot say that the division won't find probable cause that someone violated CADA for misgendering and deadnaming alone in a place of public accommodation, correct?

MS. PASSAMANECK:  Objection; form.

A    I would say that differently.

Q    (By Mr. Connolly)  How would you say it?

A    Intentional deadnaming and misgendering alone are not a violation of CADA.  They have to rise to the level of harassment.  The conduct has to rise to the level of harassment to violate CADA.

Q    And that is the division's interpretation of CADA?

A    And applicable regulations that govern CADA, yes.

Q    Another hypothetical for you.  A transgender person walks into a restaurant.  This person was born a male, and his birth name is Tom, but the person now identifies as female and goes by Sarah.  The bartender knows this person's original name.  The customer gets all the services that the

restaurant offers, but for in the next hour the bartender repeatedly calls the person Tom and repeatedly refers to the person by he/him pronouns. The transgender person finally gets sick of it and leaves.

In this factual situation, could the division find probable cause that the restaurant violated CADA?

MS. PASSAMANECK:  Objection; form.

A    So, again, same analysis here.  This is based on an interaction where deadnaming and misgendering occurred, and the deadnaming and misgendering would have to rise to the level of harassment.

So the place of public accommodation, if it's deemed to be a place of public accommodation, would have to intentionally deadname or misgender the individual based on that individual's protected class, and then the individual must subjectively experience that conduct as being a denial of the goods, services, facilities, privileges, advantages, or accommodations at the place of public accommodation based on gender identity.

And lastly, the division would have to determine that a reasonable person in the same

**806**

circumstances as the complainant would also experience that conduct to be a denial of the goods, services, facilities, privileges, advantages, or accommodation of the place of public accommodation based on protected class.  And that analysis would be context and fact specific.

Q    (By Mr. Connolly)  So it is possible that the restaurant in this situation could be -- it is possible -- strike that.

So it is possible that in this situation the division could find probable cause that the restaurant violated CADA, correct?

A    If the misgendering and deadnaming rose to the level of harassment, it is possible.

Q    Another one.  Now we have a restaurant that has a Twitter page.  Every day the restaurant is issuing tweets, and in the tweets it is specifically misgendering and deadnaming specific people.  A transgender person reads these tweets and feels that the person wouldn't be welcome at that restaurant based on all of the tweets that this restaurant is making.

Is it possible that the restaurant, because of these tweets, would be in violation of CADA?

was adopted in 2023, correct?

A    Correct.

Q    And when were the regulations last amended?

A    I can't speak to the date that the regulations were last amended.  The division and commission engage in updating rules with the assistance of counsel.  But if you are referring to -- are you referring to Rule 81.6 or just the rules in general?

Q    The rules in general.

A    The rules in general are updated with the guidance of counsel at statutorily required time frames.

Q    They haven't been updated since May of 2025, correct?

A    Correct.

Q    The division is charged with enforcing CADA, correct?

A    Correct.

Q    So if actions or speech violate CADA as written, the division will enforce that statute, correct?

MS. PASSAMANECK:  Objection; form.

A    The division would first have to

violate CADA.

Q    (By Mr. Connolly)  I'm trying to ask a more basic question, and it was probably poorly worded.  Let me try again.

H.B. 25-1312 amended CADA, correct?

A    Yes.

Q    The division intends to enforce CADA when the statute is violated, correct?

A    If the division has jurisdiction to take a complaint and a complaint is actually made with a complainant and a case and the division has jurisdiction, it will investigate the case.

Q    And take -- and not only investigate, but take whatever other steps are authorized by CADA with regard to that case, correct?

A    Yes, and to -- to further that statement, however, though, when the division has jurisdiction to investigate a case, it doesn't necessarily mean that a cause finding will be issued.  So jurisdiction in itself doesn't mean that there is a violation of CADA.  Whether there is probable cause to believe that discrimination occurred is only established throughout the investigative process by collection of evidence, et cetera.

Q    But if someone is violating CADA, the

**809**

division will enforce the statute, correct?

A    Yes.

MR. CONNOLLY:  Thank you.  I don't have any further questions.

MS. PASSAMANECK:  I've got no redirect. I'm going to put this computer just over here, and we'll turn it over to counsel.

MR. MARTIN:  We're going to move on to Exhibit 13.

(Exhibit 13 was marked.)

