IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25–cv–01572–RMR–MDB
Civil Action No. 25–cv–01668–RMR–MDB
Civil Action No. 25–cv–02177–RMR–MDB

DEFENDING EDUCATION;
COLORADO PARENT ADVOCACY NETWORK;
PROTECT KIDS COLORADO;
DO NO HARM;
TRAVIS MORRELL;
VALERI LESWING;
MOUNTAIN PEDIATRICS,
COMMITTEE OF FIVE, INC., and
DOXA ENTERPRISES, LTD,

Plaintiffs,

v.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity,
SERGIO RAUDEL CORDOVA,
GETA ASFAW,
MAYUKO FIEWEGER,
DANIEL S. WARD,
JADE ROSE KELLY,
ERIC ARTIS, as members of the Colorado Civil Rights Commission, in their official capacities, and
PHIL WEISER, Colorado Attorney General, in his official capacity,

Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

**Magistrate Judge Maritza Dominguez Braswell**

This matter is before the Court on The Attorney General's Consolidated Motion to Dismiss ("AG Motion") and the Division and Commission Defendants' Consolidated Motion to Dismiss ("Division Motion"), filed in three related cases (collectively, the "Motions"). (Case No.

1:25–cv–01572–RMR–MDB (Doc. Nos. 81; 82); Case No. 1:25–cv–01668–RMR–MDB (Doc. Nos. 69; 70); Case No. 1: 25–cv–02177–RMR–MDB (Doc. Nos. 33; 34).) Plaintiffs have responded in opposition. (Case No. 1:25–cv–01572–RMR–MDB (Doc. No. 98); Case No. 1:25–cv–01668–RMR–MDB (Doc. No. 84); Case No. 1: 25–cv–02177–RMR–MDB (Doc. No. 46).) Defendants have replied in support (Case No. 1:25–cv–01572–RMR–MDB (Doc. Nos.108; 109); Case No. 1:25–cv–01668–RMR–MDB (Doc. Nos. 93; 94); Case No. 1: 25–cv–02177–RMR–MDB (Doc. Nos. 55; 56)). After reviewing the Motions, briefing, and applicable law, the Court respectfully **RECOMMENDS** that the AG Motion be **GRANTED in part and DENIED in part** and that the Division Motion be **GRANTED in part and DENIED in part**.

## BACKGROUND

### I. The Colorado Anti-Discrimination Act and H.B. 25-1312

The Colorado Anti-Discrimination Act ("CADA") "restricts a public accommodation's ability to refuse to provide services based on a customer's identity." *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1168 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. 570 (2023). CADA defines a public accommodation as "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public." Colo. Rev. Stat. § 24-34-601(1).

Under CADA's "Accommodation Clause," a public accommodation may not "directly or indirectly ... refuse, withhold from, or deny to an individual or a group, because of ... sex, sexual orientation, gender identity, [or] gender expression ... the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." Colo. Rev. Stat. § 24-34-601(2)(a). In other words, a public accommodation

may not deny the "full and equal enjoyment" of the accommodation based on one's protected status.

Further, under CADA's "Communication Clause," a public accommodation may not

> directly or indirectly ... publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of … sex, sexual orientation, gender identity, [or] gender expression[.]

*Id.*; *see also* Colo. Rev. Stat. § 24-34-701 (prohibiting the publication of discriminatory advertisements by persons who own or operate places of public accommodation). Sexual orientation was added as a protected class in 2008 and was defined to include "transgender status." *See* 2008 Colo. Legis. Serv. Ch. 341 (S.B. 08-200). Gender identity and gender expression were added as protected classes in 2021. *See* 2021 Colo. Legis. Serv. Ch. 156 (H.B. 21-1108).

In May 2025, H.B. 25-1312 amended the definition of "gender expression" to include an individual's "chosen name, and how the individual chooses to be addressed." *See* Colo. Rev. Stat. § 24-34-301(9). The bill further defined "chosen name" as "a name that an individual requests to be known as in connection to the individual's ... sexual orientation, gender identity, [or] gender expression, ... so long as the name does not contain offensive language and the individual is not requesting the name for frivolous purposes." Colo. Rev. Stat. § 24-34-301(3.5).

## II. Enforcement Under CADA

"CADA provides several different means of enforcement." *303 Creative LLC*, 6 F.4th at 1169. A person alleging a violation of CADA can bring a civil action in state court. *See* Colo. Rev. Stat. § 24-34-602(1)(a). An individual can also file charges alleging discrimination with the

Colorado Civil Rights Division (the "Division"), as can the Attorney General (the "AG"), the Colorado Civil Rights Commission (the "Commission"), or individual commissioners. *See* Colo. Rev. Stat. § 24-34-306(1); *see* § 24-34-306(1)(b) (stating that the AG, the Commission, or a commissioner can bring a complaint when the alleged discriminatory practice "imposes a significant societal or community impact"). Following the filing of a complaint,

> [t]he Director of the Civil Rights Division ... investigates the allegations and determines whether the charge is supported by probable cause. If probable cause is found, the Director provides the parties with written notice and commences a compulsory mediation. If mediation fails, a hearing may be held before the Colorado Civil Rights Commission, a single Commissioner, or an administrative law judge. If a violation is found after a hearing, the Commission may issue a cease and desist order against the offending public accommodation.

*303 Creative LLC*, 6 F.4th at 1169. At a hearing, the Commission is represented by counsel from the AG's office. *See* Colo. Rev. Stat. §24-34-306(8); 3 Colo. Code Regs. § 708-1:10.7(B) ("The case in support of the complaint shall be presented at the hearing by the attorney general's office as counsel in support of the complaint.").

**III. Plaintiffs**

Plaintiffs "believe that sex is immutable and fixed at birth" and that H.B. 25-1312 violates their First Amendment Right to "speak consistently with that view" because, according to Plaintiffs, the amendment makes it a "'discriminatory practice' ... to refer to transgender-identifying individuals by their birth name (i.e., not their 'chosen name') or to use biological pronouns (i.e., not their preferred pronouns) in a place of public accommodation." (1:25–cv–01572–RMR–MDB (Doc. No. 25 at ¶¶ 6-9).) Plaintiffs further contend that H.B. 25-1312 "means that Coloradans who operate in a place of public accommodation are prohibited from publishing or sending materials that refer to a transgender-identifying individual by their birth name ... or use their biological pronouns[.]" (*Id.* at ¶ 7.)

No Plaintiff alleges that H.B. 25-1312 has been enforced against them. They bring these cases as "pre-enforcement" challenges.