MS. PASSAMANECK:  This is 2 of 3 and 3 of 3.  Is there a 1 of 3?  It doesn't appear to be a full document.

MR. MARTIN:  1 of 3 was just stated Exhibit A.  This was taken from our brief.

MS. PASSAMANECK:  Okay.  Very good.

EXAMINATION

BY MR. MARTIN:

Q    Have you seen this document before?

A    Yes.

Q    And you're aware that this is a post that XX-XY Athletics made on its official X account; is that right?

A    Yes.

Q    All right.  If an individual were to file

a charge of discrimination alleging that while perusing Twitter they saw this post and believed that it was a discriminatory publication, would the division investigate that charge?

A    So this is -- if I understand your question, you're asking about the statement that is on -- the statement alone?

Q    Correct, yes.  All that they allege in the charge was that they were on Twitter and/or X, and they saw this string of posts, it's seven together, would the division investigate that charge?

A    So the statement on its own is not a violation of CADA, because it doesn't say that an individual will be denied goods, services, facilities, privileges, advantages, or accommodations or that their patronage or presence is unwelcome at a place of public accommodation based on their protected class.

And without a complaint or a complainant, the division would not have reason to investigate a charge of discrimination.

Q    So I understand your position on whether this violates CADA or doesn't.  I'm just asking -- let's change the hypothetical.

*AB Litigation Services*

Let's say that an individual does file a charge, and they say, while perusing Twitter, I saw this post and it made me feel unwelcome at XX-XY Athletics.  Would that be enough for the division to just start an investigation?  So I'm not asking whether or not it violates CADA, just is it enough to start an investigation.

A    The post in itself does not describe an interaction where a person would have been subjected to an adverse action based on their protected class.  The post is just a statement itself, and it doesn't tell what an interaction would look like.

So if a -- let's say an individual -- if an individual contacted the division with this, because the division has never received a charge based on a written communication, the division would likely consult with counsel before deciding how to handle a case like this.

Q    So it is possible that -- given the hypothetical, it is possible that the division would proceed to the investigation stage?

MS. PASSAMANECK:  Objection.

A    In order to proceed to the investigation stage, the division would have to conduct an

*30(b)(6) Colorado Civil Rights Division, Aubrey C. Sullivan  - 01/19/2026*

**812**

analysis to determine whether the entity was a place of public accommodation and whether the individual was alleging that they were treated differently based on a protected class.

But when the division does establish jurisdiction based on those allegations, it investigates charges of discrimination.

Q    (By Mr. Martin)  And so it's possible that the division would conclude that there was, in fact, jurisdiction, at least, over such a charge?

A    In this instance, this is just a policy or a statement that is being made by XX-XY Athletics, and unless the policy or statement states that an individual will be denied goods, services, privileges, advantages, or accommodations based on a protected class or that their presence is unwelcome based on a protected class, there is not a violation of CADA.

And because there is not a violation of CADA, it is not something -- this doesn't look like there is an allegation of differential treatment being made.

Q    All right.  But you use the investigation process to determine whether or not there's been a violation of CADA, correct?

A    We do.  But prior to the investigative process, the division had to determine whether there is jurisdiction or not to take the case and investigate the case.  And if there is not jurisdiction, because the entity is not a place of public accommodation or someone is not alleging that they were treated differently based on a protected class, then we would not take the case.

Q    All right.  I'm going to go back to Exhibit 9.  So this is your first supplemental response to plaintiffs first set of interrogatories, and I'd like to go to page 5.

And this is what you've said already in your testimony today, but just to clarify it, in the first paragraph on page 5, you say that, "The Policy does not state that XX-XY intends to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of XX-XY based on a protected trait."

Why did you conclude that this statement does not state that?

A    Because the statement doesn't say that an individual -- an individual will be denied goods, services, facilities, privileges, advantages, or

*AB Litigation Services*

meaning that it is both subjectively -- it is

creating an environment that is both subjectively

and objectively hostile based on the individual

protected class, their gender identity.

Q   (By Mr. Martin)  Is it possible for a

single instance of deadnaming or misgendering to

amount to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A   In order for deadnaming or misgendering

to be a violation of CADA, the place of public

accommodation would have to intentionally treat,

deadname or misgender, an individual based on their

gender identity; and then the individual would have

to subjectively experience that conduct to be a

denial of the goods, services, facilities,

privileges, advantages, or accommodations of a

public accommodation based on the individual's

gender identity.