***Defending Education and Do No Harm***

Defending Education ("DE") and Do No Harm ("DNH") are "nationwide, grassroots" 501(c)(3) non-profit membership organizations. (*Id.* at ¶¶ 12, 15.) "DE's mission is to prevent ... the politicization of education and the spread of harmful gender ideology." (*Id.* at ¶ 12.) "DNH's mission is to ensure that medicine is driven by scientific evidence rather than ideology," and it "opposes the spread of gender ideology and the use of so-called gender-affirming medical treatments." (*Id.* at ¶ 15.) DE and DNH claim standing through their members, and do not assert organizational injury. (*Id.* at ¶¶ 49, 99.)

***Colorado Parent Advocacy Network and Protect Kids Colorado***

Colorado Parent Advocacy Network ("CPAN") is a Colorado 501(c)(4) non-profit organization with a "mission ... to defend the fundamental right of parents to direct the upbringing, care, and education of their children." (*Id.* at ¶ 51.) "In furtherance of this mission, CPAN ... opposes policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives." (*Id.* at ¶ 52.) CPAN is an advocacy organization. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 82-1[1] at 62 (29:17–20) (deposition of CPAN executive director Lori Gimelshteyn) (saying that CPAN "exists to support advocacy for Coloradans ... around issues that our organization is centered on").) In furtherance of its mission, CPAN has hosted events and gatherings at different public and private locations in Colorado. (*See id.* at 68–79 (noting, for example, a press conference in

[1] This document is a set of exhibits. The set is identical across all three cases and hereafter the Court will refer to it as the "Division Exhibits." Defendants included page numbers the bottom right hand corner of the document, which the Court will refer to when citing the document.

front of the Colorado Supreme Court, rallies and roundtables on the Capitol's steps, a press conference at the Arapahoe County Judicial Center, a summit at The Inverness Denver, and multiple events at different churches).)

Protect Kids Colorado ("PKC") is also a 501(c)(4) non-profit organization. It "aims to restore the principle that parents have a fundamental right to make decisions about their children's wellbeing and education," and "hopes to raise awareness about the prevalence of false gender ideologies and the dangers of so-called gender-affirming treatments." (1:25–cv–01572–RMR–MDB (Doc. No. 25 at ¶ 75).) Like CPAN, PKC is an advocacy organization and has hosted events and gatherings at different public and private locations in Colorado. (Division Exhibits at 93–102) (deposition of PKC executive director Erin Lee) (noting, for example, rallies on the Capitol's steps, the screening of a documentary at Denver University's Daniels College of Business, a ballot petition signing event at a sports bar, a press conference at the Byron White Federal Courthouse, and a town hall at a recreation center).)

CPAN and PKC do not claim standing through their members. They claim standing on their own behalf, asserting organizational injury. (1:25–cv–01572–RMR–MDB (Doc. No. 98 at 13–17).)

***Dr. Travis Morrell***

Dr. Morrell is a dermatologist practicing out of Mountain West Dermatology in Grand Junction. (1:25–cv–01572–RMR–MDB (Doc. No. 27-5 at ¶¶ 3–4).) Dr. Morrell "believe[s] that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity." (*Id.* at ¶ 5.) Dr. Morrell has "treated transgender-identifying, gender-dysphoric, and gender-questioning patients in [his] medical practice in the past .... [and] addressed these patients ... us[ing] biologically accurate pronouns and birth names." (*Id.* at ¶ 6.)

He does not "address or refer to patients using 'chosen names' connected to their 'gender expression' or preferred pronouns that conflict with the patient's biological sex." (*Id.*) Dr. Morrell "anticipate[s] treating transgender-identifying, gender-dysphoric, and gender-questioning patients in the future." (*Id.*) He believes H.B. 25-1312 "renders [him] unable to speak candidly about biological sex in [his] practice" and that he is "no longer allowed to use [his] preferred language in [his] practice." (*Id.* at ¶ 27.) Dr. Morrell is a member of DNH. (*Id.* at ¶ 2.)

Outside of his practice, and in his personal capacity, Dr. Morrell, "regularly speak[s] and write[s] on the issues of sex and gender as they relate to the medical profession." (*Id.* at ¶ 14.) In those speaking engagements and publications, he "opposes gender ideology... and raise[s] awareness about the dangers of gender-affirming care." (*Id.*) Dr. Morrell is "active on social media" and he "regularly publish[es] content that opposes gender ideology and refers to transgender-identifying individuals using biological pronouns and birth names rather than preferred pronouns or chosen names." (*Id.* at ¶ 16.)

***Dr. Valeri Leswing and Mountain Pediatrics***

Dr. Leswing is a pediatrician who owns and operates Mountain Pediatrics in Evergreen. (1:25–cv–01572–RMR–MDB (Doc. No. 27-6 at ¶¶ 3–4).) Dr. Leswing "believe[s] that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity." (*Id.* at ¶ 6.) Dr. Leswing has "treated transgender-identifying, gender-dysphoric, and gender-questioning patients in [her] medical practice in the past .... [and] addressed these patients ... us[ing] biologically accurate pronouns and birth names." (*Id.* at ¶ 7.) She declines to use "'chosen names' connected to [a patient's] 'gender expression' or preferred pronouns that conflict with the patient's biological sex." (*Id.*) Dr. Leswing "anticipate[s] treating transgender-

identifying, gender-dysphoric, and gender-questioning patients in the future." (*Id.*) Dr. Leswing says that "H.B. 25-1312 threatens to punish deadnaming and misgendering," and as a result, she "must stop addressing or referring to individuals in [her] medical practice using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported 'gender identity' or 'gender expression.'" (*Id.* at ¶ 23.) She says she fears "that, if [she] continue[s] to engage in [such] speech…[she] will be investigated by the Colorado Civil Rights Commission, sued by individuals, and face financial or equitable penalties." (*Id.*) Dr. Leswing is a member of DNH. (*Id.* at ¶ 2.)