And then the division would have to

objectively determine that a reasonable person in

the same circumstances as the complainant would

experience the conduct as a denial of goods,

services, facilities, privileges, advantages, or

accommodations based on their gender identity.

MS. PASSAMANECK:  Counsel, I don't mean

Q    (By Mr. Martin)  Yes.

A    To be in violation of CADA, it would have to state that an individual would be denied goods, services, facilities, privileges, advantages, or accommodations based on a protected class or that their presence or patronage is objectionable or unwelcome based on a protected class.

Q    And is it possible for that communication to state that an individual's presence is unwelcome or objectionable based on a protected class without stating that it is going to engage in harassment or stating that it is going to create an objectively -- an objectively hostile environment?

MS. PASSAMANECK:   Objection; form.

A    I think that is very fact and context specific, but I think it's possible.

Q    (By Mr. Martin)  Okay.  So then it's possible that publishing -- that XX-XY's publishing of this post in Exhibit 13, it's possible that that could create -- that could make someone feel unwelcome or objectionable, but not necessarily that -- strike that.

MR. MARTIN:  I think we may stop there. Let's take a break.

(Break taken from 3:05 p.m. to 3:16 p.m.)

*AB Litigation Services*

MS. PASSAMANECK:  Objection; form.

A     Every case is different, and it depends on context and the specifics of the case, and the division looks to its intake and investigations manual and the regulations that govern CADA and CADA itself to process the case.

Q    (By Mr. Martin)  So let's say that -- going back to the original hypothetical.  Let's say that the complainant alleged that XX-XY Athletics misgendered them five different times, and that the complainant stated that XX-XY Athletics was using incorrect pronouns, and XX-XY Athletics continued to misgender the complainant.

Would those facts be enough for you to determine that that misgendering by XX-XY Athletics had risen to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A     Again, all cases are different, and we would look to see if the three prongs that we've discussed are met if we are analyzing whether deadnaming or misgendering rises to the level of harassment.

Q    (By Mr. Martin)  And are those facts that I gave you sufficient for you to make the harassment determination?

A    Please restate the facts.

Q    A person visited the XX-XY pop-up shop in the Pilates studio that was open to the public. They were selling goods and services to the public. They misgendered an individual five times. The individual is a customer. And the individual told the employee that the employee was using incorrect pronouns, and the employee continued to misgender the complainant.

If you received that charge, would those be enough facts for you to determine that that encounter had arisen to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A    The division would need to determine whether the place of public accommodation, provided that it is actually a place of public accommodation, intentionally deadnamed or misgendered the individual based on that individual's gender identity, and that the individual subjectively experienced the conduct as a denial of goods, services, facilities, privileges, advantages, or accommodations based on their gender identity.

And then the division would have to objectively determine that a reasonable person in

the same set of circumstances as the complainant would have experienced the conduct as a denial of goods, services, facilities, privileges, advantages, accommodations based on a protected class, based on gender identity.

Q    And I understand that's how the division would analyze that.  What I'm asking is are those facts sufficient for you to make a determination, yes or no?

A    I think that I can't speak to what an individual would feel subjectively without an actual case.  And I think that there are a lot of facts and circumstances that go into developing a case, and without a collection of evidence and facts and doing a full investigation, I can't answer that.

Q    Okay.  And are there any additional facts that, if proven, would show that, yes, that encounter did rise to the level of harassment?

A    It's possible.  But again, it would depend on the specific facts of the interaction and the circumstances of what occurred.

Q    In the hypothetical I gave you, it is possible that that encounter could rise to the level of harassment, correct?

MS. PASSAMANECK:  Objection; form.

A    Again, it would be fact and context dependent, but it's possible.

Q    (By Mr. Martin)  Okay.  And could it be possible that -- let's change the hypothetical a bit to say that there was only one instance -- let's change the hypothetical to be that the XX-XY employee knew that a transgender person, a transgender customer identified as a man, but the employee referred to that customer as her or she or ma'am.

Is it possible that that deliberate misgendering could rise to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A    So intentional deadnaming and misgendering by themselves are not per se violations of CADA.  The intentional deadnaming or misgendering would have to rise to the level of harassment and would have to create an environment that is both subjectively and objectively hostile based on the individual's protected class, and those analyses are very fact and context specific.