Dr. Leswing's practice, Mountain Pediatrics, "maintains a Facebook page to advertise ... and communicate with the public." (*Id.* at ¶ 15.) Dr. Leswing "want[s] to post a statement on [the] Facebook page explaining to potential patients that ... [she] will not refer to them using biologically inaccurate terms like preferred pronouns and chosen names." (*Id.*) She has also "considered doing a formal review" of the "literature" regarding gender identity and expression on Mountain Pediatrics Facebook page. However, Dr. Leswing has not made either post. (Division Exhibits at 138–39 (80:21–81:19) (Dr. Leswing's deposition).) In her deposition, Dr. Leswing cited H.B. 25-1312 and "not wanting to generate further angst and anger in [her] community" as reasons she has not made the posts in question. (*Id.* at 139–40 (81:11–13, 82:21–22); *see id.* at 139 (81:11–13) (saying "I stopped considering [posting the literature review] as much after the law was passed, because I think it will lead to further anger in people who disagree with me" and "I'm concerned that the State will come after me if I refer ... to the patient ... by their biological sex or ... their biological pronouns, including using their given birth name").)

***Committee of Five d/b/a XX-XY Athletics***

XX-XY Athletics ("XX-XY") is an "athletic-apparel retailer ... grounded in the belief that men and women are physiologically different; sex is binary, biological, and immutable." (1:25–cv–01668–RMR–MDB (Doc. No. 1 at ¶ 1).) XX-XY generally sells its clothing online but it also "regularly" hosts "pop-up shops"—"physical, short-term retail locations"—at events in Colorado. (*Id.* at ¶¶ 32, 36–42; *see* 1:25–cv–01668–RMR–MDB (Doc. No. 84-1 at 347–352).) XX-XY makes apparel for men and women (1:25–cv–01668–RMR–MDB (Doc. No. 1 at ¶ 33)), and has sold apparel to at least two transgender individuals. (Division Exhibits at 172–73).)

XX-XY's "brand messaging" "focuses almost exclusively on protecting women's sports from the unfair inclusion of biologically male athletes," and "regularly" deadnames and misgenders transgender athletes in its online communications. (1:25–cv–01668–RMR–MDB (Doc. No. 1 at ¶¶ 48, 67–90).) It is also XX-XY's policy to deadname and misgender customers and members of the public. (*Id.* at ¶¶ 93–96.) XX-XY communicates with the public at its pop-up shops, at speaking events and public engagements, and through online advertising, email, posts on social media, and online review boards. (*Id.* at ¶¶ 42–45.) Asserting organizational injury, XX-XY claims standing as a corporation. (*Id.* at ¶ 12.)

***Doxa Enterprises d/b/a Born Again Used Books***

Born Again Used Books ("Born Again") is a store in Colorado Springs that sells books and provides "Christian literature and homeschool curricula." (1:25–cv–02177–RMR–MDB (Doc. No. 1 at ¶¶ 23, 25).) Born Again "curates its selection in accordance with its Christian faith.... the store will not sell books with a message that it believes contradicts its mission of providing uplifting Christian support[,] [a]nd it seeks out books for sale that advance this mission." (*Id.* at ¶ 41.) However, Born Again, "serves everyone regardless of gender identity. That includes customers who present as transgender." (*Id.* at ¶ 4.) Born Again has had

transgender individuals patronize the store on at least three occasions. (Division Exhibits at 186–94).)

Born Again maintains that the "use [of] pronouns, titles, or other language that does not align with an individual's biological sex" is inconsistent with its values. (1:25–cv–02177–RMR–MDB (Doc. No. 1 at ¶¶ 63–78).) As such, "[w]hen asked to use pronouns, titles, or language that does not align with a customer's biological sex," Born Again employees "respectfully decline and instead intentionally, respectfully, and consistently use a form of address that does not contradict the customer's sex, such as the customer's first or last name." (*Id.* at ¶ 77.) Born Again says it seeks to "formalize" and publish its pronoun policy, and a blog post on the subject, in writing. (*Id.* at ¶¶ 79–88; *see* 1:25–cv–02177–RMR–MDB (Doc. Nos. 4-2; 4-3).) However, Born Again contends that H.B. 25-1312 prevents it from publishing its pronoun policy or blog post without fear of sanction. (1:25–cv–02177–RMR–MDB (Doc. No. 1 at ¶¶ 111–17).) It further contends H.B. 25-1312 has caused "anxiety" in its employees about informally maintaining the pronoun policy, but it nevertheless "intends" to continue using biological pronouns. (1:25–cv–02177–RMR–MDB (Doc. No. 56-1 at 520–21).) Asserting organizational injury, Born Again claims standing as an LLC. (1:25–cv–02177–RMR–MDB (Doc. No. 1 at ¶ 12).)

## IV. The Motions to Dismiss

Defendants challenge Plaintiffs' standing to bring this pre-enforcement challenge.[2] (Division Motion at 16–28; AG Motion (stating that the AG joins the Division Motion's standing

[2] Defendants also argue Plaintiffs' claims are not ripe, either under Article III or a prudential ripeness framework. (Division Motion at 29–30.)

The Article III ripeness argument overlaps with Defendants' pre-enforcement standing argument. (*See id.* at 30 ("For the same reasons outlined above that Plaintiffs lack standing, Plaintiffs have not shown any threatened injury that is sufficiently imminent to establish Article III ripeness."));

arguments), *id.* at 12–14.) The AG also argues he has Eleventh Amendment immunity. (AG Motion at 6–12.)

**PROCEDURAL HISTORY**

Plaintiffs initiated these actions during the spring and summer of 2025, following the passage of H.B. 25-1312. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 1); 1:25–cv–01668–RMR–MDB (Doc. No. 1); 1: 25–cv–02177–RMR–MDB (Doc. No. 1).) In light of the significant factual and legal overlap across each suit, the cases were assigned to a single presiding and magistrate judge. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 58); 1:25–cv–01668–RMR–MDB (Doc. No. 59); 1: 25–cv–02177–RMR–MDB (Doc. No. 6).) The parties resisted consolidation, (*see, e.g.*, 1:25–cv–01572–RMR–MDB (Doc. No. 74)), but agreed to a joint schedule for jurisdictional discovery, the preliminary injunction motions ("PI Motions"), and the instant Motions. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 75); 1:25–cv–01668–RMR–MDB (Doc. No. 64); 1: 25–cv–02177–RMR–MDB (Doc. No. 24).)

---

*Teva Pharms., USA, Inc. v. Weiser*, 709 F. Supp. 3d 1366, 1375 (D. Colo. 2023) ("Standing and ripeness are closely related in that each focuses on whether the harm asserted has matured sufficiently to warrant judicial intervention. In pre-enforcement challenges, moreover, standing and ripeness often boil down to the same question." (internal citation and quotations omitted) (quoting *Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022), *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014))), *aff'd*, 2025 WL 2555552 (10th Cir. Sept. 5, 2025).