Q    (By Mr. Martin)  I'm asking, though, if just the harassment analysis, whether it's

possible, just possible that the division could find that there was harassment based on one instance of deliberate misgendering to a customer?

MS. PASSAMANECK:  Objection; form; asked and answered.

A    The division would need to look at the full circumstances of the interaction.

Q    (By Mr. Martin)  Okay.  If the complainant alleged that she thought the employee who misgendered her used a rude or mocking tone, could that affect the analysis of whether the encounter rose to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A    Again, every case is different, fact specific, and the analysis would be the came.  It would depend on whether the place of public accommodations intentionally treated the individual differently, in this case, deadnamed or misgendered the individual based on the individual's gender identity, and whether the conduct created an environment that was both subjectively and objectively hostile based on the individual's protected class.

Q    (By Mr. Martin)  So just to be clear, though, it is not your position that a single use,

a single instance of misgendering or deadnaming
could never rise to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A    Again, it would be fact specific and
depend on the specific interactions -- specific
facts of an interaction, excuse me.

Q    (By Mr. Martin)  All right.  I'm going to
move on to Born Again Used Books.  What do you know
about Born Again Used Books?

A    The information that I know is from
reviewing the documents in this case.

Q    What are the basic facts about the
business that you're aware of?

MS. PASSAMANECK:  Objection; form.

A    They are a bookstore.

Q    (By Mr. Martin)  And you understand they
sell books to the public?

A    Yes.

Q    And you understand they're a storefront
that's open to the public?

A    Yes.

Q    Okay.  And in the division's view, is
Born Again Used Books a place of public
accommodation?

A    If Born Again Used Books is providing

*AB Litigation Services*

A     I think that we had discussed this before, but using pronouns I do not believe would be a service.

Q     (By Mr. Martin)  All right.  But stepping back a bit, it is possible that intentional deadnaming or misgendering of a patron at a place of public accommodation could rise to the level of harassment such that it violates CADA; is that right?

A     Intentional deadnaming or misgendering, in order to be -- to rise to the level of discrimination must rise to the level of harassment and create an environment that is both subjectively and objectively hostile based on an individual's protected class.

Q     Is it possible for intentional deadnaming or misgendering of a patron by a place of public accommodation to create a subjectively and objectively hostile environment and rise to the level of harassment?  I'm simply asking if that is a possibility that could happen.

MS. PASSAMANECK:  Objection; form.

A     It depends on the facts and circumstances of an actual interaction; it is possible.

Q     (By Mr. Martin)  Okay.  Could there be a

**823**

situation or can you -- strike that.

Can you think of a scenario where the division would find that there was not an objectively hostile denial of service when a public accommodation intentionally deadnamed or misgendered a customer and the customer objectively experienced that experience as discrimination?

MS. PASSAMANECK:  Objection; form.

A    Because the division has never received a case based on a communication like this --

Q    (By Mr. Martin)  I'll just stop you for a moment.  At this point, I apologize, I'm not referring to the publication in specific.

A    Okay.

Q    I'm just asking in general.  Can you think of a scenario where the division would find that intentional misgendering or deadnaming did not rise to the level of harassment or an objective -- objectively hostile environment where there was intentional deadnaming and misgendering and the customer subjectively experienced the deadnaming or misgendering as discrimination?

MS. PASSAMANECK:  Objection; form.

A    I kind of got lost in your question.

Q    (By Mr. Martin)  The scenario is a

complainant alleges they were intentionally deadnamed or misgendered at a place of public accommodation, and the division finds that the customer subjectively experienced that encounter as discrimination.

Can you imagine a scenario where the division would not also find that that was an objectively hostile environment that was created by the misgendering or deadnaming?

MS. PASSAMANECK:  Objection; form.

A    The division would need to determine objectively whether a reasonable person in similar circumstances to the complainant would experience alleged conduct as a denial of goods, services, facilities, privileges, advantages, or accommodations based on their protected class. Sitting here, I can't think of specific examples.

Q    (By Mr. Martin)  Okay.  Going back generally to the charges -- potential charges against XX-XY Athletics.  If the division were to receive a complaint alleging that XX-XY Athletics misgendered or deadnamed the complainant at a pop-up shop in Colorado, can you say definitively that the division would not investigate that charge?