The prudential ripeness inquiry is slightly different. *See United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 903 (10th Cir. 2016) (noting prudential ripeness "turn[s] on both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."). But here, Defendants say the lack of prudential ripeness requires dismissal for "all the same reasons ... as ... standing," and their paragraph addressing this issue is merely a conclusory rehash of their standing arguments. (*See* Division Motion at 30 (saying Plaintiffs lack prudential ripeness because "Plaintiffs have shown no hardship where" (1) CPAN and PKC are not regulated by CADA, (2) XX-XY and Born Again have not establish their conduct is proscribed by CADA or that there is a credible threat of enforcement, and (3) Drs. Leswing and Morrell have not established a chilling effect).) Because Defendants treat the prudential ripeness arguments as coterminous with their standing arguments, the Court will not analyze the prudential ripeness arguments separately.

Jurisdictional discovery was complete in January 2026, and the PI Motions were fully briefed in February. The PI Motions sought to enjoin Defendants from enforcing the gender expression and chosen name definitions as amended by H.B. 25-1312, as well as certain long-standing provisions in CADA that bar public accommodations from engaging in unwelcoming actions and communications. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 27 at 27); 1:25–cv–01668–RMR–MDB (Doc. No. 15 at 1–2); 1:25–cv–02177– RMR–MDB (Doc. No. 4 at 1–2).) On February 19, 2026, the Court held a hearing on the PI Motions. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 107); 1:25–cv–01668–RMR–MDB (Doc. No. 92); 1:25–cv–02177–RMR–MDB (Doc. No. 54).) [3]

Following the parties' arguments, the Court issued an oral recommendation that the PI Motions be denied. (PI Recommendation at 78:24–92:18.) The Court emphasized the "clear showing" standard applicable to preliminary injunction motions, (*see id.* at 85:15–22 (citing *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008); *Am. Encore v. Fontes*, 152 F.4th 1097, 1106 (9th Cir. 2025))), and determined Plaintiffs fell short. (*Id.* at 91:18–21; *see id.* at 90:2–3 (finding "two of the three factors weigh against finding a credible threat of enforcement").) The Court also reasoned that the requested injunction was "exceptionally broad," seeking to strike long-standing portions of CADA and requesting the same relief as the operative Complaint, which also counseled against a preliminary injunction. (*Id.* at 80:3–81:4.) The Court noted that it reviewed the "voluminous" record on an "expedited basis, ... in order to give Plaintiffs a prompt hearing without disrupting the Court's docket," and that the PI Recommendation "should not be read as a decision on the

[3] These documents are the transcript of the PI motion hearing filed in each of the cases. Because the transcript contains the Court's Recommendation, the Court will refer to the transcript as the "PI Recommendation."

pending motions to dismiss." (*Id.* at 92:1–7; *see id.* at 92:8–12 ("A finding that Plaintiffs have not made a clear showing that is required to carry their burden on the preliminary injunction motions is not a prediction of the outcome under [the motion to dismiss] standard and with the benefit of full briefing on those … motions.").)

On March 31, 2026, the presiding Judge adopted this Court's Recommendation and denied the PI Motions. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 115); 1:25–cv–01668–RMR–MDB (Doc. No. 98); 1:25–cv–02177–RMR–MDB (Doc. No. 60).)[4] The presiding Judge emphasized the threshold considerations discussed in the PI Recommendation, including the scope of the relief requested. (PI Order at 11–16.) She also concurred with the Court's determination that Plaintiffs fell short of making a "clear showing" of a credible threat of enforcement. (*Id.* at 15–16, 22.)

All Plaintiffs have appealed the PI Order to the Tenth Circuit. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 118); 1:25–cv–01668–RMR–MDB (Doc. No. 101); 1:25–cv–02177–RMR–MDB (Doc. No. 63).) The appeals remain pending at the time of this Recommendation.

## LEGAL STANDARD

Federal Rule of Civil Procedure Rule 12(b)(1) allows a court to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Such dismissal is not a judgment on the merits of a plaintiff's case; rather, it is a determination that a court lacks authority to adjudicate the matter. *Creek Red Nation, LLC v. Jeffco Midget Football Ass'n., Inc.*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016). A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking[,]" C*aballero v. Fuerzas Armadas Revolucionarias de Colombia*, 945 F.3d 1270, 1273 (10th Cir. 2019)

[4] The Court will refer to this document as the "PI Order."

(quotation omitted), and the dismissal is without prejudice. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006).

Challenges to subject matter jurisdiction may take two forms—a facial attack or a factual attack—each with distinct analytical frameworks. *U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). A facial challenge focuses on the sufficiency of the allegations in the complaint. *Id*. In resolving a facial challenge, "the district court must accept the allegations in the complaint as true." *Id*. Conversely, a factual challenge—the type of challenge at issue here—allows a party to "go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id*. (quotation omitted).

In addressing a factual challenge to subject matter jurisdiction, "the court does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id*. (citation and quotations omitted); *see also Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) ("[A] court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion"). The burden of establishing subject matter jurisdiction by a preponderance of the evidence lies with the party asserting it. *U.S. ex rel. Hafter D.O.v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999).

## ANALYSIS

### I. Article III Standing

Article III standing is a prerequisite to suit requiring "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*

*v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Defendants argue that Plaintiffs have failed to establish an injury in fact. (Division Motion at 16.) An injury-in-fact need not amount to an "actual arrest, prosecution, or other enforcement action," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), and can be found "even if a plaintiff has 'never been prosecuted or actively threatened with prosecution.'" *Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1203 (D. Colo. 2023) (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)). A plaintiff seeking prospective relief demonstrates an injury in fact if he "alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *Ward*, 321 F.3d at 1267 (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)). Moreover, in the First Amendment context, a plaintiff can also demonstrate injury in fact by establishing that he suffers from an "ongoing injury resulting from the statute's *chilling effect* on his desire to exercise his First Amendment rights." *Id.* at 1267 (quoting *Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987)) (emphasis in original).

"Line-drawing in standing cases is rarely easy," but in the First Amendment context, "the standing inquiry is particularly delicate." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006). Because "the First Amendment context creates unique interests ... [courts] apply the standing requirements somewhat more leniently, facilitating pre-enforcement suits." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (citing *Ward*, 321 F.3d at 1267); *see also Colorado Union of Taxpayers, Inc. v. Griswold*, 2023 WL 5426581, at *2 (10th Cir. Aug. 23, 2023) (unpublished) (noting the court "appl[ies] a low evidentiary bar for pre-enforcement

standing on First Amendment claims."); *see also Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) ("As to whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met is extremely low.").

Still, "[a] plaintiff bringing a facial challenge to a statute on First Amendment grounds ... must nonetheless establish an injury-in-fact sufficient to satisfy Article III's case-or-controversy requirement." *Ward*, 321 F.3d at 1267 (citing *Phelps v. Hamilton,* 122 F.3d 1309, 1326 (10th Cir. 1997)). Here, Defendants argue the following:

- The "Commerce Plaintiffs"—XX-XY and Born Again—have not established that their conduct is proscribed by CADA. (Division Motion at 23–28.)
- The Commerce Plaintiffs and the "Medical Plaintiffs"—Dr. Morrell, Dr. Leswing, and Mountain Pediatrics—have failed to demonstrate a credible threat of enforcement or chilling effect on their activities. (Division Motion at 21–23.)
- The "Advocacy Plaintiffs"—CPAN, PKC, DNH, and DE—lack standing because CPAN and PKC do not fit the definition of public accommodations,[5] and DNH and DE cannot assert standing through their members.

The Court considers each argument in turn.

**A. Commerce and Medical Plaintiffs**

1. Have the Commerce Plaintiffs established by a preponderance of the evidence that they are engaged in activities that are arguably proscribed by CADA?

Defendants argue the Commerce Plaintiffs' claimed injuries are too speculative to support a pre-enforcement suit because they have not established that their specific conduct violates CADA. (Division Motion at 19–21, 23–28.) Defendants' arguments boil down to two

[5] Defendants also say this argument applies with equal force to Dr. Morrell's personal speaking activities outside of his practice. (Division Motion at 19.)

primary contentions: (1) the Commerce Plaintiffs have not demonstrated that instances of deadnaming or misgendering are likely to occur, and (2) even if they did occur, deadnaming and misgendering are not *per se* violations of CADA; instead they are but one factor in a "highly fact-specific" inquiry into whether the individual has been denied the full enjoyment of an accommodation. (Division Motion at 5, 19–21, 23–28.)

The Court rejects the first argument. While it may be difficult to say when exactly the Commerce Plaintiffs will deadname or misgender customers or use deadnaming or misgendering in their brand's communications, it is almost certain to occur. Indeed, the owners of both Commerce Plaintiffs testified that such instances *have already occurred* and that they do not intend to make any changes to their practices. (*See* Division Exhibits at 180 (5:13), 182 (58:11–12) (Sey deposition); Division Exhibits at 186–87 (23:17–24:9), 195 (3:16–25) (Smith deposition).)

The second question presents a closer call. Determining whether a CADA violation has occurred requires, as Defendants say, a fact-intensive inquiry. (PI Recommendation at 87:18–88:2; *see also* Division Exhibits at 208 (Sullivan Declaration) ("Whether a place of public accommodation would violate CADA by failing and/or refusing to use an individual's chosen name ... and/or how the individual chooses to be addressed based on gender identity would be highly fact specific and contains both subjective and objective elements.... [I]t requires a close analysis of all facts and context of the usage and the circumstances related to the usage, including how such usage relates to providing any good, service, facility, privilege, advantage, or accommodation to the general public").) Under this fact-intensive inquiry, it is at least possible that Plaintiffs' conduct will *not* trigger enforcement. However, it is also possible that their conduct *will* trigger enforcement. Applying a preponderance of the evidence standard, the

question is whether the evidence tips one way or the other. *See Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1040 (10th Cir. 2006) ("The preponderance of the evidence standard requires the party with the burden of proof to support its position with the greater weight of the evidence." (footnote omitted)).

Here, the Commerce Plaintiffs have not suggested that they will deadname or misgender customers occasionally or accidentally; they intend to do so on an ongoing basis and as a matter of practice and strongly held beliefs. For example, Jennifer Sey, the owner of XX-XY testified that the "vast majority of the time" XX-XY employees use pronouns and honorifics in interactions with customers at its pop-up shops and that, because the company is "adamant in adhering to the truth about biological reality," it will always use "biologically [ ]correct pronouns." (1:25–cv–01668–RMR–MDB (Doc. No. 84-1 at 459:23–24, 460:2–3, 463:14).) Similarly, Eric Smith, the owner of Born Again, testified that "gendered language comes up a lot" in interactions with customers and if "we saw a biological reality of a man and he said, call me ma'am, we would say we are just not going to do that[.]" (*Id.* at 534:67:18, 534:68:10–13 (cleaned up).)

Thus, while it is true that context matters, and that one particular instance of deadnaming or misgendering may not, in and of itself, constitute a violation of CADA, the type of conduct described by the Commerce Plaintiffs is at least more likely than not to give rise to a denial—or perceived denial—of services at some point in the future. Accordingly, they have established by a preponderance of the evidence that their conduct is arguably proscribed by CADA. *Scott v. Allen*, 153 F.4th 1088, 1096 (10th Cir. 2025) (saying a pre-enforcement plaintiff "need not show that his intended conduct *actually* violates the law, just that it *arguably* does" (emphasis in original)).

2. <u>Have the Commerce and Medical Plaintiffs established by a preponderance of the evidence that there is a credible threat of enforcement?</u>

The credible threat prong "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Chiles v. Salazar*, 116 F.4th 1178, 1198 (10th Cir. 2024) (quoting *Peck*, 43 F.4th at 1133), *rev'd and remanded on other grounds*, 2026 WL 872307 (U.S. Mar. 31, 2026); *see Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987) ("[T]he Supreme Court has often found a case or controversy between a plaintiff challenging the constitutionality of a statute and an enforcement official who has made no attempt to prosecute the plaintiff under the law at issue."); *see also Mangual*, 317 F.3d at 57 ("As to whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met is extremely low."); *Peck*, 43 F.4th at 1129 ("[T]he First Amendment context creates unique interests.").

There are "at least three factors to be used in determining a credible fear of prosecution: (1) whether the plaintiff showed 'past enforcement against the same conduct'; (2) whether authority to initiate charges was 'not limited to a prosecutor or an agency' and, instead, 'any person' could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement." *303 Creative LLC*, 6 F.4th at 1174 (quoting *SBA List*, 573 U.S. at 164–65). "No one 'credible threat' factor is dispositive." *Chiles v. Salazar*, 2022 WL 17770837, at *4 (D. Colo. Dec. 19, 2022), *aff'd*, 116 F.4th 1178 (10th Cir. 2024), *rev'd and remanded on other grounds*, 2026 WL 872307 (U.S. Mar. 31, 2026).

As to past enforcement, Plaintiffs have not presented evidence of any enforcement action predicated on deadnaming or misgendering. (*See* PI Order at 20–22.) Nevertheless, the Court recognizes that one year is still a relatively limited period. It also recognizes that these suits

parallel the law's inception[6] and may be playing some role in the lack of enforcement. Thus, the Court finds the past enforcement factor to be neutral. *See Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1176 (D. Colo. 2023) (finding the past enforcement prong "appear[ed] to be neutral" when the law was "new" and "being implemented for the first time this academic year"); *see also id.* ("Even if this factor weighed against a finding of standing, that would not torpedo Plaintiff's claims.").

The second factor weighs in Plaintiffs' favor because under CADA, "any (would be) customer ... may file a complaint and initiate [enforcement proceedings]." *303 Creative LLC*, 6 F.4th at 1174, Thus, Plaintiffs must fear complaints brought not only by the State, but by any person patronizing their business. *See SBA List*, 573 U.S. at 164 ("The credibility of that threat is bolstered by the fact that authority to file a complaint ... is not limited to a prosecutor or an agency. Instead, the ... statute allows 'any person' with knowledge of the purported violation to file a complaint.").

The third factor—and, ultimately, the dispositive one here—is whether the State has disavowed enforcement. *See Rocky Mountain Gun Owners*, 121 F.4th 96, 110 (10th Cir. 2024) ("The threat of prosecution is generally credible where the defendant 'has not disavowed any intention of invoking' the statute against the plaintiff." (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979))).

Here, Defendant Sullivan offers some assurances by stating that deadnaming and misgendering are not *per se* denials of service:

> 1) the public accommodation must intentionally treat a customer or prospective customer differently based on their protected class status; (2) the customer must, as a subjective matter, experience the conduct at issue to be a denial of the full

---

[6] For example, 1:25–cv–01572–RMR–MDB was filed May 19, 2025, three days after Governor Polis signed the amendment into law.

> and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation because of the customer's gender identity; and (3) the Division would have to determine that a reasonable person, under the circumstances, would experience the conduct to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on their gender identity.

(Division Exhibits at 208, ¶ 11; PI Order at 18–19 (citing 1:25–cv–01668–RMR–MDB (Doc. No. 84-1 at 4)) (internal quotation marks omitted).) At the preliminary injunction stage, these statements created a meaningful hurdle for Plaintiffs. CADA enforcement decisions are highly "fact-specific" and because Defendants' representations indicated that "the mere act of speaking would not automatically trigger enforcement," (PI Recommendation at 87:18–88:2 (quoting Defendant Sullivan's declaration), 88:13–14)), the extraordinary remedy of a preliminary injunction was not appropriate. *See Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1250 (10th Cir. 2024); *see also U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc*., 883 F.2d 886, 888 (10th Cir. 1989) ("A preliminary injunction is an extraordinary remedy, the exception rather than the rule.").

However, at the motion to dismiss stage, Plaintiffs' burden is relatively lighter. *See Celli*, 40 F.3d at 327; *see also Rocky Mountain Gun Owners*, 121 F.4th at 108; *Lujan*, 504 U.S. at 561. Viewed through that lens, the calculus is different. The ultimate question before the Court is not whether the status quo should be disrupted, and Defendants broadly enjoined, but whether Plaintiffs should be permitted to move their claims forward at all. Put simply, do Plaintiffs have enough assurances from Defendants, such that adjudication of these issues is unnecessary? The answer is no.

Defendant Sullivan's assurances, are not the kind of clear and definitive commitments courts recognize as sufficient at the motion to dismiss stage. *See e.g., Ward*, 321 F.3d at 1268

(finding no disavowal where the plaintiff had been given "no assurances" he would not be charged under the law in question). *Cf. D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) (finding disavowal "where the ... prosecutor ... stated in an affidavit that he will *not* bring charges against [the plaintiff] for the conduct as he has described it" (emphasis in original)). She does not promise that complaints based on deadnaming or misgendering will always go unprosecuted. She promises only that enforcement will follow "a close analysis of all facts and context." (Division Exhibits at 208, ¶ 11. *See generally* PI Recommendation at 24:21–22 (noting that Defendants had not committed themselves to a "broad disavowal"; PI Order at 19–20 (where the presiding judge noted that "Defendants have not completely disavowed any possible prosecution.").) Defendant Sullivan's statements leave intact the State's full enforcement authority, and where a declaration continues to reserve rather than relinquish enforcement discretion, the disavowal is insufficient to halt the prosecution of a pre-enforcement action. *See Scott*, 153 F.4th at 1097 (declining to find disavowal where a state trooper "reserved the right" to file a criminal complaint against the plaintiff and the district attorney "[did] not disavow the possibility of a future prosecution"). In short, Defendants' failure to commit to a broad disavowal weighs against them, and with the balance of factors tipping in favor of Plaintiffs, the Court finds the credible threat of enforcement element satisfied.

3. Have the Medical Plaintiffs established by a preponderance of the evidence that their speech has been chilled?

In the First Amendment context, a plaintiff can demonstrate injury-in-fact by showing "the statute's chilling effect on his desire to exercise his First Amendment rights." *Peck*, 43 F.4th at 1129 (quoting *Ward*, 321 F.3d at 1267). Under the chilling effect test, "the plaintiff must provide (1) evidence that in the past they engaged in the type of speech or conduct affected by the challenged government action; (2) evidence that the plaintiff has a present desire, though no

specific plans, to engage in such speech or conduct; and (3) a plausible claim that the plaintiff has no intention to engage in such speech or conduct because of a credible threat that the law will be enforced." *Bella Health*, 699 F. Supp. 3d at 1203 (citing *Peck*, 43 F.4th at 1129–31).

There are two sets of allegations that appear to leverage the chilling effect test. First, the Medical Plaintiffs state they "would deadname and misgender patients but for H.B. 25-1312." (1:25-cv-01572-RMR-MDB (Doc. No. 98 at 22).) Second, they say they would like to publish materials that arguably give rise to statutory violations now that H.B. 25-1312 has passed. (*See* Division Exhibits at 138–40 (80:21–82:22) (Dr. Leswing's deposition).)[7]

The Medical Plaintiffs satisfy the first prong of the chilling effect test because there is no dispute that each previously implemented a policy or practice of deadnaming and misgendering customers and patients. They also satisfy the second prong because they have demonstrated a present desire to engage in that speech, even if no specific plans to do so at this time. *See Peck*, 43 F.4th at 1130–32 (finding this prong met where the plaintiff submitted an affidavit "clarify[ing] the type of speech she wishes to engage in" and "indicated that she would likely be in a position to make such statements in the future"). The third prong is also met because each plausibly alleges that the reason for self-censorship is a credible threat of prosecution. As found already, Defendant Sullivan's declaration—which may have been sufficient to warrant preserving the status quo at the preliminary injunction stage, *see supra* at 21–22,—reserves enforcement authority and leaves open the possibility of prosecution. This is enough to demonstrate a credible threat of enforcement and, in turn, a chilling effect supporting standing.

[7] Similarly, Born Again would like to formalize and circulate its pronoun policy to current and future employees, and post a blog on the subject, but has not done so out of fear of sanction. (*See* 1:25–cv–02177–RMR–MDB (Doc. Nos. 1 at ¶¶ 79–88; 4-2; 4-3).) The Court declines to address this issue, because it has already found that Born Again intends to engage in a course of conduct arguably proscribed by CADA, and faces a credible threat of enforcement. Still, the Court notes that Born Again's allegations also appear to demonstrate a chilling effect.

**B. Advocacy Organization Plaintiffs**

1. Do CPAN and PKC meet the definition of public accommodation?

CADA defines a "place of public accommodation" to include "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public[.]" Colo. Rev. Stat. § 24-34-600.3(1)(a). Defendants argue that, on its face, the definition of public accommodation cannot apply to advocacy organizations like CPAN and PKC which merely "hold[ ] events for the purpose of expressing their views," and "do not offer goods, services, facilities, privileges, advantages, or accommodations to the general public when they engage in lobbying, coalition-building' or the other advocacy efforts[.]" (Division Motion at 18 (internal quotation marks omitted).)

Plaintiffs respond that CPAN and PKC may not be "places of public accommodation," but they nevertheless host some of their events at such places, bringing them within CADA's scope. (1:25–cv–01572–RMR–MDB (Doc. No. 98 at 14–15 (noting that section 601's title is "[d]iscrimination *in* places of public accommodation" (emphasis in original)).) The Court disagrees. Plaintiffs do not offer case law to support their construction, and the plain language of CADA betrays their interpretation.

CADA applies in the context of "sales to the public" or "services, facilities, privileges, advantages, or accommodations to the public." Colo. Rev. Stat. §24-34-600.3(1)(a). Neither CPAN nor PKC are in the business of selling goods to the public nor do they offer services, facilities, privileges, advantages or accommodations. Moreover, the mere fact that these entities hold an event inside a facility that meets the definition of public accommodation, does not transform them into public accommodations themselves.[8] The relevant inquiry under CADA

[8] And indeed, Defendant Sullivan has disavowed such a construction of CADA. (*See* Division Exhibit at 211, ¶ 18 (saying "it does not appear that Plaintiffs CPAN or PKC offer any good,

concerns the nature of the organization itself, not its partners, venues, or hosts.[9] Accordingly, the Court finds CPAN and PKC lack standing and recommends that they be dismissed from this action.

2. Do DNH and DE have standing through their members?

"An association has standing to sue even if it has not been injured itself, so long as the association's members satisfy the constitutional minimum of Article III." *Colorado by & Through Colorado Dep't of Nat. Res., v. United States Fish & Wildlife Serv.*, 362 F. Supp. 3d 951, 963 (D. Colo. 2018). The associational standing inquiry is satisfied when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).

---

service, facility, privilege, advantage, or accommodation to the general public that would subject them to CADA's public accommodation provisions").

[9] Perhaps anticipating this conclusion, the Advocacy Organization Plaintiffs offer an alternative argument in a single paragraph: even if CPAN and PKC are not in danger of themselves violating CADA, the public accommodations hosting them are, and accordingly, "are unlikely to lease space ... out of fear that [CPAN and PKC's] practice of deadnaming and misgendering will incur liability for the venue itself." (1:25–cv–01572–RMR–MDB (Doc. No. 98 at 17).) Plaintiffs say this potential enforcement against a third party indirectly chills their own First Amendment rights. At a high level, Plaintiffs are correct that an unregulated party can establish injury in fact based on the indirect effects of regulation on a third party. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 384–85 (2024). But Plaintiffs' argument is too underdeveloped to demonstrate "a predictable chain of events leading from the government action to the asserted injury." *Id.* at 385. Plaintiffs do not offer evidence that any public accommodation has actually refused, or is likely to refuse, to host their events. In fact, the opposite appears to be true. *See supra* at 5–6 (noting CPAN and PKC have held multiple events at public accommodations including, hotels and restaurants) Essentially, Plaintiffs ask the Court to infer, based solely on the fact that venues have previously received complaints about CPAN and PKC, that third parties will begin denying them space. (1:25–cv–01572–RMR–MDB (Doc. No. 98 at 17).) That is an unsupported leap that the Court will not make.

Here, Defendants argue DNH and DE lack standing because their members lack standing. (Division Motion at 23.) However, the Court has already found that at least two DNH members, Drs. Morrell and Leswing, have standing. *See supra* at 22–23. Moreover, Defendants do not argue, and the Court does not independently see, any basis for finding DNH's purpose is not germane to the issues in the case, nor that the claims or relief involved in this suit cannot be adequately litigated by DNH, in the place of remaining members.

The Court reaches a different conclusion with respect to DE. In its briefing, DE, merely states that it "easily satisfy[ies] the requirements for associational standing," before making conclusory statements that it meets each element of the associational standing test. (1:25–cv–01572–RMR–MDB (Doc. No. 98 at n.*).)[10] At best, DE offers the declarations of PKC's executive director, Erin Lee, and CPAN's executive director, Lori Gimelshteyn. (1:25–cv–01572–RMR–MDB (Doc. Nos. 27-1 at ¶ 6; 27-2 at ¶ 2; 27-3 at ¶ 2).) Both Ms. Lee and Ms. Gimelshteyn say they are DE members, and DE says those individuals "would otherwise have standing to sue in their own right," but that assertion is also conclusory and unsupported. *See Vianello v. City of Prairie Vill., Kansas*, 812 F. Supp. 3d 1207, 1210 (D. Kan. 2025) ("Mere conclusory allegations of jurisdiction are not enough." (citing *United States ex rel. Hafter, D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999))).[11] In short, DE has not carried its burden of establishing standing. *See Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 ("[T]he plaintiffs bear the burden of establishing standing.").

## II. Defendant Weiser's Eleventh Amendment Immunity

[10] Plaintiffs' brief also states that "Defendants don't dispute that ... Defending Education and Do No Harm have associational standing through their members." But as noted, Defendants *do* dispute this. (Division Motion at 23.)

[11] Moreover, the Court has already found that neither PKC nor CPAN have standing in this matter. (*See supra* at 24–25.).

"The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013). "It also extends to 'suit[s] against a state official in his or her official capacity' because such suits are 'no different from a suit against the State itself.'" *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

However, Eleventh Amendment immunity "is not absolute." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990). Indeed, and as is relevant here, *Ex parte Young*, 209 U.S. 123 (1908) "created an exception under which individuals can sue state officers in their official capacities if the lawsuit seeks prospective relief for an ongoing violation of federal law." *Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024) (citing 209 U.S. 123, 159–60 (1908)). To come within the *Ex parte Young* exception, the state official whom a plaintiff seeks to enjoin must have (1) "a particular duty to enforce" the challenged law and (2) "a demonstrated willingness to exercise that duty." *Free Speech Coal*., 119 F.4th at 736 (citations and quotations omitted).

**A. Particular Duty to Enforce**

"CADA establishes an administrative system for the resolution of discrimination claims." *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 628 (2018). Claims may be brought by any aggrieved person, the Colorado Civil Rights Commission, or the AG. *See* Colo. Rev. Stat. § 24-34-306(1)(a)–(b). Complaints are reviewed by the Colorado Civil Rights Division. *Masterpiece Cakeshop, Inc. v. Scardina*, 556 P.3d 1238, 1246 (Colo. 2024) (citing Colo. Rev. Stat. 24-34-306(2)(a)). If the Division finds probable cause for a CADA violation, the matter can be referred to the Commission. *Id.* (citing Colo. Rev. Stat. § 24-34-306(4)). The

Commission, in turn, decides whether to initiate a formal hearing before a state administrative law judge ("ALJ"), who hears evidence and argument before issuing a written decision. *Id.* at 1246–47 (citing Colo. Rev. Stat. § 24-34-306(4)). When the Commission decides to pursue a case, the AG's office is tasked with prosecuting that case before an ALJ. Colo. Rev. Stat. § 24-34-306(8); 3 Colo. Code Regs. § 708-1:10.7 ("The case in support of the complaint shall be presented at the hearing by the attorney general's office as counsel in support of the complaint."). In other words, the AG's role in CADA enforcement is two-fold: a discretionary ability to bring complaints, and a mandate that he prosecute complaints on behalf of the Commission.

One Court in this District has already concluded that the AG's connection to CADA enforcement is sufficient to constitute a particular duty to enforce the law. *See Masterpiece Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226, 1253 (D. Colo. 2019). Though he does not point to any conflicting decisions, the AG says the Court should decline to follow that decision. (AG Motion at 9.) He argues his prosecution efforts before an ALJ are akin to ministerial work by an agent tasked with advancing the Commission's goals and thus are not true independent or discretionary enforcement decisions. (*Id.* at 9–11.) But the Tenth Circuit has explained that an official need only have "some connection" to the enforcement of a law, not necessarily a "special connection." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007). Accordingly, the Tenth Circuit has applied *Ex parte Young* in cases where, like here, the state officer was "not specifically empowered to ensure compliance with the statute at issue," but "clearly [has] assisted … in giving effect to the law." *Id.*

In *Bella Health*, the AG asserted Eleventh Amendment immunity from a suit involving actions referred to him by the State Nursing Board. 699 F. Supp. 3d at 1210–11. As in this case,

the AG argued that his participation in enforcement proceedings was akin to "client-service duties," not independent enforcement. *Id.* at 1335. The Honorable Daniel D. Domenico rejected that argument. He concluded that the duty to prosecute charges referred by the Nursing Board "easily me[t] the requirements of *Ex Parte Young*." *Id.* at 1335–36; *see Masterpiece Cakeshop*, 445 F. Supp. 3d at 1253 ("Because the Attorney General must represent the Commission at a hearing in support of the complaint ... I conclude the Attorney General has a duty to enforce C.R.S. § 24-34-601(2)(a).").

So too here. The AG is not statutorily required to bring complaints, nor is he tasked with choosing the complaints to bring before an ALJ, but he has an important role to play when he's called upon to appear on the Commission's behalf. Under the applicable law, the AG's legal representation, and by extension, his actions in furtherance of enforcement, are not discretionary. He is required to assist the Commission in their enforcement efforts, and this connection to enforcement is sufficient to meet the requirements of *Ex Parte Young*.

**B. Demonstrated Willingness to Enforce**

The *Ex parte Young* exception may be "narrow," *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021), but it is hardly an insurmountable hurdle. Here, the Court's credible-threat finding, *see supra* at 19–22, leaves little room for doubt on the demonstrated-willingness prong. Indeed, the analysis overlaps significantly. Moreover, a "demonstrated willingness" can be attributed to the AG himself because, as noted in the preceding section, he has a meaningful role in enforcement. Additionally, the AG does not dispute that he regularly prosecutes discrimination charges at Commission hearings.

Finally, it is undisputed that the Commission's regulations identify the AG as its attorney for administrative enforcement actions. (AG Motion at 10, fn.3); *see Masterpiece Cakeshop*, 445

F.Supp.3d at 1253 ("At an administrative hearing on a charge of discrimination, '[t]he case in support of the complaint shall be presented at the hearing by one of the commission's attorneys or agents.' According to the Commission's Rules and Regulations, the Commission's 'attorney' is the Attorney General's office." (internal citations omitted) (citing and quoting Colo. Rev. Stat. 24-34-306(8); 3 C.C.R. 708-1:10.7(A)(3); 3 C.C.R. 708-1:10.7(B))). And because the AG has not disavowed this role in this context, it is reasonable to conclude that the AG would appear on the Commission's behalf if and when they choose to prosecute a denial of services predicated on deadnaming or misgendering.

The *Ex parte Young* exception is satisfied. *See Masterpiece Cakeshop*, 445 F. Supp. 3d at 1253 ("The Attorney General has also demonstrated a willingness to enforce [CADA].").

## CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that The Attorney General's Consolidated Motion to Dismiss and the Division and Commission Defendants' Consolidated Motion to Dismiss be **GRANTED in part and DENIED in part**. The Court further

**RECOMMENDS** that Defending Education, Colorado Parent Advocacy Network and Protect Kids Colorado's claims be dismissed without prejudice for lack of standing.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will

not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 1st day of May, 2026.

**BY THE COURT:**

Maritza Dominguez Braswell
United States Magistrate Judge